IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JICARILLA APACHE NATION, Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | ) | No. 02-25 L<br>Judge Francis M. Allegra |

**DEFENDANT'S SUPPLEMENTAL STATUS REPORT DESCRIBING COMPLIANCE WITH THE MARCH 19, 2004 ORDER**

## I. INTRODUCTION

On March 19, 2004, the Court issued a record retention order (RRO) in this case, requiring the parties to take reasonable steps to preserve "documents, data, and tangible things" that contain information relevant to, or that may reasonably lead to information relevant to, the subject matter of this case. As explained in its April 26, 2004 Status Report describing compliance with that Order, the federal agencies that have been identified as having documents potentially subject to the RRO[1/] proceeded to implement reasonable measures to preserve those documents, data and tangible things. The agencies explained to the Court how the RRO had been distributed, the additional instructions

[1/] The RRO does not identify the specific agencies subject to its coverage, instead simply referring generally to the Defendant, (i.e., the United States) along with its "agencies" and "employees." Based on the information provided in the complaint, including references to specific statutes and regulations in Plaintiff's proposed Record Retention Order filed on September 12, 2003, and on the Department of Justice's experience in previous tribal trust cases, the Defendant has focused its attention on the Department of the Interior (DOI), Department of the Treasury (Treasury), the National Archives and Records Administration (NARA), the General Services Administration Indian Trust Accounting Division (ITAD), the Department of Energy (DOE), the Nuclear Regulatory Commission (NRC), and the United States Forest Service (USFS) as the agencies likely to have information subject to the RRO.

for complying with the RRO that had been provided to employees, the additional measures taken in order to comply with the RRO, and the means by which they intended to monitor compliance with the RRO.[2] The focus of the agencies' initial efforts after entry of the RRO was to ensure that their employees were fully informed of their individual obligations under the RRO, particularly the need to save or transcribe voice mails and e-mail.[3]

Since April 26, 2004, the agencies have continued these efforts, focusing on the systematic measures for preserving relevant electronic records. This Supplemental Status Report, along with the attached declarations, updates Defendant's April 26, 2004 Status Report and describes the steps taken by Defendant to continue compliance, particularly in the context of certain electronic media covered by the RRO, including backup data, network and computer activity logs, metadata, web pages, and hard drives.

## II. STATUS

### A. DEPARTMENT OF THE INTERIOR

#### 1. Measures to Ensure the Continued Preservation by Individual Interior Employees of Documents, Data, and Tangible Things

Senior Department of the Interior ("DOI" or "Interior") management has continued to remind

---

[2] *See* April 26, 2004 Status Report, Declaration of Abraham Haspel, Deputy Secretary in the Office of the Secretary, DOI, April 26, 2004 (Haspel Decl.) ¶ 8; Declaration of Cristobal Alvarez, Attorney-Advisor, DOI, April 26, 2004 (Alvarez Decl.) ¶¶ 2-7; Attachment 1 to Declaration of Debra Deiner, April 23, 2004 (Deiner Decl.) ¶¶ 4-6; Declaration of Jason Baron, Director of Litigation in the Office of General Counsel, NARA, April 21, 2004 (Baron Decl.) ¶¶ 3-5; Second Declaration of Dow Davis, Attorney, DOE, April 23, 2004 (Davis Decl.) ¶¶ 8-10; Declaration of Marie Clark, Acting Director (Former), ITAD, April 22, 2004 (Clark Decl.) ¶¶ 4-6, 9-10; and Declaration of James Snow, Special Counsel, DOA, April 22, 2004 (Snow Decl.) ¶ 7; *see also* Declaration of Susan Fonner, Attorney, NRC, April 22, 2004 (Fonner Decl.) ¶¶ 5-10.

[3] Haspel Decl. ¶ 8 and Exhibit D; Alvarez Decl. ¶¶ 3, 4 and Exhibits; Attachment 1 to Deiner Decl. ¶ 4; Baron Decl. ¶ 3.d.; Clark Decl. ¶¶ 7-8; and Fonner Decl. ¶ 6.

employees, particularly those having daily responsibility for administration of Jicarilla funds and assets held in trust for the Tribe, of their continuing obligations under the RRO to retain documents, data, and tangible things containing information relevant to or that reasonably may lead to information relevant to the subject matter of the case. On September 24, 2004, Interior's then-Deputy Secretary, J. Steven Griles, in a memorandum distributed by e-mail, provided additional guidance to all Interior employees regarding the preservation duties under the RRO. Memorandum from J. Steven Griles to All Employees (September 24, 2004) (Attached as Exhibit 1). Deputy Secretary Griles explained that the subject matter of the litigation includes the management and accounting of the tribal resources and funds of the Jicarilla Apache Nation from August 13, 1946, to the present,[4/] and further explained that

> [d]ocuments potentially relevant to [this case] are those that reflect, refer, or relate to:
>
> 1. any asset, including funds and other assets and resources of the . . . Jicarilla Apache Nation which is, or at any time has been, held in trust by the United States or its agents;
> 2. policies, procedures, guidelines, or correspondence relative to any aspect of the management or administration of such assets;
> 3. any proceeds, interest, or income from such assets; or disbursement, distribution, disposition or transfer of any such assets; and
> 4. any reports, appraisals, reconciliations or evaluations of any such assets.

*Id*. at 1. In closing, Deputy Secretary Griles reiterated the importance of the preservation efforts as follows:

> It is imperative that all documents, data, and tangible things related to the management and accounting of the tribal resources and funds of the . . . the Jicarilla

---

[4/] Deputy Secretary Griles noted that this time frame was a correction to previous memorandum instruction issued by himself and Lawrence Jensen, Counselor to the Solicitor, which had stated the relevant time period to be August 13, 1946 to January 8, 2002, the filing date of the original complaint.

> Apache Nation be preserved. Employees must preserve both relevant paper and electronic documents and data, whether or not those items are deemed to be federal records under the Federal Records Act.

*Id.* at 2.

In an October 8, 2004 memorandum, Interior reminded key members of DOI management of the preservation obligations under the RRO. Memorandum from Lawrence J. Jensen & W. Hord Tipton to Secretary, *et al.* (October 8, 2004) (Attached as Exhibit 2). Among other directives, the memorandum reiterated Interior's definition of relevant documents and data, set forth requirements for saving and maintaining electronic data on network storage devices, and explained the RRO requirement that hard drives containing relevant information must be preserved. *Id.* at 2.

**2. Systematic Preservation of Electronic Data**

In order to provide an appropriate context for describing Interior's retention of electronic data, the following first discusses the functions of the relevant Interior offices and bureaus ("components") and describes each component's primary computer systems. The following then addresses retention practices for backup data, network and computer activity logs, metadata, web pages, and hard drives.

**a. DOI Electronic Applications**

The preservation of Interior's potentially relevant electronic records is, for the most part, accomplished by the Interior components' active computer systems. These systems host various applications that enable the Interior components to fulfill their statutory and regulatory duties. The following breaks the types of applications into two categories: business or proprietary applications and office applications. These applications are discussed in detail in each of the appended DOI declarations.

**i. Business or Proprietary Applications**

By "business or proprietary applications" of DOI, Defendant refers to software (computer programs) designed to provide an electronic means to process, track and store the specific transactions and other data necessary for each Interior component to complete its statutory and regulatory responsibilities. The operation and maintenance of this software is frequently outsourced to a vendor, thus allowing the agency to concentrate more directly on its substantive responsibilities. Four DOI components have business or proprietary applications potentially having Jicarilla trust-related data. The components are the Minerals Management Service (MMS), the Bureau of Land Management (BLM), the Office of the Special Trustee for American Indians (OST), and the Bureau of Indian Affairs (BIA).

Minerals Management Service. The MMS's Minerals Revenue Management (MRM) program is responsible for collecting, accounting for, and distributing mineral revenues from Jicarilla tribal leases and for evaluating the lessees' compliance with laws, regulations, and lease terms. Declaration of Robert E. Brown, Associate Director for Administration and Budget, MMS, March 11, 2005 (Brown Decl.) ¶ 2 (Attached as Exhibit 3). MRM receives and maintains reported information on Jicarilla tribal leases and provides distribution and disbursement data to OST, BIA, and the Tribe two times per month. *Id.* The Jicarilla tribe has a cooperative audit agreement with MRM to conduct audits and investigations under Section 202 of Federal Oil and Gas Royalty Management Act, 30 U.S.C. §§ 1701 et seq. Under the agreement, one tribal employee works with a six-member team of MRM auditors. This agreement allows for the Tribe to work with MMS to manage royalty payment compliance on its leases. *Id.*

MMS's Minerals Revenue Management Support System (MRMSS) is the primary software

application for the storage of tribal leasing and royalty information. The MRMSS consists of the financial, data warehouse, compliance assessment management, and Royalty In Kind sub-systems. Brown Decl. ¶ 4. a. Transactional data that MMS possesses -- including payments, data from royalty reports, and data from oil and gas operational reports – are included in the Data Warehouse component of MRMSS, which is the repository for long-term storage of MMS's transactional data dating back to the formation of MMS in 1983. *Id.* In short, the electronic data from MMS's current and predecessor systems is available online in the MRMSS Data Warehouse. *Id*. at 4.d.

Bureau of Land Management. BLM has historic and ongoing responsibilities relevant to the oil and gas activities on Indian trust lands, including lands of the Jicarilla Apache Nation. BLM is charged with reviewing and advising on leasing and Indian Minerals Development Act agreements; reviewing and approving applications for permits to drill and sundry notices; and performing production accountability audits and inspection and enforcement activities. Declaration of Scott E. MacPherson, Indian Trust Project Manager for Information Resources Management, BLM, March 3, 2005 (MacPherson Decl.) ¶ 2 (Attached as Exhibit 4).

The key system utilized by BLM in carrying out these responsibilities is the Automated Fluid Minerals Support System (AFMSS). In AFMSS, BLM collects and retains information related to post-lease well and facility data, inspection and enforcement data, and events such as oil spills. MacPherson Decl. ¶ ¶ 5-5.a AFMSS also contains information relating to such things as well-bore treatments, production tests, descriptions of well repair and abandonment operations. *Id.* Further, AFMSS stores data about specific leases, unit agreements, participating areas, communitization agreements, bond coverage, and drainage assessments. *Id.*

The data in AFMSS is retained indefinitely in the application. MacPherson Decl. ¶ 5.b. When

data in the AFMSS is edited to correct data entry errors, a log of the editing activities is created and is preserved indefinitely. *Id.* Furthermore, the ability to alter or delete data in the AFMSS is strictly controlled. *Id.* ¶ 5.c.; *see also id.* ¶ 6 (describing subsystem of AFMSS known as the Well Information System (WIS) and retention of data therein).[5/]

Office of Special Trustee. OST is responsible for the management of tribal trust funds, including the receipting, investing, and disbursing of collected funds for the Jicarilla Apache Nation. Declaration of Robert C. McKenna, Chief Information Officer, Office of the Special Trustee for American Indians, March 17, 2005 (McKenna Decl.) ¶ 2 (Attached as Exhibit 5). OST manages various types of accounts such as Individual Indian Money, Forestry, Judgment and Settlement Awards, and Proceeds of Labor, which includes funds received for natural resources such as oil and gas on tribal land. *Id.* ¶ 2. OST processes requests for routine withdrawal of trust funds in accordance with applicable laws and regulations. *Id.* In addition, OST provides statements of performance reflecting financial account activity and conducts periodic reviews of the investments that OST holds and manages on behalf of the Jicarilla Apache Nation. *Id.*

OST's major electronic application is the Trust Funds Accounting System (TFAS), owned and operated by a third-party vendor. TFAS is used to account for the funds held in trust by the government on behalf of individual Indians and Tribes. McKenna Decl. ¶ 5a. It contains information about the Indian or Tribal account holders and the various financial transactions (including receipt,

[5/] In addition to these nationwide systems, state and regional BLM offices may create local systems based upon the specific work of these smaller offices. For example, BLM New Mexico state personnel have developed the Natural Gas Policy Act ("NGPA") System that tracks applications for well category determinations that allow applications to receive IRS tax credits. MacPherson Decl. ¶ 8. While retention periods for local systems vary, the NGPA system has been retained indefinitely.

investment and disbursement transactions) associated with the funds in the accounts. *Id.* The system allows access, in real time, to approximately 16 ½ months of historical data. *Id.* Older data is available from backup tapes. *Id.* Subsets of data from TFAS are stored in a computer server located in Albuquerque in the Open Data Replication (ODR) database. *Id.* ¶ 5b. OST Information Technology Services staff use ODR to produce reports for field and management use. *Id.* Data in the ODR database is retained in perpetuity on monthly back-up tapes. *Id.* In addition, computer generated reports from TFAS are stored on a Computer Output to Laser Disc database called StrataVision. The reports in StrataVision are retained in perpetuity on monthly back-up tapes. Id. ¶ 5c.

Bureau of Indian Affairs. The Land Record Information System (LRIS) and the Trust Asset and Accounting Management System (TAAMS) are the primary electronic applications containing, or that will contain, data potentially relevant to Jicarilla trust assets. Declaration of John A. Messano, Director of Information Operations, Bureau of Indian Affairs, March 17, 2005, (Messano Decl.) ¶ 5a and 5b. (Attached as Exhibit 6).

BIA staff in the Land Title Records Offices use LRIS, which is run on a mainframe in Denver, Colorado, to track ownership and title history of land held in trust for Indians and Tribes by the United States.[6/] Messano Decl. ¶5.a. The information includes descriptions of the land, when and how it was acquired or disposed of, and changes in the use of the land (eg. rights of way, leases, etc.). *Id.* Data in LRIS may be altered by authorized personnel, but records are maintained in a history data base, and all data is cumulative. *Id.*

---

[6/] TAAMS, Trust Asset and Account Management System, is expected to ultimately replace the LRIS system. TAAMS is expected to be implemented in the Southwest Region of BIA encompassing the Jicarilla Apache Nation during calendar year 2005. Messano Decl. ¶ 5.b.

**ii. Office Applications**

In addition to the business applications described above, each of the Interior components has electronic "office applications" (e.g. Microsoft Office), which include products such as word processing, spreadsheets, presentation software, e-mail, and calendaring. Using these products, employees generate correspondence, memoranda, or presentations. Individual employees creating potentially relevant documents are responsible for saving such records. *See* September 24, 2004 Memorandum from J. Steven Griles at 1 (Exh. 1). In order to ensure that such potentially relevant documents saved by individuals are preserved in the event of problems with individuals' personal computers, Interior has specifically instructed employees to store relevant work product on a backed-up network server versus their own hard drives, which are not typically backed up. Brown Decl. ¶ 7; McKenna Decl. ¶ 7. In addition, BLM's office applications automatically direct and store a user's work product to a network server. MacPherson Decl. ¶ 12.

**b. Backup Data**

"Backup data" has been defined as information stored upon some portable media so as to permit data recovery in the event of a disaster. *See The Sedona Principles: Best Practices, Recommendations, & Principles for Addressing Electronic Discovery* (Sedona Working Group Series 2003) ("Sedona Principles") at App. A, 51. In the event of a system problem, backups provide for system recovery to the most recently backed up state of the system prior to the problem. This approach is identified as the "disaster recovery model."

The Interior components create full or incremental backups of their electronic data on a periodic basis: hourly, daily, weekly, monthly, quarterly, and/or annually. A full backup contains a snapshot of all the data or files on the system at the time of the backup. An incremental backup

contains data or files that are new or were changed since the last backup. Messano Decl.¶ 9; Brown Decl. ¶¶ 4-5; McKenna Decl. ¶¶ 6-6a; MacPherson Decl. ¶¶ 9-9b. It is standard practice for Interior components to recycle, or overwrite, backup tapes after a scheduled retention period. Thus, BLM, for AFMSS, creates full backups on a real-time and weekly basis, which it retains for one month, and creates full backups on a monthly basis, which it retains for six months. At the end of its retention period, the backup media is released for reuse and thereafter may be overwritten. MacPherson Decl. ¶ 9a-9b; *see also* Brown Decl. ¶ 4b. While recycling backup media for shorter term backups, the BIA and OST retain certain periodic tapes indefinitely. McKenna Decl.¶ 6 (monthly backups of mission-critical servers retained indefinitely); Id. ¶ 6a (yearly backups of TFAS data retained indefinitely); Messano Decl. ¶ 9 (weekly backups for major applications and office automation retained indefinitely); *see also* Brown Decl. ¶ 5 (yearly office automation backups for MRM compliance sites retained indefinitely).

Interior components have evaluated the costs of retaining all of the backups indefinitely. MMS has estimated that the cost of maintaining all backup data indefinitely would be $1 million per year, Brown Decl. ¶ 4c, and BLM has estimated the cost at $630,400 per year, MacPherson Decl.¶ 9.c. OST has estimated that the annual cost to indefinitely retain its daily backup tapes (not including those associated with TFAS) would approximate $100,000. McKenna Decl. ¶ 6.

Interior components have determined that it would be unreasonable to incur these additional costs because doing so would unlikely result in the preservation of any additional, non-duplicative, relevant data, and thus would not justify the burden of taking extra preservation steps. MMS has concluded that "all data from the current and legacy systems is available online in the data warehouse, therefore no additional utility is gained by retaining backup tapes in perpetuity." Brown Decl. ¶ 4.d.

Likewise, BLM has concluded that "[m]aintaining backup tapes beyond what is currently done for disaster recovery purposes would create an undue burden on BLM. Replacing BLM's existing disaster recovery backup processes with additional tape archival strategies will not preserve any more data in AFMSS or WIS than is already being saved [for] the data entered into AFMSS and WIS is retained indefinitely in each application's database." McPherson Dec. ¶ 9.b; *see also* Messano Decl. ¶ 5.a. (explaining that LRIS data is maintained in history database and is cumulative). In short, potentially relevant electronic data, or data that may lead to relevant data, that might be retained through further efforts to retain all backup data is generally available elsewhere.

The Interior components have also determined that there is no need to maintain indefinitely e-mail back-up tapes in order to retain e-mail. MacPherrson Decl. ¶ 9.e.; McKenna Decl. ¶ 8; Brown Decl. ¶ 6. For MMS, BLM, OST, BIA as well as other DOI components, e-mail is already being retained indefinitely by a DOI contractor, Zantaz, as part of *Cobell v. Norton*, Civil Action No. 96-1285 (D.D.C.). E-mail, e-mail attachments, and distribution lists are captured by Zantaz in an electronic e-mail archive system, for indefinite retention. *E.g.,* Brown Decl.¶ 6.

**c. Computer and Network Activity Logs and Web Pages**

Computer and network activity logs are computer system records containing technical information regarding the utilization of programs or applications running on a particular network or system. As noted in the attached Interior declarations, computer and network activity logs are not data files in any substantive sense related to Plaintiff's claims in this case. Rather, the logs provide agency IT departments with information concerning system access, maintenance requirements, and system security indicators. Messano Decl.¶ 11; Brown Decl. ¶ 8; McKenna Decl. ¶ 8; MacPherson Decl. ¶ 10. Much like backup data, log information is kept by the DOI components for varying periods

based on system requirements. Also, backup data is retained as part of the general backup regimen, such that, to the extent backup data is retained indefinitely, the logs are retained indefinitely as well. Messano Decl.¶ 11; McKenna Decl. ¶ 8. Consequently, unless captured on a backup tape that is retained indefinitely, logs are not permanently preserved. Brown Decl. ¶ 8; MacPherson Decl. ¶¶ 10.b and 10.c.; *but see* MacPherson Decl. ¶ 10.a. (certain monthly log files of BLM are currently retained indefinitely).

The Interior components would incur significant additional expenditures if they retained computer and network logs beyond normal backup retention schedules or maintained a level of detail beyond the current system capabilities. McKenna Decl. ¶ ¶ 6, 9; Brown Decl. ¶ 8. To preserve this information beyond normal schedules and procedures, the Interior components would have to make expensive hardware and software changes and devote additional staff hours to these tasks. *See* MacKenna Decl. ¶ ¶ 6, 9; Brown Decl. ¶ 8. Such additional expenses are not justified based upon the apparent irrelevance of the information that would be retained. Messano Decl. ¶ 11; MacPherson Decl. ¶ 10.d.

**d. Metadata**

The RRO requires retention of metadata by the Parties to this litigation. "Metadata" is defined as information about an electronic file – or "data about data." It does not include substantive business data or information. Most, if not all, electronic records of the DOI components contain some form of metadata. MacPherson Decl. ¶ 11; Messano Decl. ¶ 12; McKenna Decl. ¶ 10; Brown Decl. ¶ 9. For instance, documents created on word processing or spreadsheet software, such as Microsoft Word, Corel WordPerfect, or Microsoft Excel, include metadata such as date of creation, author name, file size, or file name. *E.g.,* McKenna Decl. ¶ 10; Brown Decl. ¶ 9. Such metadata is saved with the

electronic file and is retained for as long as the file is saved. *Id.* There is no need nor practical method to preserve such metadata separately from the file. MacPherson Decl. ¶ 11. Accordingly, so long as individuals are following directives requiring them to retain the potentially relevant electronic records they create within office automation systems, the metadata for those records is also preserved.[7/]

Metadata may also exist for certain of the proprietary or database-driven applications of the DOI components. In this respect, metadata refers to data definitions or data structures for applications such as the MRMSS or AFMSS. Brown Decl. ¶ 9; MacPherson Decl. ¶ 11. This type of metadata is retained indefinitely. *Id.*

**e. Web Pages**

The BLM, OST, and MMS have websites on the Internet available to the general public for review.[8/] Under the terms of the RRO, agencies having Websites are required to take reasonable steps to maintain copies of relevant web pages. RRO at ¶¶ 1, 5. The DOI components' current preservation practice for Web pages is to rely on disaster recovery backups according to the periodic schedules referenced in the Interior declarations. Messano Decl. ¶ 12; Brown Decl. ¶ 10; MacPherson Decl. ¶ 12.b. The information on the web pages appears to be of little or no relevance to this litigation and generally is available from other sources. Brown Decl. ¶ 10; McKenna Decl. ¶ 11; MacPherson Decl. ¶ 12.b.[9/]

---

7/ Metadata for e-mail and attachments is being preserved as part of the Zantaz application described *supra*, page 11. *See* Brown Decl. ¶ 6.

8/ BIA has exclusively an intranet presence that contains primarily organizational/employee information. Messano Decl. ¶ 13.

9/ Because the web pages are publicly available, Plaintiff may obtain information from the sites at any time.

**f. Hard Drives**

"Hard drives" refer to storage areas for electronic records and user work product on stand-alone individual PCs. At the Interior components, hard drives are not the primary source for stored data and are disfavored as storage locations. MacPherson Decl. ¶ 13; Brown Decl. ¶ 7; McKenna Decl. ¶ 12; Messano Decl. ¶ 14. For the Interior components, desktop computers are used primarily, if not exclusively, as access points to systems contained on central computers or servers. At these bureaus and offices, the electronic records that are relevant or potentially relevant to the accounting or management of Plaintiff's trust assets typically reside on central storage devices for the systems, not on the individual desk top PC hard drives. MacPherson Decl. ¶ 13; Brown Decl. ¶ 7.

Each of the key Interior components has reaffirmed with employees who work with and are responsible for Jicarilla trust-related information the requirement to save relevant work product to network servers, which are backed up. MacPherson Decl. ¶ 13; Brown Decl. ¶ 7; McKenna Decl. ¶ 12; Messano Decl. ¶ 14.[10/] Some Interior components, like BLM, ensure this result by technically redirecting employee hard drives to backed up, network storage devices. MacPherson Decl. ¶ 13.

In addition to these measures, Interior is taking extra steps to ensure the preservation of hard drives that are no longer used by Interior employees and that might contain data relevant to the Jicarilla. On October 8, 2004, Lawrence J. Jensen, Counselor to the Solicitor and W. Hord Tipton, Chief Information Officer of DOI sent a memorandum to the Secretary, Deputy Secretaries, Directors,

---

[10/] In a memorandum dated March 20, 2002, from Steven Griles to All DOI Employees, Deputy Secretary Griles reiterated previously-issued instructions to preserve all tribal trust documents including electronic media. Memorandum from J. Steven Griles to All Employees, (March 20, 2002) (Attached as Exhibit 7). This was repeated in another memorandum from Mr. Griles, dated April 6, 2004. Memorandum from J. Steven Griles to Secretary, Acting Solicitor, et al. (April 6, 2004). (Attached as Exhibit 8)

Superintendents, and Commissioners to ensure that hard drives that are no longer in use but were previously used by employees dealing with Jicarilla and Laguna trust assets are being physically preserved and stored in a safe and secure environment. Memorandum from Lawrence Jensen & W. Hord Tipton to Secretary, *et al.* (October 8, 2004) (Attached as Exhibit 2). The directive also requires that bureaus and offices "label and catalog all preserved hard drives with appropriate documentation to allow for meaningful search and recovery." *Id.*

## B. DEPARTMENT OF THE TREASURY

This part of the Status Report describes the steps that Treasury is taking to preserve certain electronic media currently used for tribal trust activities. As noted in Treasury's original status report, there are six such activities, and only one of those activities (disbursing) is known to generate electronic records that specifically relate to the Jicarilla Apache Nation. *See* April 26, 2004 Status Report, Attachment 1 to Deiner Decl. at 2. The other activities generate electronic records that relate to undifferentiated funds in Treasury accounts that may belong to many tribes.[11] Treasury performs transactions with these funds at Interior's direction, and only Interior – as the agency responsible for carrying out the tribal trust fund program – knows the extent to which particular transactions relate to a particular tribe. This fact is critically important when evaluating the reasonableness of Treasury's

---

11 Prior to July 1, 1973, Treasury maintained separate accounts for tribal trust funds in its central accounting and financial reporting system. On July 1, 1973, with the concurrence of the U.S. General Accounting [now Government Accountability] Office, these separate accounts (totaling approximately 1,500) were consolidated into a few general tribal accounts. *See* April 26, 2004 Status Report, Attachment 1 to Deiner Decl. at 3.

Certain deposits made by specific types of electronic funds transfers may be accompanied by an addendum identifying a particular tribe; however, that information is used (if at all) by the program agency, not Treasury. Although Treasury would likely be able to retrieve that addendum if provided sufficient predicate information to locate a particular electronic funds transfer (just as it can retrieve copies of certain cancelled checks if provided sufficient predicate information), Treasury does not need or use the addendum information in maintaining the general tribal accounts established in 1973.

preservation plan for electronic media.

The following chart shows how the activities that Treasury currently performs for tribal trust funds relate specifically to the Jicarilla Apache Nation.

| **Treasury Trust Activity** | **Relationship to Jicarilla Apache Nation** |
|---|---|
| Establishing Accounts | Treasury does not maintain any accounts specifically for the Jicarilla Apache Nation. Declaration of Richard L. Gregg, Commissioner, FMS, March 4, 2005, (Gregg Decl.) ¶ ¶ 2,3 (Attached as Exhibit 9). Only Interior, as the program agency responsible for carrying out the government's tribal trust fund-related activities, would know the extent to which Jicarilla funds exist in Treasury's general tribal accounts. |
| Funding Tribal Accounts | Treasury keeps electronic records of funds added to general tribal accounts, but (with the exception of certain deposits made through electronic funds transfers), cannot identify which funds may belong to the Jicarilla Apache Nation. *Id.* Only Interior, as the responsible program agency, would be able to do that. |
| Investing Money in Tribal Accounts | Treasury records how it invests funds in general tribal accounts, Declaration of Anne M. Meister, Deputy Commissioner, Bureau of the Public Debt, March 8, 2004 (Meister Decl.) ¶ 2 (Attached as Exhibit 10). Only Interior, as the responsible program agency, would be able to determine the share belonging to the Jicarilla Apache Nation. |
| Redeeming Investments | Treasury records when it redeems investments, but cannot identify what share may belong to the Jicarilla Apache Nation. *Id.* Only Interior, as the responsible program agency, would be able to do that. |

| | |
|---|---|
| Assisting Interior with Disbursing Money to the Jicarilla Apache Nation. | At the direction of Interior, Treasury may disburse money by check or electronic funds transfer to the Jicarilla Apache Nation. Gregg Decl. ¶ ¶ 2, 3. In addition, Interior reports its disbursements to Treasury. *Id.* Treasury retains electronic records of disbursements made by Treasury and Interior, including disbursements to the Jicarilla Apache Nation. *Id.* |
| Accounting Activities | Treasury does accounting for the activities listed above. Gregg Decl. ¶ 2; Meister Decl. ¶ 1. Electronic accounting records are at the general tribal account level, and so do not contain information specific to the Jicarilla Apache Nation. Gregg Decl. ¶ 2; Meister Decl. ¶ 1. |

In the discussion below, Treasury shows how it preserves electronic media and data used in these trust activities. The components performing these activities are the Financial Management Service (FMS), the Bureau of the Public Debt (BPD), and to a very minor degree, Treasury's departmental offices (DO). Tribal trust activities are only a small part of these components' missions. For example, FMS provides centralized disbursement, collection, and accounting services for almost all federal agencies, and oversees the federal government's central accounting and reporting system.[12/] *See* Financial Managment Service, *What We Do at FMS*, (2004), *at* http://www.fms.treas.gov/aboutfms/what.html.

---

[12] To illustrate the breadth of these activities, FMS oversees the daily cash flow of nearly $58 billion into and out of federal accounts, disburses more than $1.5 trillion annually to more than 100 million individuals via Social Security and veterans' benefits, income tax refunds and other federal payments, and collects more than $2 trillion in federal revenues annually. In fiscal year 2004, nearly 235 million of FMS's payments were disbursed by check. *See* Financial Managment Service*, What We Do at FMS*, (2004), *at* http://fms.treas.gov/aboutfms/what.html.

BPD borrows the money needed to operate the Federal Government and accounts for the resulting debt. *See* Bureau of Public Debt, *The Commssion of the Public Debt Welcomes You*, (2004), at http://www.publicdebt.treas.gov/com/comhello.html. DO is primarily responsible for making policy and managing the entire department. *See* U.S. Department of Treasury, *Departmental Offices*, (2005), *at* http://www.treas.gov/offices/index.html. DO does not perform any of the operations associated with the tribal trust activities listed above. *See id.*

**1. Backup Data.**

Treasury stores tribal trust data in the same systems used for all data central to its mission, and protects it with the same high level of care. Gregg Decl. ¶ 2; Meister Decl. ¶ 2; Declaration of Rory Schultz, Director (Acting) for Headquarters Information Technology, DO, February 28, 2005 (Schultz Decl.) (Attached as Exhibit 11). For example, the system that stores information about Treasury checks issued to tribes, called the Check Payment and Reconciliation System, also stores data about *all* checks issued by the Federal Government since the system was created. Gregg Decl. ¶ 5.A. The system that stores information about tribal investments also stores data about many other government trust funds. Meister Decl. ¶ 2. Safely preserving electronic data in these systems, including tribal trust data, is an essential and integral part of Treasury's mission.

Treasury is currently retaining indefinitely potentially relevant electronic data (*i.e.,* data that documents the six tribal trust activities described in Treasury's original status report filed on April 26, 2004), either in an electronic system's storage device or in archival storage media, such as a magnetic tape or DVD. Gregg Decl. ¶ 5; Meister Decl. ¶ 3. If such data must be removed from an electronic storage device for archival storage, Treasury follows a plan that ensures the data's retention in another media designed for long-term storage. Gregg Decl. ¶ 7; Meister Decl. ¶ 3. As a result, relevant data

may be moved, but it is not lost.

In addition, Treasury protects the operating systems and applications that contain trust data from catastrophic loss through creation of business continuity (a/k/a disaster recovery) backup tapes. Gregg Decl. ¶ ¶ 11, 12; Meister Decl. ¶ 4; Schultz Decl. ¶ 3. Business continuity tapes are designed to permit the wholesale restoration of data to a system in the event of a disaster; such tapes are not designed to be used (or to allow access to data on them) independent of the system that they back up. In other words, the contents of the tapes are generally intelligible and useful only to and in connection with the system being backed up; they are not necessarily intelligible or useful independent of that system. *See* The Sedona Conference, "Best Practice Guidelines & Comments for Managing Information and Records in the Electronic Era" (Sept. 04) at pp. 21, 79 (backup data is distinct from archived data). Because the systems and applications that may contain trust data are constantly in use, and therefore accumulate additional data continually, Treasury creates new backup tapes of the data in active systems at regular intervals and may re-use superseded tapes. (DO does not currently reuse tapes but may decide to do so in the future). Gregg Decl. ¶ 11; Meister Decl. ¶ 4; *see also* Schultz Decl. ¶ 3. Full backup tapes contain all relevant data from previous backup tapes as well as any new data accumulated in the operating system or application being backed up. Gregg Decl. ¶ 11; Meister Decl. ¶ 4; Schultz Decl. ¶ 3.

These procedures ensure that data pertaining to the trust activities above are preserved and protected against inadvertent loss, and meets the Court's requirement that Treasury take reasonable steps to preserve data that may be relevant to the case.[13/]

---

[13] Treasury notified Plaintiff of its practices regarding backup data by letter dated August 26, 2004. *See* Letter from Robert W. Rodrigues to Alan Taradash and Thomas Peckham,
(continued...)

**2. Metadata**

The Court's March 19 Order calls for Treasury to take reasonable steps to maintain the integrity of "metadata" reasonably anticipated to be subject to discovery in this case. In general, Treasury interprets "metadata" to mean "data about data." In the context of the systems used to perform the trust activities listed above, this term can refer to data that are attached to and travel with other electronic data automatically, so that data can be identified, located, linked, or made accessible. Gregg Decl. ¶ 13; Meister Decl. ¶ 5; Schultz Decl. ¶ 4. Thus defined, Treasury is preserving metadata to the same extent that it is preserving any electronic data that evidences the trust activities mentioned above. Gregg Decl. ¶ 13; Meister Decl. ¶ 5; Schultz Decl. ¶ 4.

**3. Computer and Network Activity Logs**

The Court's March 19 Order calls for Treasury to take reasonable steps to maintain the integrity of "computer and network activity logs" that may reasonably be subject to discovery in this case. At Treasury, these logs are general system logs that contain such information as the time and date that individual users logged into system computers, data related to the use of certain applications, and data related to security incidents. Gregg Decl. ¶ 14; Meister Decl. ¶ 6; Schultz Decl. ¶ 5. Plaintiff has not alleged or otherwise raised any issue in this case that would implicate Treasury's general system logs. Accordingly, Treasury is not taking any additional measures beyond its normal data backup procedures to preserve them. Gregg Decl. ¶ 14; Meister Decl. ¶ 6; Schultz Decl. ¶ 5.

**4. Web Pages**

---

(...continued)
dated August 26, 2004 (Attached as Exhibit 17).

The Court's March 19 Order calls for Treasury to take reasonable steps to maintain the integrity of "Web pages" that may reasonably be subject to discovery in this action. Plaintiff has not sought discovery or information about any issue that implicates Treasury's web pages. Nonetheless, Treasury is taking the following steps to preserve them.

The public websites for FMS and BPD can be found at http://www.fms.treas.gov/ and http://www.publicdebt.treas.gov/, while a list of the divisions that comprise Treasury's Departmental Offices (with appropriate links) can be found at http://www.treas.gov/offices/. The FMS and DO websites are static; that is, each page within the site displays text and other information that has been built into the page itself (such as the departmental seal), or built into documents linked to the page (such as the most recent Daily Treasury Statement, viewable at http://www.fms.treas.gov/dts/index.html. Gregg Decl. ¶ 15; Schultz Decl. ¶ 6. BPD's website is predominantly static, but some pages are not. Meister Decl. ¶ 7. For example, BPD posts the daily rates for state and local government securities, viewable at https://wwws.publicdebt.treas.gov/SZ/SPESDailyRate?requestType=R. This page uses an application that draws correct data from a database, and a program that turns the data into a web page. Meister Decl. ¶ 7. As with most material posted publicly on the Internet, all of these pages are usually available to the public at all times.

Each organization's retention policy concerning its website reflects the nature of the information presented therein. For example, BPD (which hosts the FMS website) provides FMS each month with a copy of FMS's website on CD-rom, which FMS is retaining indefinitely. Gregg Decl. ¶ 15. Additionally, FMS itself makes interim copies of its website and retains those copies for as long as they are needed (after which time they are written over). *Id.* BPD retains a copy of every static HTML webpage, but not copies of the dynamic web pages. Meister Decl. ¶ 7. Instead, BPD retains the

underlying data used to create those dynamic web pages. Meister Decl. ¶ 7. DO backs up all of its Web server data onto tapes and onto its storage area network. Schultz Decl. ¶ ¶ 3, 6.

### 5. Personal Computer Hard Drives

The Court's March 19 Order calls for Treasury to take reasonable steps to maintain the integrity of "hard drives" reasonably anticipated to be subject to discovery. The following describes what Treasury is doing to comply with this part of the Court's order.

FMS's systems that may contain data subject to the RRO are designed to run on mid tier or mainframe systems, and data related to these systems reside on the storage devices for those systems rather than on individual desktop PC hard drives. Gregg Decl. ¶ 6. Such systems at FMS perform centralized payment, collection, and accounting and reporting services for the federal government. Gregg Decl. ¶ 4. Desktop computers can be used only as an access point or gateway to these systems. Gregg Decl. ¶ 6. Accordingly, PC hard drives would not contain any data from these systems that is not already residing within the systems' storage devices.[14/]

FMS employees may also access office automation systems through their desktop PCs. Gregg Decl. ¶ 6. Electronic documents created using those systems (such as e-mail, word processing documents, or spreadsheets) are saved to either the PC's hard drive or to a network drive. *Id.* FMS

---

14 Moreover, the data potentially discoverable in this action stored in connection with these systems is preserved in two ways. First, none of that data is ever deleted from those storage devices while they are actively supporting a system. Gregg Decl. ¶ 6. FMS routinely upgrades or replaces these storage devices, but ensures that the data is preserved by moving a complete copy of that data to the new device. *Id.* Second, the data is backed up. *See supra* Section II.B.1., "Backup Data." As a result, it is neither necessary nor sensible for FMS to preserve decommissioned storage devices. It is not necessary because the data has been moved to the newer storage device. Nor is it sensible, because the older equipment will gradually become technologically obsolete. Just as data on 5.25" floppy discs is now virtually inaccessible, data on discarded equipment is destined to become unusable.

has instructed its employees to forward any Jicarilla-related electronic documents that they have used in the course of conducting agency business to the dedicated mailbox set up in response to the Court's March 19 Order. *Id.* ¶ 16. Treasury discussed this dedicated mailbox in the status report filed April 26, 2004. *See* April 26, 2004 Status Report, Attachment 1 to Deiner Decl. at 4. In the remote event that an FMS employee had a potentially discoverable (and non-privileged) electronic document on his or her PC hard drive, that document should also have been copied to FMS's dedicated mailbox. Gregg Decl. ¶ 16. This dedicated mailbox (along with the rest of FMS's email system) resides on a network drive, not on any PC's hard drive. *Id.* Because FMS's dedicated mailbox preserves tribal trust-related information that might also exist on a PC hard drive, FMS has not retained PC hard drives for this litigation. *Id.*

BPD does not perform any trust functions for funds that can be specifically identified as belonging to the Jicarilla Apache Nation. Meister Decl. ¶ 2. BPD does invest undifferentiated tribal funds that may include plaintiff's money, redeems those investments, and performs accounting functions relating to them. *Id.* The official electronic records for these investments, redemptions, and accounting activities are kept on the network, not PC hard drives. Meister Decl. ¶ 8. The network is protected by the backup and archive processes described above. BPD does not anticipate that any information reasonably subject to discovery can be found on its PC hard drives, unless the information has been copied from the network. Accordingly, BPD has not made a special effort to retain PC hard drives. Meister Decl. ¶ 8. When this equipment becomes antiquated or otherwise unsuitable for use, BPD replaces it. *Id.*

Finally, DO uses "DO LAN" work stations that are configured to save data files to the customer's "home" or shared data directories, which reside on the "DO LAN." Schultz Decl. ¶ 7. All

data servers for this local area network containing customer "home" or shared data are backed up onto the storage area network and backup tapes. *Id.* Accordingly, DO, like FMS and BPD, is not retaining PC hard drives for purposes of this litigation. *Id.*

## C. NATIONAL ARCHIVES AND RECORDS ADMINISTRATION (NARA) AND THE INDIAN TRUST ACCOUNTING DIVISION (ITAD) OF THE GENERAL SERVICES ADMINISTRATION

Neither NARA nor ITAD have on-going trust management responsibilities with respect to Jicarilla trust funds or assets. At most, they have functioned as repositories for historical documents that may be responsive to the subject matter of the Jicarilla litigation and the RROs.

NARA has two broad categories of documents: 1) historical documents from governmental agencies kept in Federal Records Centers (FRCs) and archives, and 2) NARA's own operational records. Declaration of L. Reynolds Cahoon, Assistant Archivist for Human Resources and Information Services, NARA, December 29, 2004 (Cahoon Decl.) ¶¶ 7-8, 14 (Attached as Exhibit 12). NARA has physical custody of agency records stored at FRCs, but legal custody remains in the agency that transferred the records to NARA. *Id.* ¶ 8. Pursuant to agency record retention schedules, records may be transferred to the legal custody of NARA. Such archival records are permanently retained at archive facilities. *Id.* Most of the archival records (primarily originating from Interior) relevant to the Jicarilla case are in hard-copy format. *Id.* ¶ 12. NARA staff have identified only four archival series of records (each relating to agencies other than Interior) in its custody maintained in electronic format that could conceivably be relevant to the cases. *Id.* In addition to the historical documents, NARA creates and maintains its own daily operational records, which are frequently in electronic form. NARA does not expect that any non-privileged information relevant to the litigation would be located in such records, nor in NARA's computer and network activity logs or web pages. *Id.* ¶ ¶ 14, 17, 19, 22-23. NARA

is retaining the few potentially relevant, though privileged, operation records that it has. *Id.* ¶¶ 17-21.

Similar to NARA, ITAD has until recently acted primarily as a repository of historical Indian trust records. Its role as such has recently diminished, however. At the request of Interior for the return of its records in ITAD's custody, the division has released the historical records to Interior for storage in Lenexa, Kansas. Declaration of Helena Lee, Director, ITAD, March 2, 2005 (Lee Decl.) ¶ 5 (Attached as Exhibit 13). As a result, ITAD currently has only a small number of potentially relevant, historical documents, none of which are in electronic form. Lee Decl. ¶ 5. In addition, ITAD has been reorganized and its previous functions outsourced to a private vendor, such that ITAD's involvement in this case is now negligible. *Id.* ¶ ¶ 3, 8.

**D. DEPARTMENT OF ENERGY, NUCLEAR REGULATORY COMMISION, AND UNITED STATES FOREST SERVICE**

Three additional agencies– DOE, NRC, and the Forest Service–have played much smaller roles in connection with the Tribe's claims in this litigation. These agencies do not manage tribal resources and have few identifiable potentially relevant records.

The number of potentially relevant records at DOE and the NRC are few, are largely historic in nature, and are being preserved in hard copy. Third Declaration of L. Dow Davis, Attorney, DOE, December 13, 2004 (Davis Dec. Decl.) ¶ ¶ 4, 6, 9 (Attached as Exhibit 14);[15] Declaration of Susan Fonner, Attorney, NRC, March 2, 2005 (Fonner Decl.) ¶ ¶ 7-8, 10 (Attached as Exhibit 15). Accordingly, for purposes of the RRO, DOE and NRC are not undertaking any steps beyond normal operating procedures for the ongoing retention of electronic records. For a description of these procedures, see Davis Decl. ¶ 7-9; Fonner Decl. ¶ 9.

---

[15] Mr. Davis retired from government service on December 31, 2004.

Finally, the connection between the Forest Service and the Tribe's claims in these cases is even more limited. The Forest Service does not manage Tribal resources or generate or maintain any specific records for the management of trust land or other assets for the Jicarilla. Declaration of James Snow, Special Counsel, DOA, March 2, 2005 (Snow Decl.) ¶ 3 (Attached as Exhibit 16). Indeed, the National Forest system resources for which the Forest Service has responsibility is managed under different statutory and regulatory authorities from those that apply to Tribal trust resources. *Id.* Nevertheless, based on information provided by counsel for the Jicarilla, the Forest Service has taken steps to protect information and data regarding timber management on the Carson National Forest, which is located adjacent to the Jicarilla reservation. *Id.* ¶ 4. This includes preservation activities in relation to electronic media. *Id.* ¶ 5.

Respectfully submitted this 18th day of March, 2005.

THOMAS L. SANSONETTI
Assistant Attorney General

*/s/ Robert W. Rodrigues*

ROBERT W. RODRIGUES
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 353-8839
Fax: (202) 353-2120

Attorney for Defendant

OF COUNSEL:

BRENDA RIEL

Office of the Solicitor
United States Department of the Interior
Washington, D.C. 20240

TERESA E. DAWSON
Office of the Chief Counsel
Financial Management Service
United States Department of the Treasury
Washington, D.C. 20227