UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JICARILLA APACHE NATION, Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | ) ) ) ) ) ) ) ) | No. 02-24-L Judge Francis M. Allegra |

DECLARATION OF SCOTT E. MACPHERSON

I, Scott E. MacPherson, pursuant to 28 U.S.C. § 1746, do hereby declare and state:

1. I currently serve as the Indian Trust Project Manager for Information Resources Management at the Bureau of Land Management (BLM), a position I have held since August 22, 2004. My responsibilities include the coordination and management of all Indian Trust Issues related to BLM's Information Technology (IT) systems and the implementation of applicable Department of Interior (DOI) policies and directives The BLM's IT programs conduct backup and recovery activities for electronic data processing applications and electronic mail operations. Those functions serve over 11,000 BLM staff located across the United States in multiple locations which house Headquarters, State, Center, and Field Offices.

2. The BLM has historic and ongoing responsibilities related to the Oil and Gas (O&G) activities for the Jicarilla Apache Nation which include (1) reviewing and advising on leasing and Indian Minerals Development Act (IMDA) actions; (2) reviewing and approving of Applications for Permits to Drill (APD's) and miscellaneous notices; and (3) performing production accountability audits, and Inspection and Enforcement (I&E) activities. The BLM



**EXHIBIT 4**

New Mexico State Office has jurisdictional responsibility for BLM interaction with the Jicarilla Apache Nation. In addition, by federal law, cadastral surveys of Indian lands are performed by the BLM. Cadastral surveys provide assurance that land boundaries for individual and tribal trust lands are identified appropriately. Ownership information, distribution of trust assets, and management of trust accounts may be related to or based upon information recorded in official surveys.

3. I am familiar with the *Jicarilla Apache Nation v. United States* lawsuit. I am also familiar with the Orders of this Court, dated March 19, 2004, requiring preservation of documents, data, or tangible things that are related to or may reasonably lead to the discovery of the subject matter involved in the pending lawsuit. This declaration is based upon my personal knowledge or information gathered from BLM staff. For purposes of this declaration, the BLM has reviewed its existing policies and procedures for the offices within BLM which are predominantly responsible for those activities related to the management and creation of policy for trust assets in the Jicarilla Apache Nation case. Those offices are the Washington, DC Headquarters Office; the Denver, Colorado National Information Resources Management Center (NIRMC); and the New Mexico State Office including the Albuquerque and Farmington District Offices and the Cuba Field Station. BLM's historic and ongoing responsibilities on the Jicarilla Reservation include review and advisement on O&G leasing activities, review and approval of drilling wells, and production of Indian Minerals Development Agreements (IMDA's) and leases. The Albuquerque District Office maintains the official files associated with those actions. Duplicate copies are retained at the Cuba Field Station. Official copies of all files related to the review and approval of Applications for Permits to Drill (APD's) and Sundry Notices are kept at the Albuquerque District Office. Official records of Inspection and

Enforcement (I&E) activities are retained at the Cuba Field Station. Production accountability audit records are currently maintained at the Albuquerque District Office. Due to an on-going reorganization of the New Mexico State Office, management responsibilities for O&G activities are being transferred from the Albuquerque District Office to the Farmington District Office. The official records currently housed in Albuquerque will be transferred to Farmington. The official records maintained at the Cuba Field Station will remain there. The Petroleum Engineering Technicians assigned to the Cuba Field Station currently report to supervisors in the Farmington District Office. Once the reorganization is complete and the records are relocated, the Albuquerque District will no longer be responsible for BLM O&G functions conducted in support of the Jicarilla Apache Nation.

4. The following informs the Court of the compliance measures BLM has taken and continues to take in response to the Court Orders of March 19, 2004, with respect to the preservation of "every document, data or tangible thing" including: "backup data," "computer and network activity logs," "metadata," "Web pages" and "hard drives."[1]

5. The Bureau of Land Management's Automated Fluid Minerals Support System (AFMSS) application was implemented Bureauwide in October, 1996 to assist BLM in fulfilling its responsibilities for production and operational aspects of O&G development on Federal and Indian lands. As designed, AFMSS supports operational approval and I&E processes for Federal and Indian Trust O&G operations. AFMSS is used by O&G specialists, petroleum engineers and

---

[1] In an effort to provide some context for discussion of BLM's data preservation measures, one should be aware that BLM's two key software applications are the Automated Fluid Minerals Support System (AFMSS) and the Well Information System (WIS). AFMSS supports operational approvals and I&E processes for Federal and Indian Trust O&G operations. WIS is a Web-based Electronic Commerce system used to support and expedite processing of key O&G applications.

In addition to AFMSS and WIS, general purpose office automation software such as electronic mail, voice mail, word processing, and spread sheets are used by BLM personnel to manage a variety of trust-related activities associated with the Jicarilla Apache Nation.

technicians, geologists, environmental and compliance specialists, land adjudication personnel, and land law examiners. BLM restricts data modification of the AFMSS application to a very small and limited subset of employees in those positions. Most employees only have read access permissions to AFMSS reports (see Paragraph 5.c). The computer hardware (servers) that the AFMSS software resides on is operated by NIRMC. That facility has recently undergone multiple security audits and has completed OMB Circular A-130 based Information Technology Security Certification and Accreditation (C&A) reviews. Program responsibilities for development and maintenance of the AFMSS software are assigned to the Office of Minerals, Realty & Resource Protection (WO-300) in BLM's headquarters, Washington, D.C. Development and maintenance of the AFMSS application software is performed by the Land and Resources Project Office, WO-330D, Denver, Colorado.

5.a. AFMSS functionality includes collection and retention of information related to post-lease well and facility data, I&E data, and logging/description of undesirable events such as oil spills. AFMSS stores data about specific leases, unit agreements, participating area, communitization agreements, bond coverage, and drainage assessments. AFMSS also stores information on well-bore treatments, production tests, reservoir performance/pressure metrics, descriptions of well repair, plugging, and abandonment operations.

5.b. AFMSS data is retained indefinitely in the application. The AFMSS application was deployed in 1996. It was re-engineered from two legacy systems known as the Automated Inspection and Recordation System (AIRS) and the Monthly Report of Operations (MRO). Those systems were developed and deployed in the 1983 timeframe. Data from AIRS and MRO was retained in AFMSS and dates back to 1983. Data input

into AFMSS may be edited to correct data entry errors. All data is stored within the AFMSS data base including additions, changes, and deletions. All data editing activities are preserved in a log file which documents who made the changes and the date the edits occurred. The log file is preserved indefinitely and is not re-written or deleted by any aging schedule. Deletion of AFMSS data only occurs when a known error in the data is discovered. The deletion of erroneous records can only be initiated by a limited number of authorized personnel. There is only one person and a designated back up per office who are allowed to delete data. Those personnel are referred to as the AFMSS Local Support Group.

5.c. Access to specific screens which allow users to add or modify data is very tightly controlled, and only seven individuals have this ability Bureauwide. They are referred to as the National Support Group. Only certain types of data can be added or modified. For instance, only an O&G inspector or petroleum engineering technician may be granted access to inspection related data. Only petroleum engineers with the designated authority to approve an Application for Permit to Drill (APD) may be granted access to APD related data. Management access is generally limited to viewing reports and summary details on a read only basis. All changes to data (add, modify, and delete) are logged. Log functions are tracked by the specific user, the screen/system area accessed, the date, and the time of the access/activity. AFMSS log files are retained in the production system on an indefinite basis and are not alterable by users.

6. In October, 2004, enhancements to an electronic commerce application, known as the Well Information System (WIS), were implemented. WIS is a set of web-based electronic forms used to support electronic commerce (E-Government) between BLM and the Public. WIS is

Internet enabled. It does not contain Individual Indian Trust Data as defined in *Cobell v. Norton*. The forms available through WIS are Notice of Staking, Application for Permit to Drill (APD), Well Completion Report, and Sundry Notices on Wells. BLM uses a Net Continuum Application Security Gateway to ensure WIS users cannot penetrate BLM's external perimeter security. WIS users include the O&G industry and permit agents. To utilize WIS, a customer must first be issued an authorized user ID/password and a Personal Information Number (PIN). WIS data is retained indefinitely within the application. It contains a historical data base which maintains all data entered since the system's inception in the year 2000. Data deletions do not occur except when a known error is discovered following identical procedures described for AFMSS. AFMSS is not Internet enabled. This distinction is critical in accordance with the Court Orders of *Cobell v. Norton*.

7. In addition to the BLM's national systems, AFMSS and WIS, general purpose office automation software such as electronic mail, voice mail, word processing, and spreadsheets are used by BLM New Mexico State Office personnel to manage a wide variety of information, some of which is associated with activities related to the Jicarilla Apache Nation.

8. BLM New Mexico personnel also utilize a local application referred to as the Natural Gas Policy Act System (NGPASYS). It is a database application which resides upon a computer server located at the New Mexico State Office. NGPASYS tracks applications for well category determinations that allow applicants to receive IRS tax credits. This software was deployed in May 1989. Data which is entered into NGPASYS is cumulative and is retained indefinitely. The data is modified only when an error is discovered and needs correction. That system contains data related to the Jicarilla Apache Nation. However, the official records pertaining to the

Jicarilla Apache Nation only reside in the paper-based case files located at the Offices of the BLM New Mexico organization as discussed in Paragraph 3.

9. Backup Data. BLM's electronic records are routinely written ("backed up") to magnetic tape for the purpose of restoring systems and/or data when problems occur. Tape backup processes capture all of the data associated with the two business systems (AFMSS and WIS) discussed in Items 5 and 6, above. Tape backup processes also copy office automation data and files, computer and network activity logs, metadata, and web pages. Within BLM's operational procedures, tape backups are used to restore data in case the original data or information is lost or destroyed. As a part of its disaster recovery program, BLM's NIRMC has established a contract with a commercial firm (Iron Mountain) for an environmentally controlled and physically secured off-site tape storage facility. According to documented procedures, backup tapes are transported following specific schedules for off-site storage at that facility. Those backup tapes provide a source from which the Bureau could recover mission critical business information and data in the event of a disaster or service outage at NIRMC.

9.a. Backup processing schedules are depicted in the following table:

| **Backup and Retention Information**[2] | **AFMSS and WIS** | **National Web Services**[3] | **E-mail** | **EEAS** [4]**(Cobell)** | **Office Automation: Word Processing Documents, Spreadsheets, etc.** |
|---|---|---|---|---|---|
| **Schedule** | Real Time | Daily | Daily | Daily | Daily |
| **Type** | Full | Incremental | Incremental | Full | Incremental |
| **Retention** | 1 Month` | 2 Weeks | 2 Weeks | Indefinitely | 2 Weeks |
| | | | | | |
| **Schedule** | Weekly | Weekly | Weekly | Weekly | Weekly |
| **Type** | Full | Full | Full | Full | Full |
| **Retention** | 1 Month | 1 Month | 1 Month | Indefinitely | 1 Month |
| | | | | | |
| **Schedule** | Monthly | Monthly | Monthly | | Monthly |
| **Type** | Full | Full | Full | | Full |
| **Retention** | 6 Months | 6 Months | 6 Months | | 6 Months |

[2] Note: AFMSS and WIS contain functionality for Authorized System Representatives to initiate back-ups on an as needed basis. Daily e-mail back up tapes are retained indefinitely pursuant to a Court Order in the Cobell litigation.

[3] See discussion on pp.14-15.

[4] EEAS stands for Electronic E-mail Archival System. All of BLM's e-mail is currently captured by a contractor under EEAS.

Retention cycles for AFMSS and WIS are specified in the systems' documentation which is maintained by the WO-300 group referred to in Footnote 1. Retention cycles for Office Automation data are maintained locally by the NIRMC Division of IRM Support and by the New Mexico State Office Information Resources Management Team. Guidance and policies on data retention are published on BLM's Intranet. The procedures for data retention and backup state that all BLM backups must conform to national data retention standards set forth by the BLM Records Management Officer. Those policies establish specific rules to ensure the integrity, retention, and availability of Indian Trust records. BLM New Mexico also utilizes an off-site tape storage facility. Tapes are transported to that location each week or biweekly as production volumes dictate. The BLM New Mexico organization utilizes Bureau standard hardware, tape back up software, and data tapes. The New Mexico State Office backup procedures and retention schedules are identical to those used by NIRMC with the minor exception that the daily and weekly backups of Office Automation and online storage files are retained 6 days and 6 weeks, respectively.

9.b. Maintaining backup tapes beyond what is currently done for disaster recovery purposes would create an undue burden on the BLM. Replacing BLM's existing disaster recovery backup processes with additional tape archival strategies will not provide or preserve any more data in AFMSS or WIS than is already being saved.[5] Tape backups for all of the systems and files depicted in the table in Paragraph 5.a., already contain duplicate information stored on other backup tapes. A given data element that has not been updated or changed will be identical on the daily, weekly, and monthly backup tapes. This is because not all data changes on a daily basis. Daily backups capture a snapshot of files each day. This includes data that has

[5] Note: data entered in these systems is retained indefinitely in each applications database.

changed and data that has not changed. Weekly backups capture a comprehensive file of all changes reflected in daily backups as well as data that has not been changed. Once it is confirmed that weekly backups are successful, unchanged data from daily backups will be duplicated in the weekly data backup tape. This also occurs in the monthly tape backup process.

9.c. Backup tapes are released for reuse when it is confirmed that a more comprehensive backup was successfully completed in accordance with BLM procedures for recycling tapes. This helps manage costs by lowering the annual volume of blank tapes purchased and used. As an illustration, daily backup tapes are generally only preserved for a two week period after the next full daily backup is completed and verified. After a two week retention cycle, the daily backup tapes are released for reuse. The costs associated with moving from a backup recycling process to an indefinite retention process are substantial. Indefinite preservation of backup media would impose an approximate cost of $630,400 per year on the BLM over and above current costs. On average, BLM's tape backup and recovery activities generate 258 backup tapes per week, 1,032 in an average month, and 13,416 per year. It would be burdensome for the BLM to incur the significant costs of taking additional steps to indefinitely preserve all backup tapes.

9.d. Retrieving information from backup tapes depicted in Paragraph 5.a. is costly. First, the backup tapes would have to be restored for use, which would cost approximately $40.00 per tape. BLM data center employees generally take at least one full hour to locate a specific tape, load it into a tape drive, and run the processes required to restore the data it contains. Their labor rates average $40.00 per hour. Additionally, restoring the contents (such as Office Automation data) of any given tape will only provide a copy of the information as it is formatted on the tape. Depending upon the application, a printout of the tape's contents may yield information formatted for tape storage and/or use by application software. Since most of the data contained

on backup tapes is not stored in a readable report format, any search of that data will be extremely cumbersome. Custom query software would have to be developed to read the data and format it in a report layout for viewing. Total cost for this type of retrieval will vary greatly and be dependent on the format and type of data and the number and complexity of the queries made. Correspondingly, administrative costs associated with manually searching data on a restored tape can be outrageously high since employees would have to scan extremely large volumes of information not necessarily formatted to be easy to read.

9.e. Currently, as part of the *Cobell v. Norton* litigation, all BLM e-mail messages are captured and stored by a contractor under the Electronic E-mail Archiving System (EEAS). EEAS is not an official record-keeping or backup system for BLM. Also, pursuant to the *Cobell* litigation, BLM is retaining all e-mail backup tapes on an indefinite basis. The BLM New Mexico organization operates a centralized e-mail server which is located in Santa Fe. All BLM mail clients for New Mexico are configured on this server. All e-mail and attachments sent by or to BLM employees are copied in real time to EEAS. If the BLM were to permanently retain e-mail backups for the Jicarilla Apache Nation litigation, this would only capture what is already available in a preserved state within EEAS. The BLM estimates this would require additional costs of approximately $900,000 per year. This action would not provide anything that doesn't already exist and would only result in replicating what is already redundant data. Also, BLM employees are under instruction to print and file all e-mail messages pertinent to Indian Trust issues. This would mean that between normal e-mail backup tapes, e-mail stored in EEAS, and retained hard copies, the redundancy of data is already threefold.

10. *Computer and network activity logs.* Computer and network activity logs are computer or device generated records. They contain technical information regarding the utilization of

programs or applications running on a particular network or computer. These logs do not contain any information regarding the content of business systems or office automation documents. The logs are maintained for Bureau computers, servers, and other specific devices. The level of information captured varies greatly by the device for which log entries are recorded, the purpose of the device, and its particular operating system. Log files can be searched, but their formats vary from device to device; and they are very time consuming and labor intensive to review.

10.a. *Device/System logs.* The primary purposes of the majority of device/system logs are to allow systems personnel to diagnose operational anomalies. For instance, a daily system log from a file server might contain information which records the occurrence of an intermittent disk Input/Output (I/O) error condition. This might indicate the disk drive needs to be replaced. System logs can generate a great deal of data. For the Microsoft Desktop/Server environment, event logs are retained by Application, Directory Services, Domain Named Services (DNS), File Replication, Security, and Operating System from all the domain controllers in the Bureau. These are aggregated on a monthly basis. The active domain controller logs are written daily to a network attached storage device at NIRMC, and this device is backed up to tape using "NetBackup" proprietary software. Monthly log files have been retained indefinitely using this process since May, 2002. Regardless, BLM may cease the practice of indefinitely retaining such logs. Requiring BLM to continue to indefinitely retain the system log files would be a burden on the Agency.

10.b. *Security logs.* BLM follows DOI policies on capturing Computer and Network Security Logs" according to DOI Office of the Chief Information Officer (OCIO) Directive Number 2004 – 020, which states that those logs shall be maintained "for 90 days or the period specified in the System Security Plan (SSP)." For instance, a "Firewall" is a security device that

prevents unauthorized access into BLM's telecommunications network. Daily Firewall activity logs are maintained for six months on the hard drives of the Firewall computer. When the six month retention period expires, the logs are copied to tape; and the information is retained for another six months. Firewalls also record outbound traffic information. These logs record all access of external web sites by BLM employees. If, for example, an employee accesses an external web site, the Firewall log will capture when (calendar date and time) the employee accessed the site, where the employee went within that site, how long the employee remained at that site, and the nature of the content accessed.

10.c. *Activity logs*. Computer and network activity logs are included on system backup tapes pursuant to the BLM's retention schedules set out in backup Standard Operational Procedures (SOP's) and/or System Security Plans (SSP's). They are not retained indefinitely. These logs record information specific to the nature and purpose of a given device. For example, a Cisco Router is used to route traffic across telecommunications networks. The log file for a router will record any event or change in its operational status over a given period of time. All traffic/activity on BLM's telecommunications network is monitored by the proprietary software package "Cisco Works." It resides on a computer workstation. The daily network activity is retained on disk for six months and is then backed up to tape and retained for an additional six months. Another such device is a customized computer which filters unwanted e-mail referred to as "Spam." BLM utilizes a commercial product known as "Spam Assassin" for this purpose. That product logs all incoming e-mail, determines whether or not the message appears to be Spam, checks the message to see if it contains prohibited types of attachments that might contain a computer virus, records the subject of the e-mail, who it is from, and to whom it is addressed.

In short, the information contained on computer and network activity logs is generally only of value to systems administration personnel who operate and maintain the specific devices.

10.d. The BLM New Mexico Organization does not maintain any additional logs beyond those mentioned herein. Requiring BLM to make and retain additional copies of tape backups for computer and network activity logs will not likely provide information meaningful to this case and will result in an undue burden on BLM.

11. *Metadata.* The term "metadata" is generally regarded as meaning "data about data," which is intended to improve business and technical understanding of the data. Most, if not all, electronic records contain some forms of metadata retained by proprietary software which is not necessarily seen or available to end users when viewing records. For example, e-mail records originating from external sources and transmitted to BLM contain "header" or routing information not normally viewed by the end user. Word processing documents also contain numerous forms of metadata, depending on the proprietary software (i.e., Microsoft Word), which may show the file's size, the author, and when the file was last modified. Documents generated by most commercial software products retain their own metadata. As long as the document is retained electronically, its metadata is also retained. There is no need or practical manner to preserve it separately. In addition, the BLM maintains metadata for each custom business application. BLM's metadata defines the data elements of the unique business application software that process it. For example, metadata could define a data element such as a "telephone number" as a 20 character, alphanumeric field. All of the data elements, their definitions, the format of the data items, table structures, and any codes (domain values) referenced for AFMSS or WIS are contained in BLM's Corporate Metadata Repository. That information is retained in a paper-based, hard copy file and electronically. Metadata associated

with individual e-mail messages and the metadata associated with any attached file(s), such as Excel Spreadsheets or Word documents, are also captured and stored by the Electronic E-mail Archiving System (EEAS).

12. *Web Pages.* BLM maintains and operates an Intranet which contains internal web sites and application systems. BLM also maintains an Internet which contains different, public applications and information.

12.a. The web sites on BLM's Intranet are only viewable or accessible internal to BLM's Virtual Private Network (VPN) by BLM employees. The computer servers that these sites operate upon are located behind BLM's Firewalls and information technology architecture external perimeter security. BLM's Intranet contains information and application systems only shared among Headquarters, States, National Centers, and Field Office employees. BLM's Intranet is not accessible by the public. Examples of the functions performed on BLM's Intranet include posting of internal policies and procedures, Human Resources (HR) business processes such as accident reporting and safety inspections, Continuity of Operations Plans (COOPs), and BLM's emergency management program. Both National and State/local web sites exist on BLM's Intranet. All BLM New Mexico web sites on the BLM Intranet are maintained on computers located at NIRMC. BLM New Mexico personnel are responsible for the content of their web sites, and NIRMC employees provide operational support. For example, BLM's Intranet contains policy memoranda for complying with the Court Orders of March 19, 2004 in *Jicarilla Apache Nation v. United States*. However, there is no Individual Indian Trust Data or actual business information related to the Jicarilla Apache Nation on BLM's Internet.

12.b. BLM also operates and maintains Internet web sites which provide general information such as office locations, environmental planning activities, and scientific records published by

the Bureau. The Internet web sites are publicly accessible at any time. The vast majority of BLM's Web pages are simply public copies of official records, which are paper reports or other documents that exist in another form elsewhere. For example, some of the information available on BLM Internet sites includes employment opportunities, miscellaneous publications, public land statistics, and the Federal Land Policy and Management Act (FLPMA). BLM is under multiple, existing policy directives arising from *Cobell v. Norton* to not publish any Indian Trust Data on the Internet and does not do so. As per the table contained in Paragraph 5.a., web pages are included on backup tapes pursuant to the retention schedules set out in the BLM's backup operational practices. BLM conducts a daily incremental backup of all National and New Mexico web sites which is retained for two weeks. A full save is done weekly which is retained for one month. Each month, a full save is conducted which is retained for six months.

13. *Hard Drives.* BLM's official records are not maintained on individual hard drives on desktop computers. BLM has official policies for maintaining electronic data on network storage devices rather than on individual computer workstation hard drives. This is documented on BLM's Intranet in Instruction Memorandum (IM) Number 2003-160, dated April 25, 2003 which defines policy for BLM's deployment of the Microsoft Windows XP Operating System. That IM references standards and procedures contained in BLM's Windows 2000 Desktop Infrastructure Management Strategy Document. Those standards ensure that users save files to network storage devices. For example, BLM desktop computer users have their hard drives redirected to a network server so that, when a user saves a file, the file will, by default, be saved on a network server. The user can, however, change the default to the temporary (TMP) folder on their local hard drive. As stated in Paragraph 3, BLM does not utilize desktop hard drives for

official storage media. Official records are only stored in the paper based case files at the local office which has the jurisdiction for any specific business transaction conducted by BLM.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

Executed on this 3rd day of March, 2005

Scott E. MacPherson