UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JICARILLA APACHE NATION f.k.a. JICARILLA APACHE TRIBE, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 02-25-L Judge Francis M. Allegra |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DECLARATION OF L. REYNOLDS CAHOON

I, L. Reynolds Cahoon, pursuant to 28 U.S.C. § 1746, do hereby declare and state:

1. I serve as Assistant Archivist for Human Resources and Information Services at the National Archives and Records Administration (NARA), a position I have held since February 1996. I am also NARA's designated Chief Information Officer. My responsibilities include oversight of NARA's nationwide information technology programs. Among my overall duties, I supervise a staff of 40 personnel and approximately 105 contractor staff devoted to managing NARA's "live" electronic records systems as well as NARA's disaster recovery operations for NARA facilities nationwide. These operations serve approximately 3,000 NARA staff located across the United States in 18 regional facilities and 11 Presidential libraries, in addition to the Main Archives building in Washington, D.C. and the Archives II headquarters facility in College Park, Maryland. This Declaration is based on my personal knowledge as well

EXHIBIT 12

as factual information gathered on my behalf by NARA staff.

2. I am generally familiar with the *Jicarilla Apache Nation v. U.S.* and *Pueblo of Laguna v. U.S.* lawsuits. I am specifically aware of the Orders of this Court, dated March 19, 2004, requiring preservation of documents, data or tangible things that are relevant or may reasonably lead to the discovery of information relevant to the subject matter involved in the pending two lawsuits. I am also familiar with the Declaration of Jason R. Baron, Director of Litigation at NARA, dated April 21, 2004, which provided the Court with a summary of the actions NARA has taken in compliance with the Court's Order through that date, including the preservation of all textual (*i.e.,* paper) records related to the Jicarilla and Pueblo of Laguna tribes, as well as e-mail and voice mail messages of relevance.

3. This declaration is in two parts. Part I provides general background information concerning the role NARA plays with respect to the management and retention of federal records throughout the U.S. government, as well as a brief general description of the records in NARA's custody relevant to this litigation. Part II informs the Court of NARA's current preservation efforts regarding retention of NARA's backup data, computer and network activity logs, metadata, and web pages, and the resource burdens NARA would face were this Agency to undertake additional preservation steps.

PART I

4. *NARA's Role in the Management and Retention of U.S. Government Records.* The Archivist of the United States has the statutory responsibility to "provide guidance and assistance to Federal agencies with respect to ensuring adequate and proper

documentation" of governmental policies and transactions, as well as to ensure "proper records disposition." 44 U.S.C. 2904. Working in cooperation with the Archivist, the head of each agency is, in turn, required to "establish and maintain an active, continuing program for the economical and efficient management of the records of the agency." *Id.* at § 3102. Both the Archivist and agency heads have the responsibility "to promulgate standards, procedures and guidelines with respect to records management." *Id.* at § 2904(a). By statute, the Archivist "establish[es] standards for the selective retention of records of continuing value, and assist[s] Federal agencies in applying the standards to records in their custody." *Id.* at § 2905.

5. The statutory scheme thus contemplates that all federal records will be appraised as either having temporary or continuing value. Agencies submit records schedules to the Archivist for records that are not needed to conduct current business and that "do not appear to have sufficient administrative, legal, research, or other value to warrant their further preservation by the Government." *Id.* at § 3303(2) & (3). After NARA staff conduct an appraisal of the records, and after provision for public notice and comment via the Federal Register, the Archivist has the authority to approve record dispositions. *Id.* at § 3303a(a). The Archivist also may promulgate general records schedules covering authorizing the disposition of certain types of governmental records common to some or all agencies. *Id.* at § 3303a(d). At least two of these general record schedules (GRS 20 and 24) specifically provide guidance on how long certain types of common forms of electronic records should be maintained (*e.g.,* GRS 24, Item 4, systems backups).

6. Agencies develop their individual record schedules in accordance with NARA guidance, as is generally set out at 36 C.F.R. Part 1228. Agency staff, working with

NARA, develop specific recommended retention and disposition instructions for particular series of records, including records in automated information systems, based on the agency's unique circumstances and business needs. 36 C.F.R. 1228.22(d). In turn, NARA staff review records schedules for conformance with NARA regulations and perform a written appraisal and recommendation to the Archivist of the continuing historical, research, legal or other value of the covered records. Given that there are currently tens of thousands of records schedules in existence (submitted from over 300 separate Executive branch departments and agencies, as well as other legislative and judicial components of the U.S. government covered by the Federal Records Act, *see* 44 U.S.C. 2901(14) (defining "federal agency")), the Archivist has authorized to date a wide variety of retention schedules with varying disposition periods covering a vast array of federal records.

7. *Records in NARA's Legal and/or Physical Custody – General Overview.* The Archivist is responsible for the custody of records transferred to NARA, and by statute is required to maintain adequate facilities for the housing of those records. 44 U.S.C. 2108(a) & 2110. To house what at latest estimate is approximately 3.1 million cubic feet of archival holdings, 540,000 artifacts, and over 5.5 billion electronic logical data records, NARA currently maintains two national headquarters facilities in the Washington, D.C. area, and 18 regional facilities throughout the United States. (NARA also is responsible for the preservation of hundreds of millions of presidential records contained within 11 presidential libraries.)

8. Given the enormous volume of federal records that exist, agencies may also choose to physically store portions of their non-active or semi-active records in a NARA facility

known as a "federal record center" ("FRC"). 44 U.S.C. 3103 & 36 C.F.R. Parts 1253-54. As Assistant Archivist for Regional Records Services Thomas Mills explained in his Declaration (executed Nov. 3, 2003) filed in this action (at ¶ 3):

> Each records center facility provides reference and other services to the federal agency that owns the records, and, upon authorization by the owning agency, to the public. NARA has physical custody of such records; however, the legal custody of the records remains with the agency that transfers the records to the NARA records center facility. Such records may be destroyed or transferred to the legal custody of NARA (i.e. accessioned), subject to NARA and agency approval, when all legal retention requirements have been met.

As provided for in NARA regulations, agency record schedules normally set out a future date (*e.g.*, "after 30 years"), for the transfer of legal custody of agency records in FRCs records which have been appraised as "permanent." Usually, at the time of transfer of legal custody, such permanent records are moved from FRCs to either a NARA regional or headquarters archival facility. Unless and until legal custody has been transferred to NARA, provision for access to records in FRCs is controlled by and is the responsibility of the agency that transferred the records. 36 C.F.R. 1254.8. In the normal course, once NARA has obtained legal custody of records designated as permanent, such records are open and available to the public at a NARA archival facility after processing (subject only to any restrictions imposed by the transferring agency).

9. *NARA's Storage of Records Relevant To This Litigation.* NARA's vast archival holdings are organized or classified in over 500 record group designations. Of these, the records of the Department of the Interior collectively comprise sixteen record groups; for example, records of the Bureau of Indian Affairs are designated as Record Group 75, while records of the Office of the Secretary of the Interior constitute Record Group 48. Each NARA headquarters and regional facility employs archivists who are generally

knowledgeable concerning existing finding aids and transfer documentation for particular groups of records.

10. While NARA staff cannot certify that all Jicarilla Apache Nation and Pueblo of Laguna records preserved within NARA headquarters and regional archival facilities can be easily identified based on existing finding aids, I am informed that available documentation indicates that NARA's regional archival holdings contain approximately 60 cubic feet of records relating to the Jicarilla Apache Nation and Pueblo of Laguna tribes, of which 46 cubic feet of Pueblo of Laguna records are in the Denver Regional Archives. These 60 cubic feet, which translate into approximately 120,000 pages of records, are open and available to the public for research. I am also informed that Jicarilla Apache Nation and Pueblo of Laguna tribe records can be found amongst the General Correspondence files within BIA Record Group 75, located and available to the public at our headquarters Main Archives building in downtown Washington, D.C.

11. Additionally, in the case of tribal trust records which until recently have been in the physical custody of the Department of Interior (DOI), DOI and NARA jointly have established the American Indian Records Repository (AIRR) located within NARA's FRC in Lenexa, Kansas. A large collection of tribal trust records, including records potentially relevant to these proceedings, are expected to be stored in the AIRR.

12. I wish to emphasize that the above-listed holdings of relevant records are all in traditional *paper* form. NARA staff have identified to date only four archival series of records within our holdings which are maintained in electronic form (all of which involve records from agencies other than from the Department of the Interior) and which conceivably would be relevant to this litigation, namely: the Federal Assistance Award

Data System, 1980-2002 (FAADS) (records of the Bureau of the Census and of the Community Services Administration); Individual Contract Action Report Files of the Federal Procurement Data System, 1978-1997 (records of the General Services Administration); and Community Action Program Grant Master Files, 1964-1981 (records of the Community Services Administration). (I note that earlier this year NARA signed six records schedules for certain databases of DOI records in electronic form; however, as of this date, no records have been transferred to NARA under these schedules and NARA would not be expected to obtain legal custody of such records at any time in the foreseeable future.)

13. All of NARA's archival holdings are, of course, permanent records and thus are being preserved during the pendency of this litigation. Additionally, as of April 19, 2002, NARA suspended the destruction of all temporary DOI records in its custody (*i.e.,* housed within FRCs) that were otherwise eligible for destruction. This "Cobell" freeze on disposition remains in effect as of the present time, and is expected to continue indefinitely for all identified DOI Indian and tribal trust records.

PART II

14. NARA is uniquely situated in this litigation in that apart from NARA's historical, archival holdings of the records of U.S. government agencies, NARA staff also create their own operational records. While it would be expected that tribal trust records relevant to the outcome of this litigation would be found amongst NARA's archival holdings, I submit that the same expectation does not (and should not) exist with respect to NARA's daily creation of its own contemporaneous email and other forms of records, which presently come into existence in electronic form. I will next proceed to discuss

NARA's current preservation efforts regarding retention of NARA's backup data, computer and network activity logs, metadata, and web pages.

15. *Backup data.* NARA does not possess backup tapes from the Department of Interior or any other agency whose records are within the scope of the Court's preservation order. Rather, any backup data in NARA's possession solely consists of NARA's own internal operational records which are not expected to have any relevance to plaintiff's claims.

16. NARA's main disaster recovery system generates 95 backup tapes a week. Backup tapes are retained in accordance with an existing, approved NARA records retention schedule at an offsite location for two months, before being rotated and recycled for subsequent use. Each tape costs $45.00. If NARA were to purchase new additional tapes on an ongoing basis, I estimate that it would cost NARA an additional $185,300 per year. Moreover, NARA's current tape storage costs of nearly $7,000 per year would increase to approximately $30,000. Thus, indefinitely preserving backup data would pose an additional financial burden on NARA of approximately $208,000 per year, over and above the ongoing and already budgeted costs of disaster recovery to this Agency. In addition, to "restore" backup data (*i.e.*, recover data), NARA would need to spend anywhere from $500 to $3000 per tape, or $2.46 million to $14.79 million per year to restore one year's backup tapes. Given the unlikelihood that any documents relevant to this litigation are to be found among NARA's internal operational records, NARA has deemed that the assumption of the foregoing expenses is not justified. Special arrangements have, however, been made with respect to preserving NARA email and voicemail records (see ¶ 17, below).

17. Taking additional steps to preserve backup data would serve very little if any useful purpose when, pursuant to three nationwide directives, including my own directive of April 5, 2004 (*see* Baron Decl., ¶ 3(d) & Tab C thereto), NARA's nationwide staff have been directed to forward relevant email and voice mail messages relating to the Jicarilla and Pueblo of Laguna tribes to central mailboxes. As of December 22, 2004, the voice mail and email boxes contained 10 and 301 messages respectively, all of which constitute attorney work product in that they are either messages among NARA and Department of Justice attorneys regarding the Jicarilla and Pueblo of Laguna lawsuits, messages from NARA counsel to NARA staff regarding records the staff may have that are related to the lawsuits, or the NARA staff's responses thereto. The backups from NARA's disaster recovery operations would, at most, capture redundant copies of all such forwarded messages. (Backups would also capture multiple redundant copies of other types of responsive records (*e.g.,* word processing files) otherwise being preserved by NARA staff on NARA's live electronic systems.)

18. Notwithstanding the ongoing burden associated with capture of all backup data, to ensure maximum compliance with the Court's Orders, and at the advice of NARA counsel, my staff has acted to remove from further recycling any and all sets of backup tapes created on March 19, 2004, representing backups of NARA's email and voice mail systems nationwide as of that date. I have further directed that a second, "preservation copy" set of tapes created on March 19, 2004 be made for safekeeping.

19. *Computer and network activity logs.* I understand the definition of "computer and network activity logs" to include data concerning the time and date when individual users logged on or off the NARA computer network, plus general data concerning the

utilization of specific applications running on our network. This type of "audit trail" information is normally preserved only on the backup tapes described in ¶¶ 16-18 above, and necessarily consists solely of NARA operational records. However, "audit trail" information in the form of computer and network activity logs as are currently kept by NARA staff would not reveal what specific network or application actions a user took while on the "live" electronic mail system or other network-hosted applications. Thus, so far as I am aware, there is no audit data in our existing computer and network activity logs that would reference or have any direct relevance to the Jicarilla and Pueblo of Laguna cases. NARA has decided not to add detailed activity logs to our systems because doing so would place significant strain on the NARA network infrastructure and degrade our network performance, and would divert NARA's scarce IT resources by requiring one additional staff and additional hardware and software to manage the capture and retention of the activity log data.

20 *Metadata.* The term "metadata" is a general term, consisting of all data about data, and may or may not constitute "record" material covered under existing records schedules. Most if not all electronic records contain some forms of metadata retained by proprietary software, and not necessarily seen or available to end users when viewing records. For example, email records originating from external sources and transmitted through the Internet into an agency's email system contain various "header" or routing information not normally viewed by the end user. Word processing documents also contain numerous forms of metadata, depending on the proprietary software (NARA for the most part uses Microsoft Word), which may show the size of files, and when files were last revised. Voice mail (NARA uses Siemens Expressions) also can be said to

have metadata associated with it, in the form of "extra" information available on the system describing when messages were left for the recipient and the telephone number of the calling party.

21. Because all relevant email and voice mail messages to these lawsuits are being retained in their electronic form by NARA staff, pursuant to guidance requiring forwarding such messages to central box locations, all of the associated *metadata* with such email and voice mail is necessarily being retained. Accordingly, there is no utility in requiring NARA to retain operational records metadata independently of the actions already taken in compliance with the Court's Order.

22. *Web pages.* NARA has an extensive website currently consisting of approximately 29,000 Web pages. At present, apart from capturing web pages as part of the routine backup process described in ¶ 16, above, NARA staff do not take special "snapshots" to preserve the entirety of the NARA Web site on a daily or ongoing basis. The resources to be devoted to preserving multiple snapshots of NARA's Web site would constitute the same type of burden as described in ¶ 16, namely, the additional costs of purchasing, maintaining, and eventually engaging in restoration of the necessary backup tapes required for each Web "snapshot." Based on an estimate of 15 backup tapes being devoted to making each snapshot, and assuming a daily snapshot were to capture all potential changes to NARA's Web pages, 75 tapes per week would need to be preserved. I estimate that it would cost NARA an additional $138,500 per year to purchase new tapes (at $45 per tape), an additional $23,000 per year for tape storage costs beyond current storage costs, and an eventual cost to "restore" tapes of between $1.95 and $11.7 million to restore one year's backups.

23. However, in response to this Court's Order, NARA staff believe that they have conducted an adequate search of materials currently listed on NARA's Web site so as to be in the position to advise and assist plaintiffs of the extent of NARA holdings related to the two tribes involved in these lawsuits. I can state with a high degree of confidence that there are few, if any, copies of tribal trust source records posted on NARA's Web site, although there may be catalog references to the tribes posted on the Website and publicly available. Moreover, if any such Web records exist, they would be electronic copies of paper records otherwise being preserved. In light of the public nature of the NARA Website, and the limited relevance of the information contained therein, I believe taking additional steps to preserve NARA's Website would serve no useful purpose.

24. As I stated above, I wish to emphasize that there remains a freeze on any disposition or destruction of Department of Interior records in the legal custody of the Department of Interior but in the physical custody of NARA facilities nationwide. This necessarily includes Jicarilla Apache Nation and Pueblo of Laguna source records. Of course, all archival holdings in the legal custody of NARA, by definition, are permanent records not subject to destruction. In light of NARA's ability to preserve relevant desktop-created records indefinitely, including electronic mail and voice mail messages as well as with word processing files, I do not believe that it would be reasonable for NARA to preserve redundant copies of such solely operational records in the form of backups. Nor is it reasonable for NARA to preserve other forms of tangential electronic data (*e.g.*, computer and network activity logs, metadata, and Web pages) that have little relevance to the issues involved in these lawsuits. Records in NARA's legal custody directly related to the underlying tribal trust issues involved in this litigation are to be

found in our collections of permanent, historical, archival records, and not in our operational records or electronic data as described above.

I declare under penalty of perjury that the foregoing is true and correct.

L. REYNOLDS CAHOON

Executed on this 29 day of December, 2004