IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| JICARILLA APACHE NATION,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 02-25 L<br>Judge Francis M. Allegra |

DECLARATION OF SUSAN FONNER

I, Susan Fonner, do hereby declare, pursuant to 28 U.S.C. 1746, that:

1. I am employed by the United States Nuclear Regulatory Commission (NRC) in the NRC Office of the General Counsel.

2. In that capacity, I am assigned as a point of contact for NRC relating to the Record Retention Order (RRO) dated March 19, 2004, issued by the Court in the above-captioned case.

3. The purpose of this declaration is to explain NRC's capacity to search for and preserve every record that is in NRC's possession, custody, or control containing information that is relevant to the pending litigation. The steps being taken in the search effort were described in my declaration of April 22, 2004, which was filed with the Court on April 26, 2004, as attachment 1F of the Defendant's Notice of Filing Status Report Describing Compliance Monitoring Mechanisms.

4. The basis of the information in this declaration is my personal knowledge and information provided to me by other NRC employees and by employees of NRC contractors. Because I do not have in-depth knowledge of the field of information technology, I have had to rely to a considerable extent on NRC employees and contractors who specialize in that field for

EXHIBIT 15

information regarding electronic records, transmissions, and data. Among the individuals on whom I have relied for information are a paralegal who worked in my office until recently and who spent considerable time searching for documents responsive to the Court's RRO, a new NRC attorney who assisted with the search for responsive documents and two new NRC attorneys who assisted with the privilege review of documents for a period of time,[1] NRC employees and NRC contractors' employees who work in or for NRC's Office of the Chief Information Officer (particularly, those who are knowledgeable in the area of information technology), NRC employees engaged in handling NRC file systems and NRC libraries, and NRC technical staff engaged in the substantive work of the agency. I contacted some individual NRC employees, including both Headquarters and Regional personnel, and employees of contractors, by telephone, e-mail, or in face-to-face meetings, to obtain information regarding the location of possible responsive documents and information about information technology systems used at the NRC.

5. NRC also issued e-mail network announcements to all NRC employees regarding this lawsuit and the lawsuit filed by the Pueblo of Laguna. The first announcement was put on the NRC network on March 30, 2004, and related to the Pueblo of Laguna lawsuit; the second announcement was issued on April 15, 2004, and related to the Jicarilla Apache Nation lawsuit; the third announcement was issued on April 21, 2004, and related to both lawsuits. These announcements described the main focus of the lawsuits and the responsibility of each NRC employee to comply with the mandates of the RRO. On May 20, 2004, the NRC Solicitor sent an e-mail message to NRC Records Liaison Officers, clarifying issues related to documents placed in the NRC File Center by an NRC office on condition that anyone not a member of the office would not be permitted to view the documents, unless the office first approved. On

---

[1]Most of the documents found to be responsive to the RRO were located in the course of file searches conducted by the paralegal and a new attorney. Their standard procedure was to have the relevant pages of the documents copied, and then to return the document that was copied to its original file.

May 21, 2004, an announcement was sent by e-mail to all NRC officers and employees, reminding them of their obligation to comply with the RRO. Another such reminder announcement was sent by e-mail to all NRC officers and employees on September 14, 2004. Some of these e-mail messages were previously submitted to the Court, but for ease of reference a copy of each of these e-mails is appended to this declaration.

6. In explaining the search requirements to NRC employees, we described the nature of the lawsuit, with special reference to the plaintiff's claim that the United States has failed to exercise fiduciary duties owed the plaintiff with regard to supervision, control, and management over the plaintiff's trust funds and other trust property. So that NRC employees would better understand the type of subject matter that might be contained in documents, data and tangible things in the possession of the NRC that could be considered responsive to the RRO, we explained that though the complaint in this case does not contain allegations that implicate the NRC or AEC, we had learned that the plaintiff's attorneys had indicated that the plaintiff intends to seek damages relating to at least two AEC projects (Operation Ploughshare, Gasbuggy Project).

Our announcements described the broad definition of "document, data or tangible things" covered by the RRO, and emphasized the need to preserve any record that may be subject to the order. The announcements instructed NRC employees to take the RRO with the utmost seriousness, and explained that disciplinary action could result from failure to preserve any document, data or tangible thing in an employee's possession or custody. Additionally, we explained that an NRC employee's search should not be limited to NRC records, because old records of the long-defunct Atomic Energy Commission (AEC) could also be relevant. NRC employees were instructed to inform me, if they knew of any responsive document, data or tangible thing that may be in the possession or custody of the NRC, an NRC officer or employee, or an NRC contractor.

7. NRC's Office of the General Counsel (OGC), which has the responsibility for overseeing the agency search pursuant to the RRO and obtaining compliance with the order by agency officers and employees, is a very active office and its attorneys frequently have before them multiple demanding assignments. Though the NRC is smaller in size than Federal Executive Branch Departments, its attorneys deal with as broad a range of matters as do attorneys working for the Departments. As part of OGC's ongoing responsibilities, OGC attorneys represent the NRC in public hearings throughout the United States, review proposed and enacted legislation for its impact upon NRC programs, draft and interpret internal regulations, advise the NRC staff in security, international, labor, contract, personnel, and patent matters, and represent the NRC in adjudicatory proceedings and trial and appellate litigation.

As of September 1, 2004, OGC employed 54 full-time staff attorneys,[2] two part-time attorneys, and one paralegal. As of October 30, 2004, 700.75 hours of attorney time and 426 hours of paralegal time had been devoted to NRC's response to the RRO in this case and in Pueblo of Laguna v. United States. NRC calculates the cost of that time as $169,012.50. In addition, over 500 hours have been expended by staff of NRC's File Center, NRC libraries, and NRC's Public Document Room in searching for and retrieving records that might be responsive to the RROs. NRC calculates the cost of this time to be at least $13,000. Thus, the cost to the NRC of responding to the RRO has been over $182,012.50.[3] NRC is a small agency and has limited personnel with which to pursue the search and compliance mandates of the Court's broad order. The figures cited raise questions of the reasonableness of this expenditure of time and money, particularly since a large part of the records are historical in nature and NRC plans

---

[2]The count of 54 full-time staff attorneys does not include OGC managers or a staff attorney acting in a managerial position.

[3]This amount does not include the cost of such services as OGC secretarial support or the work of the NRC copying center.

to make available to the plaintiff copies of all responsive, non-privileged records that have been identified (see paragraph 12 of this declaration). A mandate for the exercise of excessive efforts that at best provide only very limited results should be reconsidered.

8. It is clear from the history of the NRC that it was created as a regulatory agency, and not to promote commercial use of radioactive material. Most of NRC's authority comes from the Atomic Energy Act of 1954, 42 U.S.C. 2011 et seq., and the Energy Reorganization Act of 1974, 42 U.S.C. 5801 et seq. The latter statute abolished the AEC and transferred its functions to two newly created agencies: the NRC and the Energy Research and Development Administration (ERDA). The Energy Reorganization Act moved the AEC's function of regulation of the commercial use of radioactive material to the NRC. ERDA, which inherited such aspects of AEC authority as encouragement of commercial use of radioactive material, became the Department of Energy a few years later.

In addition, section 274 b. of the Atomic Energy Act of 1954, 42 U.S.C. 2021(b), authorizes the Commission to enter into agreements with States providing for discontinuance of the Commission's regulatory authority with respect to certain radioactive material. Since 1974, New Mexico, which is the site of the Jicarilla Apache Nation reservation, has been an Agreement State.

Thus, during the time period in which activities relating to use of radioactive material that might have any relationship to this case were ongoing, NRC did not exist or its involvement in such matters was limited and only regulatory in nature. Other agencies have had far greater involvement in matters related to the subject of the plaintiff's complaint than has the NRC, and they should have a far more complete record of activities relating to those matters. Therefore, it would be reasonable to exempt the NRC from the application of the RRO issued in this case, or, at the least, to alleviate the burden it has imposed by limiting the RRO's application appropriately.

9. NRC records are maintained in several different formats. The agency does not have a main recovery system for its electronic records, transmissions, and data, and uses several different methods for backing up its server data. The latter are designed for disaster recovery and file restoration, and not for retention of material over a lengthy period of time. Because most of the substantive documents found in the NRC search for documents responsive to the Court's RRO are historical or privileged, NRC has not made any arrangements beyond its usual backup regime to retain backup computer files.

A. ADAMS BACKUP. As I explained in my declaration of April 22, 2004, the NRC's Agencywide Documents Access and Management System (ADAMS) is an electronic recordkeeping system that provides access to most official documents generated by NRC during the last five years and many that were contained in an older, discontinued document management system. ADAMS has a non-public and a public version. The public version is a subset of the non-public version. Documents are deleted from ADAMS in accordance with their retention schedule, and after they are deleted the documents are retained on tape for one year. When that period has terminated, the tapes are reused. (When a document that is available in both the public and non-public versions of ADAMS is deleted in accordance with the retention schedule, the document is deleted from both versions at the same time.)

The current ADAMS backup system does not allow for creating a daily snapshot in time of every record in the system. Instead, only changes in the documents that are on the system are recorded on the backup tapes. To allow for backup of the non-public version of ADAMS on a daily snapshot basis, NRC would have to purchase a new auxiliary backup system, at a projected cost in excess of $500,000. (Without such a purchase, the annual cost of permanently retaining daily backup tapes using the current system, is estimated to be in excess of $20,000,000, an impossible expense for the

NRC to sustain.) Even without a daily snapshot of every record in the ADAMS system, the agency would require an additional 750 tapes per year over its current usage, at a projected annual cost of $60,750, if the tapes it now uses could not be recycled one year after the material on them has been deleted from ADAMS.

B. Network Backup. A similar problem would arise with respect to backing up the NRC network, which includes all agency e-mail, employees' individual computer directories that are backed up remotely, and agency file and print servers. Currently, the NRC network is backed up on a daily basis, but the backup tapes are recycled every two weeks. Even so, because of wear and tear on the tapes, 160 new tapes are purchased each year for this purpose at an annual cost of approximately $8,000. If a daily snapshot was required to be retained, the system would need to be redesigned at a projected cost of $250,000 or more. Without the redesigned system, the cost of daily backups that would need to be permanently retained would be prohibitive, with a projected annual cost of almost $1,500,000. Moreover, implementation time for a changeover to a new backup system is estimated to require three to six months.

When the costs of increased network backup are measured against the benefits that would accrue from the actions that would be required to be taken, the clear disproportion between those costs and benefits becomes readily apparent. This is particularly true because the preponderance of potentially relevant records that are in the possession of the NRC are historical documents that have already been preserved by agency personnel, and most, and likely all, the information on the backup tapes would not have any relevance to this case.

C. Web Pages Backup. NRC web pages, which are backed up every night, generally contain little information relevant to uranium mining on the plaintiff's reservation. The standard system used for backup of both NRC's public web pages and

NRC's non-public web pages entails an initial full backup of the contents of the pages, supplemented on a daily basis by backups of changes made to those pages. A deletion can be recovered for one year after it takes place. The cost of the standard backup process now in use is approximately $4,565 per year for NRC's non-public pages, and approximately $2,503 per year for the public web pages. If instead of using the standard system for NRC web pages, backup tapes were made daily of all the NRC web pages (a daily snapshot), the cost is projected to be $21,900 per year for the non-public web pages and $31,025 per year for the public web pages.

D. Audit Trail of Computer and Network Activity Logs. Computer and network activity logs contain data concerning the time and date when individual users logged on or off computer network, plus general data concerning the utilization of specific applications running on our network. This type of "audit trail" information is normally preserved only on the backup tapes described above. Audit trail information in the form of computer and network activity logs currently kept by NRC would not reveal what specific network or application actions a user took while on the electronic mail system or otherwise. Thus, there is no audit data in our existing computer and network activity logs that would reference or have any direct relevance to the Jicarilla Apache Nation lawsuit. A judicial requirement to add detailed activity logs to our systems would place significant strain on NRC's network infrastructure and degrade our network performance. Such a requirement would also divert this agency's IT resources by requiring additional staff to take time on a daily basis to accomplish this task.

E. Metadata Retention. Most if not all electronic records contain some forms of "metadata" (a general term, consisting of all data about data) retained by proprietary software, and not necessarily seen or available to end users when viewing records. For example, e-mail records originating from external sources and transmitted through the

Internet into an agency contain various "header" or routing information not normally viewed by the end user. Word processing documents also contain numerous forms of metadata, depending on the proprietary software, which may show the size of files used and when files were last revised. Because all relevant e-mail and voice mail messages relevant to the Jicarilla Apache Nation lawsuit are being retained in their electronic form, there is no utility in requiring NRC to retain metadata independently of the actions already taken in compliance with the Court's orders.

F. E-Mail and Voice Mail Messages. NRC does not have the capability of tracking deletion of e-mail messages on particular subjects by individual employees. In fact, to avoid overloading the system, NRC periodically purges e-mail messages that are older than six months from its computers. Voice mail messages may be archived for up to 90 days, before they are deleted. We have arranged for installation of special boxes for e-mail and voice mail messages related to this case that allow the messages to be retained beyond the period prescribed by NRC's normal practice. The e-mail box does not require a special backup system, because it is backed up every night, and is not subject to the routine deletion of e-mail messages that are over six months of age. Only I, the NRC Solicitor, and (with respect to the e-mail box only) the Solicitor's secretary have direct access to these boxes.

10. NRC also possesses or controls a large number of paper records that are in NRC libraries, the NRC Public Document Room, the NRC File Center, or in special storage areas or facilities (particularly, the Federal Records Center in Suitland, Maryland). In addition to these types of records, NRC also has some older documents on microfiche. Microfiche records are difficult to search (special viewer/printers are required), and take considerable time to review. They may have inexplicable gaps in time or subject, and are vulnerable to mishandling. Their lifespan depends on how carefully they are filed and handled. Insofar as we could determine

from this agency's search for responsive documents, NRC appears to have only a very limited number of microfiche records of any relevance to this lawsuit.

11. In searching NRC records, we have also found that old AEC records that are in NRC custody tend to have gaps in coverage and are often difficult and sometimes impossible to find. These characteristics of old (and sometimes even newer) records make it difficult to search for records in NRC possession or control that pertain to a specific subject. When the subject is not well defined, searching NRC records becomes difficult, imposing excessive expense in both time and money. This is the situation with respect to the search undertaken by the NRC in response to the very broad court order issued in this case.

12. NRC records have disposition schedules, and they may be destroyed or transferred to the National Archives after the retention period has been satisfied, unless there is an overriding mandate for retention, as with the RRO in this case. Once records are transferred to the National Archives, the documents are no longer under the control of the NRC. With respect to records responsive to the RRO in this case, NRC expects to provide to the plaintiff copies of all non-privileged records that our search has identified, if the plaintiff desires to have them. We will also provide a privilege log for those responsive NRC records that have been identified as being privileged. In total, we estimate that we will produce no more than three boxes of potentially relevant documents for which no privilege is claimed.

I hereby declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge.

Executed on March 2, 2005.

Susan Fonner

Susan Fonner
Senior Attorney
U.S. Nuclear Regulatory Commission