UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JICARILLA APACHE NATION,<br>f.k.a. JICARILLA APACHE TRIBE,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Electronically filed<br>April 8, 2005<br><br><br>No.: 02-25 L<br>Judge Francis M. Allegra |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION PURSUANT TO SECTION 6 OF THE MARCH 19, 2004 RECORD RETENTION ORDER**

## I. INTRODUCTION

Defendant filed a Motion Pursuant to Section 6 of the March 19, 2004 Record Retention Order ("RRO"), to amend the RRO, on March 18, 2005.[1] In that Motion Defendant requested that the Court modify the RRO to "remove any doubt that agencies may continue to take actions which do not make information that is subject to the RRO incomplete or inaccessible, actions such as the routine electronic transfer of data to an archival system." Br. at 1. To accomplish this "clarification," the Defendant requested that the final phrase of Paragraph 5(b) of the RRO be "modified modestly" so that the paragraph would read as follows (modified portion is underlined):

> "Preservation" is to be interpreted broadly to accomplish the goal of maintaining the integrity of all documents, data, and tangible things reasonably anticipated to be subject to discovery under RCFC 26, 45, and 56(e) in this action. Preservation includes taking reasonable steps to prevent the partial or full destruction, alteration, testing, deletion, shredding, incineration, wiping, relocation, migration, theft, <u>mutation, negligent</u>

[1] On April 4, 2005, the Court granted Plaintiff's motion for an enlargement of time until April 8, 2005 in which to respond to Defendant's motion to amend the RRO.

> handling, or intentional mishandling of any documents, data, or tangible things containing information reasonably anticipated to be subject to discovery if such actions would make that information incomplete or inaccessible.

Br. at 1 (quoting in part RRO ¶ 5(b)). The underlined wording would replace the phrase that currently reads as follows: ". . . or mutation of such material, as well as negligent or intentional handling that would make material incomplete or inaccessible."

Defendant asserts that the final phrase is potentially ambiguous in that

> the qualification that the material is rendered "incomplete or inaccessible" arguably applies only in cases of "negligent or intentional handling" of the material. It is not clear whether the qualification applies to other specified actions such as testing, wiping, relocation or migration. Thus the RRO could be read to forbid all such actions, even if they do not make the material incomplete or inaccessible. Such a reading expands the RRO beyond its goal of maintaining the integrity of discoverable information, because, if information is not made incomplete or inaccessible by actions such as testing, wiping, relocation or migration, its integrity has not been compromised.

Br. at 2.

## II. DISCUSSION

Plaintiff recognizes the ambiguity Defendant describes and is not opposed to clarification by Defendant's proposed modification to RRO ¶ 5(b). Plaintiff wishes to emphasize, however, that this modification, and Plaintiff's non-opposition to it, must not in any way be viewed as reducing Defendant's obligation to maintain the integrity of all documents, data, and tangible things reasonably anticipated to be subject to discovery in this action, including of course information responsive to discovery requests "reasonably calculated to lead to the discovery of admissible evidence." RCFC 26(b)(1). Moreover, it is Plaintiff's understanding that the proposed modification will not result in information

being made incomplete or inaccessible and is instead intended to facilitate Defendant's preservation of discovery materials.

Defendant's Supplemental Status Report Describing Compliance with the March 19, 2004 Order and the accompanying exhibits, submitted in support of its motion to amend, also serve to highlight ongoing concerns related to record preservation. For example, while cost constraints may influence the choice of record preservation method, cost, alone and unexamined, cannot be seen as justification for inadequate preservation. Also, the decision as to what material is relevant or may lead to information relevant to the subject matter of the case should not fall to those who may not be prepared to accurately make that determination. *See, e.g.*, Supp. SR at 9 (store *relevant* work product on network server, not PC hard drive); Brown Decl. ¶ 7 (do not store *relevant* data on PC hard drive); Baron Decl. at 3, April 21, 2004 (central NARA repository "for the preservation of *relevant* e-mail and voice mail messages related to the [JAN and POL] lawsuits"); Dow Davis Decl. at 2, April 23, 2004 ("a few *arguably relevant* [DOE] documents); *compare* McKenna Decl. ¶¶ 5, 7, 12 (indicating that all files are to be stored on the network drive where they are backed up); *see also* Supp. SR at 13 (web pages info of little or no relevance); *compare* Brown Decl. ¶ 10 (web pages are not described as irrelevant, merely not sole sources). When in doubt, personnel should be instructed to err on the side of preservation. *See* DOI Departmental Manual, 303 DM 6, appendices 1-6, *in* Defendant's April 26, 2004 Status Report on Compliance ("When in doubt whether a record is a trust record, err on the side of caution and treat the record as a trust record").

**III. SPECIFIC CONCERNS**

*Record Keeping*

The Defendant's obligations here with respect to making, preserving, and making available to the Plaintiff (the trust beneficiary) records of matters that affect the trust corpus are not solely a function of the Rules of Procedure of this court. Rather, those obligations arise in the first instance precisely because of the unilateral decision of the Defendant to impose this trust relationship upon Plaintiff with regard to Plaintiff's property–property which Defendant unilaterally placed into its own hands as trustee for Plaintiff. Defendant unilaterally took prepayment from Plaintiff for performing these trust duties by demanding at the barrel of many guns that Plaintiff accede to this scheme and cede to the Defendant valuable land and natural resources that were rightfully and historically Plaintiff's–land and resources that would be worth hundreds of millions of dollars today. This trustee record keeping function is not a gratuity. It is a duty long ago paid for by the cession of valid consideration of extremely valuable land and resources in exchange for the Defendant's promise to act with regard to the Plaintiff's remaining property as a loyal fiduciary trustee. *See generally*, Veronica E. Velarde Tiller, *The Jicarilla Apache Tribe, A History* (Revised ed., Univ. Neb. Press 1983); Robert J. Nordhaus, *Tipi Rings* (Bow Arrow Pub., Albuquerque, N.M. 1995); The Problem of Indian Administration: Report of a Survey made at the request of Honorable Hubert Work, Secretary of the Interior, and submitted to him, February 21, 1928, pp. 779-95 (The Johns Hopkins Press, Baltimore, MD 1928) (generally referred to as the Meriam Report of 1928 which led in significant part to the passage of the Indian Reorganization Act of 1934);

Felix S. Cohen, *Handbook of Federal Indian Law* 221-28 (1982 ed. Michie Bobbs-Merrill, Charlottesville, Virginia).

The trustee delegates have "a clear obligation to maintain trust records and furnish such records to beneficiaries upon request." *Cobell IV*, 240 F.3d 1081, 1093 (2001). Management of a trust and rendering of an adequate accounting "requires the locating and retention of records," providing "operational computer systems," and providing "adequate staffing." *Id.* at 1103. Trustee delegates must "maintain and complete existing records." *Id.* at 1105.

*"Relevant Information"*

The October 8, 2004 Jensen/Hord Tipton memorandum[2] to Interior personnel properly defines "relevant information" that must be preserved in accordance with Rule 26. Plaintiff has several concerns illustrated by that memorandum, however. First, it should be made clearer that information relating to other tribes is discoverable. For example and hypothetically, an MMS employee working on an audit of natural gas royalties due a tribe in Wyoming may note that certain data necessary to properly calculate royalties for all tribes is not available in the database maintained by the United States. That statement is relevant, discoverable, and likely admissible in this action, but it is not clear that an employee would understand that such information "refer[s] or relate[s] to . . .

[2] Memos from Lawrence J. Jensen, Counselor to the Solicitor, and W. Hord Tipton, Chief Information Officer, October 8, 2004, and from Deputy Secretary J. Steven Griles, September 24, 2004, directed federal employees to comply with this Court's March 19, 2004 Record Retention Order.

policies, procedures, guidelines, correspondence relative to any aspect of the management or administration of such [Jicarilla or Pueblo of Laguna] assets." Jensen/Hord Tipton memorandum, at 2. Second, the hypothetical employee in Wyoming would not have received that memorandum, which was limited to Washington DC, Southwest region, and local Agency management, although the September 24, 2004 Griles memorandum was distributed to all employees. Plaintiff has a right to expect that all employees who may have or create "relevant information" be made fully aware of the scope of potential discovery. While Rule 26 may be second nature to lawyers, the phrase "relevant information" is far too likely to be construed too narrowly by employees.

*Backup Data*.

All discoverable information should be stored on storage media that are backed up regularly. While this generally seems to be Defendant's policy, such was not communicated in the Griles memorandum to all employees, and there are clearly exceptions. For example, "a very few [MMS users] store their files exclusively on their PC." Brown Decl. ¶ 7. If this practice were eliminated, as it surely could be across the relevant agencies, all discoverable data would be subject to the backup regimens described by the Defendant.

If personnel do store data on network servers where it will be backed up, instead of on PC hard drives, it is still not clear to what extent that backed up data is preserved. How much relevant material is on non-mission-critical servers, which are apparently subject to a less stringent back-up routine? *Compare* Supp. SR at 9 (network saving plan) with 10

(only backups of "mission-critical servers" are retained indefinitely).[3] For example, backups of BLM word processing documents and spreadsheets are preserved for only six months. McPherson Decl. ¶ 9a. If a BLM employee were to delete a spreadsheet analyzing tribal natural gas lease information today, that data would be unrecoverable within a little more than six months.

The Supplemental Status Report states that some data is stored in perpetuity or at least “indefinitely”on backup tapes. *See* Supp. SR at 8 (certain of OST's TFAS data retained in perpetuity on monthly backup tapes), 10 (BIA and OST retain certain backup tapes indefinitely, yearly backups of TFAS data are retained indefinitely); *compare* Supp. SR at 7 n. 5; McPherson Decl. ¶ 8 (BLM at the New Mexico State level retains its Natural Gas Policy Act System data indefinitely but local BLM systems retention periods vary). The Report states that it would be “unreasonable” to incur the additional costs of retaining all backups indefinitely “because doing so would unlikely result in the preservation of any additional, non-duplicative, relevant data.” Supp. SR at 10.[4] The Report adds that data “that might be retained through further efforts to retain all backup data is generally

---

[3] Treasury explains that its enterprise architecture system, which reduces redundant systems and data, “will not result in the loss of data we need to perform our mission.” Gregg Decl. at 2, March 11, 2005. Treasury’s mission, however, does not appear to include preservation of all records that may be relevant to this case. Gregg Decl. at 1, March 4, 2005 (describing Treasury’s mission).

[4] *See*, *e.g.*, Dow Davis Decl at 7 (daily and weekly backups are retained for 40 and 90 days respectively and then reused. “[A]rguably relevant documents held by DOE are few, largely historic in nature, and are being preserved in hard copy. For DOE to spend more than $1,189,000 for additional backup of e-mail, metadada, web page, and network log information would be duplicative and disproportionate compared to potential yields of any documents or data relevant to the matters at issue.”)

available elsewhere." Supp. SR at 11.[5] This analysis, which justifies losing some data if preserving it would be too costly, is cause for grave concern.

*Outsourcing to Vendors*.

Defendant explains that operation and maintenance of software "designed to provide an electronic means to process, track and store the specific transactions and other data necessary for each Interior component to complete its statutory and regulatory responsibilities" is frequently outsourced to a vendor. For example, The Office of the Special Trustee (OST) relies on the Trust Funds Accounting System (TFAS), which is owned and operated by a third-party vendor. "TFAS is used to account for the funds held in trust by the government on behalf of individual Indians and Tribes." Supp. SR at 7. While the McKenna Declaration explains how backups are performed by the vendor, it is not clear that the same preservation directives given to employees in the Griles and

[5] The Report similarly states that network activity logs are only retained indefinitely "to the extent that backup data is retained indefinitely" without also acknowledging that only some backup tapes are in fact retained indefinitely and may well not include activity logs. Supp. SR at 11, 12. Again, the Report notes that retaining computer and network logs "beyond normal backup retention schedules" would incur "significant additional expenses." Supp. SR at 12. Because network activity logs are not likely to play a significant role in this litigation, Plaintiff states only that Defendant should take "reasonable steps" to preserve such data, including its inclusion in permanently-preserved backups whenever possible. Such logs should definitely be preserved if they reflect that data was compromised or could have been compromised. To the extent that Plaintiff may desire, need, or be asked to rely on electronic data maintained by Defendant, its security and integrity is of justifiable concern to Plaintiff as a subject of this Court's order. In addition, the policy for retention of individually generated records is unclear.

Jensen/Hord Tipton memos[6] are directed to the TFAS vendor. In fact, it appears that the backup regimen performed by the vendor could result in loss of information that the Griles and Tipton memos direct be preserved. *See* McKenna Decl. at ¶ 5a (TFAS yearly backup kept in perpetuity). If a file was created and then deleted between yearly backups, that file would be lost.

Also of concern is Defendant's statement that there is no need to indefinitely retain e-mail back-up tapes for this case because "e-mail is already being retained indefinitely by a DOI contractor, Zantaz, as part of *Cobell v. Norton*." Supp. SR at 11 (citing MacPherson Decl. ¶ 9.e re BLM; McKenna Decl. ¶ 8 re OST; Brown Decl. ¶ 6 re MMS). MacPherson and McKenna state that BLM and OST employees are required to print and file e-mails but Brown does not. In any case, there is no assurance that the *Cobell* order will stay in place and that the United States will continue retaining e-mails related to this tribal trust case if the *Cobell* order is lifted. The United States has an independent order and obligation to retain e-mails for this case. Defendant already made and lost the argument that *Cobell*-related retention was sufficient for record retention in this case. Defendant's Report should reflect that e-mail retention was initiated pursuant to a *Cobell* order, but that it will remain in place for purposes of e-mails related to this case pursuant

---

[6] *See supra* n. 2 discussing memos from Deputy Secretary Griles, September 24, 2004, and from Lawrence J. Jensen, Counselor to the Solicitor, and W. Hord Tipton, Chief Information Officer, October 8, 2004, directing federal employees to comply with this Court's March 19, 2004 Record Retention Order. An earlier March 20, 2002 Griles memo directed DOI Contracting officers to "notify contractors who are in possession, custody, or control of Tribal Trust Documents that they must preserve Tribal Trust Documents." Defendant's April 26, 2004 Status Report Describing Compliance Monitoring Mechanisms, Attachment 1. This direction was omitted from the 2004 memos.

to the March 19, 2004 Record Retention Order regardless of what happens with the *Cobell* order.

*Editing and deleting information.*

Defendant states that backup tapes are not intended to be used as data repositories. Brown Decl. ¶ 6. Data may be edited or deleted, however, and that potentially relevant edited or deleted information will be lost unless preserved on a backup tape or by other means. For example, Defendant explains that BLM's Automated Fluid Minerals Support System (AFMSS) data are retained indefinitely but may be edited to correct data entry errors. Supp. SR at 6, 7. A log of editing activities is created and is preserved indefinitely and the ability to alter or delete data in the AFMSS is strictly controlled. Supp. SR at 7. MacPherson states that data modification of the AFMSS application is limited to a very small and limited subset of employees. McPherson Decl. ¶ 5. He adds that "all data is stored within the AFMSS data base including additions, changes, and deletions." *Id.* ¶ 5b. Finally, he states that a limited number of personnel, one and a backup per office, may delete data and that deletion may only occur when a known error is discovered. Still, it is not clear whether the deleted data itself is preserved (rather than just a log of editing activity). *Id.* The same concerns arise with BLM's Well Information System (WIS). Deletion is controlled, but it is not clear whether deleted material is preserved. *Id.* ¶ 6. Similarly, BIA's Land Record Information System (LRIS) data may be altered, including deletions, by authorized personnel. It is not clear, however, whether the pre-alteration data are preserved. LRIS is being converted to the Trust Asset and Accounting Management

System (TAAMS). It is not clear whether data may be lost during conversion and whether a backup of LRIS will be retained after the conversion in case data is lost. Supp. SR at 8 n. 5; Messano Decl. ¶ 5a. As discussed above, if data are created and deleted within the period for creating backups that are held "indefinitely," that data is lost unless otherwise preserved.

Plaintiff is aware that, through third-party software and through at least one operating system, deleted files can be protected until purged. Such a strategy would allow Defendant to preserve deleted files until the next permanent backup is done so that those files would be captured on a permanent backup before being purged. Plaintiff suggests that it would be a "reasonable step" for Defendant to explore such possibilities before Defendant dismisses the possibility of preserving such data without incurring the large costs cited by several of Defendant's agencies.

*Paper Records*.

The Supplemental Status Report focuses almost exclusively on electronic data, not paper files. Plaintiff has already encountered many problems related to paper records such as lack of indexation, storage issues, transfer to other locations, and limited access. Accordingly, Plaintiff is anxious to know also the status of preservation of paper records. For example, Defendant notes that the Department of Treasury maintained separate accounts for tribes before July 1973, but that Treasury's current data is not tribe-specific. Supp. SR at 15 n. 11. Plaintiff is anxious to know that pre-1973 data is still being preserved. Treasury had stated that its "preservation plan and compliance monitoring

mechanism cover existing documents, data, and tangible things created before 1973 and after." Diener Decl. at 3, April 23, 2004. Is that still true? If so, are pre-1973 Treasury records still at Treasury or perhaps now at the National Archives and Record Administration (NARA)? The Diener Declaration suggested that, in compliance with NARA schedules, some tribal trust records may have been disposed of after an approved retention period. *Id.* Indeed, a July 1999 memo from Richard Gregg to Treasury's Financial Management Service (FMS) employees states that neither the *Cobell* litigation nor orders of the Court prohibit "the authorized disposal of non-IIM records." Attached to Diener Decl., April 23, 2004.

*Privilege.*

A number of times in at least two of the declarations and in the Report, reference is made to information that Defendant alleges is privileged or attorney work product. *See, e.g.*, Supp. SR at 23 ("potentially discoverable (and non-privileged)" FMS documents) (citing Gregg Decl. at ¶16); *id.* at 24-25 ("NARA does not expect that any non-privileged information relevant to the litigation would be located in such records" but is retaining the "few potentially relevant, though privileged, operation records it has") (citing Cahoon Decl. at ¶¶ 14, 17, 19-23); Cahoon Decl. at ¶ 17 (all preserved NARA messages "constitute attorney work product"); Fonner Decl. at ¶ 9 (most substantive NRC documents responsive to RRO "are historical or privileged"). Plaintiff asserts that, certainly until privilege logs are provided and any disputes regarding the extent of various privileges and protections are resolved by the parties or by the Court, Defendant agencies may not establish their record

retention policies based on the assumption that certain information need not be protected adequately because they believe it is not subject to production.

With respect to NARA, naturally there is concern that, if former National Security Advisor Sandy Berger was able to remove and destroy documents protected by the highest possible security classification, records relevant to Plaintiff's case not so classified are even more at risk.

## CONCLUSION

Plaintiff has continuing concerns about record preservation as discussed above. Nevertheless, Defendant's Supplemental Status Report on compliance with its supporting exhibits offers some reassurance that Defendant has attempted to put preservation policies and procedures in place. Certainly the task is challenging and Plaintiff acknowledges the government's efforts to meet that challenge. As noted above, further effort is needed on policies and procedures, and on the controls used to ensure they are carried out.

Respectfully submitted,

/s Alan R. Taradash by /s Donald H. Grove

Alan R. Taradash
Nordhaus, Haltom, Taylor,
Taradash & Bladh, LLP
405 Dr. Martin Luther King Jr. Ave. NE
Albuquerque, NM 87102-3541
telephone: 505-243-4275
facsimile: 505-243-4464

Attorney of Record for Plaintiff

Of Counsel for Plaintiff:

Thomas J. Peckham
Daniel I.S.J. Rey-Bear
Deidre A. Lujan
Nordhaus, Haltom, Taylor,
Taradash & Bladh, LLP
405 Dr. Martin Luther King Jr. Ave. NE
Albuquerque, NM 87102-3541

Donald H. Grove
Nordhaus, Haltom, Taylor,
Taradash & Bladh, LLP
1401 K Street NW, Suite 801
Washington, DC 20006
telephone: 202-530-1270
facsimile: 202-530-1920

Dated: April 8, 2005