# In The United States Court of Federal Claims

No. 02-25L

(Filed under seal:  July 2, 2009)

Reissued:  July 21, 2009[1]

_____

| | | |
|---|---|---|
| JICARILLA APACHE NATION, formerly JICARILLA APACHE TRIBE, | * * * * * * | Motion to compel production; Motion for protective order; Tribal trust fund case – fiduciary obligations; Attorney-client privilege; Work product doctrine; "Fiduciary |
| Plaintiff, | * * | exception;" Applicability to attorney-client privilege; Inapplicability to work product |
| v. | * * | doctrine; Mixed-content documents; Requests for legal advice; Applicability of |
| THE UNITED STATES, | * * | attorney-client privilege to advice received from agency counsel; RCFC 26(b)(5)(A) – |
| Defendant. | * * * * * * | waiver of privilege; RCFC 26(b) – relevancy; Tribal investment information not relevant to trust fund theories; Motions granted, in part, denied, in part. |

_____

## ORDER

_____

*Steven D. Gordon,* Holland & Knight, Washington, D.C., for plaintiff.

*Barbara M.R. Marvin*, Environmental and Natural Resources Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Ronald J. Tenpas*, for defendant.

*Alan R. Taradash* and *Daniel I.S.J. Rey-Bear*, the Nordhaus Law Firm, Albuquerque, New Mexico, for Pueblo of Laguna and Navajo Nation, *amici*.

**ALLEGRA, Judge:**

Pending before the court, in this tribal trust case, are myriad discovery-related motions. Plaintiff seeks to compel the production of documents that defendant claims are privileged and, at

_____

[1] An unredacted version of this opinion was issued under seal on July 2, 2009.  The parties were given an opportunity to propose redactions, but no such proposals were made.

the same time, seeks a protective order to prevent the discovery of investment information it claims is irrelevant to the subject case. Defendant resists both motions and, for its own part, has filed motions to compel the production of the information that plaintiff seeks to protect and to modify substantially the discovery plan in this case.

## I.

A brief recitation of the underlying facts sets the context for this decision.

In this case, the Jicarilla Apache Nation (Jicarilla or plaintiff) seeks an accounting and to recover for monetary loss and damages relating to the government's breach of fiduciary duties in allegedly mismanaging the tribe's trust assets and other funds. Plaintiff, *inter alia*, avers that defendant failed to maximize returns on its trust funds, invested too heavily in short-term maturities, and failed to pool its trust funds with other tribal trusts. The parties participated in alternative dispute resolution from December 2002 to June 2008, during which time defendant produced many thousands of documents to Jicarilla. Defendant, however, also withheld a large number of documents as privileged. Ultimately, at the plaintiff's request, the case was restored to the court's active docket. Following consultations with the parties, on October 7, 2008, the court issued an order confirming that trial on the first phase of the case would be limited to fiscal claims relating to defendant's management of certain Jicarilla trust accounts from 1972 to 1992 (the Andersen Period).

Discovery as to that phase of the case ensued. On November 25, 2008, plaintiff filed a motion to compel defendant to produce certain documents withheld from production based on claims of attorney-client privilege, attorney work-product, and the deliberative process privilege. On December 19, 2008, defendant filed its response to the motion and a privilege log. In those documents, defendant continued to assert attorney-client and work-product defenses, but agreed to produce 71 of the 226 documents listed in its privilege log based, in part, upon withdrawing any deliberative process privilege claims. Plaintiff filed its reply on January 5, 2009, and on January 16, 2009, defendant, per court order, submitted 155 documents for *en camera* review.[2]

On February 25, 2009, plaintiff filed a motion for a protective order to bar defendant from discovering information relating to the tribe's non-trust investments. Plaintiff vigorously asserted, *inter alia*, that the tribe's handling of its non-trust investments is irrelevant to this lawsuit. On March 5, 2009, defendant responded to the motion, asserting that the requested documents were reasonably calculated to lead to the discovery of admissible evidence concerning the reasonableness of the government's investments as trustee, the tribe's investment directives and liquidity needs, the receipt and timing of trust disbursements, and potential damages calculations. On March 11, 2009, Pueblo of Laguna and Navajo Nation, which are plaintiffs in two similar cases pending before the court, filed an *amicus* brief in support of plaintiff's motion. Plaintiff

---

[2] The Supreme Court has recognized the important role that *en camera* inspection of disputed documents often plays in determining the existence of a privilege. *See United States v. Zolin*, 491 U.S. 554, 568-69 (1989); *see also United States v. Nixon*, 418 U.S. 683, 714 (1974).

filed its reply on March 13, 2009.  Hoping to ensure production of the same information plaintiff seeks to protect, defendant filed a motion to compel on March 17, 2009.  On March 19, 2009, it filed a response to the *amicus* brief.  Plaintiff filed its response to defendant's motion to compel on April 3, 2009.  On April 10, 2009, the *amici* filed a brief opposing defendant's motion, and defendant filed its reply.

On March 31, 2009, defendant filed a motion to extend the discovery deadlines in this case by one year, claiming the extra time is needed given the breadth of the discovery requested and the vast size of the record depositories to be searched.  Plaintiff filed its response opposing the request on April 14, 2009, alleging that most repositories have been canvassed, thousands of documents already produced, and the issues known for years.  Defendant filed its reply on April 16, 2009.  Oral argument on all the discovery motions was held on April 16, 2009.  Following oral argument, and per court order, defendant filed the deposition transcript of a former tribal assistance officer, Mr. Gabriel Abeyta, and associated exhibits on April 22, 2009.  The court permitted supplemental materials to be filed by *amici* on May 4, 2009; by plaintiff on May 5, 2009; and by defendant on May 4 and May 14, 2009.

## II.

The Federal Circuit has instructed that "[q]uestions of the scope and conduct of discovery are . . . committed to the discretion of the trial court." *Florsheim Shoe Co. v. United States*, 744 F.2d 787, 797 (Fed. Cir. 1984); *see also Stovall v. United States*, 85 Fed. Cl. 810, 813 (2009).  In deciding either to compel or quash discovery, this court must balance potentially conflicting goals.  On the one hand, it "'must be careful not to deprive a party of discovery that is reasonably necessary to afford a fair opportunity to develop and prepare the case.'" *Heat & Control, Inc. v. Hester Indus., Inc.*, 785 F.2d 1017, 1024 (Fed. Cir. 1986) (quoting Fed.R.Civ.P. 26(b)(1) advisory comm. notes (1983)); *see also Epstein v. MCA, Inc.*, 54 F.3d 1422, 1423 (9th Cir. 1995) (per curiam).  As the Supreme Court once famously indicated, "[n]o longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947).  On the other hand, the Court in *Hickman* was quick to caution that "discovery, like all matters of procedure, has ultimate and necessary boundaries . . . . [L]imitations come into existence when the inquiry touches upon the irrelevant or encroaches upon the recognized domains of privilege." *Id.* at 507-08; *see also Evergreen Trading, LLC v. United States*, 80 Fed. Cl. 122, 126 (2007); *Vons Cos., Inc. v. United States*, 51 Fed. Cl. 1, 5 (2001).  Encapsulating these considerations, RCFC 26(b)(1), like its Federal Rules counterpart, provides that a party may obtain discovery of any matter that: (i) is "non-privileged," and (ii) "is relevant to any party's claim or defense." *See also In re EchoStar Commc'ns Corp.*, 448 F.3d 1294, 1300 (Fed. Cir. 2006), *cert. denied*, 549 U.S. 1096 (2006); *Evergreen Trading*, 80 Fed. Cl. at 126; *Vons*, 51 Fed. Cl. at 5.

The fiduciary relationship between the federal government and Indian tribes took form long ago, arising first under treaties and then under statutes.  As early as 1831, Chief Justice Marshall described the relationship of the tribes with the United States as that of a "ward to his guardian." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831); *see also Worcester v.*

*Georgia*, 31 U.S. (6 Pet.) 515, 557 (1832). Early acts by Congress effectuated this view by specifically directing how the government would handle tribal trust funds. *See, e.g.*, Act of June 14, 1836, 5 Stat. 36 (rates of return); Act of Jan. 9, 1837, 5 Stat. 135 (interest on land proceeds). In the 1877 General Allotment Act, Congress appointed the United States, as trustee, to manage lands allotted for individual Native Americans and to deposit fees and royalties from use of those lands into trust accounts. 24 Stat. 388 (1887), *codified at*, 25 U.S.C. § 331, *et seq.* Although the Indian Reorganization Act of 1934 barred further allotments, federal trust obligations continued for previously allotted lands. 48 Stat. 984 (1934), *codified at*, 25 U.S.C. § 461, *et seq.* Through these and later enactments, the United States has come to manage 56 million acres of land and billions of dollars in tribal assets, collecting hundreds of millions of dollars annually on behalf of the tribes from leases, as well as mineral, timber, oil, and gas royalties. *See* Felix Cohen, Handbook of Federal Indian Law (Cohen) § 5.03(3)(b) (2005); Dep't of Interior, Fiduciary Obligations Compliance Plan, Jan. 6, 2003, http://www.doi.gov/news/fiduciaryobligations.pdf (as viewed on July 2, 2009); Robert McCarthy, "The Bureau of Indian Affairs and the Federal Trust Obligation to American Indians," 19 BYU J. Pub. L. 1, 78 (2004).

Over the last century, Congress has seen fit periodically to reaffirm the importance of the government's fiduciary role in managing tribal assets. "Nearly every piece of modern legislation dealing with Indian tribes contains a statement reaffirming the trust relationship between tribes and the federal government." Cohen, *supra* at §5.04(4)(a); *see e.g.*, 25 U.S.C. § 162a (trust investment), § 450j (contract administration), § 458cc (funding agreements), § 3120 (forest resources), § 3303 (education), § 3701 (agricultural resources), § 4021 (trust fund management) §§ 4041-43 (special trustee). When it has perceived deficiencies in the government's handling of trust assets, Congress has not hesitated to pass laws to bolster the protection of tribal investments, often by giving the tribes increased access to investment information. *See, e.g.*, American Indian Trust Fund Management Reform Act of 1994 (Trust Fund Reform Act), Pub. L. No. 103-412, 108 Stat. 4239 (1994), *codified at* 25 U.S.C. §§ 4001-61; *see also* Misplaced Trust: the Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund, H.R. Rep. No. 102-499 (1992). Of particular importance in this regard is the Trust Fund Reform Act, which required that the Department of Interior account for all Indian trust funds, report quarterly to account holders, and conduct annual audits. The act, *inter alia*, created an Office of Special Trustee to provide greater accountability in discharging trust responsibilities and to ensure that each tribe received as complete a trust fund accounting as soon as possible dating back to the earliest practicable date. 25 U.S.C. §§ 4041-44.

Commenting, from time to time, on various chapters of this history, the Supreme Court has noted the "distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people," *Seminole Nation v. United States*, 316 U.S. 286, 296 (1942), and, more recently, the "undisputed existence of a general trust relationship between the United States and the Indian people," which compromises a "distinctive obligation of trust incumbent upon the Government," *United States v. Mitchell*, 463 U.S. 206, 225 (1982).[3]

---

[3] *See also id.* (noting that the relevant sources of substantive law create "[a]ll of the necessary elements of a common-law trust"); *United States v. White Mountain Apache Tribe*, 537

Though this relationship is currently founded in statutes that undoubtedly serve to delimit somewhat the government's obligations, it has, nevertheless, historically been measured and evaluated using principles typically applied to common law fiduciary relationships. *See, e.g.*, *White Mountain*, 537 U.S. at 475; *Shoshone*, 364 F.3d at 1348 (applying traditional trust principles). Indeed, a leitmotif oft sounded in tribal trust cases is that defendant's conduct must be judged by the "most exacting fiduciary standards," *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942); *see also Shoshone*, 364 F.3d at 1348; *Ak-Chin v. United States*, 667 F.2d 980, 990 (Ct. Cl. 1981), *cert. denied*, 456 U.S. 989 (1982); *Osage Tribe v. United States*, 72 Fed. Cl. 629, 643 (2006). Thus, defendant is obliged "to preserve and maintain trust assets," *White Mountain*, 537 U.S. at 475 (quoting *Central States, Southwest & Southwest Areas Pension Fund v. Central Transp. Inc.*, 472 U.S. 559, 572 (1985)), and to provide the beneficiaries with information regarding the management of their trusts, *see Navajo Tribe of Indians v. United States*, 624 F.2d 981, 989 (Ct. Cl. 1980); *Red Lake Band v. United States*, 17 Cl. Ct. 362, 373 (1989); *see also* Restatement (Third) Trusts §§ 82-83.

### III.

With this background, we deal first with plaintiff's motion to compel. Pursuant to RCFC 37, plaintiff seeks an order compelling defendant to turn over a range of documents. These documents can be organized into five categories: (i) requests for legal advice from personnel in various Interior agencies to Interior's Office of the Solicitor (the Solicitor's Office), either directly or indirectly concerning Jicarilla's accounts; (ii) legal advice provided by the Solicitor's Office or other government legal offices, again either directly or indirectly concerning Jicarilla's accounts; (iii) documents created by or provided to the accounting firm of Arthur Andersen LLP under a series of contracts between that firm and Interior; (iv) documents generated by Interior personnel, including members of the Solicitor's Office, regarding pending or anticipated litigation involving other tribes; and (v) other miscellaneous documents or drafts (*e.g.*, cover sheets). Defendant contends that all or portions of these documents are protected by the attorney-client privilege, the work product doctrine or both. Plaintiff argues that the cited privileges are inapplicable to the wide majority of the documents requested and that, as to other documents, defendant has waived these privileges.

### A.

Regarding the twin privileges raised by defendant, this court has recently explained:

The symbiotic relationship between the attorney-client and work product privileges stems from shared pragmatic and systemic justifications and is reflected in principles common to both. Under Rule 501 of the Federal Rules of Evidence,

---

U.S. 465, 475 n.3 (2003); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin v. United States*, 367 F.3d 650, 665-66 (7th Cir. 2004), *cert denied*, 543 U.S. 1051 (2005); *Shoshone Indian Tribe of Wind River Reservation v. United States*, 364 F.3d 1339, 1348 (Fed. Cir. 2004), *cert. denied*, 544 U.S. 973 (2005).

both privileges are "governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Both also stand in tension with the desire to avoid suppressing probative evidence and, for that reason, have been narrowly construed – extended only as far as needed to effectuate their utilitarian purposes. *See, e.g.*, *Univ. of Pa. v. EEOC*, 493 U.S. 182, 189 (1990); *Baldrige v. Shapiro*, 455 U.S. 345, 360 (1982); *Fisher v. United States*, 425 U.S. 391, 403 (1976); *see generally Ullmann v. United States*, 350 U.S. 422, 438-40 (1956) (Frankfurter, J.) ("Once the reason for the privilege ceases, the privilege ceases.") . . . . Lastly, parties claiming the benefit of either privilege bear the burden of establishing all the essential elements thereof, a burden that is not "discharged by mere conclusory or *ipse dixit* assertions." *In re Bonanno*, 344 F.2d 830, 833 (2d Cir. 1965).

*Evergreen Trading, LLC v. United States*, 80 Fed. Cl. 122, 127 (2007) (alternate citations and footnotes omitted). "Yet while the attorney-client and work product privileges are similar and often invoked with respect to the same documents, they diverge in critical regards." *Id.* And, as it turns out, those differences ultimately serve to inform the extent to which the privileges apply in the context of the fiduciary relationship involved here.

The attorney-client privilege "protects the confidentiality of communications between attorney and client made for the purpose of obtaining legal advice." *Genentech, Inc. v. United States Int'l Trade Comm'n*, 122 F.3d 1409, 1415 (Fed. Cir. 1997); *see also In re EchoStar Commc'ns Corp.*, 448 F.3d 1294, 1299 (Fed. Cir. 2006), *cert. denied*, 549 U.S. 1096 (2006); *Am. Standard Inc. v. Pfizer, Inc.*, 828 F.2d 734, 745 (Fed. Cir. 1987). The privilege encourages "full and frank communication between attorneys and their clients and thereby promote[s] broader public interests in the observance of law and the administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).[4] The familiar Wigmorean definition of the privilege asserts that –

[w]here legal advice of any kind is sought from a professional legal adviser in his capacity as such, the communications relating to that purpose, made in confidence by the client, are at his instance permanently protected from disclosure by himself or by the legal adviser, except the protection be waived.

8 John Henry Wigmore, Evidence in Trials at Common Law § 2292 (McNaughton rev. 1961). "Breaking this definition into its component parts," this court recently observed, reveals that "'in order for the attorney-client privilege to attach, the communication in question must be made:

---

[4]  *See also Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998); *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888) (the privilege "is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure"); *Evergreen Trading*, 80 Fed. Cl. at 128.

(1) in confidence; (2) in connection with the provision of legal services; (3) to an attorney; and (4) in the context of an attorney-client relationship.'" *Evergreen Trading*, 80 Fed. Cl. at 128 (quoting *United States v. BDO Seidman LLP*, 492 F.3d 806, 815 (7th Cir. 2007), *cert. denied*, 128 S.Ct. 1471 (2008)); *see also United States v. Bisanti*, 414 F.3d 168, 171 (1st Cir. 2005); *In re Sealed Case*, 737 F.2d 94, 98-99 (D.C. Cir. 1984); *Stovall*, 85 Fed. Cl. at 814.[5]  "'[A]n agency can be a 'client' and agency lawyers can function as 'attorneys' within the relationship contemplated by the privilege.'"  *Rein v. United States Patent and Trademark Office*, 553 F.3d 353, 376 (4th Cir. 2009) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980)); *see also Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997).

While the attorney-client privilege has ancient Roman roots, the work product doctrine is a more recent creation, born sixty-two years ago in the Supreme Court's seminal decision in *Hickman*.  There, Justice Murphy, writing on behalf of the majority, rejected "an attempt, without purported necessity or justification, to secure written statements, private memoranda and personal recollections prepared or formed by an adverse party's counsel in the course of his legal duties." 329 U.S. at 510.  Noting that "it is essential that a lawyer work with a certain degree of privacy," he reasoned that if discovery of the material sought were permitted "much of what is now put down in writing would remain unwritten." *Id*. at 510-11.  "An attorney's thoughts, heretofore inviolate, would not be his own," Justice Murphy stated, and continued –

> Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial.  The effect on the legal

---

[5]  Although ultimately not adopted, the rule describing the attorney-client privilege promulgated by the Supreme Court in 1972 as part of the Proposed Federal Rules of Evidence has been recognized "as a source of general guidance regarding federal common law principles." *In re Grand Jury Investigation*, 399 F.3d 527, 532 (2d Cir. 2005); *see also* 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 503.02 (Joseph M. McLaughlin, ed., 2d ed. 2006).  Proposed Rule 503 was particularly instructive in summarizing the types of communications that may be subject to the privilege –

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between himself or his representative and his lawyer or his lawyer's representative, or (2) between his lawyer and the lawyer's representative, or (3) by him or his lawyer to a lawyer representing another in a matter of common interest, or (4) between representatives of the client or between the client and a representative of the client, or (5) between lawyers representing the client.

Proposed Fed. R. Evid. 503(b), 56 F.R.D. 183, 236 (1972); *see also BDO Seidman*, 492 F.3d at 814-15 (relying on this proposed rule).

profession would be demoralizing.  And the interests of the clients and the cause of justice would be poorly served.

*Id*. at 511.[6]  The "strong public policy" underlying this doctrine has often been reaffirmed by the Supreme Court, *see, e.g., Upjohn Co.*, 449 U.S. at 398; *United States v. Nobles*, 422 U.S. 225, 236-40 (1975), and has found a home in Federal Rule of Civil Procedure 26(b)(3).  That rule states that documents "prepared in anticipation of litigation or for trial" are discoverable only upon a showing of "substantial need" for the materials and cannot, without "undue hardship," obtain the "substantial equivalent by other means."  *See also* RCFC 26(b)(3) (including the identical language).  Even where this showing has been made, however, the rule provides that the court "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation."  *Id*.; *see also United States v. Adlman*, 134 F.3d 1194, 1197 (2d Cir. 1998).[7]

But, this rule leaves a few issues unresolved.  In particular, it "does not in so many words address the temporal scope of the work product immunity," *Fed. Trade Comm'n v. Groiler, Inc.*, 462 U.S. 19, 25 (1983), that is to say, "it does not precisely define when the privilege attaches," *Evergreen Trading*, 80 Fed. Cl. at 132.  Certain dimensions of this timing question are reasonably established.  For example, it is well-recognized that for the rule to apply, litigation need not already have commenced or be imminent; rather, there must merely be a real possibility of litigation at the time the documents in question are prepared.  *See, e.g., Evergreen Trading*, 80 Fed. Cl. at 132; *AAB Joint Venture v. United States*, 75 Fed. Cl. 432, 445 (2007); *Energy Capital Corp. v. United States*, 45 Fed. Cl. 481, 485 (2000); *see also Senate of Puerto Rico v. U.S. Dep't of Justice*, 823 F.2d 574, 586 n.42 (D.C. Cir. 1987).  Further, by way of guidance, the drafters of the rule stated that "[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes are not under the qualified immunity provided for by this subdivision."  *See* Rule 26(b)(3) advisory comm. notes (1970); *see also Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 138 (3d Cir. 2000); *Evergreen Trading*, 80 Fed. Cl. at 132; *United States v. KPMG, LLP*, 237 F.Supp. 2d 35, 41 (D.D.C. 2002).

---

[6]  *See also In re Seagate Tech., LLC*, 497 F.3d 1360, 1374-75 (Fed. Cir. 2007); *EchoStar*, 448 F.3d at 1301 (work product doctrine "encourages attorneys to write down their thoughts and opinions with the knowledge that their opponents will not rob them of the fruits of their labor"); *Genentech*, 122 F.3d at 1415.

[7]  In the words of the Federal Circuit, this rule "only allows discovery of 'factual' or 'non-opinion' work product and requires a court to protect against the disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative." *EchoStar*, 448 F.3d at 1302 (internal quotations omitted); *see also Seagate Tech.*, 497 F.3d at 1374-75 ("Whereas factual work product can be discovered solely upon a showing of substantial need and undue hardship, mental process work product is afforded even greater, nearly absolute, protection."); *Deseret Mgmt. Corp. v. United States*, 76 Fed. Cl. 88, 93 (2007).

Yet, there is less agreement as to when litigation is "anticipated" for purposes of this rule. After carefully analyzing this issue, this court in *Evergreen Trading* adopted a simple causation test employed by no fewer than nine circuits, *to wit*, whether a given document was prepared or obtained "because of" the prospect for litigation.  *Evergreen Trading*, 80 Fed. Cl. at 132-33.[8]  As the court noted, this test is preferable to other formulations as it closely tracks the language of the RCFC 26(b)(3), under which the doctrine is "triggered so long as anticipating litigation was one of the purposes for which the document was prepared."  *Evergreen Trading*, 80 Fed. Cl. at 133. This approach allows courts to account more readily for "dual purpose" documents that, though generated in making business decisions, "reveal an attorney's litigating strategies and assessment of legal vulnerabilities – precisely the type of discovery that the Supreme Court refused to permit in *Hickman*."  *Id.*; *see also Adlman*, 134 F.3d at 1202; *State of Maine*, 298 F.3d at 68-70; 8 Wright, Miller & Marcus, *supra* at § 2024.  Nonetheless, the court in *Evergreen* noted that the work product doctrine would not cover documents that "'would have been generated in the normal course of business even if no litigation was anticipated.'"  80 Fed. Cl. at 133 n.16 (quoting *United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1082 (N.D. Cal. 2002)); *see also Roxworthy*, 457 F.3d at 599 (work product doctrine does not attach if the documents "'would have been created in essentially similar form irrespective of the litigation'" (quoting *Adlman*, 134 F.3d at 1202)).

A final, but important, caveat about the work product doctrine bears mention – it is relatively well-established that the immunity from discovery provided by the doctrine extends into subsequent litigation.  Thus, "[i]f information was created in anticipation of litigation with respect to Case A and otherwise meets all of the work product criteria, it remains immune from discovery in Case B."  Douglas R. Richmond, "The Attorney-Client Privilege and Associated Confidentiality Concerns in the Post-Enron Era," 110 Penn. St. L. Rev. 381, 394 (2005).  While the Supreme Court has recognized this principle only in *obiter dicta*, *see Groiler*, 462 U.S. at 25 ("the literal language of [Rule 26(b)(3)] protects materials prepared for ***any*** litigation or trial as long as they were prepared by or for a party to the subsequent litigation" (emphasis in original)),[9]

---

[8]  *See also United States v. Roxworthy*, 457 F. 3d 590, 599 (6th Cir. 2006); *In re Grand Jury Subpoena*, 357 F.3d 900, 907-08 (9th Cir. 2004); *Maine v. Dep't of the Interior*, 298 F.3d 60, 68 (1st Cir. 2002); *Adlman*, 134 F.3d at 1202; *E.E.O.C. v. Lutheran Social Servs.*,186 F.3d 959, 968 (D.C. Cir. 1999); *Martin v. Bally's Park Hotel & Casino*, 983 F.2d 1252, 1260 (3d Cir. 1993); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir. 1992); *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 401 (8th Cir.), *cert. denied*, 484 U.S. 917 (1987); *Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1119 (7th Cir. 1983); Alan Wright, Arthur R. Miller & Richard L. Marcus (hereinafter "Wright, Miller & Marcus"), 8 Federal Practice & Procedure § 2024, at 343 (1994); *cf. In Re Kaiser Aluminum and Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000), *cert. denied*, 532 U.S. 919 (2001) (applying a test focusing on the "primary motivating purpose behind the creation of the document").

[9]  The Federal Circuit has suggested that courts in this circuit are obliged to follow "explicit and carefully considered" *dicta* in Supreme Court opinions.  *Stone Container Corp. v.*

it appears, nonetheless, that every circuit to address this issue has reached the same conclusion, all the more so where there is some factual or legal nexus between the two cases involved. *See, e.g.*, *Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 731 (8th Cir. 2002); *Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 695, 703 (10th Cir. 1998); *In re Grand Jury Proceedings*, 43 F.3d 966, 971 (5th Cir. 1994). This court has likewise stated that "work product immunity applies to documents prepared in anticipation of unrelated terminated litigation." *Eagle-Picher Indus., Inc. v. United States*, 11 Cl. Ct. 452, 457 (1987). This rule makes eminent sense as applied to the government, which often handles clusters of cases involving the same issues – a perfect example being the dozens of tribal trust cases now pending before this court. To rule, in such circumstances, that work product from one case may be discovered in the next would be, as one court observed, "to elide the broad rationale of the Court's decision" in *Hickman* and invite a game of discovery leapfrog. *Duplan Corp. v. Moulinage et Retorderie de Chavanoz*, 487 F.2d 480, 483-84 (4th Cir. 1973); *see also In re Murphy*, 560 F.2d 326, 334-35 (8th Cir. 1977) ("[t]he work product privilege would be attenuated if it were limited to documents that were prepared for the case for which discovery is sought"). That this court will not do.

## B.

So how do these privileges function when the party seeking the documents is in a fiduciary relationship with the party invoking the privilege?

Although the Federal Circuit has not yet addressed this issue, a "fiduciary exception" to the attorney-client privilege is "well established in [the] federal jurisprudence" of many circuits. *Geissal v. Moore Med. Corp.*, 192 F.R.D. 620, 624 (E.D. Mo. 2000). Under this exception, fiduciaries may not shield from their beneficiaries communications between them and their attorneys that relate to fiduciary matters, including the administration of trusts. *See Cobell v. Norton*, 212 F.R.D. 24, 27-29 (D.D.C. 2002). Rather, communications between the fiduciary and its attorney may be protected only if they concern the personal interests of the fiduciary or other non-fiduciary matters. The justification for this exception is two-fold. First, courts have reasoned that the fiduciary is not the exclusive client of the attorney rendering advice, but rather is obtaining that advice either as a proxy for the beneficiaries or jointly therewith.[10] These courts have concluded that it is inappropriate to prevent the beneficiary from obtaining information

---

*United States*, 229 F.3d 1345, 1350 (Fed. Cir. 2000), *cert. denied*, 532 U.S. 971 (2001); *see also Ins. Co. of the West v. United States*, 243 F.3d 1367, 1372 (Fed. Cir. 2001).

[10]   *See United States v. Evans*, 796 F.2d 264, 265-66 (9th Cir. 1986) (per curiam); *Tatum v. R.J. Reynolds Tobacco Co.*, 247 F.R.D. 488, 493 (M.D.N.C. 2008); *Cobell*, 212 F.R.D. at 27; *Washington-Baltimore Newspaper Guild, Local 35 v. Washington Star Co.*, 543 F. Supp. 906, 909 (D.D.C. 1982).

regarding the management of a trust provided to the fiduciary.[11]  Indeed, so viewed, the exception really is no exception at all, but rather reflects the fact that "at least as to advice regarding . . . administration, a trustee is not the 'real client' and thus never enjoyed the privilege in the first place."  *Mett*, 178 F.3d at 1063; *Evans*, 796 F.2d at 266.  Other courts see the fiduciary exception more as deriving from the fiduciary's duty to keep the beneficiary informed of issues involving trust administration.  *See Mett*, 178 F.3d at 1063; *Long Island Lighting*, 129 F.3d at 271-72; *Martin v. Valley Nat'l Bank*, 140 F.R.D. 291, 322 (S.D.N.Y. 1991).  These courts hold that this duty overrides the attorney-client privilege, particularly where the information sought by the beneficiary is relevant to an alleged breach of a fiduciary duty.  *Bland v. Fiatallis North Am., Inc.*, 401 F.3d 779, 787-88 (7th Cir. 2005); *Washington-Baltimore Newspaper Guild*, 543 F.Supp. at 909.[12]

Persuaded by at least one of these rationales, seven circuits (the Second, Fourth, Fifth, Sixth, Ninth, Eleventh and D.C.) have adopted some version of the "fiduciary exception" to the attorney-client privilege.  *See Mett*, 178 F.3d at 1062 ("The Ninth Circuit . . . has joined a number of other courts in recognizing a 'fiduciary exception' to the attorney-client privilege."); *In re Lindsey*, 158 F.3d 1263, 1276 (D.C. Cir. 1998), *cert. denied*, 525 U.S. 996 (1998); *Long Island*

---

[11]  *See, e.g.*, *United Stats v. Mett*, 178 F.3d 1058, 1063 (9th Cir. 1999); *In re Long Island Lighting Co.*, 129 F.3d 268, 272 (2d Cir. 1997); *Wildbur v. ARCO Chemical Co.*, 974 F.2d 631, 645 (5th Cir. 1992) ("When an attorney advises a plan administrator or other fiduciary concerning plan administration, the attorney's clients are the plan beneficiaries for whom the fiduciary acts, not the plan administrator."); *Cobell*, 212 F.R.D. at 27; *Fischel v. Equitable Life Assurance*, 191 F.R.D. 606, 607-08 (N.D. Cal. 2000).

[12]  *See also* Restatement (Third) of The Law Governing Lawyers § 84 cmt. b (2000) ("In litigation between a trustee of an express trust and beneficiaries of the trust charging breach of the trustee's fiduciary duties, the trustee cannot invoke the attorney-client privilege to prevent the beneficiaries from introducing evidence of the trustee's communications with a lawyer retained to advise the trustee in carrying out the trustee's fiduciary duties."); George G. Bogert, George T. Bogert & Amy M. Hess, The Law of Trusts and Trustees § 961 ("The beneficiary . . . has a right to obtain and review legal opinions given the trustee to enable the trustee to carry out the trust, except for such opinions as the trustee has obtained on his own account to protect himself against charges of misconduct."); 2A Austin W. Scott & William F. Fratcher, The Law of Trusts § 173 (4th ed. 1987) ("A beneficiary is entitled to inspect opinions of counsel procured by the trustee to guide him in the administration of the trust").  Indeed, various cases have held that the privilege has little place where the substance of the advice is a primary focus of a lawsuit.  *See United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991), *cert. denied*, 502 U.S. 813 (1991).  Notably, Proposed Rule 503(d) would have created an exception to the attorney-client privilege thereunder "[a]s to a communication relevant to a matter of common interest between two or more clients if the communication was made by any of them to a lawyer retained or consulted in common, when offered in an action between any of the clients."  Proposed Fed. R.Evid. 503(d)(5), 56 F.R.D. at 237.

*Lighting*, 129 F.3d at 272 ("[T]he ERISA fiduciary must make available to the beneficiary, upon request, any communications with an attorney that are intended to assist in the administration of the plan."); *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1415-16 (11th Cir. 1994) (recognizing the exception, though declining to apply it on the facts presented); *Sandberg v. Virginia Bankshares, Inc.*, 979 F.2d 332, 348 (4th Cir. 1992), *vacated on other grounds*, 1993 WL 524680 (4th Cir. Apr. 7, 1993); *Wildbur*, 974 F.2d at 645 ("[A]n ERISA fiduciary cannot assert the attorney-client privilege against a plan beneficiary about legal advice dealing with plan administration."); *Fausek v. White*, 965 F.2d 126, 132-33 (6th Cir. 1992), *cert. denied*, 506 U.S. 1034 (1992) (recognizing the exception).  While many of these cases arise in the ERISA (Employee Retirement Income Security Act) context, that is not the only domain in which the exception functions, as defendant readily admits.  Rather, it has been applied in a panoply of fiduciary settings, including cases involving shareholders, bank depositors and union members, to name but a few.[13]  And, most importantly of course, it has been applied in tribal trust cases involving Interior and one or more tribes or other trust fund beneficiaries.  *See Osage Nation and/or Tribe of Indians of Oklahoma v. United States*, 66 Fed. Cl. 244, 247-53 (2005); *Cobell*, 212 F.R.D. at 27-29; Order of May 16, 2002, in *Shoshone Indian Tribe of the Wind River Reservation, Wyoming v. United States*, Nos. 458-79 and 459-79 (copy attached).

The latter cases are particularly instructive for, in holding that the fiduciary exception applies in tribal trust cases, they discredit many of the apparently well-rehearsed arguments that defendant raises here.  Thus, contrary to defendant's claims, these cases conclude that there is nothing about the fiduciary relationship between the United States and the tribes, or the statutes and treaties from which that relationship springs, that somehow renders the "fiduciary exception" inoperable.  To the contrary, courts have recognized that the tribal trust duties, like the fiduciary duties arising in other federal statutory contexts, "draw much of their content from the common law of trusts."  *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996).  The result, as courts have confirmed repeatedly, is that basic trust principles are readily transferable to the Indian trust context.[14]  Nor has defendant identified anything about its sovereign status that would limit its

---

[13]  *See, e.g.*, *Sandberg*, 979 F.2d 350-54 (shareholder derivative action); *Fausek*, 965 F.2d at 132-33 (applying the exception in a dispute between a corporation and its minority shareholders, and noting "[t]here is a mutuality of interests between a corporation and its shareholders that precludes use of the privilege by management to deprive shareholders of information relating to their investments in the corporation"); *Quintel Corp. v. Citibank*, 567 F. Supp. 1357, 1363 (S.D.N.Y. 1983) (bank and depositor); *Aquinaga v. John Morrell & Co.*, 112 F.R.D. 671, 679-81 (D. Kan. 1986) (union and union members); *see also In re Omnicom Group, Inc. Sec. Litig.*, 233 F.R.D. 400, 410 (S.D.N.Y. 2006) ("a trustee may not withhold from the beneficiary any communications by the trustee with an attorney that were triggered by the trustee's need for advice on how to carry out his fiduciary responsibilities").

[14]  The Supreme Court and other courts have emphasized that the standards governing private fiduciaries and their beneficiaries provide effective analogies in the tribal context.  *See Nevada v. United States*, 463 U.S. 110, 127 (1983); *Mitchell*, 463 U.S. at 224; *Red Lake Band of Chippewa Indians v. Barlow*, 834 F.2d 1393, 1398-99 (8th Cir. 1987); *Shoshone Indian Tribe of*

fiduciary responsibilities here, so as to contradict the duties upon which the fiduciary exception is moored, among them, the obligation to keep the beneficiaries well-informed. *See Osage*, 66 Fed. Cl. at 248 (finding "defendant's argument that the government's sovereign interests somehow negate or offset its obligations as trustee to be unpersuasive"); *see also Cobell v. Norton*, 240 F.3d 1081, 1104 (D.C. Cir. 2001). That Interior is subject to Congressional oversight and specifically obliged by statute to make information available to the tribes hardly, as defendant intimates, belies the existence of a trust relationship – rather, if anything, it serves only to reaffirm it. *See Osage*, 66 Fed. Cl. at 250; *Cobell*, 213 F.R.D. at 11; *Shoshone Indian Tribe*, 58 Fed. Cl. at 545.[15] Finally, the aforementioned courts have made short shrift of defendant's contention that the "fiduciary exception" does not apply when the United States pays for legal advice out of its operating funds, rather than with trust funds. While the use of trust funds to pay for legal advice is an indication that the fiduciary exception may apply, the converse is not true – the absence of such an arrangement does not serve independently to negate the exception. *See* Restatement (Third) of Trusts § 182, cmt. f (noting that the current Restatement "diminishes the significance of who pays"). Rather, other factors may demonstrate the existence of the sort of fiduciary relationship upon which the fiduciary exception is founded. *See Osage*, 66 Fed. Cl. at 249; *Cobell*, 212 F.R.D. at 30.

That said, the court agrees with defendant that there is no corollary "fiduciary exception" to the work product doctrine. True, as plaintiff notes, several decisions have held that such an exception exists, operating on the rationale that a trustee's fiduciary obligations to keep the beneficiary informed trumps the doctrine. *See Osage*, 66 Fed. Cl. at 250-52; *Cobell v. Norton*, 213 F.R.D. 1, 13 (2003). But, the court is hesitant to view the exception in such cardinal terms, particularly where core work-product is involved, and especially given the Supreme Court's admonition that such product is entitled to "special protection." *Upjohn*, 449 U.S. at 400-01. In refusing to apply the fiduciary exception to work product, other cases have observed that the exception, as applied to the attorney-client privilege, is based upon a mutuality of interest between the fiduciary and the beneficiaries. They have logically opined that "once there is sufficient anticipation of litigation to trigger the work product immunity, . . . this mutuality is destroyed," making it unreasonable "to indulge in the fiction that counsel, hired by [the fiduciary], is also

---

the *Wind River Reservation, Wyoming v. United States*, 58 Fed. Cl. 542, 545 (2003); *Begay v. United States*, 16 Cl. Ct. 107, 127 n.17 (1987); *see also Wachtel v. Health Net, Inc*., 482 F.3d 225, 233 (3d Cir. 2007). Indeed, to the extent that some of these cases deviate from this analogy, it is only to emphasize that the government has even greater duties. *Nevada*, 463 U.S. at 127; *Begay*, 16 Cl. Ct. at 127 n.17.

[15] As noted in *Osage*, that some information regarding the administration of a tribal trust is available from other sources, does not relieve "the [g]overnment of *its* obligation, as a fiduciary, to provide complete and accurate information." *Osage*, 66 Fed. Cl. at 250 (emphasis in original); *see also Cobell*, 212 F.R.D. at 28. Indeed, to the extent that Congress has mandated the release of information, a reasonable argument can be made that it has waived the privilege as to other information involving the same subject matter. *See In re Seagate Tech., LLC*, 497 F.3d 1360, 1372 (Fed. Cir. 2007), *cert. denied*, 128 S. Ct. 1445 (2008); *Stovall*, 85 Fed. Cl. at 816.

constructively hired by the same party counsel is expected to defendant against." *In re Int'l Sys. and Control Corp. Sec. Litig.*, 693 F.2d 1235, 1239 (5th Cir. 1982); *see also Tatum*, 247 F.R.D. at 501; *In re Unisys Corp. Retiree Medical Benefits ERISA Litig.*, 1994 WL 6883, at *4 n.3 (E.D. Pa. 1994); *In re Dayco Corp. Derivative Sec. Litig.*, 99 F.R.D. 616, 620 (S.D. Oh. 1983).  On the strength of this sound rationale, the court agrees with the wide majority of courts that have held that the fiduciary exception does not apply to work product immunity.[16]  Indeed, this result makes particular sense given that "the work product belongs to the litigator not the litigant fiduciary and it is the lawyer's impressions, strategies, and theories, the law is attempting to guard." *Lugosch*, 219 F.R.D. at 243; *see also Donovan v. Fitzsimmons*, 90 F.R.D. 583, 588 (N.D. Ill. 1981) ("[B]eneficiaries . . . do not stand in the same position with respect to the attorney, for whom the work-product rule is designed to benefit, as they do to their own trustees.").

        The foregoing discussion begs several questions involving so-called mixed content documents – those in which both fiduciary and non-fiduciary matters are discussed, or in which the legal advice does not relate solely to the trustee's personal interests.  Several courts have held that documents must be disclosed to the beneficiary unless the trustee shows that the document relates "solely" or "exclusively" to the trustee's nonfiduciary activities. *Osage*, 66 Fed. Cl. at 246-47; *Cobell*, 212 F.R.D. at 30; *see also Cobell v. Norton*, 377 F. Supp. 2d 4, 15 n.8 (D.D.C. 2005).  But, there are several flaws with the notion that a document may be protected only if there is "not one drop" of information therein regarding trust administration.  First, this exceedingly expansive view of the fiduciary exception and concomitantly cramped view of the privilege "threaten[s] to swallow the fiduciary's attorney-client privilege whole." *Mett*, 178 F.3d at 1065.  As noted by the Ninth Circuit, under this expansive view of the exception, it would be the rare communication that would be protected and, in turn, the rarer trustee who would feel any comfort in obtaining legal advice as to his personal liability. *Id.*; *Fischel*, 191 F.R.D. at 609.  Second, this broad view of the exception far exceeds its rationale.  When fiduciaries seek legal advice for themselves, it makes little sense to pretend that they are actually seeking advice on behalf of the beneficiaries and thus obliged to reveal to the beneficiaries the substance of that advice. *Mett*, 178 F.3d at 1065.  To the contrary, when a fiduciary retains counsel and seeks legal advice for its own protection against the beneficiaries, any notion that it is seeking advice on behalf of the beneficiaries evaporates, leaving the beneficiaries with no reasonable expectation that they will be kept informed of such matters. *See Mett*, 178 F.3d at 1065, *Geissal*, 192 F.R.D. at 624-25.  Finally, the expansive view of the exception seemingly treats the release of a document as an all-or-nothing proposition, ignoring the distinct possibility that a document containing both protected and unprotected information might be redacted to exclude the former, thereby allowing the privilege and exception to reign supreme within their respective spheres.  Redactions allow a

_____

        [16]  *See In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 385 (3d Cir. 2007); *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1423 (11th Cir. 1994); *Sandberg*, 979 F.2d at 355 n.22 (the fiduciary exception "does not apply to the work product doctrine"); *Lugosch v. Congel*, 219 F.R.D. 220, 243 (N.D.N.Y. 2003); *Struogo v. BEA Assocs.*, 199 F.R.D. 515, 524 (S.D.N.Y. 2001); *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 951 F. Supp. 679, 687 W.D. Mich. 1996); *Helt Metro. Dist. Comm'n*, 113 F.R.D. 7, 11-12 (D. Conn. 1986).

fiduciary to obtain personal legal advice with less fear that having a mere "drop" of information regarding its fiduciary obligations will cause an entire communication to be revealed. Yet, at the same time, this approach prevents fiduciaries from shielding everything as involving personal legal advice.

## C.

Fully armed with these legal principles, we return to the documents themselves. As noted at the outset, the documents sought by plaintiff can be grouped into five categories. The court will consider these groups *seriatim*.

## 1.

We begin with the documents in which various Interior officials requested legal advice from the Solicitor's Office (Docs. 38, 45, 48, 50, 52, 56, 61, 67, 71-73, 75, 88, 98, 105, 106, 150, 156, 160 and 188). The advice requested generally involves what are acceptable investments for the trusts or the proper procedures for making those investments, questions that, in turn, required the interpretation of various federal statutes, among them 25 U.S.C. § 160 and the Monetary Control Act of 1980, Pub. L. No. 96-221, 94 Stat. 132. There is little doubt that, as against discovery by ordinary third parties, these documents would be protected by the attorney-client privilege as they were "made . . . for the purpose of obtaining legal advice or services." *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 805 (Fed. Cir. 2000). This would be so even though the degree to which they reveal "client" information in seeking that advice varies. *See id.* at 806 ("[i]t is enough that the overall tenor of the document indicates that it is a request for legal advice or services"); *Yankee Atomic Elec. Co. v. United States*, 54 Fed. Cl. 306, 315 (2002); *cf. Stovall*, 85 Fed. Cl. at 818 ("bare-bone" request for representation that contains no client information not protected by attorney-client privilege).

Ultimately, however, it appears that all these documents involve matters regarding the administration of tribal trusts, either directly or indirectly implicating the investments that benefit Jicarilla. As such, in the court's view, they are subject to the fiduciary exception to the attorney-client privilege and, on that basis, must be produced. *See Osage*, 66 Fed. Cl. at 252-53 (holding that the fiduciary exception applies to communications regarding trust administration "whether addressing specific tribes other than plaintiff's or Indians generally"). Six of the documents (Docs. 75, 88, 98, 150, 156 and 160), however, are exact duplicates of documents that are to be produced and the court, therefore, declines to order their production. *See Stovall*, 85 Fed. Cl. at 818 n.11; *Evergreen*, 80 Fed. Cl. at 137 n.23.

## 2.

Next, we consider various documents – by far, the largest group among our five – in which the Solicitor's Office (and other Federal legal offices) supplied legal advice to Interior and Treasury agency personnel (Docs. 9, 13-20, 26-31, 35-37, 39, 41-42, 44, 49, 51, 53-55, 60, 62-66, 69-70, 74, 76-82, 85-87, 89, 94-96, 100-04, 110, 112, 130-31, 151, 153-55, 157, 159, 167-68,

177-80, 182-87, 191-92, 202, 214-15, 217).  These documents cover nearly a 75-year span, ranging from October 16, 1923, to April 10, 1996.  They involve the legality or appropriateness of a variety of investments, investment strategies and other trust administration practices, again often by reference to specific statutes and regulations.  Most of this information relates generally to trust administration.  While only a handful of documents relate specifically to Jicarilla, all of them appear to be potentially relevant to plaintiff's claims regarding defendant's alleged breach of its fiduciary responsibilities in investing the trust corpus.  In all but seven instances, defendant objects to the production of these documents based solely on the attorney-client privilege.  With respect to documents 64, 76-77, 94, 112, 155 and 167, defendant also objects to production relying upon the work product doctrine.

As a threshold matter, there is some debate as to whether the legal advice provided by these government attorneys is protected under the attorney-client privilege.  That privilege, of course, is primarily designed to protect client communications, not the resulting attorney advice.  As this court recently noted, "[t]he question whether attorney communications are protected under the attorney-client privilege . . . has produced a spectrum of decisions."  *Stovall*, 85 Fed. Cl. at 815.  For its part, the Federal Circuit has suggested that the privilege ought to apply to "lawyer-to-client communications that reveal, directly or indirectly, the substance of a confidential communication by the client."  *Am. Standard, Inc. v. Pfizer, Inc.*, 828 F.2d 734, 745 (Fed. Cir. 1987); *see also Stovall*, 85 Fed. Cl. at 814-15.[17]  Other circuits, however, have taken a broader view of the advice that is protected based upon perceived difficulties in sorting between advice based on representation and that which is not, while still other circuits have held that all advice provided by counsel to client is privileged.  *See Stovall*, 85 Fed. Cl. at 814-15 (summarizing these cases).  Depending upon which of these views prevails, a more or less compelling case can be made for protecting some or all of the advice at issue – certainly some of the advice in question reflects the substance of communications received from the personnel who had requested the legal advice.  *See In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984); *Mead Data Central, Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977); *Stovall*, 85 Fed. Cl. at 815.

But, the court need not explore the outer reaches of this jurisprudence, as it finds that, with the exception of some duplicates,[18] virtually all the documents in question must be produced under the "fiduciary exception" to the attorney-client privilege.  In arguing to the contrary, defendant asseverates that some of these documents do not discuss the legality of certain practices, but rather reflect "policy" decisions made by the agency in consultation with legal authorities.  It is difficult to conceive how this point, if true, helps defendant much, for it would seem that, to the extent these documents are policy papers outside the fiduciary exception, they are also beyond the realm of the attorney-client privilege.  They cannot be unrelated to the

---

[17]  *American Standard* is a patent case in which the Federal Circuit applied the law of the regional circuit, in that case the Seventh Circuit.  *See In re Regents of Univ. of Cal.*, 101 F.3d 1386, 1390 n.2 (Fed. Cir. 1996), *cert. denied*, 520 U.S. 1193 (1997).

[18]  The duplicate documents that need not be disclosed are documents 17-20, 26-27, 30-31, 78-79, 82, 85, 89, 95, 101-02, 130-31, 151, 153-54, 157, 159, 183, 185, 192, 214-15.

provision of legal advice for one purpose, but related for the other.  *See* 8 Wright, Miller & Marcus, *supra*, at § 2017 ("The privilege will be denied if the communications were made for a purpose other than facilitating the rendition of professional legal services to the client."); *see also Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 360-61 (2d Cir. 2005) (holding that legal advice that is incorporated into an agency's policy is not protected by the attorney-client privilege).  Based on its *en camera* review, the court, in fact, believes that the advice provided in these documents is legal advice relating to trust administration and, for that reason, must be disclosed under the "fiduciary exception."[19]

Again, there are a few exceptions.  One is document 36, which was drafted by officials in the Solicitor's Office.  It appears to be unrelated to general trust administration and thus seemingly has no relevance to the handling of Jicarilla's accounts.  Rather, it incorporates legal advice with respect to several pending disputes.  It thus is covered by the attorney-client privilege and not subject to the fiduciary exception.

The remaining documents in this set (28 and 29) present a bit of a quandary.  In these documents (which are nearly, but not entirely, identical), the Solicitor's Office discusses the handling of "Indian moneys, process of labor" (IMPL) trust fund accounts – but does so while referring to several disputes regarding those funds.  Defendant objects to the production of these documents on the basis of the attorney-client privilege.  But, significant portions of the documents involve trust management issues and appear to be covered by the fiduciary exception.  Accordingly, these portions of the documents seemingly are produceable.  Those same portions, however, arguably are protected by the work product doctrine as the analysis in question appears to have been done in anticipation of litigation.  Yet, in its several iterative privilege logs, defendant never objected to the production of the documents on work product grounds.

Does that mean that any work product objection as to these documents was waived?  The answer may be found in RCFC 26(b)(5)(A) which, like its Federal Rule counterpart, states:

When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must:

(i) expressly make the claim; and

---

[19]  As to five of these documents (13-14, 55, 76, and 180), it also appears that defendant waived any applicable privilege when copies of these documents were provided to plaintiff by one or more government employees or otherwise were publicly made available (*e.g.*, during Congressional hearings).  *See Evergreen*, 80 Fed. Cl. at 133; *Jade Trading, LLC v. United States*, 80 Fed. Cl. 11, 44 n.65 (2007).  Defendant mounted no defense to this waiver argument in its briefs and, on that basis, the court declined to hear oral argument from defendant on this point.

(ii) describe the nature of the documents, communications, or tangible things not produced or disclosed – and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

Under this rule, one who fails expressly to invoke a privilege as to a particular document may lose that objection. *See SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 476 (E.D. Pa. 2005); *Potter v. United States*, 2002 WL 31409613, at *8 (S.D. Cal. July 26, 2002).  But, as the advisory committee notes to the analogous Federal Rule indicate, such a finding is in the nature of a sanction arising under RCFC 37.   *See* Fed. R. Civ. P. 26(b)(5), advisory comm. notes (1993); *see also Clearvalue, Inc. v. Pearl River Polymers, Inc.*, 560 F.3d 1291, 1302 (Fed. Cir. 2009). Various cases hold that, in deciding whether to impose such a sanction, a court should weigh, *inter alia*, the intent of the party producing the defective log, the harm caused by disclosure of what might otherwise be privileged documents, and the prejudice, if any, experienced by the requesting party if the sanction is not imposed.[20]  At least in a case such as this – where the documents are accurately described in the log; where their production could reveal core work product; where plaintiff would have still filed its motion to compel, was able to argue the work product issue in the context of other documents, and would not be otherwise prejudiced; and where the application of the privilege is obvious from the face of the documents in question – treating defendant as having waived the work product doctrine would be inappropriate.[21] Accordingly, the court concludes that documents 28 and 29 are protected by the work product doctrine and need not be produced.

---

[20]   *See also Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct. for the District of Montana*, 408 F.3d 1142, 1149 (9th Cir. 2005), *cert. denied*, 546 U.S. 939 (2005) (indicating that in determining whether a privilege is waived courts should make a "case-by-case determination"); *Evergreen Trading*, 80 Fed. Cl. at 126 n.2 (listing some of the factors to be considered); *Universal City Development Partners, Ltd. v. Ride & Show Eng'g, Inc.*, 230 F.R.D. 688, 695-96 (M.D. Fla. 2005) (applying a multi-factor approach in deciding whether the privilege is waived); *Cunningham v. Conn. Mut. Life Ins.*, 845 F. Supp. 1403, 1409 (S.D. Cal. 1994) (same); *Hartford Fire Ins. Co. v. Garvey*, 109 F.R.D. 323, 332 (N.D. Cal. 1985) (same); *see generally*, *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 2003 WL 41996, at *3 (S.D.N.Y. Jan. 6, 2003) (reaching the same result based on a local rule).  Another reason that cuts against treating a privilege as being waived under RCFC 26(b)(5) if not specifically asserted in an itemized privilege log is the fact that various courts have construed the comparable Federal Rule as not always requiring such logs.  *See In re Rivastigmine Patent Litigation*, 237 F.R.D. 69, 87 (S.D.N.Y. 2006) (allowing for categorical objections).

[21]   This is not to suggest that the court would never be within its rights to decide the availability of a privilege based upon the log actually filed by a party.  Here, however, the court (and the parties) have gone well beyond that point.

## 3.

In the third category of documents implicated by plaintiff's motion to compel are those documents created by or provided to the accounting firm of Arthur Andersen LLP under a series of contracts between that firm and Interior (Docs. 111, 142-48, 171-72, 203-09, 213).  Defendant objects to the production of these documents under the work product doctrine.  Under RCFC 26(b)(3) and the standards outlined above, it is important to determine when defendant first anticipated that litigation regarding the tribal trusts would arise and whether the documents in question were prepared because of the prospect of such litigation.  As noted, if the documents are protected work product for other cases, they remain so in this litigation.

Beginning in the 1950s, and accelerating in the 1980s, cases were filed in various courts, including this one, alleging that Interior's Bureau of Indian Affairs (BIA) had mishandled various matters involving tribal trust fund accounts.  *See, e.g.*, *Navajo Tribe of Indians v. United States*, Complaint No. 49692 (file June 15, 1950); *Red Lake Band of Chippewa Indians v. United States*, Complaint No. 388-82L (filed August 6, 1982).  Near the end of the 1980s, it appears that Arthur Andersen performed various work for the BIA, including financial and compliance audits of the BIA Office of Trust Funds Management for the fiscal years ending September 30, 1988, 1989 and 1990.  Although this is unclear, the impetus for these audits may have been statutes Congress passed from 1987 to 1991 requiring audits of tribal trust accounts.[22]  On May 24, 1991, BIA and Arthur Andersen entered into a new contract "to assure that the accounting records and the accounting balances in the Tribal and Individual Indian Monies (IIM) accounts are reconciled as accurately as possible back to the earliest date practicable using available accounting records and transaction data."  This contract anticipated the active involvement of the tribes in the reconciliation process and indicated that both the BIA and the relevant tribes would receive copies of the final reports and supporting documents.[23]  This reconciliation process was apparently ongoing when, in 1994, Congress enacted the aforementioned Trust Fund Reform Act, requiring the Secretary of the Interior to "account for the daily and annual balance of all funds held in trust

_____

[22] *See* Act of Nov. 13, 1991, Pub. L. No. 102-154, 105 Stat. 990; Act of Nov. 5, 1990, Pub, L. No. 101-512, 104 Stat. 1915; Act of Oct. 23, 1989, Pub. L. No. 101-121, 103 Stat. 701; Act of Sept. 27, 1988, Pub. L. No. 100-446, 102 Stat. 1774; Act of Dec. 22, 1987, Pub. L. No. 100-202, 101 Stat. 1329.

[23] Under the contract, Arthur Andersen was expected to conduct an entrance conference with the tribe to identify "outstanding accountability issues or concerns related to the Tribe's accounts."  Following the completion of the reconciliation work, it was also expected to conduct an exit conference with the tribe "to review any proposed adjusting entries relating to the Tribe's accounts," at which conference "[s]upporting documentation related to the adjustments will be made available to the Tribes."  The contract also required that each trust account owner "be presented with a copy of the reconciled statements, a summary of any required adjusting entries relating to their account(s), and access to any supporting documentation related to those adjustments."

by the United States for the benefit of an Indian Tribe or an individual Indian which are deposited or invested pursuant to the Act of June 24, 1938." 25 U.S.C. § 4011(a); *see also Eastern Shawnee Tribe of Oklahoma v. United States*, 82 Fed. Cl. 322, 324 (2008). This statute also required the tribes to either accept or dispute the reconciled account balances, with that information to be included in a report to Congress from the Secretary of the Interior by May 31, 1996. 25 U.S.C. § 4044. On December 31, 1995, Arthur Andersen completed its reconciliation of tribal trust funds for the period July 1, 1972, through September 30, 1992, and, at or around that time, delivered reports and account statements to both the BIA and the tribal account owners. In a modification of the 1991 contract, dated March 5, 1996, BIA engaged Arthur Andersen to assist it in entering into "settlement discussions" with the tribes.

On June 10, 1996, the complaint was filed in *Cobell v. Babbit*, No. 96-1285, a class action involving approximately 300,000 Native American account holders. Two months later, on August 19, 1996, BIA entered into yet another contract with Arthur Andersen, under which the latter was to provide to BIA and the Indian account owners access to, as well as a presentation and interpretation of, the work performed under the 1991 contract, as amended. As indication of the growing disputes between BIA and the tribes, the Statement of Work for this contract cautions that "[t]he Department of Interior is expecting to develop a settlement mechanism, which may include proposing legislation, to settle with tribes concerning their trust account balances," adding that the reaching of such a settlement may require explanation or interpretation of Arthur Andersen's prior work. The contract provided that before any information was supplied to a tribe, the contracting office representative or his designee "may review the specific work papers a tribe requests to be copied." It further noted that "[a]ll communications between the Government and [Arthur Andersen], as well as any materials or information developed or received by [Arthur Andersen] under this contract may be protected by applicable legal privileges and therefore must be treated as confidential by [Arthur Andersen]."

Most of the documents in this third category relate to the litigation referenced above and include communications between either the Solicitor's Office or the Department of Justice and Arthur Andersen that specifically discuss particular cases. These documents (148, 171, 172, 203-09 and 213) plainly are protected by the work product doctrine, which, for the reasons discussed above, applies even though these documents do not specifically reference Jicarilla or any matters involved with this litigation. This is true even though some of these documents were prepared by Arthur Andersen, as RCFC 26(b)(3) extends the work product protection to materials prepared

"by or for [the] party's representative."[24]  Nor has plaintiff remotely made any showing that would override the work product doctrine.

Several documents in this set, however, are different.  Included within document 111 is a research paper that was forwarded to the National Archives in 1993, to which are attached a series of historical documents.  While the first page of this document is work product, the remainder (from M50IRN341924 to M50IRN342083) is not, particularly since a hand-written notation on the paper indicates that it is "publicly-available" at the Archives.  Accordingly, the indicated pages of document 111 shall be produced.  The court also finds that documents 142-47, which are summary tables of reconciled disbursements for tribes, dated August 4, 1996, appear to stem from Arthur Andersen's reconciliation work under the 1991 contract, were not prepared in anticipation of litigation, and thus must also be produced.

**4.**

We consider next the fourth category of documents – those generated by Interior personnel, including members of the Solicitor's Office, regarding litigation involving other tribes (Docs. 32-34, 40, 43, 46-47, 58, 68, 83-84, 99, 107, 113-14, 120, 125-26, 158, 181, 189-90, 212, 216, 219).  As is true with many of the Arthur Andersen documents, all but two of these documents discuss specific legal issues involving either pending or anticipated cases, including the *Cobell* litigation.  Because these documents were prepared in anticipation of litigation, they are protected under the work product doctrine; and plaintiff has made no showing of "substantial need" or "undue hardship" as would override the work product doctrine under RCFC 26(b)(3).  Indeed, as the substance therein does not involve trust management, they fall outside the "fiduciary exception" and are protected by the attorney-client privilege, as well.

Four documents in this set (Docs. 68, 189-90, and 212), however, stand on a different footing.  They were drafted by the Solicitor's Office and recommend that particular strategies for investing tribal trust funds be adopted in response to litigation.  Document 68 discusses the investment of trust funds while making a brief footnote reference to pending litigation.  In the court's view, except for the footnote, this document is not protected by the work product doctrine

---

[24]  In *Nobles*, the Supreme Court emphasized that the work product doctrine does not merely protect an attorney's thought processes because –

> attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

422 U.S. at 238-39; *see also In Re Grand Jury Subpoena*, 357 F.3d 900, 907 (9th Cir. 2004) (applying the doctrine to materials prepared by an investigator working for attorneys); *Evergreen*, 80 Fed. Cl. at 142 (applying the doctrine to materials produced by an accountant).

as it would have been generated even if future litigation was not anticipated.  And to the extent covered by the attorney-client privilege, this material is subject to the fiduciary exception thereto. The court will order the production of this document with footnote 1 redacted.  Documents 189, 190 and 212 (which are similar, but not identical) describe the impact on trust administration of the Supreme Court's decision in *Mitchell*.  Defendant claims that these memoranda are protected by the attorney-client privilege, but, in the court's view, these documents are indistinguishable from the other documents regarding trust administration ordered to be produced under the fiduciary exception.  Hence, documents 189, 190 and 212 shall be produced, as well.[25]

### 5.

The last category of documents to be considered is admittedly a catch-all capturing things that do not readily fit into any of the other categories (Docs. 97, 109, 115-19, 173, 176).  Two of these documents involve either a request for, or the provision of, legal advice – 109 (an electronic message requesting clarification of a prior conversation) and 116 (suggested edits to a draft letter to tribal leaders regarding the Arthur Andersen reconciliation reports) – and thus seemingly are protected under the attorney-client privilege.  Document 116, however, also appears to fall within the fiduciary exception, as it relates to trust management and thus must be disclosed.  Likewise, document 97, which describes a draft bill on tribal trust funds, also is subject to the fiduciary exception and must be produced.  Three of the other documents in this set (115, 118 and 173) are cover sheets that reference associated materials, but, in fact, are not accompanied by attachments. Without the attachments and any other explanation from defendant as to the significance of these documents, the court believes that the cover sheets are protected neither by the attorney-client privilege nor the work product doctrine.  They too must be produced.  Finally, document 176, which is a letter recommending that a suit be initiated to collect on a promissory note, appears to be work product and thus need not be disclosed.[26]

*          *          *          *          *

This completes the court's consideration of plaintiff's motion to compel, with the results again summarized in the accompanying Appendix A.

### III.

Not coincidentally, plaintiff's motion for a protective order and defendant's motion to compel both involve the same subject matter: requests for information (to be obtained through

---

[25] For the reasons previously described, defendant need not produce documents 99 and 158, which are essentially duplicates of document 68, or document 216 which is an exact duplicate of document 190.

[26] For the reasons previously described, defendant need not produce documents 117 and 119, which are essentially duplicates of document 116.

various means) concerning how Jicarilla managed and invested its own funds, *i.e.*, its non-trust investments.[27]  The main bone of contention here is whether, under RCFC 26(b), the requested discovery "is relevant to the subject matter involved in the action."  Consistent with the goal of promoting the "just and complete resolution of disputes," the Federal Circuit has stated, "[r]elevancy for purposes of Rule 26 is broadly construed."  *Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed. Cir. 1993); *see also Centurion Indus., Inc. v. Warren Steurer and Assocs.*, 665 F.2d 323, 326 (10th Cir. 1981); *Evergreen Trading*, 80 Fed. Cl. at 144.  That said, "[t]he rule has boundaries," for "[d]iscovery of matter not 'reasonably calculated to lead to the discovery of admissible evidence' is outside its scope."  *Am. Standard Inc. v. Pfizer, Inc.*, 828 F.2d 734, 742 (Fed. Cir. 1987) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351-52 (1978)).

Defendant argues that its discovery requests are for relevant information or at least are reasonably calculated to lead to the discovery of admissible evidence.  It asserts that the information requested is relevant in assessing: (i) the reasonableness of the government's handling of Jicarilla's trust accounts; (ii) the tribe's liquidity needs over the period in question; (iii) the receipt and timing of trust fund disbursements; and (iv) the damages to which plaintiff may be owed.  Plaintiff and *amici* argue that Jicarilla's handling of its non-trust funds is wholly irrelevant to this suit, in which the focal point is whether defendant mismanaged plaintiff's trust funds.  They note that defendant has not cited any authority in which evidence of the sort it seeks was considered relevant in resolving the issues defendant cites.  Plaintiff and the *amici* assert that defendant's silence in this regard speaks volumes.  And, to the court's ears, it most certainly does.

Given the volume of tribal trust litigation over the last thirty years, one would expect that, if defendant were right, there would be at least one confirming case in which evidence of a tribe's non-trust investment patterns was deemed relevant in determining whether the government had breached its fiduciary duties in mishandling tribal trust accounts.  Or at least there would be some untried theory of liability under which such evidence might conceivably be relevant.  But, defendant offers nothing of the sort – nothing.  And, research, far from yielding that which defendant has omitted, instead sheds light on why no such authorities are encountered – it is because, as anyone familiar with a spendthrift trust knows, fiduciaries and beneficiaries are simply not judged by the same investment standards.  Rather, fiduciaries are governed by standards that require them to exercise more skill and care than ordinary individuals are expected to exercise in handling their own private investments.  This view is reflected in many cases involving the alleged misappropriation or mismanagement of tribal trusts, in which it is often observed that the duty of care owed by the United States "is not mere reasonableness, but the highest fiduciary standards."  *Am. Indians Residing on the Maricopa-Ak Chin Reservation v. United States*, 667

---

[27]  RCFC 26(c)(1) provides that, "for good cause," the court may issue an order to protect a party "from annoyance, embarrassment, oppression, or undue burden or expense," including provisions "forbidding the disclosure or discovery."  *See also Vons*, 51 Fed. Cl. at 4.

F.2d 980, 990 (Ct. Cl. 1981).[28]  That view, as it turns out, has been a prominent feature of the trust law landscape for the last 180 years, from the time the "prudent man rule" was announced by Judge Putnam in *Harvard College v. Amony*, 26 Mass (9 Pick.) 446, 461 (1830), through the most recent edition of the Restatement on Trusts.[29]  Accordingly, without prejudging the precise standards that will ultimately govern liability in this case, every current indication is that defendant's liability here does not depend in any way on how Jicarilla invested its own funds.  As such, the court finds that the wide majority of the information sought by defendant does not meet the relevancy requirement in RCFC 26(b) and that plaintiff, therefore, is entitled essentially to the protective order that it seeks.  The court will not allow defendant to throw out a broad net on the mere hope of catching relevant evidence.  *See Vons Cos, Inc.*, 51 Fed. Cl. at 24-25 ("While . . . some degree of fishing is anticipated by the Federal discovery rules, those rules do not sanction a party to employ essentially a purse seine that indiscriminately sweeps in not only relevant catch, but hosts of irrelevant and protected species of information.").

In a last ditch effort to avoid this result, defendant, at oral argument, cited deposition testimony that it claimed showed that BIA employees were making trust decisions based on Jicarilla's non-trust investments.  The court ordered defendant to file that deposition testimony.  A review of that document does not bear out defendant's claim.

The testimony in question is that of Mr. Gabriel Abeyta, who served as Jicarilla's chief accountant from 1958 to 1970, and as BIA's tribal assistance officer for Jicarilla from 1970 to 1986.  Mr. Abeyta's deposition, to be sure, demonstrates that he knew about plaintiff's non-trust investments, information he no doubt gleaned during his dozen or so years as the tribe's top accountant.  As part of his later job at BIA, Mr. Abeyta continued to advise Jicarilla regarding its outside investments.  But there is no indication that the information Mr. Abeyta possessed regarding Jicarilla's non-trust assets ever was factored into the BIA's investment decisions regarding tribal trust funds.  And it is doubtful that could have ever occurred given the limitations that 25 U.S.C. §§ 161(a) and 162(a) impose on the types of investments BIA could make with the tribal trust funds.  Mr. Abeyta's testimony, in fact, highlights the latter point in explaining why the tribe invested in real estate and a film project in an effort to diversify its overall investments.  Yet

---

[28]  *See also United States v. Mason*, 412 U.S. 391, 398 (1973); *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942); *Shoshone Indian Tribe*, 364 F.3d at 1348; *Short v. United States*, 50 F.3d 994, 999 (Fed. Cir. 1995); *Yankton Sioux Tribe v. United States*, 623 F.2d 159, 163 (Ct. Cl. 1980); *Red Lake Band*, 17 Cl. Ct. at 373.

[29]  While the Restatement (Third) on Trusts § 90 has abandoned the "prudent man" standard in favor of the gender neutral "prudent investor," it continues to emphasize that an adaptable part of that standard requires "fiduciaries possessing special facilities and skills to make those advantages available to the trust and its beneficiaries."  *Id.* at cmt. d; *see also id.* ("it follows from the requirement of care as well as from sound policy that, if the trustee possesses a degree of skill greater than that of an individual of ordinary intelligence, the trustee is liable for a loss that results from failure to make reasonably diligent use of that skill.").

there is no indication that the reverse was true – that the BIA calibrated its investments to take into account Jicarilla's non-trust ventures.  Contrary to defendant's claim, then, nothing in Mr. Abeyta's deposition testimony suggests in the least that any information relevant to this case could be deduced by comparing Jicarilla's outside investments to BIA's investments of the trust funds.

Defendant likewise has provided virtually nothing to back up its claim that Jicarilla's investment records are needed to assess the tribe's periodic liquidity needs, the receipt and timing of trust fund disbursements and the damages plaintiff may be owed.  The court is unwilling to order the production of what apparently are extensive records based upon such shallow and unsupported assertions, particularly given the thousands of documents that defendant might have mustered to back up its relevancy claims.  *See United States v. Monumental Life Ins. Co.*, 440 F.3d 729, 736 (6th Cir. 2006) ("the 'mere assertion of relevance' . . . will not necessarily satisfy the government's burden" in seeking documents, especially where the request seeks a "voluminous amount of . . . proprietary information.").[30]  Nevertheless, as discussed with the parties at oral argument, the court believes that Jicarilla's account information might be relevant to the limited extent that there are questions regarding whether and when trust disbursements were made. Therefore, the order that follows will permit defendant to seek leave of court to file a revised discovery request for basic account information relating to the Jicarilla accounts into which disbursements from the trust funds would have ordinarily flowed.  It is expected that this request, if it is made at all, will be narrowly tailored and should not be viewed as an opportunity to reargue points rejected herein.

## IV.

The court need go no further.  Based on the foregoing, and as reflected in the attached Appendix A, the court orders as follows:

1.   Plaintiff's motion to compel is **GRANTED**, in part, and **DENIED**, in part:

   a.   On or before July 13, 2009, the following documents shall be produced by defendant to plaintiff: **9, 13-16, 35, 37-39, 41-42, 44-45, 48-56, 60-67, 68 (sans footnote 1), 69-74, 76-77, 80-81, 86-87, 94, 96-97, 100, 103-06, 110, 111 (from M50IRN341924 to M50IRN342083), 112, 115-16, 118, 142-47, 155, 167-68, 173, 177-80, 182, 184, 186-91, 202, 212, and 217.**

--------------------------------------------------

[30]  Indeed, defendant never has explained why, if this information was so vital to the BIA's investment decisions, the agency never had it in the first place.

b.    The following documents shall not be produced: **17-20, 26-34, 36, 40, 43, 46-47, 58, 75, 78-79, 82-85, 88-89, 95, 98-99, 101-02, 107, 109, 113-14, 117, 119-20, 125-26, 130-31, 148, 150-51, 153-54, 156-60, 171-72, 176, 181, 183, 185, 192, 203-09, 213-16, and 219.**

2.    Plaintiff's motion for a protective order is **GRANTED, in part**, and **DENIED, in part** and defendant's motion to compel is **DENIED**; as described above, defendant may seek leave from the court to refile more limited discovery requests regarding plaintiff's outside investment records, with the timing of such motion to be established in the court's revised discovery plan;

3.    Because neither party has fully prevailed herein, the court will not order the payment of reasonable expenses, *see* RCFC 37(a)(5); and

4.    In lieu of granting defendant's motion to revise the discovery plan herein, on or before July 15, 2009, the parties shall file a joint status report indicating how this case should proceed, with a proposed schedule, as appropriate.[31]

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

[31]   It is the court's intention to unseal and publish this opinion after July 13, 2009.  On or before July 13, 2009, each party shall file proposed redactions to this opinion, with specific reasons therefore.

Appendix A

| | | | III.C.1 Requests for Legal Advice | | | |
|---|---|---|---|---|---|---|
| **Doc** | **Date** | **Sender / Recipient** | **Subject** | **Privileges Asserted** | **Ruling** | **Rationale** |
| 38 | 03.06.72 | Commissioner to Assoc. Solicitor | Tribal trust fund investment in securities | A-C | Produce | Fiduciary exception |
| 45 | 03.05.82 | Asst. Secretary to Assoc. Solicitor | Handling of IMPL funds | A-C | Produce | Fiduciary exception |
| 48 | 10.03.72 | Commissioner to Assoc. Solicitor | Separating restricted and unrestricted accounts | A-C | Produce | Fiduciary exception |
| 50 | 10.03.72 | Commissioner to Assoc. Solicitor | Separating restricted and unrestricted accounts | A-C | Produce | Fiduciary exception |
| 52 | 04.29.75 | Trust Responsibilities to Assoc. Solicitor | Trust funds in IIM accounts | A-C | Produce | Fiduciary exception |
| 56 | Undated | Asst. Secretary to Assoc. Solicitor | Forwarding memoranda on Treasury securities, IIM account categorizing, and irrigation and power funds | A-C | Produce | Fiduciary exception |
| 61 | 10.13.89 | Deputy Asst. Sec'y to Assoc. Solicitor | Repurchase agreement investment | A-C | Produce | Fiduciary exception |
| 67 | 10.19.71 | Commissioner to Assoc. Solicitor | Tribal trust fund investment in securities | A-C | Produce | Fiduciary exception |
| 71 | 10.19.71 | Commissioner to Assoc. Solicitor | Tribal trust fund investment in securities | A-C | Produce | Fiduciary exception |
| 72 | 10.27.72 | Asst. Secretary to Assoc. Solicitor | Effect of 25 U.S.C. § 160 on ISSDA funds | A-C | Produce | Fiduciary exception |

| III.C.1 Requests for Legal Advice | | | | | | |
|---|---|---|---|---|---|---|
| Doc | Date | Sender / Recipient | Subject | Privileges Asserted | Ruling | Rationale |
| 73 | 03.06.72 | Commissioner to Assoc. Solicitor | Tribal trust fund investment in securities | A-C | Produce | Fiduciary exception |
| 75 | 04.29.75 | Trust Responsibilities to Assoc. Solicitor | Trust funds in IIM accounts | A-C | Withhold | Duplicate of #52 |
| 88 | 10.03.72 | Commissioner to Assoc. Solicitor | Separating restricted and unrestricted accounts | A-C | Withhold | Duplicate of #50 |
| 98 | 03.06.72 | Commissioner to Assoc. Solicitor | Tribal trust fund investment in securities | A-C | Withhold | Duplicate of #38 |
| 105 | xx.xx.77 | Trust Services to Assoc. Solicitor | Setting rates on special deposits and IIMs | A-C | Produce | Fiduciary exception |
| 106 | 04.14.80 | Trust Responsibilities to Solicitor | CDs of $100,000 or more | A-C | Produce | Fiduciary exception |
| 150 | 10.03.72 | Commissioner to Assoc. Solicitor | Separating restricted and unrestricted accounts | A-C | Withhold | Duplicate of #50 |
| 156 | 03.06.72 | Commissioner to Assoc. Solicitor | Tribal trust fund investment in securities | A-C | Withhold | Duplicate of #38 |
| 160 | xx.xx.77 | Trust Services to Assoc. Solicitor | Setting rates on special deposits and IIMs | A-C | Withhold | Duplicate of #105 |
| 188 | 05.01.79 | Commissioner to Assoc. Solicitor | Using IMPL funds under 25 CFR 271.2 | A-C | Produce | Fiduciary exception |

| | | | III.C.2  Provision of Legal Advice | | | |
|---|---|---|---|---|---|---|
| Doc | Date | Sender / Recipient | Subject | Privileges Asserted | Ruling | Rationale |
| 9 | 05.13.85 | Asst. Reg. Solic. to Asst. Area Dir. | Exemption of certain trust income under IRS code | A-C | Produce | Fiduciary exception |
| 13 | 01.24.78 02.10.86 | Assoc. Solic. to Asst. Sec'y or Deputy | Pooling of tribal trust funds | A-C | Produce | Fiduciary exception; waiver |
| 14 | 01.24.78 | Assoc. Solic. to Deputy Asst. Sec'y | Pooling of tribal trust funds | A-C | Produce | Fiduciary exception; waiver |
| 15 | 01.24.78 02.10.86 | Assoc. Solic. to Asst. Sec'y or Deputy | Pooling of tribal trust funds | A-C | Produce | Fiduciary exception |
| 16 | 02.10.86 | Assoc. Solicitor to Asst. Secretary | Pooling of tribal trust funds | A-C | Produce | Fiduciary exception |
| 17 | 02.10.86 | Assoc. Solicitor to Asst. Secretary | Pooling of tribal trust funds | A-C | Withhold | Duplicate of #16 |
| 18 | 02.10.86 | Assoc. Solicitor to Asst. Secretary | Pooling of tribal trust funds | A-C | Withhold | Duplicate of #16 |
| 19 | 02.10.86 | Assoc. Solicitor to Asst. Secretary | Pooling of tribal trust funds | A-C | Withhold | Duplicate of #16 |
| 20 | 02.10.86 | Assoc. Solicitor to Asst. Secretary | Pooling of tribal trust funds | A-C | Withhold | Duplicate of #16 |
| 26 | 01.24.78 | Assoc. Solicitor to Deputy Asst. Sec'y | Pooling of tribal trust funds | A-C | Withhold | Duplicate of #14 |
| 27 | 01.24.78 | Assoc. Solicitor to Deputy Asst. Sec'y | Pooling of tribal trust funds | A-C | Withhold | Duplicate of #14 |
| 28 | 06.29.82 | Assoc. Solicitor to Deputy Asst. Sec'y | Handling of IMPL funds | A-C | Withhold | Work product |

| | | | III.C.2  Provision of Legal Advice | | | |
|---|---|---|---|---|---|---|
| Doc | Date | Sender / Recipient | Subject | Privileges Asserted | Ruling | Rationale |
| 29 | 06.29.82 | Assoc. Solicitor to Deputy Asst. Sec'y | Handling of IMPL funds | A-C | Withhold | Work product |
| 30 | 06.29.82 | Assoc. Solicitor to Deputy Asst. Sec'y | Handling of IMPL funds | A-C | Withhold | Duplicate of #28 |
| 31 | 06.29.82 | Assoc. Solicitor to Deputy Asst. Sec'y | Handling of IMPL funds | A-C | Withhold | Duplicate of #28 |
| 35 | 04.10.96 | Deputy Solicitor to Special Trustee | Indian preference statute's application to Office of Trust Fund Management | A-C | Produce | Fiduciary exception |
| 36 | 04.10.85 | Regional Solicitor to Area Director | Erroneous payment collection on Phillips estate | A-C | Withhold | Privileged; not under fiduciary exception |
| 37 | 11.23.82 | Regional Solicitor to Asst. Area Dir. | Power of tribal courts to control IIM accounts | A-C | Produce | Fiduciary exception |
| 39 | 07.17.72 | Assoc. Solicitor to Commissioner | Tribal trust fund investment in securities | A-C | Produce | Fiduciary exception |
| 41 | 10.16.23 | Solicitor to Secretary | Investing tribal trust funds in water bond purchases | A-C | Produce | Fiduciary exception |
| 42 | 11.20.72 | Solicitor to Asst. Secretary | Reclassification of trust fund deposits in Treasury | A-C | Produce | Fiduciary exception |
| 44 | 03.21.90 | Assoc. Solicitor to Asst. Secretary | Contracting tribal trust funds to tribal organizations | A-C | Produce | Fiduciary exception |
| 49 | 04.19.73 | Asst. Solicitor to Investments | Separating unrestricted and restricted accounts | A-C | Produce | Fiduciary exception |
| 51 | 04.19.73 | Asst. Solicitor to Investments | Separating unrestricted and restricted accounts | A-C | Produce | Fiduciary exception |
| 53 | 11.20.72 | Solicitor to Asst. Secretary | Reclassification of trust fund deposits in Treasury | A-C | Produce | Fiduciary exception |

| | | | III.C.2  Provision of Legal Advice | | | |
|---|---|---|---|---|---|---|
| Doc | Date | Sender / Recipient | Subject | Privileges Asserted | Ruling | Rationale |
| 54 | 10.10.73 | Assoc. Solicitor to Asst. Secretary | Irrigation and power project investment under 25 U.S.C. § 162 | A-C | Produce | Fiduciary exception |
| 55 | 01.31.73 | Area Director to Superintendents | Scope of 25 U.S.C. § 162a | A-C | Produce | Fiduciary exception; waiver |
| 60 | 11.21.90 | Asst. Solicitor to Trust Fund Mgmt. | Eligibility of Krupp, Inc. for trust fund investment | A-C | Produce | Fiduciary exception |
| 62 | 04.21.88 | Assoc. Solicitor to Asst. Secretary | Federal Advisory Committee Act | A-C | Produce | Fiduciary exception |
| 63 | 10.07.66 | Asst. AG (OLC) to Treasury Counsel | Investing in federal land bank obligations / banks for cooperatives | A-C | Produce | Fiduciary exception |
| 64 | 10.22.66 | Treasury Counsel to Treasury Secretary | Tribal trust fund investment in securities | A-C W-P | Produce | Fiduciary exception |
| 65 | 05.03.68 | Assoc. Solicitor to Commissioner | Tribal trust fund investment | A-C | Produce | Fiduciary exception |
| 66 | 01.10.67 | Asst. Solicitor to Commissioner | Treasury Circular 176 and tribal trust fund investment | A-C | Produce | Fiduciary exception |
| 69 | 12.30.69 | Acting Asst. Comm'r to Financial Mgmt. | Repurchase agreements | A-C | Produce | Fiduciary exception |
| 70 | 04.08.66 | Assoc. Solicitor to Asst. Secretary | Coeur d'Alene and Kalispel judgment fund investment | A-C | Produce | Fiduciary exception |
| 74 | 02.07.72 | Assoc. Solicitor to Commissioner | Tribal investment in bank time CDs | A-C | Produce | Fiduciary exception |

| | | | III.C.2  Provision of Legal Advice | | | |
|---|---|---|---|---|---|---|
| Doc | Date | Sender / Recipient | Subject | Privileges Asserted | Ruling | Rationale |
| 76 | Undated | Assoc. Solicitor to Deputy Asst. Sec'y | BIA tribal trust fund investment | A-C W-P | Produce | Fiduciary exception; waiver |
| 77 | 02.13.90 | Assoc. Solicitor to Deputy Asst. Sec'y | Trust fund loss liability and reimbursement methods | A-C W-P | Produce | Fiduciary exception |
| 78 | 11.20.72 | Solicitor to Asst. Secretary | Reclassification of trust fund deposits in Treasury | A-C | Withhold | Duplicate of #42 |
| 79 | Undated | Assoc. Solicitor to Deputy Asst. Sec'y | BIA tribal trust fund investment | A-C | Withhold | Duplicate of #76 |
| 80 | 12.15.88 | Trust Accounting to Area Dirs. / Supers. | Relaying advice on *Keechi* litigation and IIM duties | A-C | Produce | Fiduciary exception |
| 81 | 04.10.96 | Deputy Solicitor to Special Trustee | Indian preference statute's application to Office of Trust Fund Management | A-C | Produce | Fiduciary exception |
| 82 | 05.13.85 | Asst. Regional Solic. to Asst. Area Director | Exemption of certain trust income under IRS code | A-C | Withhold | Duplicate of #9 |
| 85 | 02.10.86 | Assoc. Solicitor to Asst. Secretary | Pooling of tribal trust funds | A-C | Withhold | Duplicate of #16 |
| 86 | 04.26.76 | Asst. Solicitor to Trust Responsibilities | Collateral pledged to secure non-trust tribal funds | A-C | Produce | Fiduciary exception |
| 87 | 05.24.89 | Assoc. Solicitor to Asst. Secretary | Tribal fund investment in unlisted agency securities | A-C | Produce | Fiduciary exception |
| 89 | 04.19.73 | Asst. Solicitor to Investments | Separating unrestricted and restricted accounts | A-C | Withhold | Duplicate of #49 |

| | | | III.C.2  Provision of Legal Advice | | | | |
|---|---|---|---|---|---|---|---|
| Doc | Date | Sender / Recipient | Subject | Privileges Asserted | Ruling | Rationale | |
| 94 | 06.27.73 | Acting Assoc. Solicitor to Solicitor | Enumerating Secretary's tribal trust responsibilities | A-C W-P | Produce | Fiduciary exception | |
| 95 | 04.19.73 | Asst. Solicitor to Investments | Separating unrestricted and restricted accounts | A-C | Withhold | Duplicate of #49 | |
| 96 | 03.21.90 | Assoc. Solicitor to Asst. Secretary | Contracting tribal trust funds to tribal organizations | A-C | Produce | Fiduciary exception | |
| 100 | 05.03.68 | Assoc. Solicitor to Commissioner | Tribal trust fund investment | A-C | Produce | Fiduciary exception | |
| 101 | 04.08.66 | Assoc. Solicitor to Asst. Secretary | Coeur d'Alene and Kalispel judgment fund investment | A-C | Withhold | Duplicate of #70 | |
| 102 | 04.08.66 | Assoc. Solicitor to Asst. Secretary | Coeur d'Alene and Kalispel judgment fund investment | A-C | Withhold | Duplicate of #70 | |
| 103 | 10.30.72 | Solicitor to Asst. Secretary | Reclassification of trust fund deposits in Treasury | A-C | Produce | Fiduciary exception | |
| 104 | 11.01.72 | Solicitor to Asst. Secretary | Reclassification of trust fund deposits in Treasury | A-C | Produce | Fiduciary exception | |
| 110 | 06.01.92 | Field Solicitor to Area Director | Non-trust tribal funds | A-C | Produce | Fiduciary exception | |
| 112 | 10.29.86 | Field Solicitor to Area Director | Application of 31 U.S.C. § 3527 to IIM accounts | A-C W-P | Produce | Fiduciary exception | |
| 130 | 04.26.76 | Asst. Solicitor to Trust Responsibilities | Collateral pledged to secure non-trust tribal funds | A-C | Withhold | Duplicate of #86 | |

| III.C.2  Provision of Legal Advice | | | | | | |
|---|---|---|---|---|---|---|
| Doc | Date | Sender / Recipient | Subject | Privileges Asserted | Ruling | Rationale |
| 131 | 05.24.89 | Assoc. Solicitor to Asst. Secretary | Tribal fund investment in unlisted agency securities | A-C | Withhold | Duplicate of #87 |
| 151 | 04.19.73 | Asst. Solicitor to Investments | Separating unrestricted and restricted accounts | A-C | Withhold | Duplicate of #49 |
| 153 | Undated | Assoc. Solicitor to Deputy Asst. Sec'y | BIA tribal trust fund investment | A-C | Withhold | Duplicate of #76 |
| 154 | Undated | Assoc. Solicitor to Deputy Asst. Sec'y | BIA tribal trust fund investment | A-C | Withhold | Duplicate of #76 |
| 155 | 06.27.73 | Acting Assoc. Solicitor to Solicitor | Enumerating Secretary's tribal trust responsibilities | A-C W-P | Produce | Fiduciary exception |
| 157 | 07.17.72 | Assoc. Solicitor to Commissioner | Tribal trust fund investment in securities | A-C | Withhold | Duplicate of #39 |
| 159 | 10.30.72 | Solicitor to Asst. Secretary | Reclassification of trust fund deposits in Treasury | A-C | Withhold | Duplicate of #103 |
| 167 | 10.29.86 | Field Solicitor to Area Director | Application of 31 U.S.C. § 3527 to IIM accounts | A-C W-P | Produce | Fiduciary exception |
| 168 | 05.13.85 | Assoc. Solicitor to Deputy Asst. Sec'y | Using outside vendors for trust fund management | A-C | Produce | Fiduciary exception |
| 177 | 04.10.96 | Deputy Solicitor to Special Trustee | Indian preference statute's application to Office of Trust Fund Management | A-C | Produce | Fiduciary exception |
| 178 | 01.16.84 | Assoc. Solicitor to Trust Responsibilities | Investing trust funds in savings and loan certificates | A-C | Produce | Fiduciary exception |

| | | | III.C.2  Provision of Legal Advice | | | |
|---|---|---|---|---|---|---|
| Doc | Date | Sender / Recipient | Subject | Privileges Asserted | Ruling | Rationale |
| 179 | 01.07.81 | Field Solicitor to Assoc. Solicitor | Classification of trust funds under Monetary Control Act | A-C | Produce | Fiduciary exception |
| 180 | Undated | Assoc. Solicitor to Deputy Asst. Sec'y | BIA tribal trust fund investment | A-C | Produce | Fiduciary exception; waiver |
| 182 | 08.16.82 | Assoc. Solicitor to Deputy Asst. Sec'y | Transfer of IMPL account funds | A-C | Produce | Fiduciary exception |
| 183 | 08.16.82 | Assoc. Solicitor to Deputy Asst. Sec'y | Transfer of IMPL account funds | A-C | Withhold | Duplicate of #182 |
| 184 | 10.xx.76 | Acting Assoc. Solic. to Commissioner | Effect of Public Law 93-638 on IMPL accounts | A-C | Produce | Fiduciary exception |
| 185 | 08.16.82 | Assoc. Solicitor to Deputy Asst. Sec'y | Transfer of IMPL account funds | A-C | Withhold | Duplicate of #182 |
| 186 | 06.17.76 | Asst. Solicitor to Commissioner | IMPL fund request under Public Law 93-638 | A-C | Produce | Fiduciary exception |
| 187 | 06.09.80 | Acting Assoc. Solic. to Asst. Director | Draft regulations for 25 CFR 103 | A-C | Produce | Fiduciary exception |
| 191 | 05.13.85 | Assoc. Solicitor to Deputy Asst. Sec'y | Using outside vendors for trust fund management | A-C | Produce | Fiduciary exception |
| 192 | 01.24.78 | Assoc. Solicitor to Deputy Asst. Sec'y | Pooling of tribal trust funds | A-C | Withhold | Duplicate of #14 |
| 202 | Undated | Assoc. Solicitor to Asst. Secretary | BIA's authority to put disbursing functions with eligible institution | A-C | Produce | Fiduciary exception |
| 214 | 02.10.86 | Assoc. Solicitor to Asst. Secretary | Pooling of tribal trust funds | A-C | Withhold | Duplicate of #16 |

| III.C.2  Provision of Legal Advice | | | | | | |
|---|---|---|---|---|---|---|
| Doc | Date | Sender / Recipient | Subject | Privileges Asserted | Ruling | Rationale |
| 215 | 01.24.78 | Assoc. Solicitor to Deputy Asst. Sec'y | Pooling of tribal trust funds | A-C | Withhold | Duplicate of #14 |
| 217 | 09.30.66 | Attorney General to Treasury Secretary | FNMA guarantees under FNMA Charter Act | A-C | Produce | Fiduciary exception |

| III.C.3 Arthur Anderson Documents | | | | | | |
|---|---|---|---|---|---|---|
| Doc | Date | Sender / Recipient | Subject | Privileges Asserted | Ruling | Rationale |
| 111 | 10.04.96 | DOJ attorney to Arthur Anderson | Proposing legal strategy and forwarding Archives essay on GAO IIM audits | W-P | Withhold 1st page; produce remainder | Pg 1 is work product (M501RN341923); remainder is not |
| 142 | 08.05.96 | | Reconciled disbursement summary | W-P | Produce | Not work product |
| 143 | 08.05.96 | | Reconciled disbursement summary | W-P | Produce | Not work product |
| 144 | 08.05.96 | | Reconciled disbursement summary | W-P | Produce | Not work product |
| 145 | 08.05.96 | | Reconciled disbursement summary | W-P | Produce | Not work product |
| 146 | 08.05.96 | | Reconciled disbursement summary | W-P | Produce | Not work product |
| 147 | 08.05.96 | | Reconciled disbursement summary | W-P | Produce | Not work product |
| 148 | Undated | | Report on likely exposure from trust reconciliation, noting settlement strategy | W-P | Withhold | Work product |

| | | | **III.C.3 Arthur Anderson Documents** | | | |
|---|---|---|---|---|---|---|
| **Doc** | **Date** | **Sender / Recipient** | **Subject** | **Privileges Asserted** | **Ruling** | **Rationale** |
| 171 | 06.08.90 | Assoc. Solicitor to Arthur Anderson | Information on litigation and claims for audit | W-P | Withhold | Work product |
| 172 | 03.30.89 | Asst. Solicitor to Arthur Anderson | Information on litigation and claims for audit | W-P | Withhold | Work product |
| 203 | Undated | | Chart weighing scenarios in *Cobell* | W-P | Withhold | Work product |
| 204 | Undated | | Chart weighing scenarios in *Cobell* | W-P | Withhold | Work product |
| 205 | 10.16.96 | | IMPL accounting for *Cobell* | W-P | Withhold | Work product |
| 206 | 10.24.95 | | IMPL accounting for *Cobell* | W-P | Withhold | Work product |
| 207 | 10.24.95 | | IMPL accounting for *Cobell* | W-P | Withhold | Work product |
| 208 | 10.24.95 | | IMPL accounting for *Cobell* | W-P | Withhold | Work product |
| 209 | 10.16.96 | | IMPL accounting for *Cobell* | W-P | Withhold | Work product |
| 213 | 03.30.89 | Asst. Solicitor to Arthur Anderson | Information on litigation and claims for audit | W-P | Withhold | Work product |

| | | | **III.C.4 Other Tribal Litigation** | | | |
|---|---|---|---|---|---|---|
| **Doc** | **Date** | **Sender / Recipient** | **Subject** | **Privileges Asserted** | **Ruling** | **Rationale** |
| 32 | 08.28.72 | Commissioner to Assoc. Solicitor | Deposit and timber issues in pending *Cheyenne* case | A-C W-P | Withhold | Privileged; work product |
| 33 | 09.29.71 | Solicitor to DOJ Litigation Chief | Increasing interest rates and impact on *Navajo* litigation | A-C W-P | Withhold | Privileged; work product |

| | | | III.C.4 Other Tribal Litigation | | | |
|---|---|---|---|---|---|---|
| Doc | Date | Sender / Recipient | Subject | Privileges Asserted | Ruling | Rationale |
| 34 | 01.24.96 | Assoc. Solicitor to Solicitor | Options for resolving tribal claims in response to trust reconciliation project | W-P | Withhold | Work product |
| 40 | 08.11.71 | Acting Assoc. Solic. to Commissioner | Seeking client explanation related to *Navajo* litigation | A-C W-P | Withhold | Privileged; work product |
| 43 | 09.30.97 | Special Trustee to Solicitor and DOJ | Answers to attorney questions on tribal trust funds in *Cobell* | A-C W-P | Withhold | Privileged; work product |
| 46 | 07.25.90 | Acting Area Dir. to Asst. Field Solicitor | Liability for restoring overpayments to Pueblo related to litigation | A-C W-P | Withhold | Privileged; work product |
| 47 | 07.25.90 | Acting Area Dir. to Asst. Field Solicitor | Liability for restoring overpayments to Pueblo related to litigation | A-C W-P | Withhold | Privileged; work product |
| 58 | 10.23.87 | Assoc. Solicitor to Assoc. Director | Indian oil and gas payments in *Shii Shi* litigation | A-C W-P | Withhold | Privileged; work product |
| 68 | 12.14.70 | Acting Assoc. Solicitor to Solicitor | Investment alternatives for trust funds in outside Treasury deposits | W-P | Produce, but redact n.1 on p.2 | Fiduciary exception, except work product footnote |
| 83 | 09.10.79 | Investments to Regional Solicitor | IIM interest in *Dominique* | A-C W-P | Withhold | Privileged; work product |
| 84 | 02.28.01 | Acting Dep'y Solic. to various DOI offices | Communications with special master in *Cobell* | A-C W-P | Withhold | Privileged; work product |
| 99 | 12.14.70 | Acting Assoc. Solicitor to Solicitor | Investment alternatives for trust funds in outside Treasury deposits | W-P | Withhold | Duplicate of #68 |
| 107 | 06.02.99 | Interior Chief of Staff to various DOI offices | Document retention related to *Cobell* litigation | W-P | Withhold | Work product |
| 113 | 02.23.88 | Acting Reg'l Solic. to Acting Assoc. Solic. | Agua Caliente Act and potential litigation | W-P | Withhold | Work product |

| | | | III.C.4 Other Tribal Litigation | | | |
|---|---|---|---|---|---|---|
| **Doc** | **Date** | **Sender / Recipient** | **Subject** | **Privileges Asserted** | **Ruling** | **Rationale** |
| 114 | 10.21.85 | Acting Asst. Dir. to All Area Directors | IMPL escrow payments made to plaintiffs in *Mitchell* | W-P | Withhold | Work product |
| 120 | 01.24.96 | Assoc. Solicitor to Solicitor | Options for resolving tribal claims in response to trust reconciliation project | A-C W-P | Withhold | Privileged; work product |
| 125 | Undated | | Summary of options for IIM accounting in advance of settlement | W-P | Withhold | Work product |
| 126 | Undated | | Summary of options for IIM accounting in advance of settlement | W-P | Withhold | Work product |
| 158 | 12.14.70 | Acting Assoc. Solicitor to Solicitor | Investment alternatives for trust funds in outside Treasury deposits | W-P | Withhold | Duplicate of #68 |
| 181 | 02.08.95 | DOJ attorney to Trust Funds Mgmt. | Report on Yakima procedures | A-C W-P | Withhold | Privileged; work product |
| 189 | 07.21.83 | Acting Assoc. Solic. to Asst. Secretary | Applicability of *Mitchell* to other BIA functions and potential liability | A-C | Produce | Fiduciary exception |
| 190 | 07.21.83 | Acting Assoc. Solic. to Asst. Secretary | Applicability of *Mitchell* to other BIA functions and potential liability | A-C | Produce | Fiduciary exception |
| 212 | 07.21.83 | Acting Assoc. Solic. to Asst. Secretary | Applicability of *Mitchell* to other BIA functions and potential liability | A-C | Produce | Fiduciary exception |
| 216 | 07.21.83 | Acting Assoc. Solic. to Asst. Secretary | Applicability of *Mitchell* to other BIA functions and potential liability | A-C | Withhold | Duplicate of #190 |
| 219 | Undated | | Proposed legislation in response to tribal trust reconciliation noting potential claims and settlement | W-P | Withhold | Work product |

| III.C.5 Administrative / Miscellaneous | | | | | | |
|---|---|---|---|---|---|---|
| Doc | Date | Sender / Recipient | Subject | Privileges Asserted | Ruling | Rationale |
| 97 | 05.15.75 | Legislative Affairs to Legislative Counsel | Requesting review of draft bill | A-C | Produce | Fiduciary exception |
| 109 | 04.11.02 | Internal OST | Seeks to clarify conference call comments on settlement contract and cost-sharing | A-C | Withhold | Privileged |
| 115 | 12.28.95 | Deputy Solicitor to Trust Funds Mgmt. | Cover sheet transmitting edits to draft letter on reconciliation project | A-C | Produce | Not privileged |
| 116 | 12.28.95 | | Suggests edits to draft letter on reconciliation project | A-C W-P | Produce | Fiduciary exception |
| 117 | 12.28.95 | | Suggests edits to draft letter on reconciliation project | A-C W-P | Withhold | Duplicate of #116 |
| 118 | 12.28.95 | Deputy Solicitor to Trust Funds Mgmt. | Cover sheet transmitting edits to draft letter on reconciliation project | A-C | Produce | Not privileged |
| 119 | 12.28.95 | | Suggests edits to draft letter on reconciliation project | A-C W-P | Withhold | Duplicate of #116 |
| 173 | 05.30.89 | Asst. Solicitor to Accounting Mgmt. | Fund recovery from credit union | A-C | Produce | Not privileged |
| 176 | 05.29.85 | Special Asst. to Solicitor | Interest computations and outstanding balances on notes | A-C W-P | Withhold | Work product |

ORIGINAL

# In the United States Court of Federal Claims

(Filed: May 16, 2002)

FILED

MAY 1 6 2002

U.S. COURT OF
FEDERAL CLAIMS

THE SHOSHONE INDIAN TRIBE OF THE
WIND RIVER RESERVATION, WYOMING,

        Plaintiff,

      v.

THE UNITED STATES,

        Defendant.

No. 458a-79 L

THE ARAPAHO INDIAN TRIBE OF THE
WIND RIVER RESERVATION, WYOMING,

        Plaintiff,

      v.

THE UNITED STATES,

        Defendant.

No. 459a-79 L

## ORDER

    The court has before it Defendant's Motion for a Protective Order Preventing the Deposition and Testimony of Richard K. Aldrich (Def.'s Mot.); Plaintiffs' Opposition to Defendant's Motion for a Protective Order Preventing the Deposition and Testimony of Richard K. Aldrich (Pls.' Opp.); and Defendant's Reply to Plaintiffs' Opposition to Defendant's Motion for a Protective Order Preventing the Deposition and Testimony of Richard K. Aldrich (Def.'s Reply).  For the following reasons, defendant's motion is DENIED.

    Defendant seeks a protective order preventing the deposition and testimony of Richard Aldrich, the sometime Field Solicitor at the United States Department of the Interior's Billings, Montana Regional Office.  Def.'s Mot. at 2; Def.'s Reply at 1.



Defendant asserts that Mr. Aldrich provided legal advice to components of the Department of the Interior and, therefore, his testimony is protected by the attorney-client privilege and work product doctrine.[1]  Def.'s Mot. at 2-3.

## I.  Background

In the late 1980s, Mr. Aldrich issued opinions concerning the ownership of sand and gravel.  Def.'s Mot. at 2.  Plaintiffs provided to the court copies of three memos that Mr. Aldrich authored and provided to several officials within the United States Department of the Interior.  See Exhibits 1-3 to Pls.' Opp.  The first memo, dated October 1, 1975, was addressed to an Area Director and opines that "mineral reservation or restoration [does] not include sand and gravel."  See Exhibit 1 to Pls.' Opp.  The second memo, dated September 17, 1980, revokes the opinion contained in the October 1, 1975 memo pending the outcome of the appeal of the district court's decision in Western Nuclear, Inc. v. Andrus.  See Western Nuclear, Inc. v. Andrus, 475 F. Supp. 654 (D. Wyo. 1979), rev'd, 664 F.2d 334 (10th Cir. 1981), rev'd, Watt v. Western Nuclear, Inc., 462 U.S. 36 (1983).  See Exhibit 2 to Pls.' Opp.  The second memo advises that the sand and gravel within the Riverton Unit of plaintiffs' reservation should be treated as if owned by the Shoshone and Arapahoe Tribes of the Riverton Project.  See id.  The third memo from Mr. Aldrich is a transmittal dated June 18, 1987, attaching a letter from a private law firm, White & White.  See Exhibit 3 to Pls.' Opp.  The substance of the letter from the law firm is a general discussion of ownership of the sand and gravel deposits on plaintiffs' reservation.  Id.

## II.  Discussion

The attorney-client privilege does not apply here.  First, the mere fact that an individual is an attorney is insufficient to bar his testimony at deposition or trial.  If an attorney has personal knowledge of facts underlying the litigation, his testimony will be permitted.[2]  The court agrees with plaintiffs that Mr. Aldrich, as an employee of the

---

[1]In footnote 1 of its motion, defendant alludes to the deliberative process privilege. Defendant does not explain why the deliberative process privilege may apply to its set of facts. Because defendant bears the burden under United States Court of Federal Claims Rule 26(c) to show "good cause" for the entry of protective order, the court believes defendant's bare reference to the deliberative process privilege is insufficient to grant a protective order on that basis.  The court agrees with plaintiff that defendant had an obligation to assert the privilege in its original motion (so that the plaintiff would have had an opportunity to respond in its opposition) and the failure to do so constituted a waiver of the right to assert the deliberative process privilege.  See Pls.' Opp. at 8.

[2]There is wide support in the case law for the view that an attorney may testify when he
(continued...)

United States, was involved in determining the scope of the United States's trust responsibilities and is, therefore, a fact witness with personal knowledge relevant to the litigation. See Pls.' Opp. at 5.

Moreover, the fiduciary exception to the attorney-client privilege applies here. Under the fiduciary exception to the attorney-client privilege, the privilege does not apply to prevent disclosure to beneficiaries of communications between a trustee and its counsel concerning management and administration of the trust. See In re Grand Jury Proceedings Grand Jury No. 97-11-8, 162 F.3d 554, 556 (9th Cir. 1998) (citing Riggs Nat'l Bank of Washington, D.C. v. Zimmer, 355 A.2d 709 (Del. Ch. 1976)); Comegys v. Glassell, 839 F. Supp. 447, 448-49 (E.D. Tex. 1993).

There are two distinct rationales for this exception. First, the exception derives from a trustee's duty to disclose all information about a plan's administration to the plan's beneficiaries, a rationale which has had particular force in the ERISA context. See, e.g., In re Long Island Lighting Co., 129 F.3d 268, 272 (2d Cir. 1997) (holding that "an employer acting in the capacity of ERISA fiduciary is disabled from asserting the attorney-client privilege against plan beneficiaries on matters of plan administration"); Wildbur v. ARCO Chemical Co., 974 F.2d 631, 645 (5th Cir. 1992) (holding that "an ERISA fiduciary cannot assert the attorney-client privilege against a plan beneficiary about legal advice dealing with plan administration"); Petz v. Ethan Allen, Inc., 113 F.R.D. 494, 496-97 (D. Conn. 1985) (ERISA fiduciary may not raise attorney-client privilege against beneficiary.). Second, a trustee, as the representative for the beneficiaries of a trust, is not the "real client" when he seeks advice about the administration of that trust. See United States v. Evans, 796 F.2d 264, 265-66 (9th Cir. 1986) Rather, the beneficiaries are the "real client" being served by the advice concerning trust administration. Id. at 266.

Defendant argues that the fiduciary exception does not apply when beneficiaries bring suit against the trustee. Def.'s Reply at 2. However, in Riggs, the leading case finding the fiduciary exception, the beneficiaries had brought suit against the estate

---

[2](...continued)
has personal knowledge as a fact witness. See, e.g., Rainbow Investors Group, Inc. v. Fuji Trucolor Mo., Inc. , 168 F.R.D. 34, 37 (W.D. La. 1996) (permitting deposition of attorney due to his involvement as a negotiator in business activity prior to litigation); United Phosphorus, Ltd. v. Midland Fumigant, Inc., 164 F.R.D. 245, 248-49 (D. Kan. 1995) (permitting attorney to be deposed because he was invloved in underlying facts of litigation); Kaiser v. Mutual Life Ins. Co. of N.Y., 161 F.R.D. 378, 382 (S.D. Ind. 1994) (finding deposition of attorney appropriate after determining that he was involved in underlying facts as either an actor or a witness); Bogan v. Northwestern Mut. Life Ins. Co., 152 F.R.D. 9, 14 (S.D.N.Y. 1993) (permitting deposition of opposing counsel because that attorney had concededly participated in disputed pre-litigation events which relate to the issues raised in litigation).

trustees.  See Riggs, 355 A.2d at 710.  In United States v. Mett,178 F.3d 1058 (9ᵗʰ Cir. 1999), the case on which defendant relies, the court appears to narrow the fiduciary exception.  Mett, which the court finds inapposite here, was a criminal case in which the court reversed the embezzlement convictions of a trustee.  Id. at 1060.  In Mett, the court found that where it is clear that the trustee has sought legal advice for his own personal benefit, that is, to defend himself, the attorney-client privilege exists.  Id. at 1064.

In this case, the memos at issue related to management of the trust.  The United States did not seek this information to defend itself from liability, but rather to understand the scope of the assets it was under a duty to protect in the administration of the trust.  In these circumstances, the fiduciary exception applies, and the testimony of Mr. Aldrich is discoverable.

Finally, defendant attempts to prevent the deposition of Mr. Aldrich by invoking the work product doctrine.  The work product doctrine applies to attorney work produced in anticipation of litigation or for on-going litigation.  Although this suit had been filed at the time these memos were written, the suit was in abeyance at the time.  Moreover, it is apparent from their face that these documents were written in the ordinary course of business, that is, the business of managing the trust; they were not produced for the purposes of the litigation.  No reference is made to this litigation; no attorney-work-product reference appears on the face of the documents; and the content of the documents is of a general, informative nature.  Accordingly, the work product doctrine does not apply.

III.  Conclusion

For the foregoing reasons, defendant's motion is DENIED.

IT IS SO ORDERED.

_Emily Hewitt_
EMILY C. HEWITT
Judge

4