# In The United States Court of Federal Claims

No. 02-25L

(Filed Under Seal: August 18, 2011)

Reissued: August 26, 2011[1]

_____

| | | |
|---|---|---|
| JICARILLA APACHE NATION, <br> formerly JICARILLA APACHE TRIBE, <br><br>            Plaintiff, <br><br>    v. <br><br> THE UNITED STATES, <br><br>            Defendant. | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * | Tribal trust case; Motions for partial summary judgment; Indian Tucker Act – 28 U.S.C. § 1505; *Navajo Nation* – when statutes give rise to claims under the Indian Tucker Act; Statutes governing accounting and management of tribal trust funds – 25 U.S.C. §§ 161, 161a, 162a; *Cheyenne-Arapaho* – statutes give rise to fiduciary obligation to maximize trust income by prudent investment; *Cheyenne-Arapaho* still binding precedent; Court has jurisdiction over pooling claim; Court lacks jurisdiction over disbursement lag claim. |

_____

## OPINION

_____

*Steven D. Gordon*, Holland & Knight, Washington, D.C., for plaintiff.

*Stephen R. Terrell*, Environmental and Natural Resources Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Ignacia S. Moreno*, for defendant.

*Alan R. Taradash* and *Daniel I.S.J. Rey-Bear*, the Nordhaus Law Firm, Albuquerque, New Mexico, for the Pueblo of Laguna and the Navajo Nation, *amici*.

_____

[1] An unredacted version of this opinion was issued under seal on August 18, 2011. The parties were given an opportunity to propose redactions, but no such proposals were made. Nonetheless, the court has incorporated some minor changes into this opinion.

**ALLEGRA, Judge:**

Pending before the court, in this tribal trust case, are two motions for partial summary judgment under RCFC 56, raising important issues regarding the reach of this court's jurisdiction under the Indian Tucker Act, 28 U.S.C. § 1505.

**I.**

A brief recitation of the underlying facts sets the context for this decision.

In this case, the Jicarilla Apache Nation (Jicarilla, the Nation, or plaintiff) seeks an accounting and to recover for monetary loss and damages relating to the government's breach of fiduciary duties in allegedly mismanaging the Nation's trust assets and other funds. Plaintiff, *inter alia*, avers that defendant failed to maximize returns on its trust funds. For trial purposes, the court has broken this case into several phases, the first of which involves the alleged mismanagement of plaintiff's trust funds for the period from February 22, 1974, through September 30, 1992. Among the claims of mismanagement that plaintiff makes as to this period are that the United States breached its fiduciary obligations by: (i) failing to pool the Nation's trust funds with those of other tribes for investment purposes (the pooling claim); and (ii) immediately removing funds from the Nation's trust fund to cover a disbursement check, thereby creating a lag between when such funds were removed and the check was negotiated, during which time no income was earned on the subject funds (the disbursement lag claim). Through its experts, plaintiff has developed investment models that calculate the hypothetical earnings associated with these claims. Via that model, plaintiff estimates that, in what it terms "2011" dollars, it is owed approximately $90 million on its pooling claim, and $810,789.90 on its disbursement lag claim.

On March 18, 2011, and May 20, 2011, defendant filed motions for partial summary judgment on plaintiff's pooling and disbursement lag claims, respectively. Defendant's argument in both motions is essentially the same: it asserts that the United States has not waived its sovereign immunity as to these claims. In response, plaintiff, *inter alia*, filed a cross-motion for partial summary judgment as to the disbursement lag claim. After the briefing on these motions was completed, the court, on July 22, 2011, conducted oral argument on the motions. Following that argument, the parties filed supplemental memoranda on August 12, 2011.

**II.**

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment. *Id*. at 248. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party."

*Id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Becho, Inc. v. United States*, 47 Fed. Cl. 595, 599 (2000).

When making a summary judgment determination, the court is not to weigh the evidence, but to "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Agosto v. Immigration & Naturalization Serv.*, 436 U.S. 748, 756 (1978) ("a [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"); *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004). The court must determine whether the evidence presents a disagreement sufficient to require fact finding, or, conversely, is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 250-52; *see also Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009) ("'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" (quoting *Matsushita*, 475 U.S. at 587)). Where there is a genuine dispute, all facts must be construed, and all inferences drawn from the evidence must be viewed, in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587-88 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also Stovall v. United States*, 94 Fed. Cl. 336, 344 (2010); *L.P. Consulting Grp., Inc. v. United States*, 66 Fed. Cl. 238, 240 (2005).

## A.

"It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983) (*Mitchell II*). The Nation asserts federal subject-matter jurisdiction under the Indian Tucker Act (as it is colloquially known), 28 U.S.C. § 1505. That Act provides:

> The United States Court of Federal Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe . . . whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band, or group.

28 U.S.C. § 1505. The reference in this provision to "which otherwise would be cognizable in the Court of Federal Claims" incorporates the Tucker Act, 28 U.S.C. § 1491. The latter provision, in turn, grants this court "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1491(a)(1). "If a claim falls within the terms of the [Indian] Tucker Act," the Supreme Court has held, "the United States has presumptively consented to suit." *Mitchell II*, 463 U.S. at 216; *see also United States v. Navajo Nation*, 537 U.S. 488, 503 (2003) (*Navajo I*); Gregory C. Sisk, "Yesterday and Today: Of Indians, Breach of Trust, Money, and Sovereign Immunity," 39 Tulsa L. Rev. 313, 316-17 (2003) (hereinafter "Sisk").

Like the Tucker Act, the Indian Tucker Act "is not itself a source of substantive rights." *Navajo I*, 537 U.S. at 503; *see also Mitchell II*, 463 U.S. at 216. Accordingly, to state a claim under the Act, "a tribal plaintiff must invoke a rights-creating source of substantive law that 'can fairly be interpreted as mandating compensation by the Federal Government for damages sustained.'" *Navajo I*, 537 U.S. at 503 (quoting *Mitchell II*, 463 U.S. at 218). In *Navajo I*, Justice Ginsburg, writing on behalf of the Court's majority, bifurcated this analysis into two discrete steps. "To state a claim cognizable under the Indian Tucker Act," she first wrote, "a tribe must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *Navajo I*, 537 U.S. at 506 (citing *Mitchell II*, 463 U.S. at 216-17). "If that threshold is passed," she further opined, "the court must then determine whether the relevant source of substantive law" is money-mandating. *Id*. In this regard, the opinion went on to explain that "[a]lthough 'the undisputed existence of a general trust relationship between the United States and the Indian people' can 'reinforc[e]' the conclusion that the relevant statute or regulation imposes fiduciary duties, that relationship alone is insufficient to support jurisdiction under the Indian Tucker Act." *Navajo I*, 537 U.S. at 506 (quoting *Mitchell II*, 463 U.S. at 225). Rather, "the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions," albeit prescriptions that "need not . . . expressly provide for money damages" as "the availability of such damages may be inferred." *Navajo I*, 537 U.S. at 506; *see also United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2325 (2011); *United States v. Navajo Nation*, 129 S. Ct. 1547, 1551-52, 1558 (2009) (*Navajo II*).

Seizing on the Supreme Court's reference to "specific rights-creating or duty-imposing statutory . . . prescriptions," *Navajo I*, 537 U.S. at 506, defendant asseverates that plaintiff's pooling and disbursement lag claims are deficient because they are not based upon a substantive source of law that establishes fiduciary or other duties. As such, according to defendant, this court lacks jurisdiction over these claims. Not so, argues plaintiff (and, as to the pooling claim, the *amici*), asserting that various Federal statutes and regulations establish fiduciary obligations that underlie the claims in question.

**B.**

The United States' trust relationship with American Indian tribes includes a spectrum of obligations and responsibilities. While the general trust relationship between the United States and Indian tribes "reinforce[es]" the United States' fiduciary obligations, *see Navajo I*, 537 U.S. at 506, the United States' "specific fiduciary or other duties" to a tribe determine the precise consequences which flow from the United States' legal responsibilities. *Id*.

As noted, this phase of the litigation between the United States and the Jicarilla involves the United States' accounting, management, and investment of the Jicarilla's trust funds from 1972 to 1992.[2] Those claims principally arise under 25 U.S.C. §§ 161 ("Deposit in Treasury of

---

[2] "The system of trusteeship and Federal management of Indian funds is deeply rooted in Indian-U.S. history." Misplaced Trust: The Bureau of Indian Affairs' Mismanagement of the

trust funds"), 161a ("Trust funds in trust in Treasury Department; investment by Secretary of the Treasury"), 162a ("Deposit of tribal funds in banks; . . . investments"), and, to a lesser extent, the American Indian Trust Fund Management Reform Act of 1994, 25 U.S.C. §§ 4001 *et seq*. (the 1994 Trust Fund Act), which recognizes and codifies the existing trust relationship.  These statutes expressly refer to the United States as "trustee of the various Indian tribes," *id*. § 161, and to the accounts at issue as "tribal trust funds," *see*, *e.g.*, *id*. § 162a.  They confer control and discretion upon the United States with respect to the management and investment of the funds. Thus, section 161 requires the United States to deposit in the Treasury and pay interest on such funds when "the best interests of the Indians will be promoted by such deposits, in lieu of investments."  And, section 162a acknowledges "[t]rust responsibilities of the Secretary of the Interior," stating that they "shall include (but are not limited to)" providing "adequate systems for accounting for and reporting trust fund balances.  *Id*. § 162a(d); *see also* Misplaced Trust, *supra*, at 6-7 (discussing these statutes).

These statutory "prescription[s] . . . bear[] the hallmarks of a 'conventional fiduciary relationship.'"  *Navajo II*, 129 S. Ct. at 1558 (quoting *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 473 (2003)).  They vest the United States with management control over the trust funds, discretion with respect to their investment, and detailed responsibilities to account to the tribal beneficiaries.  *See also White Mountain Apache*, 537 U.S. at 480 (the statute "expressly and without qualification employs a term of art ('trust') commonly understood to entail certain fiduciary obligations, and 'invests the United States with discretionary authority to make direct use of portions of the trust corpus'") (citation and alteration omitted) (Ginsburg, J., concurring). As stated somewhat differently by the Supreme Court in *Mitchell II*, these statutes give the Secretary of the Interior "authority to invest tribal . . . funds held in trust in banks, bonds, notes or other public debt obligations of the United States if deemed advisable and for the best interest of the Indians."  463 U.S. at 223 n.24 (citing 25 U.S.C. § 162a).[3]

_____

Indian Trust Fund, H.R. Rep. No. 102-499, at 6 (1992) (Misplaced Trust).  The United States first adopted the policy of holding tribal funds in trust in 1820.  *Id*.

[3]  Congress further addressed the United States' administration of tribal and individual Indian trust funds in the 1994 Trust Fund Act.  *See* Pub. L. No. 103-412, 108 Stat. 4239 (codified at 25 U.S.C. §§ 161a(b), 162a, 4001, *et seq*.).  In that Act, Congress acknowledged both the existence and the fiduciary nature of the United States statutory responsibilities and sought to address serious deficiencies in the government's management of Indian trust funds.  *See*, *e.g.*, H.R. Rep. No. 103-778, at 8 (1994); Misplaced Trust, *supra*, at 1-8.  Indeed, the 1994 Trust Fund Act described its provisions as a " recognition" of the existing trust responsibility with respect to tribal and individual Indian trust funds.  *See* 1994 Trust Fund Act,  108 Stat at 4240 (capitalization omitted; emphasis supplied).  It provided that "[t]he Secretary shall account for the daily and annual balance of all funds held in trust" for a tribe or an individual Indian "which are deposited or invested pursuant to [25 U.S.C. § 162a]."  25 U.S.C. § 4011(a).  It further required the Secretary to conduct an "annual audit" of all funds held in trust for the benefit of a tribe or individual Indian "which are deposited or invested pursuant to section 162a."  *Id*. § 4011(c).  The 1994 Trust Fund Act also amended 25 U.S.C. § 162a, adding a subsection (d),

The Court of Claims examined this network of statutes in *Cheyenne-Arapaho Tribes of Indians of Oklahoma v. United States*, 512 F.2d 1390 (Ct. Cl. 1975).  In that consolidated case, several Tribes alleged that "defendant breached its fiduciary duties in the care of plaintiffs' funds by not making the funds productive (by not investing moneys ready for investment and also by delay in making funds available for investment), by not maximizing the productivity of funds, and by using the funds to its own benefit and to the detriment of the tribes." *Id*. at 1392.  In laying a foundation for considering these claims, this court's predecessor observed that "[w]hen Congress, in the exercise of its power over the Indians, determined by statute and by treaty to hold funds due the tribes in trust rather than immediately distributing them to the Indians, it also developed a series of investment policies for those funds." *Id*. at 1393.  The court noted that its focus was on the statutes embodying those policies, as the plaintiffs were not claiming that "Congress breached its trust duties under the Constitution or treaties," but rather that "the Bureau of Indian Affairs has not properly used the tools Congress provided in order to meet the Government's fiduciary obligation." *Id*.  The court proceeded to review the statutory investment scheme, tracing the history and language of statutes like 25 U.S.C. §§ 161a, 161b, and 162a back into the 1880s.  *Id*.  Based on its review of this history and the statutory language, the court concluded that "[t]he fiduciary duty which the United States undertook with respect to these funds includes the 'obligation to maximize the trust income by prudent investment,'" adding that "[t]his is the general law governing the Government's duty and responsibility toward the Indian funds involved in this case."  512 F.2d at 1394 (quoting *Blankenship v. Boyle*, 329 F. Supp. 1089, 1096 (D.D.C. 1971)).

*Cheyenne-Arapaho* recognizes that the Indian Tucker Act combined with the investment statutes – 25 U.S.C. §§ 161a, 161b and 162a – provide jurisdiction over claims predicated upon the assertion that defendant has not maximized the income of a tribal trust by prudent investment.[4]  This holding was cited, with approval, in the 1992 Congressional report, Misplaced

---

which specified that the Secretary of the Interior's "proper discharge of the trust responsibilities of the United States shall include (but are not limited to)" a series of accounting, auditing, management, and disclosure obligations with respect to tribal and individual Indian trust funds. *See id*. § 162a(d).

[4]  *See also Osage Tribe of Indians of Okla. v. United States*, 72 Fed. Cl. 629, 668 (2006) ("The Court of Claims has addressed the statutory obligations under 25 U.S.C. §§ 161a, 161b, and 162a on a number of occasions and has uniformly held the United States responsible for investing Indian trust funds in the highest yielding investment vehicles available to the funds in question."); *id*. ("The requirement to invest Indian trust funds in the highest yielding investments available is a legal requirement mandated by the applicable statutes – here, 25 U.S.C. §§ 161a and 162a – and not solely a prudential one.").  If more were needed to support this conclusion, one might look to the Bureau of Indian Affairs Manual, as in effect for the years in question. The Manual listed, in detail, the types of investments that could be made of "[f]unds held in trust for the benefit of the tribes," and described the policy guiding those investments as "selecting securities that will yield the best possible return."  Bureau of Indian Affairs, Financial

Trust, *supra*, that forms part of the legislative history for the 1994 Trust Fund Act.  *See Cobell v. Norton*, 392 F.3d 461, 464 (D.C. Cir. 2004) (noting that "[i]n 1994 Congress moved from [the report's] findings to legislation").  Quoting from the opinion, the report iterated:

> Apart from the duty to account, the Federal Government has a fiduciary duty to "maximize the trust income by prudent investment," and the burden to justify less than a maximum return.  This responsibility requires the Government to stay well-informed about the rates of return and investment opportunities and to intelligently choose from among authorized investment opportunities to obtain the highest rate of return to make the trust funds productive.

Misplaced Trust, *supra*, at 6 (quoting *Cheyenne-Arapaho*, 512 F.2d at 1394).[5]  Despite Congress' reliance on this statement, defendant claims that *Cheyenne-Arapaho* was wrongly decided because it employs a common law trust analysis that has been overruled by more recent Supreme Court cases such as *Mitchell II*, *Navajo I*, and the recent decision in this very case, *United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313.  But, there are a number of holes in this argument.

For one thing, defendant presumes that this court can disregard otherwise binding circuit precedent based on the mere belief that a prior decision of the Court of Claims or Federal Circuit is inconsistent with the rationale of a subsequent Supreme Court precedent.[6]  The Federal Circuit, however, seems to have a more restrictive view of *stare decisis*, as illustrated by its decision in *El-Shifa Pharmaceutical Industries Co. v. United States*, 378 F.3d 1346 (Fed. Cir. 2004), *cert. denied*, 545 U.S. 1139 (2005).  In that case, the Federal Circuit was faced with a scenario essentially identical to that presented here – the United States urged it to overrule

-----

Management Accounting Procedures Handbook, 42 BIAM Supplement No. 3. 11.A, 11.D. (June 5, 1972).

[5]  At a later point, the same report provides that –

The challenge for the Bureau is to provide competent and reliable trust services.  To fulfill these important obligations it is necessary for the agency to fully understand both its fiduciary duties and the financial marketplace.  Stated simply these fundamental assignments are:  To accurately account to the beneficiary; to make accounts productive for the beneficiaries; and to maximize the trust income through prudent investment.  To successfully perform these tasks, the Bureau of Indian Affairs, as any fiduciary, must conduct itself as a sophisticated investor, a smart shopper, and a highly diligent and resourceful manner.

Misplaced Trust, *supra*, at 8.

[6]  In *S. Corp. v. United States*, 690 F.2d 1368, 1369 (Fed. Cir. 1982) (en banc), the Federal Circuit adopted the precedent of the Court of Claims as its own.

*Turney v. United States*, 115 F. Supp. 457 (Ct. Cl. 1953), on the basis of the Supreme Court's intervening decision in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990). While *Turney* had applied the Fifth Amendment to an alien claiming a takings in a foreign land, 115 F. Supp. at 464, *Verdugo-Urquidez* construed prior Supreme Court cases as having "rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States." 494 U.S. at 269. Although it could not reconcile these holdings, the panel in *El-Shifa* refused to declare *Turney* no longer the law, stating, "'[w]e cannot simply overrule the [*Turney*] decision, even if we were persuaded . . . that it is appropriate; to overrule a precedent, the court must rule en banc.'" *El-Shifa*, 378 F.3d at 1352 (quoting *George E. Warren Corp. v. United States*, 341 F.3d 1348, 1351 (Fed. Cir. 2003), *cert. denied*, 543 U.S. 808 (2004)).

While *El-Shifa* is perhaps the Federal Circuit decision that most closely parallels this case, it is, by no means, an isolated precedent. The Federal Circuit, in fact, has often given similar admonitions regarding the binding nature of its decisions.[7] Logic and common sense suggest that if a panel of that court lacks the authority to overrule a prior circuit decision, then this court also must lack that authority. To conclude otherwise would be folly. On the basis of this line of authority, and, particularly, *El-Shifa*, this court declines defendant's invitation to "underrule" the Court of Claims' decision in *Cheyenne-Arapaho*. *See generally*, *Consol. Edison Co. of N.Y., Inc. v. U.S. Dep't of Energy*, 247 F.3d 1378, 1386 (Fed. Cir. 2001) (Plager, J., concurring).

Even if *El Shifa* leaves some wiggle room for this court to consider whether *Cheyenne-Arapaho* has been undermined by subsequent precedent,[8] the essential premise for defendant's

---

[7]   *See Atamirzayeva v. United States*, 524 F.3d 1320, 1327 (Fed. Cir. 2008); *Fed. Nat'l Mortgage Ass'n v. United States*, 469 F.3d 968, 972 (Fed. Cir. 2006); *Barclay v. United States*, 443 F.3d 1368, 1373 (Fed. Cir. 2006), *cert. denied*, 549 U.S. 1209 (2007) ("Panels of this court are bound by previous precedential decisions until overturned by the Supreme Court or by this court en banc."); *Medimmune, Inc. v. Genentech, Inc.*, 427 F.3d 958, 963 n.2 (Fed. Cir. 2005), *rev'd on other grounds*, 549 U.S. 118 (2007); *Sacco v. Dep't of Justice*, 317 F.3d 1384, 1386 (Fed. Cir. 2003) ("A panel of this court is bound by prior precedential decisions unless and until overturned en banc."); *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir. 1988), *cert. denied*, 493 U.S. 814 (1989); *Kimberly-Clark Corp. v. Fort Howard Paper Co.*, 772 F.2d 860, 863 (Fed. Cir. 1985); *see also* 13 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, *et al.*, Fed. Prac. & Proc. § 3506 (3d ed. 2010).

[8]   In one decision cited by defendant, the Federal Circuit suggested that the rule is different if a Supreme Court decision is "directly at odds" with an earlier Federal Circuit precedent. *Doe v. United States*, 372 F. 3d 1347, 1356-57 (Fed, Cir. 2004). But, even assuming that this case can be reconciled with the dozen or so precedents cited above, the circumstance described in *Doe* is not the case here. In arguing that this court may disregard prior precedent, defendant also quotes from *Texas American Oil Corp. v. United States Department of Energy*, 44 F.3d 1557, 1561 (Fed. Cir. 1995) (en banc), seemingly ignoring that the statements it invokes were made by an *en banc* court describing its own authority to overrule prior precedents. That decision, therefore, is inapposite.

argument – that *Cheyenne-Arapaho* is at odds with intervening Supreme Court decisions – is simply wrong.  In fact, in many ways, the reasoning employed by the Court of Claims in *Cheyenne-Arapaho* presaged the analysis later prescribed by the Supreme Court.  Thus, as would later be dictated by *Navajo I*, the Court of Claims initially focused on the network of statutory provisions dealing with the investment of tribal funds – for the most part, the same statutes at issue here.[9]  *Cheyenne-Arapaho*, 512 F.2d at 1392-94.  Examining the language and history of those statutes, the court found that they collectively imposed a fiduciary duty on the United States to make prudent investments.  *Id*. at 1394.  The court went on to flesh-out this skeletal duty in holding that defendant was liable to the plaintiffs for the difference between what had been earned on the funds and the maximum the funds could have legally and practically earned if properly invested.  *Id*. at 1396.  Toward this end, the Court of Claims outlined a series of government obligations that stemmed from that duty, none of which were itemized in the statutes.[10]  As would later be dictated by the Supreme Court, the court thus used common law principles not to establish the fiduciary obligations, but rather "to inform [its] interpretation of statutes and to determine the scope of liability that Congress has imposed."  *Jicarilla*, 131 S. Ct. at 2325; *see also White Mountain Apache*, 537 U.S. at 475-76; Sisk, *supra*, at 339 ("In the case of a Native American claimant, where the government has assumed pervasive control over Indian assets, the trust doctrine unavoidably overlays and infuses the legal analysis.").

　　Reinforcing the view that *Cheyenne-Arapaho* was correctly decided are the striking similarities among that case, *Mitchell II* and *White Mountain Apache*.  In *Mitchell II*, the Supreme Court focused on a statute which mandated that sales of timber from Indian trust lands

---

[9]  To be sure, there is not a perfect overlap between the statutes discussed in *Cheyenne-Arapaho* and those discussed here.  Thus, *Cheyenne-Arapaho* discusses 25 U.S.C. § 161b, a statute that plaintiff does not invoke, while plaintiff invokes 25 U.S.C. § 161, a statute that *Cheyenne-Arapaho* does not discuss.  In the court's view, these differences have minimal impact, as it is this group of statutes that collectively establishes the investment obligations from which the fiduciary duties at issue spring.

[10]  Accordingly, the court in *Cheyenne-Arapaho* found, *inter alia*, that defendant:  (i) was obliged to consider specific public-debt obligations of the United States and securities guaranteed by the United States that had specifically been listed as eligible investments by the Associate Solicitor of the Interior Department; (ii) could not deflect liability based upon "its policy of consulting the Indians before investing and the plaintiffs' failure to respond to its request for advice," but instead was "duty bound to make the maximum productive investment unless and until specifically told not to do so by a tribe and until defendant also made an independent judgment that the tribe's request was in its own best interest;" (iii) should, as to funds held in the Treasury, be held "to a strict standard of fiduciary duty – if eligible investments were available at higher, yields, defendant will be liable to plaintiffs for the difference between what interest defendant paid for the funds and the maximum the funds could have legally and practically earned if properly invested outside;" and (iv) was liable for income lost as to various funds that could have been invested at more productive returns during various periods at suit.  512 F.2d at 1395-96.

be based upon the Secretary's consideration of "the needs and best interests of the Indian owner and his heirs" and that proceeds from such sales be paid to owners "or disposed of for their benefit." *Mitchell II*, 463 U.S. at 224 (citing 25 U.S.C. § 406(a)).  And from this statute and the control it afforded to the Secretary, the Supreme Court deduced that this court had jurisdiction over the tribal damage claims not only for breaches of fiduciary duties that immediately sprang from the statute, such as the failure to obtain a fair market value for timber sales, but also for breaches of obligations that seemingly had no direct tie to the statutory language.  Among the latter were the government's: (i) failure to manage timber on a sustained-yield basis; (ii) failure to develop a proper system of roads and easements for timber operations; (iii) exaction of improper charges from allottees for maintenance of roads; and (iv) exaction of excessive administrative fees from the allottees.  463 U.S. at 210, 228.[11]

A generation later, in *White Mountain Apache*, the Supreme Court heavily relied on *Mitchell II* in again finding that the United States had a fiduciary obligation to perform duties that were not specifically described by a statute.  The Court there predicated the existence of a fiduciary relationship on a 1960 statute that stated that the "'former Fort Apache Military Reservation' would be 'held by the United States in trust for the White Mountain Apache Tribe, subject to the right of the Secretary of the Interior to use any part of the land and improvements for administrative or school purposes for as long as they are needed for the purpose.'"  537 U.S. at 469 (quoting Act of March 8, 1960, Pub. L. No. 86-392, 74 Stat. 8).  From this statute, the Court made a "fair inference" that the United States was required to maintain and conserve the buildings on the reservation.  The Court so held even while readily admitting that "the 1960 Act

---

[11]  Notably, the dissenters in *Mitchell II* took the majority to task for not requiring greater evidence of congressional intent to authorize a suit for money damages.  In this regard, Justice Powell, writing on behalf of the dissenters, stated –

> The Court does not – and clearly cannot – contend that any of the statutes standing alone reflects the necessary legislative authorization of a damages remedy.  None of the statutes contains any "provision . . . that expressly makes the United States liable" for its alleged mismanagement of Indian forest resources and their proceeds or grants a right of action "with specificity."  *Testan*, 424 U.S., at 399, 400, 96 S.Ct., at 954.  Indeed, nothing in the timber-sales statutes, 25 U.S.C. §§ 406, 407, 466, the road and right-of-way statutes, §§ 318a, 323- 325, or the interest statute, § 162a, addresses in any respect the institution of damages actions against the United States.  Nor is there any indication in the legislative history of the statutes that Congress intended to consent to damages actions for mismanagement of Indian assets by enacting these provisions.  The Court does not suggest otherwise.

463 U.S. at 230 (Powell, J., dissenting).  Of course, it is telling that the argument that Justice Powell criticized the majority for rejecting is essentially the same argument that defendant makes here.

does not . . . expressly subject the Government to duties of management and conservation." *Id.* at 475.[12]

More importantly, in reaching the latter conclusion, the *White Mountain Apache* Court thoroughly repudiated defendant's cramped view of its fiduciary obligations. As recounted by the Supreme Court, defendant had contended below "that jurisdiction was lacking . . . because no statute or regulation cited by the Tribe could fairly be read as imposing a legal obligation on the Government to maintain or restore the trust property, let alone authorizing compensation for breach." *Id.* at 470; *see White Mountain Apache Tribe v. United States*, 46 Fed. Cl. 20, 27-28 (1999)). Persuaded by this argument, this court dismissed the complaint for lack of jurisdiction, finding that "[a]lthough the cited statutes and regulations may give the government complete control over the Fort Apache site, they do not require that the government manage the Fort Apache site for the purpose of protecting the tribe's financial interests." *Id.* at 28. The Federal Circuit, however, reversed, rebuffing defendant's argument that "the *Mitchell* cases, read together, impose a fiduciary obligation only when the pertinent statute . . . . creating the trust relationship also directs the United States to manage the trust corpus for the benefit of the beneficiaries, i.e., the Native Americans." *White Mountain Apache Tribe v. United States*, 249 F.3d 1364, 1375 (Fed. Cir. 2001). Once this duty was found, the Federal Circuit held, a court could look to the common law of trusts "for assistance in defining the nature of that obligation." *Id*. at 1377. After granting certiorari, 535 U.S. 1016 (2002), the Supreme Court affirmed.

In so holding, the Supreme Court, like the Federal Circuit before it, rejected defendant's banner defense – akin to the one it offers here: "that no intent to provide a damages remedy is fairly inferable, for the reason that '[t]here is not a word in the 1960 Act – the only substantive source of law on which the Tribe relies – that suggests the existence of such a mandate.'" *White Mountain Apache*, 537 U.S. at 476-77 (quoting Brief for the United States 28). The Court made short shrift of this claim in a passage that bears repeating in its entirety –

> To the extent that the Government would demand an explicit provision for money damages to support every claim that might be brought under the Tucker Act, it would substitute a plain and explicit statement standard for the less demanding requirement of fair inference that the law was meant to provide a damages remedy for breach of a duty. To begin with, this would leave *Mitchell II* a wrongly decided case, for one would look in vain for a statute explicitly providing that inadequate timber management would be compensated through a suit for damages. But the more fundamental objection to the Government's position is

---

[12]   Again, the dissenters in *White Mountain Apache* would have adopted defendant's position that the text of the 1960 Act did not create a fiduciary responsibility to maintain and conserve the buildings on the reservation. *See White Mountain Apache*, 537 U.S. at 484 (Thomas, J., dissenting) ("If Congress intended to create a compensable trust relationship between the United States and the Tribe with respect to the Fort Apache property, it provided no indication to this effect in the text of the 1960 Act.").

that, if carried to its conclusion, it would read the trust relation out of Indian
Tucker Act analysis; if a specific provision for damages is needed, a trust
obligation and trust law are not.  And this likewise would ignore *Mitchell I*, where
the trust relationship was considered when inferring that the trust obligation was
enforceable by damages.  To be sure, the fact of the trust alone in *Mitchell I* did
not imply a remedy in damages or even the duty claimed, since the Allotment Act
failed to place the United States in a position to discharge the management
responsibility asserted.  To find a specific duty, a further source of law was
needed to provide focus for the trust relationship.  But once that focus was
provided, general trust law was considered in drawing the inference that Congress
intended damages to remedy a breach of obligation.

*Id*. at 477; *see also* Sisk, *supra*, at 336.  Summing up, the Court concluded that "[w]hile it is true
that the 1960 Act does not, like the statutes cited in [*Mitchell II*], expressly subject the
Government to duties of management and conservation, the fact that the property occupied by
the United States is expressly subject to a trust supports a fair inference that an obligation to
preserve the property improvements was incumbent on the United States as trustee."  537 U.S. at
475.[13]  Accordingly, despite the fact that no statute or regulation imposed a duty to restore and
maintain the buildings at issue, the Court determined that this court had jurisdiction over a claim
alleging the breach of that duty.  *Id*. at 479. [14]

    While *White Mountain Apache* may be the sockdolager here, it is neither the first nor the
only case to reject defendant's theory.  Prior to the Supreme Court's decision, the Court of
Claims had repeatedly dismissed the notion that defendant's fiduciary duties must be specifically
enumerated by statute.  *See Duncan v. United States*, 667 F.2d 36, 42-43 (Ct. Cl. 1981), *cert.
denied*, 463 U.S. 1228 (1983) (applying *Mitchell I* while rejecting defendant's claim that "a

---

[13]  Twenty years earlier, in *Mitchell II*, Justice Marshall rejected the notion that the
contours of the government's trust obligations were mapped solely by statutory language,
stating:  "[w]here the Federal Government takes on or has control or supervision over trial
monies or properties, the fiduciary relationship normally exits with respect to such monies or
properties (unless Congress has provided otherwise) even though nothing is said expressly in the
authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or
fiduciary connection."  *Mitchell II*, 463 U.S. at 225 (quoting *Navajo Tribe of Indians v. United
States*, 624 F.2d 981, 987 (Ct. Cl. 1980) (internal quotations omitted)).

[14]  In her concurring opinion, Justice Ginsburg indicated that she believed that the
majority's opinion was consistent with the analysis prescribed in *Navajo I*.  537 U.S. at 479
(Ginsburg, J., concurring).  In this regard, she posited that "[t]he dispositive question . . . is
whether the 1960 measure, in placing property in trust and simultaneously providing for the
Government-trustee's use and occupancy, is fairly interpreted to mandate compensation for the
harm caused by maladministration of the property."  *Id*.  Justice Ginsburg answered this question
affirmatively, holding that the 1960 Act imposed concrete and substantive obligations on the
United States.  *Id.* at 480-81.

federal trust must spell out specifically all the trust duties of the Government"); *Navajo Tribe*, 624 F.2d at 988 ("Nor is the court required to find all the fiduciary obligations it may enforce within the express terms of an authorizing statute . . . .").[15]  And cases decided in the wake of *White Mountain Apache* reflect a similar view.[16]  Subsequent decisions of the Supreme Court, moreover, confirm that *Mitchell II* and *White Mountain Apache* remain good law.  In *Navajo I*, decided the same day as *White Mountain Apache*, the Supreme Court referred to the *Mitchell II* decision as "pathmarking."  537 U.S. at 503.  A half a dozen years later, in *Navajo II*, the Court again relied upon both decisions.  *Navajo II*, 129 S. Ct. at 1552; *see also* Sisk, *supra*, at 336 ("both *Navajo Nation* and *White Mountain Apache* echo the teaching of *Mitchell II*").  Most recently, in *Jicarilla*, the Supreme Court reaffirmed the analysis in *Mitchell II* and *White Mountain Apache*.  *See Jicarilla*, 131 S. Ct. at 2325 ("we have found that particular 'statutes and regulations . . . clearly establish fiduciary obligations of the Government' in some areas") (citing *Mitchell II*, 463 U.S. at 226; *White Mountain Apache,* 537 U.S. at 475).  The Court in *Jicarilla*, moreover, reemphasized that while a Tribe needs to point, at the outset, to a specific, trust-creating statute, the language of such a statute ultimately does not cabin defendant's fiduciary obligations.  *Jicarilla*, 131 S. Ct. at 2325.  Rather, the Court concluded, "once federal law imposes such duties, the common law 'could play a role.'"  *Id.*  (quoting *Navajo II*, 129 S. Ct. at 1558).  In this regard, it added that "[w]e have looked to common-law principles to inform our interpretation of statutes and to determine the scope of liability that Congress has imposed."  *Id.* (citing *White Mountain Apache*, 537 U.S. at 475-76).[17]

Defendant would have this court blithely accept what so many courts have rejected – that for the breach of a fiduciary duty to be actionable in this court, that duty must be spelled out, in

---

[15]  The Court of Claims plainly did not think that *Mitchell I* overruled *Cheyenne-Arapaho* as it relied upon the latter opinion in deciding the remand of the first *Mitchell* case.  *See Mitchell v. United States*, 664 F.2d 265, 274 (Ct. Cl. 1981) (*Mitchell I on remand*).  Indeed, in that remand decision, the Court of Claims specifically rejected the notion that its *en banc* decision in *United States v. Mescalero Apache Tribe*, 518 F.2d 1309 (Ct. Cl. 1975), *cert. denied*, 425 U.S. 911 (1976), had overruled *Cheyenne-Arapaho*.  *Mitchell I on remand*, 664 F.2d at 274.  In so concluding, the court noted that "the controlling standards for determining breaches of the fiduciary obligations" remained the same in its cases.  664 F.2d at 274 n.17.

[16]  *See Cobell*, 392 F.3d at 472 (under *White Mountain Apache*, "once a statutory obligation is identified, the court may look to common law trust principals to particularize that obligation"); Sisk, *supra*, at 339 ("In the case of a Native American claimant, where the government has assumed pervasive control over Indian assets, the trust doctrine unavoidably overlays and infuses the legal analysis.").

[17]  Notably, the Federal Circuit has applied *Cheyenne-Arapaho* in several cases following the *Mitchell II* decision.  *See Short v. United States*, 50 F.3d 994, 999 (Fed. Cir. 1995); *see also Shoshone Indian Tribe of Wind River Reservation v. United States*, 364 F.3d 1339, 1353 (Fed. Cir. 2004), *cert. denied*, 544 U.S. 973 (2005) (finding that 25 U.S.C. §§ 161a, 161b, and 162a require defendant to earn interest on trust funds).

no uncertain terms, in a statute or regulation. But to conclude this, this court would have to perform a logic-defying feat of legal gymnastics.

That routine would commence with a full jurisprudential gainer – a twisting, backwards maneuver that would allow the court to ignore cases like *White Mountain Apache* and *Mitchell II* that have relied upon the common law to map the scope of enforceable fiduciary duties established by statutes and regulations. The court would then need to vault over *Cheyenne-Arapaho* and a soaring pyramid of other precedents, all of which have found defendant's argument wanting. Next, the court would be called upon to handspring to the conclusion that Congress' repeated legislative efforts to ensure the safe investment of tribal funds were mostly for naught – because, if defendant is correct, the provisions enacted were generally not perspicuous enough to create enforceable duties and, even where specific enough to do so, left interstices in which defendant could range freely. Indeed, while egging the court on, defendant never quite comes to grip with the fact that if the government's fiduciary duties are limited to the plain dictates of the statutes themselves, such duties are not really "fiduciary" duties at all. *See Varity Corp. v. Howe,* 516 U.S. 489, 504 (1996) ("[i]f the fiduciary duty applied to nothing more than activities already controlled by other specific legal duties, it would serve no purpose"). Taken to its logical dismount, defendant's view of the controlling statutes would not only defeat the twin claims at issue, but virtually ***all*** the investment claims found in the tribal trust cases, few of which invoke *haec verba* specific language in a statute or regulation. Were the court convinced even to attempt this tumbling run, it almost certainly would end up flat on its back and thereby garner from the three judges reviewing its efforts a combined score of "zero" – not coincidentally, precisely the number of decisions that have adopted defendant's position.

This court will not be the first to blunder down this path. Like the courts before it, it can accept neither defendant's assertion that *Cheyenne-Arapaho* has, *sub silentio*, been overruled, nor the wooden interpretation of the United States' statutory duties upon which that claim is based. A phalanx of contrary precedent requires this court instead to honor the Court of Claim's holding that the trust investment statutes in question establish defendant's "obligation to maximize the trust income by prudent investment." *Cheyenne-Arapaho*, 512 F.2d at 1394. It remains to apply this principle to the claims at issue.

## C.

Based on the foregoing, the court concludes that it has jurisdiction, under the Indian Tucker Act, over claims predicated upon defendant's violation of its obligation to maximize trust income by prudent investment. The latter duty, in accordance with prior precedent, derives from the various statutory provisions in Title 25 cited by Jicarilla – provisions that are undoubtedly money-mandating. *See Navajo I,* 537 U.S. at 506 (citing *Mitchell II,* 463 U.S. at 216-17). Accordingly, the United States has waived its sovereign immunity as to such claims.

- 14 -

**1.**

There is little doubt that plaintiff's pooling claim falls within this jurisdictional grant, as it directly involves the alleged breach of the aforementioned investment obligation. Thus, this court has jurisdiction to determine whether, in choosing among the alternative investments authorized by 25 U.S.C. §§ 161, 161a, and 162a, and the regulations thereunder, defendant was obligated to consider whether pooling the funds of more than one Tribe would maximize the income derived from particular investments. Consistent with this view, there is strong indication in the common law of trusts that, at least in some instances, a fiduciary charged with maximizing trust income by prudent investment would be expected to pool investments. *See* Restatement (Third) of Trusts § 90 cmt. m (2007); *see also Manchester Band of Pomo Indians, Inc. v. United States*, 363 F. Supp. 1238, 1248 n.3 (N.D. Cal. 1973) (citing an earlier version of this Restatement provision and concluding that "the Secretary must consider whether funds from one Indian trust fund should be combined with funds from another Indian trust to purchase a single instrument of indebtedness, and thereby extending to small trusts the benefits of larger returns from larger and longer term investments").

But, this is to say neither that pooling was actually required here nor that defendant acted with less than the requisite care in failing to implement it.[18] The court is precluded from so

_____

[18] Defendant argues that Interior's decision not to employ pooling here is subject to traditional arbitrary and capricious review, like that applied under the Administrative Procedures Act, 5 U.S.C. § 702. This court, however, has already ruled to the contrary once in this case, describing, in a portion of its discovery ruling unaffected by the Supreme Court's subsequent opinion, the "many cases involving the alleged misappropriation or mismanagement of tribal trusts, in which it is often observed that the duty of care owed by the United States 'is not mere reasonableness, but the highest fiduciary standards.'" *Jicarilla Apache Nation*, 88 Fed. Cl. 1, 20 (2009), *mandamus denied*, 2011 WL 3022400 (Fed. Cir. July 25, 2011) (quoting *Am. Indians Residing on the Maricopa-Ak Chin Reservation v. United States*, 667 F.2d 980, 990 (1981) and citing *United States v. Mason*, 412 U.S. 391, 398 (1973); *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942); *Shoshone Indian Tribe*, 364 F.3d at 1348; *Short*, 50 F.3d at 999; *Yankton Sioux Tribe v. United States*, 623 F.2d 159, 163 (Ct. Cl. 1980); *Red Lake Band*, 17 Cl. Ct. 362, 373 (1989)); *see also Duncan*, 667 F.2d at 45. Indeed, in *Yankton Sioux*, the Court of Claims specifically rejected the application of the arbitrary and capricious standard in the tribal trust context, stating "[a] breach of that obligation by the Government may obviously involve conduct less than arbitrary, capricious, or fraudulent by an official charged with the position of trust." 623 F.2d at 163; *see also Sac & Fox Tribe of Indians v. United States*, 340 F.2d 368, 375 (Ct. Cl. 1964); *Osage Tribe*, 72 Fed. Cl. at 643; *Cheyenne-Arapaho Tribes of Okla. v. United States*, 33 Fed. Cl. 464, 469 (1995) (quoting *Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555, 1563 (10th Cir. 1984) (Seymour, J., concurring in part and dissenting in part), *adopted as majority opinion*, 782 F.2d 855 (10th Cir. 1986) (en banc) (in this context, defendant's "'actions must not merely meet the minimal requirements of administrative law, but must also pass scrutiny under the more stringent standards demanded of a fiduciary.'")); *Minn. Chippewa Tribe v. United States*, 14 Cl. Ct. 116, 130 (1987); *see also Cobell*, 240 F.3d at 1104.

ruling based upon the existence of numerous material questions of fact. Those same questions of fact also preclude this court from ruling that the United States did ***not*** have this duty, as defendant argues. Among the questions presented are whether countervailing obligations, founded in, or springing from, other statutory and regulatory provisions, precluded the pooling of investments in the circumstances presented. Evidence as to these questions includes defendant's past practices in pooling the investments of individual Native Americans, their tribes, and tribal organizations.[19] Still other factual questions center on the prior interactions between Jicarilla and defendant regarding this issue and focus, *inter alia*, on whether duly authorized officials of the Nation previously rejected the use of investment pooling on its behalf. These and other related questions will be answered in short order, as trial in this case is already scheduled.

## 2.

The situation as to plaintiff's disbursement lag claim is different. Recall, that claim hinges on the theory that defendant should not have removed funds from Jicarilla's trust account until the disbursement check was negotiated. Relying on its experts, plaintiff asserts that if the funds had not been withdrawn until the check was cashed, it would have received an additional 10.2 days of potential investment income as to each of the thirty-seven disbursement transactions that plaintiff claims occurred during the phase-one period.

---

Defendant would have this court disregard this whole line of authority based on the Court of Claims' statement, in *Mitchell I on remand*, that: "the standard by which Interior's actions are to be judicially tested is, not the court's or plaintiff's own view of the preferable conduct, but the normal standard for government fiduciaries – were their actions in good faith and within the realm of their acceptable discretion, or were they arbitrary, capricious, an abuse of discretion, or contrary to law?" 664 F.2d at 274. But, as has been observed elsewhere, *see Osage Tribe*, 68 Fed. Cl. at 335, this statement is *obiter dicta*, and at all events dealt with a fiduciary matter (the management of lands) quite distinct from those involved here. *See Minn. Chippewa Tribe*, 14 Cl. Ct. at 129-30 (distinguishing *Mitchell I on remand* on this basis). Indeed, in its remand decision, the Court of Claims noted that "'[i]n each situation, the precise scope of the fiduciary obligation of the United States and any liability for breach of that obligation must be determined in light of the relationships between the Government and the Indians.'" 664 F.2d at 274 (quoting *Navajo Tribe*, 624 F.2d at 988).

[19]   On this point, plaintiff relies upon a finding made by the district court in *Manchester Band of Pomo Indians*, to the effect that "[d]efendants have made investments of Indian trust funds by purchasing a single instrument of indebtedness with the funds of more than one Indian, Indian tribe, or other Indian organization." 363 F. Supp. at 1251. However, this finding was made as a discovery sanction under then Rule 37(b)(2)(A) of the Federal Rules of Civil Procedure. *Id*. at 1250. While plaintiff and the *amici* have cited to various other documents that indicate that the United States has previously engaged in pooling, those documents do not establish that pooling was authorized under the law as it existed during the period in question.

The practice at issue apparently emanates from a government memorandum dated January 10, 1973, in which the Chief Division of Financial Management of the Interior Department informed all BIA Area Directors that "funds will stop earning interest the day they are disbursed by the Regional Disbursing Office" in light of Treasury Department General Accounting Office's Joint Regulation No. 3.  Under this practice, when Interior submitted a Standard Form (SF) 1166 requesting that Treasury issue a check to disburse tribal trust funds, Interior immediately debited that amount from the combined trust account.  Treasury recognized the disbursement as a liability and recorded it as a "Check Outstanding" on its general ledger.

Disbursing funds from the Treasury has been a basic function of the Department of the Treasury since it was first established in 1789.  *See* Act of September 2, 1789, 1 Stat. 65 (1789) (establishing the Department and authorizing the Secretary to disburse funds from the Treasury). Not surprisingly, various policies and procedures have been prescribed for such disbursements. Congress has defined the features of a Treasury check as "an order for the payment of money: payable on demand; that does not bear interest; drawn by an authorized disbursing official or agent of the United States Government; and the amount of which is deposited with the Treasury or another account available for payment."  31 U.S.C. § 3331(a).  By law, funds represented by Treasury checks have next-day availability.  12 U.S.C. § 4002(a)(2)(A); 12 C.F.R. § 229.10(c)(1)(i).  Under these provisions, once a Treasury check is issued, a government liability is immediately recognized.[20]  Contrasting this process with the disbursement process employed by private companies, a 1956 report by the Joint Program to Improve Accounting in the Federal Government[21] explained –

> In business, such disbursements serve to reduce an asset (cash in bank) for the corresponding reduction of liabilities.  The situation in the Federal Government, however, is different because most of its cash is held by the Treasurer of the United States – not by commercial banks.  Therefore, the action of drawing checks on the Treasurer creates new liabilities, which should be on the Treasury Department's books, in place of those on the books of the administrative agencies which were extinguished by the payment of vouchers.  One of the several

---

[20]  Historically, Treasury checks had no temporal limits on when they could be cashed. That changed during the midst of the period at issue when Congress passed the Competitive Equality Banking Act of 1987, Pub. L. No. 100-86, Title X, § 1003, 101 Stat. 552, 658, which provided that, as of October 1, 1989, Treasury checks could be cashed for only one year from the date of issuance.

[21]  The Joint Program was established by Congress in 1947 to provide guidance to federal agencies regarding accounting, budgeting and financial reporting.  The Program was run by the Comptroller General of the General Accounting Office (now the General Accountability Office), the Secretary of the Treasury, and the Director of the Bureau of the Budget (now the Office of Management and Budget).  The Joint Program was later given the authority to "conduct a continuous program for the improvement of accounting and financial reporting in the Government.  Accounting and Auditing Act of 1950, Pub. L. No. 81-784, 64 Stat. 835.

objectives in the development of appropriate accounting for cash operations has been to provide for disclosure of the foregoing type of liability along with certain other types of liabilities and assets which are germane to cash operations and essential factors in the bridge between receipts and expenditures overall and the changes in the Treasury's cash position.

Joint Program to Improve Accounting in the Federal Government, Seventh Annual Progress Report 131 (Feb. 7, 1956). It thus appears that a Treasury check functions much like a cashier's check – each represents a liability not of the depositor from whose account the moneys are drawn, but rather of the issuer of the check. And, it is for this reason that Treasury debits an account, like the trust fund here, when it issues a Treasury check.

Now, of course, this does not answer the question whether defendant should have used such checks to effectuate disbursement or whether it should have somehow modified the procedures applicable to disbursements. But, those questions must remain unanswered as none of the statutes cited by Jicarilla – neither section 161, 161a, nor 162a – provides a jurisdictional foundation for this court to consider whether defendant's application of the normal rules governing Treasury checks to Jicarilla's disbursement checks somehow violated a fiduciary obligation. As discussed above, *Cheyenne-Arapaho* and other precedents focus on statutes that outline the types of decisions that defendant is required to make in investing tribal trust funds and imply from those statutory obligations a fiduciary duty to make those decisions prudently. While, as described above, the latter obligation requires defendant to decide whether pooling would enhance the income of the trust, that same obligation is not implicated by defendant's decision to use Treasury checks, and the features ordinarily associated therewith, to effectuate disbursements from the trust fund. Though this practice likely impacts the yield of the trust funds, it is not an investment decision, but rather, at bottom, a managerial one. And, plaintiff has pointed to no statutory provision that would give rise to a money-mandating obligation in this latter regard, at least for the period in question.

In arguing otherwise, plaintiff asserts that its disbursement lag claim mirrors its claim that defendant violated its fiduciary duty by failing more promptly to deposit into the trust fund moneys owed the Nation. It notes that defendant has not challenged the court's jurisdiction to consider the latter claim, even though there is little to distinguish its economic impact from that of the disbursement lag claim at issue here. Both practices, plaintiff contends, affect the amount of investment income produced by the trust. To buttress this argument, plaintiff cites *Osage Tribe*, in which this court found that defendant's failure to deposit tribal funds promptly constituted a breach of the government's fiduciary duties. 72 Fed. Cl. at 662-65. But, *Osage Tribe* did not rely on the investments statutes at issue here, but rather upon a different set of provisions dealing with deposits to trust funds, specifically those found in the Act of June 28, 1906, 34 Stat. 539, and 25 C.F.R. § 226.13. 72 Fed. Cl. at 662-65. The latter provisions do not establish any duties with respect to disbursements. Accordingly, plaintiff's reliance on *Osage Tribe* comes up short. This court cannot establish jurisdiction over claims for which there is no statutory support by analogizing them to claims for which there is such support. That is not the way that waivers of sovereign immunity work. *Orlando Food Corp. v. United States*, 423 F.3d

- 18 -

1318, 1320 (Fed. Cir. 2005) ("[c]ourts are not free to infer waivers of sovereign immunity"); *Coflexip Servs., Inc. v. United States*, 20 Cl. Ct. 412, 416 (1990) (an "[a]nalogy" cannot "override the lack of an express waiver to sovereign immunity"); *see also Library of Congress v. Shaw*, 478 U.S. 310, 318 (1986).  For good or naught, Congress can, and sometimes does, make distinctions between categories of claims that cannot easily be distinguished.  Sovereign immunity gives it that prerogative.

Accordingly, the court concludes that it lacks jurisdiction over plaintiff's disbursement lag claim.

**III.   CONCLUSION**

Based on the foregoing, defendant's motion for partial summary judgment on the pooling claim is hereby **DENIED** and plaintiff's cross-motion for partial summary judgment on the pooling claim is hereby **DENIED**.  In addition, defendant's motion for partial summary judgment on the disbursement lag claim is hereby **GRANTED**.  That portion of plaintiff's complaint is hereby dismissed for lack of jurisdiction.[22]

**IT IS SO ORDERED.**

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

[22]  It is the court's intention to unseal and publish this opinion after September 1, 2011. On or before September 1, 2011, each party shall file proposed redactions to this opinion, with specific reasons therefore.