# In The United States Court of Federal Claims

No. 02-25L

(Filed Under Seal:  June 4, 2013)

Reissued:  June 24, 2013[1]

_____

|  |  |
|---|---|
| JICARILLA APACHE NATION,<br>formerly JICARILLA APACHE TRIBE,<br><br>          Plaintiff,<br><br>   v.<br><br>THE UNITED STATES,<br><br>          Defendant. | * Tribal trust case; Trial; Standard of review;<br>* *Cheyenne-Arapaho Tribes* – statutes give<br>* rise to fiduciary obligation to maximize trust<br>* income by prudent investment; Breach of<br>* trust – investment decisions;<br>* Underinvestment – investing in short-term<br>* investments/lack of diversification;<br>* Liquidity; Pooling; Unauthorized<br>* disbursements; Deposit lag; Negative<br>* interest; Damages; Standard for damages for<br>* breach of trust; Use of investment modeling<br>* techniques; Evaluation of hypothetical<br>* portfolios; Damages determined for period<br>* of suit; No damages awarded for period from<br>* 1992 to present; Damages for breach of<br>* trust; Damages for deposit lag. |

_____

## OPINION

_____

*Steven D. Gordon*, Holland & Knight, LLP, Washington, D.C., for plaintiff.

*Stephen R. Terrell*, Environmental and Natural Resources Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Ignacia S. Moreno*, for defendant.

**ALLEGRA, Judge:**

_____

[1]  An unredacted version of this opinion was filed under seal on June 4, 2013.  The parties were given an opportunity to propose redactions, but no such proposals were made. Nonetheless, the court has incorporated some minor changes into this opinion.

This Indian trust case is before the court following an extensive trial in Washington, D.C. In this case, the Jicarilla Apache Nation (the Nation) seeks an accounting and to recover for monetary losses and damages relating to the government's alleged breach of fiduciary duties in mismanaging the Nation's trust assets and other funds. Specifically, the Nation alleges that the United States: (i) failed to invest Jicarilla's trust monies prudently so as to obtain an appropriate return; (ii) made certain unauthorized disbursements of Jicarilla's trust monies; (iii) took too long to deposit funds received for Jicarilla into interest-bearing trust accounts; and (iv) charged Jicarilla interest for covering overdrafts on Jicarilla's trust accounts that were caused by the United States.

For case management purposes, the court has broken this case into several tranches, the first of which covers the Nation's claims relating to the government's actions with respect to certain trust fund accounts from February 22, 1974, through September 30, 1992 (sometimes referred to as the "Andersen Period," for reasons described below), for which plaintiff seeks damages in excess of $100 million. For the reasons that follow, the court concludes that defendant, in fact, grossly mismanaged the Nation's funds during the period in question, thereby breaching its fiduciary obligations to the Nation, and entitling plaintiff to damages in the amount of **$21,017,491.99**.

## I.      FINDINGS OF FACT

Based upon the record, including the stipulation of facts, the court finds as follows:

### A.      Background Facts

The Nation is a federally-recognized Indian Tribe, organized under the Indian Reorganization Act of 1934, 48 Stat. 984 (1934) (codified at 25 U.S.C. §§ 461, *et seq.*). The Nation's first Constitution, approved by the Secretary of the Interior on August 4, 1937, preserved for it all powers conferred by section 16 of the Indian Reorganization Act of 1934, 48 Stat. 984. In 1968, the Nation revised its Constitution to specify that the "[t]he inherent powers of the Jicarilla Apache Tribe . . . shall vest in the tribal council," adding that the council "may enact ordinances to govern the development of tribal lands and other resources." Revised Constitution of the Jicarilla Apache Tribe, Art. XI, § 1. Among the other relevant provisions in that Constitution is one requiring the establishment of a Capital Reserve Fund, "into which there shall be deposited each year no less than fifteen percent (15%) of the total annual income for the preceding fiscal year." The Constitution gives the Tribal Council the responsibility for investing these funds.

The Nation occupies an approximately 900,000-acre reservation in New Mexico that was set aside by an 1887 Executive Order. This land contains timber and gravel, as well as oil and gas reserves, the development of which is governed by statutes administered by the Department of the Interior (Interior). *See Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 135 (1982) (citing Indian Mineral Leasing Act of 1938, 25 U.S.C. § 396a, *et seq.*). Over 3,000 individuals live on the reservation, with the majority residing in the town of Dulce, New Mexico, near the Colorado border.

From February 22, 1974, through September 30, 1992, the Bureau of Indian Affairs (BIA) held funds in trust for Jicarilla in "proceeds of labor" (PL) and "judgment award" (JA) accounts.[2]  The BIA is responsible primarily for managing the aforementioned trusts.  BIA maintains an office in Dulce (the BIA Jicarilla Agency), which, during the years in question, was the locus for these management activities.  The BIA Jicarilla Agency is part of the BIA's Southwestern Region, formerly known as the Albuquerque Area Office.

### B.    The United States' Fiduciary Obligations to Manage the Nation's Trust Funds

"The United States' trust relationship with American Indian tribes includes a spectrum of obligations and responsibilities."  *Jicarilla Apache Nation v. United States*, 100 Fed. Cl. 726, 731 (2011) (*Jicarilla Apache II*).  In the first instance, these obligations and responsibilities originate in statute.  But, once established, they may be reinforced by principles that flow from the general trust relationship that has existed between the United States and the Tribes for centuries.  *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 475-77 (2003); *United States v. Mitchell*, 463 U.S. 206, 210, 228 (1983); *Cheyenne-Arapaho Tribes of Indians of Okla. v. United States*, 512 F.2d 1390, 1392-93 (Ct. Cl. 1975); *Jicarilla Apache II*, 100 Fed. Cl. at 732-38.

As part of this framework, Congress enacted various federal statutes that "define the contours of the United States' fiduciary responsibilities" with respect to its management of Indian trust assets and other tribal property.  *Mitchell*, 463 U.S. at 224.  The United States first adopted a policy of holding tribal funds in trust in 1820.  That system of trusteeship and federal management of Indian funds evolved with the passage of various laws in the first half of the nineteenth century, directing the government to hold and manage Indian tribal funds in trust.  *See, e.g.*, Act of 1837, 5 Stat. 135 (1837); *see also* Misplaced Trust:  The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund, H.R. Rep. No. 102-499, at 6 (1992) (hereinafter, "Misplaced Trust").  As is true with other Tribes, the trust fund accounts at issue here are comprised mainly of money received through the sale or lease of reservation lands, and include proceeds from the sale of timber, gravel, oil, and gas.  *See also* H.R. Rep. No. 103-778, at 9 (1994).  They also include the proceeds of various judgments that have been awarded to the Tribes.[3]  The United States has held these funds in trust for the Nation since the late 1800s.

The BIA started its centralized investment program for tribal funds in mid-1966.  On June 16, 1966, the Commissioner of Indian Affairs (the Commissioner) sent a memorandum to BIA officials, in which he noted that the 4-percent simple interest statutorily available to Tribes was "below rates that can be obtained on investments in securities in the current money market," adding that "[t]he difference between a five percent rate with interest payable semiannually, for

---

[2]  The PL accounts included funds received from the Nation's severance, timber, mineral, ranching, and farming activities.  The JA accounts included primarily funds received from awards made by the Indian Claims Commission.

[3]  The specific accounts in question were Jicarilla PL and JA accounts 7114, 7161, 7379, 7411, 7455, 7614, 7661, 7879, 7911, 7955, 9053, 9066, 9553, and 9566.

example, and the Treasury rate is $10.63 per thousand annually." The Commissioner recommended that BIA Area Offices solicit the views of the Tribes as to the investment of surplus trust fund cash being held by the United States Treasury (Treasury). He noted that "any investment program must be designed with built-in features to assure a high status of liquidity, thus providing ready cash when required either for emergency needs or to take advantage of possible extraordinary reinvestment opportunities." But, he anticipated that, with planning, these needs could be met by staggering the Tribes' investments. The Commissioner provided similar advice in memoranda he issued on January 2, 1968, and May 22, 1969, respectively. In 1971, the same advice – urging local BIA officials to solicit Tribes as to their views on investment, but noting the need to maintain liquidity – was incorporated into a formal BIA investment policy that remained in effect through June 6, 2002.[4]

During the period in question, the BIA invested virtually all of Jicarilla's tribal trust funds in securities with maturities of one year or less. The weighted average days to maturity of these investments fluctuated between a low of 11 days to a high of 333 days, and typically ranged from approximately 30 to 180 days. Approximately 86 percent of Jicarilla's funds were invested in certificates of deposit (CDs) over this period, with the vast majority of non-CD investments (*i.e.*, government securities) limited to a five-year window from 1980 to 1984. From 1974 through 1978, in 1985, and again from 1989 through 1991, all of Jicarilla's funds were invested in CDs (as of the relevant reporting dates).

The BIA did not waiver from this investment approach despite significant fluctuations in Jicarilla's trust fund balance and market interest rates. From February 21, 1974, to September 30, 1983, the amount of Jicarilla trust funds under BIA management jumped from $2.3 million to $62.6 million. Then, from 1983 to September 1992, that balance gradually diminished, as the Nation shifted its assets to privately-managed reserve accounts (primarily to take advantage of longer-term investments) – it dropped so much, that by September 1992, BIA was managing only $5.4 million in Jicarilla tribal trust funds. Interest rates also fluctuated widely during this period, rising from a floor of 7 percent in 1974 to a peak of 16 percent in 1981, before settling at between 4 to 6 percent at the end of the period in question. Moreover, there were times during this period (from mid-1973 to mid-1974, and again from early 1979 to mid-1981) in which the yield curve on interest-bearing obligations inverted, that is to say, the rates reflected on long-term obligations became lower than those being paid on short-term obligations.[5]

---

[4] On January 22, 1973, Interior's Phoenix Field Solicitor issued an opinion interpreting 25 U.S.C. § 162a. In that opinion, he concluded that section 162a "does not levy upon the Secretary the fiduciary responsibility to invest tribal trust funds at the highest return obtainable." Instead, the Field Solicitor concluded that the Secretary was required to consider many factors in making investment decisions, including "the location of the depository, the financial condition thereof, and the security offered." In addition, the Field Solicitor interpreted the investment statutes to require investments that are "in effect, absolutely guaranteed, both as to principal and interest, by the credit of the United States," adding that this requirement places a greater premium "on security than on return on the investment."

[5] A 2007 study cited by one of plaintiff's experts indicated that over an 80-year period, long-term rates exceeded short-term rates approximately 90 percent of the time, with long-term

As these rates fluctuated, so did the value of fixed-income securities generally, and more specifically, those in Jicarilla's portfolio. For some investors, the fluctuations in interest rates offered the possibility of realizing significant income from selling particular securities. But, the short-term nature of the CDs in Jicarilla's portfolio, though favorable in terms of the interest rates that were available when the yield curve inverted,[6] essentially eliminated the potential for Jicarilla to realize much capital appreciation by selling securities that bore favorable interest rates. BIA made no attempt to alter its investment practices to take advantage of this capital appreciation opportunity, but instead adhered to its "buy and hold" investment strategy in which financial instruments were generally held to term.[7]

Defendant claims that the BIA was compelled to utilize only short-term investments for Jicarilla's funds for several reasons. First, it asserts that such investments were necessary because Jicarilla's cash flow needs fluctuated widely, requiring the BIA to keep Jicarilla's funds in highly liquid assets. The record, however, suggests that the vacillations in Jicarilla's account had little to do with fluctuations in its annual cash flow needs and mostly were the result of the Nation's decision to shift its funds to other forms of investments. Beginning in 1975, Treasury made available to the BIA "Treasury Specials" – these were specially-issued, non-marketable securities that were identical to marketable Treasury securities in terms of interest rate and other terms, except that they could be sold at any time through the Treasury without any transaction costs, essentially by shifting a book entry.[8] Yet, BIA failed to invest much of Jicarilla's funds in

_____

bonds tending to yield approximately 1.5 percent more than their shorter-term cousins. This spread was confirmed by a chart contained in a report authored by Dr. Gordon Alexander, one of defendant's experts, that provided average returns for Treasury bills, notes, and bonds for the period in question. These statistics showed, for example, that the average return on six-month Treasury bills during this time was 9.0 percent, while the average return on a seven-year Treasury note was 10.4 percent. The spread becomes even more pronounced when even shorter-term instruments were compared to the Treasury notes – for example, during the period in question, three-month Treasury bills produced an average return of 8.6 percent.

[6]  A 1983 report by Price Waterhouse documented the advantages that the BIA's short-term investment approach produced when the yield curve was inverted and other anomalies existed in the interest market.

[7]  The record suggests that BIA changed its investment patterns for other Tribes. In October 1992, Fred Kellerup, the Chief of the BIA Branch of Investments, indicated in a newsletter that: "Four years ago we had 75 percent of our money in CD's and 25 percent in government securities. . . . Now we have 75 percent in government securities and 25 percent in CD's." Mr. Kellerup boasted that BIA had gotten a Tribe "totally out of CD's" because of better yields in government securities. However, as of September 30, 1992, over 94 percent of Jicarilla's funds were invested in CDs – the remaining funds were invested in two categories of government securities.

[8]  On February 24, 1975, the Fiscal Assistant Secretary sent a letter to the Chief of the BIA's Investment Branch in which he noted that the use of the new securities "will eliminate (1) a Fund's dependence on the availability in the market of desired securities, (2) the adverse

these Treasury Specials, instead adhering to its approach of investing in short-term CDs.[9]  This approach was called into question by Mr. Kellerup in 1992, who advised the Tribes:  "Even if you have cash flow needs, go for the three-to-seven year government securities.  Avoid the one-year CDs."[10]  Accordingly, it appears that even if Jicarilla's cash flow needs fluctuated widely, investment vehicles were available that would have allowed BIA to keep those funds in

―――――――――――――――

effects upon a Fund of its own operations in the market, and (3) the costly delays in investment which can occur under even the best of circumstances because of delivery and other requirements of the market."

[9]  The following chart shows the BIA's investment patterns during the years in question:

| MIX OF JICARILLA TRIBAL TRUST FUND INVESTMENTS FROM ARTHUR ANDERSEN RECORDS FY 1974 – FY 1992 | | | | | | |
|---|---|---|---|---|---|---|
| | Government Securities | | Certificate of Deposit | | Total | |
| | $ | % | $ | % | $ | % |
| FY 1974 | $0 | 0.0% | $8,436,235 | 100.0% | $8,436,235 | 100.0% |
| FY 1975 | $0 | 0.0% | $7,653,588 | 100.0% | $7,653,588 | 100.0% |
| FY 1976 | $0 | 0.0% | $7,770,976 | 100.0% | $7,770,976 | 100.0% |
| FY 1976Q | $0 | 0.0% | $7,875,887 | 100.0% | $7,875,887 | 100.0% |
| FY 1977 | $0 | 0.0% | $3,683,899 | 100.0% | $3,683,899 | 100.0% |
| FY 1978 | $0 | 0.0% | $2,924,127 | 100.0% | $2,924,127 | 100.0% |
| FY1979 | $507,837 | 6.8% | $6,947,805 | 93.2% | $7,455,642 | 100.0% |
| FY1980 | $4,954,808 | 23.5% | $16,120,552 | 76.5% | $21,075,361 | 100.0% |
| FY 1981 | $9,023,268 | 26.5% | $25,034,897 | 73.5% | $34,058,165 | 100.0% |
| FY 1982 | $10,544,912 | 20.9% | $39,841,875 | 79.1% | $50,386,787 | 100.0% |
| FY 1983 | $14,814,903 | 23.6% | $47,978,364 | 76.4% | $62,793,268 | 100.0% |
| FY 1984 | $12,306,038 | 19.7% | $50,047,556 | 80.3% | $62,353,594 | 100.0% |
| FY 1985 | $0 | 0.0% | $32,257,949 | 100.0% | $32,257,949 | 100.0% |
| FY 1986 | $312,676 | 1.3% | $23,467,066 | 98.7% | $23,779,742 | 100.0% |
| FY 1987 | $311,234 | 3.4% | $8,873,615 | 96.6% | $9,184,848 | 100.0% |
| FY 1988 | $311,234 | 3.2% | $9,439,240 | 96.8% | $9,750,473 | 100.0% |
| FY 1989 | $0 | 0.0% | $5,122,947 | 100.0% | $5,122,947 | 100.0% |
| FY 1990 | $0 | 0.0% | $2,949,861 | 100.0% | $2,949,861 | 100.0% |
| FY 1991 | $0 | 0.0% | $5,531,823 | 100.0% | $5,531,823 | 100.0% |
| FY 1992 | $296,573 | 5.5% | $5,125,525 | 94.5% | $5,422,098 | 100.0% |
| Total | $53,383,483 | 14.4% | $317,083,785 | 85.6% | $370,467,268 | 100.0% |

The "FY 1976Q" entry represents the year in which the government shifted its fiscal year.

[10]  Indeed, years earlier, on July 11, 1978, BIA's Chief of Investments advised Area Directors that interest rates appeared to be peaking and that benefits could be derived from investing in longer-term U.S. Treasury bonds and notes.  The memorandum specifically cited the yields on such debt instruments with one-to-five year maturities, and noted that "U.S. Treasury Bonds or Notes can be sold at any time based on the market price at the time of sale."

instruments that were higher-yielding than the CDs, but still liquid enough to meet Jicarilla's needs.

In fiscal year 1980, an automated investment system partially was implemented by the BIA.  That system, called Money-Max, provided basic investment information, *e.g.*, the amount invested, rate of return, *etc*.  In 1985, the BIA created a new position, the Cash Management Officer, who was responsible for reviewing the revenues that were being produced from tribal lands and coordinating investment.  In 1989, the BIA Albuquerque Area Office recommended that Tribes designate an investment coordinator or the equivalent, to work with BIA personnel.  On October 26, 1989, the Secretary of the Interior issued an order creating a new Office of Trust Funds Management (OTFM), to consolidate all activities relating to the collection, holding, and disbursement of all tribal trust income.  One of plaintiff's experts, Jim R. Parris, served as the Director of this office between 1991 and 1995.

### C.   Pooling

In a June 3, 1976, memorandum, employees of the Portland Area Office of the BIA Branch of Financial Management suggested that tribal trust funds be invested on a pooled basis, similar to the way funds in Individual Indian Money (IIM) accounts, or Indian Service Special Disbursing Agent Accounts, were invested.[11]  The memorandum suggested that the terms of most investments could be for one year, with staggered maturities each month.  It indicated that a computer program could be established for scheduled cash needs and to compute the interest due each tribal fund on a daily basis.  The memorandum described the benefits of this approach, thusly:

> The Investment Branch would be free to invest cash balances to the fullest extent possible.  Currently many tribes are reluctant to invest funds beyond a 30, 60 or 90 day period.  Under this [pooling] procedure higher rates of interest would be obtained since investments could be staggered over long periods of time and still meet the cash needs of any tribe. . . .  Being able to invest for longer period of times [sic] additional interest could be earned.  As of June 30, 1975, Bureau-wide there was $542,300,000.00 invested.  If longer term investments increased the interest earned by 1/2% the additional earnings would be $2,711,500.00.  A 1% increased earnings would result in an additional $5,423,000.00.

On April 5, 1977, the Acting Director, Office of Trust Responsibilities, recommended to the Commissioner that this pooling concept be adopted immediately, arguing that "[t]here is an urgent need to combine all trust funds and invest the funds on a pool basis."  The memorandum indicated that over the past year, there had been a "noticeable reduction in efforts by some Area Offices in attempting to maximize returns," and suggested additional earnings of about $2.5 million could be realized through the pooling approach.  The Acting Director's recommendation

---

[11] "The IIM accounts hold money that originates from various sources, but a majority of the funds are derived from income earned off of individual land allotments."  *Cobell v. Babbitt*, 30 F. Supp. 2d 24, 28 (D.D.C. 1998).

concluded by asserting that pooling would:  (i) increase the probability of a greater return; (ii) produce greater equitability by minimizing the variance in rates; (iii) increase investment analysis opportunity; and (iv) enhance the agency's trust responsibility.  On September 7, 1977, the Chief of the Branch Investments for the BIA similarly recommended approval of the pooling suggestion, finding that it offered benefits similar to those that had been described by the Acting Director.

In its fiscal year 1977 Annual Report on Indian Trust Fund Investments, the BIA reported that approval of the pooling process was being solicited from the current BIA administration, noting that the pooling arrangement could "result[] in increased earnings for the tribe."  In December 1977, John Vale, Chief of the Branch of Investments for the BIA, made a presentation to BIA management.  In his presentation, Vail listed the pros and cons of pooling tribal trust funds.  He ultimately concluded that "the idea [of pooling] is not only feasible but highly desirable from the standpoint of the Secretary's carrying out his trust responsibilities for tribal trust funds."  He urged BIA's management to proceed with pooling.  Notwithstanding his recommendation, it appears that the pooling proposal remained under active consideration throughout 1978, and well into 1979.  On November 26, 1979, the BIA distributed a memorandum to Area Directors in which it indicated that "[a] determination has been made that increased earnings can be realized by combining the tribal trust funds and investing them in a pool rather than by individual tribes."  This memorandum was forwarded to the Albuquerque Area Superintendents on December 11, 1979.  The memorandum advised that pooling was optional, but indicated that any Tribe electing not to participate in pooling would need to submit an official tribal resolution to that effect.  According the memorandum, any Tribe that did not submit such a resolution by February 15, 1980, would be included in the pool starting about March 1, 1980.[12]

The Tribal Council of the Nation did not pass any resolution during the calendar years 1979 or 1980 that addressed the BIA proposal to pool tribal trust funds for investment purposes.  Furthermore, none of the minutes from Tribal Council meetings during this period even discuss or address the issue of pooling tribal trust funds for investment purposes.

On April 15, 1980, the Director, Office of Trust Responsibilities, reported that thirty-five Tribes had expressed their desire not to participate in pooling.  The Director also reported that a subsequent discussion with the Federal Deposit Insurance Corporation (FDIC) had raised issues regarding how the pooled accounts would be treated for FDIC insurance purposes.  He also noted

---

[12]  A presentation attached to the memorandum outlined the benefits and disadvantages of pooling.  The potential advantages of pooling identified were:  (i) increased earnings; (ii) reduced workload for the BIA; (iii) more time for BIA investment staff to evaluate investment opportunities; (iv) reduced collateral requirements; (v) greater equitableness in the distribution of investments; and (vi) increased liquidity.  The disadvantages to pooling were identified as:  (i) individual investment decisions by the Tribes would be eliminated; (ii) Tribes would no longer be able to make determinations as to the term of individual investments; and (iii) Tribes would no longer be able to specify banks where their tribal trust funds would be invested.

that various Tribes had raised other questions regarding pooling.  Because of these developments, he indicated that pooling would be postponed until October 1, 1980.  The Director's anticipated starting date proved to be wildly optimistic.  From 1980 through 1985, the Annual Reports on Indian Trust Fund Investments repeatedly discussed the pooling option, each year indicating that "[a] problem has developed with the Federal Deposit Insurance Corporation (FDIC) coverage in converting from the present method to pooling."  The 1983, 1984, and 1985 reports noted that Price Waterhouse was studying the management of Indian tribal funds.  The report for 1987[13] dropped any reference to the status of the pooling proposal, and instead stated that tribal trust funds were "segregated for both investment and accounting purposes," adding that the default investment option was a Treasury one-day certificate.  The report suggested that the situation might be changed through the pooling of investments.

On April 30, 1985, BIA published a request for proposals for contracting out some or all of BIA's trust management functions.  On October 6, 1986, the BIA and the Treasury's Financial Management Service (FMS) announced a tri-party contract with Mellon Bank of Pittsburgh (Mellon Bank) to provide financial Indian trust services.  The Mellon Bank contract contemplated the creation of two pooled funds within which Indian tribal trust funds could be invested:  an "intermediate portfolio" with a short-term reserve, and a "composite portfolio."  The announcement of this contract was met with skepticism by certain Tribes and, ultimately, by the committees in Congress that had oversight over the BIA.  Although it continued to tout the advantages of pooling, as well as the advantages of contracting out these services, the BIA never convinced critical members of Congress that it should be allowed to proceed with the contract.  Accordingly, on March 23, 1987, an Assistant Secretary of the Interior announced, in a letter to a Senator, that "the BIA has voided its intent to contract with Mellon Bank in concert with the U.S. Treasury."

Despite all this, on July 24, 1987, at a special meeting, Sherryl Vigil, the Superintendent of BIA's Jicarilla Agency, advised the Jicarilla Tribal Council that the BIA planned to begin pooling all tribal trust funds for investment starting on September 1, 1987.  On September 15, 1988, the BIA entered into a contract with Security Pacific National Bank for financial trust services.  Although it appears that this contract too was terminated, the fact remains that Jicarilla's tribal trust funds were never pooled through the end of the Andersen Period (September 30, 1992).[14]

---

[13]  The report for fiscal year 1986 is not in the record.

[14]  The Andersen Period takes its name from the study that Arthur Andersen did of tribal investments made by the BIA from 1972 to 1992.  In this study, Arthur Andersen examined information from internal Interior records and conducted basic reconciliation of account transactions.

### D.    Other Issues

Beyond the underinvestment claims just discussed, the Nation makes several other claims in which it asserts that the BIA breached its fiduciary duties.  The following are the facts relevant to these claims.

### (1)  Improper Disbursements

During the period in question, the BIA made various disbursements from the Nation's trust funds without authorization.  The record demonstrates that between February 22, 1974, and June 1, 1976, there were eighty disbursements from Jicarilla's trust accounts for government payroll or expenses, totaling $131,218.44.  The record does not reveal any indication that the Nation authorized these expenditures or any others, with one exception:  it appears that on January 1, 1954, the Jicarilla Tribal Council authorized $6,810 of "tribal funds" to be appropriated annually through 1974 for BIA salaries and expenses associated with forest management.

### (2)  Disbursement Lag

During the period in question, BIA's policy, as reflected in the Bureau of Indians Affairs Manual (BIAM), was to deposit tribal funds in an authorized depositary within twenty-four hours of receipt or by the next workday.  *See* 42 BIAM Supp. 3 § 3.9.I(1) ("All funds shall be deposited in an authorized Federal depositary with[in] 24 hours of receipt or by the next work day after receipt if the funds were received too late in the day to meet the depository's and/or cognizant Collection Officer's cutoff requirements.").  In practice, however, it often took considerably longer for the BIA to deposit funds it received on behalf of Jicarilla.  There were several reasons for this delay.  One was the time associated with identifying the lease owners on whose behalf particular royalty payments were received.  This process, performed by the BIA Jicarilla Agency's Realty Office, often took two to three days.  Another was the time lost in assembling a deposit package and then transmitting it from the BIA Jicarilla Agency in Dulce, to the Albuquerque Area Office located over 170 miles away, for deposit into a Treasury-approved local depository bank.  This process would often require three to five days to complete.

Payments made to Jicarilla by electronic funds transfer (EFT) were not subject to these delays.  Beginning in May 1979, the BIA required all deposits of $25,000 or more to be made via EFT.  In 1986, this requirement was expanded to require the use of EFT for payments of $10,000 or more.

### (3)  Negative Interest

A 1988 audit, conducted by Interior's Office of the Inspector General, found that, between April 1971 and September 1988, "accounting errors occurred which allowed more funds to be withdrawn from some [Jicarilla] accounts than was available."  Mr. Parris, as Chief of BIA's Branch of Trust Fund Accounting, caused negative interest to be posted to overdrawn Jicarilla accounts.  As explained by Mr. Parris in a September 14, 1990, memorandum:

The negative interest is the result of an overpayment from the Jicarilla accounts that must be resolved before any adjustment can be posted to offset the negative balances that cause the negative interest to be computed.  The interest cannot be stopped since actual dollars were disbursed over the amount available for payment, which impacts all other Tribal funds participating in the overnighter investments during the period the overdrawn status is allowed to continue.  Funds must be located to offset the negative balance in order to halt the negative interest computation.

During the period at issue, $799,868.46 in negative interest was posted to Jicarilla's accounts.  On December 10, 2008, in response to a request by the Nation to withdraw trust funds from one of its accounts, the Office of the Special Trustee for American Indians agreed to "waive[] any claim to 'negative interest' on the overdrawn principal."

### E.    The Price Waterhouse Review

On May 24, 1983, the BIA engaged Price Waterhouse to conduct an in-depth review of the BIA's management of Indian trust funds.  On December 24, 1983, Price Waterhouse issued a report addressing the BIA's investment portfolio management, totaling, as of August 31, 1983, over $1.5 billion.  The report made five recommendations, *to wit*, that the BIA:  (i) develop and implement an ongoing process to assist Tribes and individuals in formulating investment objectives; (ii) offer Tribes and individuals the option of splitting their trusts among portfolios that have a variety of risk-return objectives; (iii) establish a formal oversight committee to provide independent evaluation of trust fund performance; (iv) engage an investment advisory service with experienced portfolio managers; and (v) enhance timely and current trust fund reporting and monitoring.

The report's recommendation regarding investment options is the one most germane here.  The report found that "the BIA Branch of Investments has achieved excellent investment results relative to other managed portfolios operating under similar investment authorizations."  It admitted, however, that this finding was based only on estimates of returns, as "[m]easurement of actual portfolio performance was confounded by an absence of data."  It noted that "[t]hese recent successes are primarily attributable to a strategy of investing in short-term assets in the face of volatile interest rates and to the discovery of federal subsidies implicit in the pricing of FDIC and FSLIC insured CDs."[15]  But, both circumstances (the interest rate inversion and

---

[15]  At a later point in the report, Price Waterhouse discussed the impact of the BIA's short-term investment approach, thusly:

It should be noted that the Indian trust funds have tended to be invested heavily in nonmarketable assets, such as certificates of deposit.  The rewards from such investments have more than compensated for the risk involved insofar as the amounts invested have been fully insured by the FDIC and FSLIC, yet many of the depository institutions offered rates which reflected the risk of default.  The only negative aspect of this investment policy has been the bookkeeping and

mispricing of CDs), the report noted, were, to a degree, happenstance and not likely to be repeated – that "unusual market conditions" had resulted in a "perversity" of interests rates, with short-term obligations yielding more than long-term ones, and that subsidies associated with the FDIC and FSLIC securities could be eliminated.  Price Waterhouse recommended that Tribes be given the opportunity to assign portions of their trust funds to portfolios with different investment objectives, including, at a minimum a short-term fund and a medium-term diversified portfolio.

### F.      Procedural History and Trial

On January 8, 2002, plaintiff filed its complaint in this matter, which it amended on August 26, 2002.  On December 13, 2002, the court stayed this case and referred it to alternative dispute resolution.  On July 1, 2008, after a settlement had not occurred, the court restored this matter to the active docket.  Following consultations with the parties, on October 7, 2008, the court issued an order confirming that trial on the first phase of the case would be limited to fiscal claims relating to defendant's management of certain Jicarilla trust accounts from 1972 to 1992 (during the Andersen Period).  During discovery on that phase, a dispute arose over whether certain government documents were privileged.  Discovery in the case continued, while that matter was resolved.  *See Jicarilla Apache Nation v. United States*, 88 Fed. Cl. 1 (2009) (*Jicarilla Apache I*), *petition for mandamus denied*, *sub nom.*, *In re United States*, 590 F.3d 1305 (Fed. Cir. 2009), *reversed and remanded*, 131 S. Ct. 2313 (2011), *petition for mandamus denied*, *sub nom.*, *In re United States*, 460 Fed. Appx. 914 (Fed. Cir. 2011).  Following the conclusion of discovery, on August 18, 2011, the court denied, in part, and granted, in part, defendant's motion for partial summary judgment, and denied plaintiff's cross-motion for summary judgment. *Jicarilla Apache II*, 100 Fed. Cl. 726 (2011).

Following the filing of several pre-trial motions, trial on plaintiff's claims for the Andersen Period commenced on November 8, 2011.  That trial covered the following issues: (i) whether the BIA prudently invested the Nation's trust funds so as to maximize trust income (the "underinvestment claim"); (ii) whether defendant is liable for allegedly disbursing Nation trust funds to pay for BIA payroll or expenses (the "unauthorized disbursement claim"); (iii) whether defendant is liable for allegedly taking excessive time to deposit the Nation's trust revenue into interest-bearing trust accounts (the "deposit lag claim"); and (iv) whether defendant is liable for allegedly allowing the Nation's trust fund accounts to be overdrawn, causing the Nation to be charged interest on the overdrawn amounts (the "negative interest claim").   The trial also extensively dealt with the appropriate amount of damages, if any, stemming from defendant's alleged breaches.

---

transaction burden imposed by having to deal with hundreds of different institutions and in comparatively small amounts for each transaction.

Aside from its various fact witnesses, plaintiff offered at trial expert reports[16] from the following individuals:

- ○ **Peter A. Ferriero** and **Kevin W. Nunes**, principals of Rocky Hill Advisors, Inc. (Rocky Hill), addressed whether defendant breached its duty to invest the Nation's funds so as to obtain a maximum return. More specifically, they addressed: (i) whether the government breached its fiduciary obligations to Jicarilla with respect to the management and investment of trust funds; and (ii) the amounts that would have been earned had the trust accounts been properly managed, for the purpose of computing damages suffered by the Nation. In addition, these experts computed damages attributable to Jicarilla's unauthorized disbursement, deposit lag, and negative interest claims, but did not opine on whether these actions constituted breaches of trust.

- ○ **Michael A. Goldstein**, Ph.D., a professor of finance at Babson College, addressed issues relating to the BIA's management of the Nation's trust accounts, including investment strategy, maturity and liquidity, fiduciary obligations, and pooling. Dr. Goldstein also responded in detail to one of defendant's reports and proposed an alternative model investment portfolio.

- ○ **Jim R. Parris**, CPA, a former long-time BIA employee, addressed the accounting and identification of transactions posted to the Nation's trust fund accounts. He specifically focused on various disbursement transactions to determine whether they properly were authorized by the Nation and BIA. In addition, Mr. Parris addressed Jicarilla's deposit lag claims.

Defendant, of course, had its own fact witnesses. It also offered expert reports from the following individuals:

- ○ **Gordon H. Alexander**, Ph.D., a professor of finance at the University of Minnesota, responded to plaintiff's damages submission, addressing, in particular, the substitute portfolio utilized in that submission.

---

[16] Using a practice employed by the United States Tax Court, *see* Tax Ct. R. 143(g), the court received the experts' reports in lieu of live expert direct testimony. This practice was adopted by the court at the Rule 16 conference, at the outset of discovery, in order to give the parties fair warning of its use prior to the time their experts generated their reports. Live examination of the expert witnesses began with cross-examination. The use of this practice saved considerable trial time. *See* Samuel R. Gross, "Expert Evidence," 1991 Wis. L. Rev. 1113, 1215-16 (1991) (advocating this approach).

○   **Laura T. Starks**, Ph.D., a professor of finance at the University of Texas at Austin, evaluated BIA's trust fund management practices and opined on whether the BIA had breached its fiduciary duties in connection with its management of the Nation's trust funds. In particular, Dr. Starks addressed whether the BIA conformed to the terms of its Congressionally-mandated investment guidelines, its internal regulations and policies, and the general concept of prudence. In addition, she responded to plaintiff's damages calculation, specifically addressing plaintiff's claims regarding maximizing investment returns and negative interest.

○   **William G. Hamm**, Ph.D., a professional economist and director of the Berkeley Research Group, LLC, evaluated how damages, if any, should be brought forward to the time of judgment, and responded to plaintiff's model for bringing damages forward to the time of judgment.

Following the completion of trial and post-trial briefing, on May 31, 2012, the court heard closing arguments. Per the court's request, the parties have made a supplemental filing since that date, which included electronic copies of the spreadsheets used by the experts in calculating damages.

## II.   DISCUSSION

This phase of the litigation between the United States and Jicarilla involves the United States' accounting, management, and investment of Jicarilla's funds from 1974 to 1992. In this case, the Nation alleges that the BIA breached its fiduciary duties to the Tribe in imprudently investing the Nation's funds; inappropriately disbursing the Nation's funds to pay government expenses; unduly delaying the deposit of funds into the Nation's accounts; and charging the Nation with interest for overdrafts attributable to BIA's mis-accounting. Before turning to these claims, it makes sense to define the standard of review here.

### A.   Standard of Review

Although defendant continues to argue otherwise, in a portion of its discovery ruling unaffected by the Supreme Court's subsequent opinion, this court noted that "many cases involving the alleged misappropriation or mismanagement of tribal trusts" have held that "the duty of care owned by the United States 'is not mere reasonableness, but the highest fiduciary standards.'" *Jicarilla Apache I*, 88 Fed. Cl. at 20 (quoting *Am. Indians Residing on the Maricopa-Ak Chin Reservation v. United States*, 667 F.2d 980, 990 (Ct. Cl. 1981), *cert. denied*, 456 U.S. 989 (1982)). As was held by the Federal Circuit, "[b]ecause of its treaty and statutory obligations to tribal nations, the United States must be held to the 'most exacting fiduciary standards' in its relationship with the Indian beneficiaries." *Shoshone Indian Tribe of Wind River Reservation v. United States*, 364 F.3d 1339, 1348 (Fed. Cir. 2004), *cert. denied*, 544 U.S.

973 (2005).[17]  More recently, in ruling on the parties' cross-motions for summary judgment, the court noted that, in *Yankton Sioux Tribe*, "the Court of Claims specifically rejected the application of the arbitrary and capricious standard in the tribal trust context," stating "'[a] breach of that obligation by the Government may obviously involve conduct less than arbitrary, capricious, or fraudulent by an official charged with the position of trust.'"  *Jicarilla Apache II*, 100 Fed. Cl. at 739 n.18 (quoting *Yankton Sioux Tribe*, 623 F.2d at 163).[18]  In the court's view, the reasoning of its earlier opinion remains sound.

A claim for breach of a fiduciary duty relating to the investment of trust funds requires proof that a fiduciary duty with respect to such investments existed and that the United States "failed faithfully to perform those duties."  *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003); *Mitchell*, 463 U.S. at 216-17, 219.  A breach of trust may be established by showing that Interior failed to comply either with mandatory trust obligations specified in a statute or in its own regulations, or with the fiduciary duties that spring from those obligations.  *See Cheyenne-Arapaho Tribes*, 512 F.2d at 1392-93; *Shoshone Indian Tribe of the Wind River Res., Wyo. v. United States*, 56 Fed. Cl. 639, 649 (2003); *see also Jicarilla Apache II*, 100 Fed. Cl. at 734-35.

## B.      Breach of Trust – Investment Decisions

Numerous statutes outline defendant's specific obligations as trustee in managing the Nation's trust funds.  The investment claims at issue principally arise under 25 U.S.C. §§ 161 ("Deposit in Treasury of trust funds"); 161a ("Tribal funds in trust in Treasury Department; investment by Secretary of the Treasury"); 162a ("Deposit of tribal funds in banks; . . . investments"), and, to a lesser extent, the American Indian Trust Fund Management Reform Act of 1994, 25 U.S.C. § 4001, *et seq.*, which recognizes and codifies the existing trust relationship.  These statutes expressly refer to the United States as "trustee of various Indian tribes," *id.* at § 161, and to the accounts at issue as "tribal trust funds," *see, e.g., id.* at § 162a.  They confer control and discretion upon the United States with respect to the management and investment of the funds.  *See, e.g., id.* at § 162a(a) ("The Secretary of the Interior is hereby authorized in his discretion . . . .").  Thus, section 161 requires the United States to deposit in the Treasury and pay

---

[17]  *See also United States v. Mason*, 412 U.S. 391, 398 (1973); *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942); *Yankton Sioux Tribe v. United States*, 623 F.2d 159, 163 (Ct. Cl. 1980); *Red Lake Band v. United States*, 17 Cl. Ct. 362, 373 (1989).

[18]  *See also Sac & Fox Tribe of Indians of Okla. v. United States*, 340 F.2d 368, 375 (Ct. Cl. 1964); *Osage Tribe of Indians of Okla. v. United States*, 72 Fed. Cl. 629, 643 (2006); *Cheyenne-Arapaho Tribes of Okla. v. United States*, 33 Fed. Cl. 464, 469 (1995) (quoting *Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555, 1563 (10th Cir. 1984) (Seymour, J., concurring in part and dissenting in part), adopted as majority opinion, 782 F.2d 855, 857 (10th Cir.1986) (en banc), *cert. denied, sub nom., Southland Royalty Co. v. Jicarilla Apache Tribe*, 479 U.S. 970 (1986) (in this context, defendant's "'actions must not merely meet the minimal requirements of administrative law, but must also pass scrutiny under the more stringent standards demanded of a fiduciary.'")); *Minn. Chippewa Tribe v. United States*, 14 Cl. Ct. 116, 130 (1987).

interest on such funds when "the best interests of the Indians will be promoted by such deposits, in lieu of investments." *Id.* at § 161.  Section 162a acknowledges the "[t]rust responsibilities of [the] Secretary of the Interior," stating that they "shall include (but are not limited to)" providing "adequate systems for accounting for and reporting trust fund balances."  *Id.* at § 162a(d); *see also* Misplaced Trust, *supra*, at 6-7 (discussing these statutes).  As this court has noted previously, these statutes "vest the United States with management control over the trust funds, discretion with respect to their investment, and detailed responsibilities to account to the tribal beneficiaries."  *Jicarilla Apache II*, 100 Fed. Cl. at 731-32.[19]

As this court has observed, *Jicarilla Apache II*, 100 Fed. Cl. at 732, the Court of Claims carefully examined this network of statutes in *Cheyenne-Arapaho Tribes of Indians of Oklahoma v. United States*, 512 F.2d 1390 (Ct. Cl. 1975).  In that consolidated case, several Tribes alleged that "defendant breached its fiduciary duties in the care of plaintiffs' funds by not making the funds productive (by not investing moneys ready for investment and also by delay in making funds available for investment), by not maximizing the productivity of funds, and by using the funds to its own benefit and to the detriment of the tribes."  *Id.* at 1392.  Laying the foundation for considering these claims, the court observed that "[w]hen Congress, in the exercise of its power over the Indians, determined by statute and by treaty to hold funds due the tribes in trust rather than immediately distributing them to the Indians, it also developed a series of investment policies for those funds."  *Id.* at 1393.  The court noted that its focus was on the statutes adopting those policies, based upon the plaintiffs' claim that "the Bureau of Indian Affairs has not properly used the tools Congress provided in order to meet the Government's fiduciary obligation."  *Id.*  The court proceeded to review the statutory investment scheme, tracing the history and language of statutes like 25 U.S.C. §§ 161a, 161b, and 162a back into the 1880s.  512 F.2d at 1393.  Based on this careful review, the court concluded that "[t]he fiduciary duty which the United States undertook with respect to these funds includes the 'obligation to maximize the trust income by prudent investment,'" adding that "[t]his is the general law governing the Government's duty and responsibility toward the Indian funds involved in this case."  *Id.* at 1394 (quoting *Blankenship v. Boyle*, 329 F. Supp. 1089, 1096 (D.D.C. 1971)).[20]  In light of this standard, the court found that "the trustee has the burden of proof to justify less than a maximum

---

[19]  *See also White Mountain Apache*, 537 U.S. at 480 (Ginsburg, J., concurring); *Mitchell*, 463 U.S. at 222 n.24.

[20]  *See also Osage Tribe*, 72 Fed. Cl. at 668 ("The Court of Claims has addressed the statutory obligations under 25 U.S.C. §§ 161a, 161b, and 162a on a number of occasions and has uniformly held the United States responsible for investing Indian trust funds in the highest yielding investment vehicles available to the funds in question."); *id.* ("The requirement to invest Indian trust funds in the highest yielding investments available is a legal requirement mandated by the applicable statutes – here, 25 U.S.C. §§ 161a and 162a – and not solely a prudential one.").  If more were needed to support this conclusion, one might look to the BIAM, as in effect for the years in question.  That manual listed, in detail, the types of investments that could be made of "[f]unds held in trust for the benefit of the tribes," and described the policy guiding those investments as "selecting securities that will yield the best possible return."  3 BIAM Supp. 3 § 3.11.A-D.

return." *Id.* at 1394; *Osage Tribe of Indians of Okla. v. United States*, 72 Fed. Cl. 629, 666 (2006); *White Mountain Apache Tribe of Ariz. v. United States*, 20 Cl. Ct. 371, 380 (1990).

At the summary judgment stage of this case, this court rejected defendant's claim that *Cheyenne-Arapaho Tribes* was wrongly decided and had been overruled by more recent Supreme Court cases, including *United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313 (2011). It found instead that *Cheyenne-Arapaho Tribes* remains binding precedent within this circuit. *Jicarilla Apache II*, 100 Fed. Cl. at 734. In this regard, the court noted that in *Cheyenne-Arapaho Tribes*, the Court of Claims did not use common law principles to establish the fiduciary obligations of the United States, but rather employed them only '"to inform [its] interpretation of statutes and to determine the scope of liability that Congress has imposed."' *Jicarilla Apache II*, 100 Fed. Cl. at 735 (quoting *Jicarilla Apache*, 131 S. Ct. at 2325); *see also White Mountain Apache*, 537 U.S. at 475-76. It was on that permitted basis, this court concluded, that the Court of Claims, in *Cheyenne-Arapaho Tribes*, "outlined a series of government obligations that stemmed from [the statutory] duty." *Jicarilla Apache II*, 100 Fed. Cl. at 734. In this regard, the court noted the "striking similarities" between *Cheyenne-Arapaho Tribes* and the Supreme Court's subsequent decisions in *Mitchell*, 463 U.S. 206 (1983) and *White Mountain Apache*, 537 U.S. 465 (2003), which "thoroughly repudiated defendant's cramped view of its fiduciary obligations." *Jicarilla Apache II*, 100 Fed. Cl. at 735-36. Indeed, the court ultimately found that "[a] phalanx of contrary precedent requires this court [] to honor the Court of Claims' holding that the trust investment statutes in question establish defendant's obligation to maximize the trust income by prudent investment.'" *Id.* at 738 (quoting *Cheyenne-Arapaho Tribes*, 512 F.2d at 1394). It remains then to apply this standard to the investment decisions in question.

### (1)   Underinvestment

Plaintiff argues that the BIA deprived it of millions of dollars in lost investment earnings by keeping unreasonably large balances invested in relatively low-yielding, short-term investments, and failing to diversify the Nation's trust fund portfolio. For most of the period in question, BIA's investment practice was to invest virtually all of Jicarilla's tribal trust funds in securities with maturities of one year or less – the weighted average days to maturity of these investments typically ranged from approximately 30 to 180 days. During this period, the BIA adopted a practice of keeping tribal trust funds in cash equivalents (as short as one-day instruments), unless a Tribe specifically asked it to invest those funds in longer term investments. About 86 percent of Jicarilla's funds were invested in CDs over this period, with the vast majority of non-CD investments (*i.e.*, government securities) limited to a five-year window from 1980 to 1984.

Defendant does not seriously contest that this investment approach failed to maximize the investment return on Jicarilla's trust funds. Yet, it still claims that the BIA's approach was "prudent." Like other trustees, the BIA must administer the trust as a prudent person would, in light of the purposes, terms, and other circumstances of the trust. *See Osage Tribe*, 72 Fed. Cl. at 662; *see also Navajo Tribe of Indians v. United States*, 9 Cl. Ct. 336, 400 (1986); Restatement

(Second) of Trusts § 227 (1959).[21]  This duty of prudence has three prongs:  the BIA must apply care in investigating the investments available for the funds; it must employ a reasonable degree of skill in selecting among those investments; and it must be cautious in preserving the trust estate while seeking a reasonable return on investment.  *See Osage Tribe*, 72 Fed. Cl. at 667.[22] "Because . . . the permissible investments in which [a Tribe's] . . . trust funds must be placed have been spelled out by Congress, . . . defendant's prudent discharge of the requirements of care and caution is limited to selecting the highest yielding investment instruments of suitable maturity available for trust funds."  *Id.* (internal quotations omitted).  The requirement of skill obliges the BIA to obtain the highest rate of return available consistent with the prudent management of the statutorily-mandated investments.  *Id.* at 668.

Plaintiff's experts convincingly testified that no prudent trustee would have invested the Nation's trust funds in the way that the BIA did.  The BIA's heavy reliance on short-term investments reduced the yield on Jicarilla's portfolios by failing to take appropriate advantage of the higher yields available on longer-term instruments.  While there were isolated instances during the period in question when the yield curve was inverted (*i.e.*, short-term interest rates were higher than long-term interest rates), when push came to shove, none of the experts in this case – even defendant's – suggested that a prudent fiduciary would ever have counted on that being the case.[23]  As pointed out by plaintiff's experts, several studies suggest that the spread between investments of less-than-one-year and longer-term U.S. Treasury bonds (*e.g.,* between 5

---

[21]  In this opinion, the court purposely refers to the older Restatement (Second) of Trusts even though those provisions were supplanted by amendments made to the prudent investor rule in the 1992 Restatement (Third) of Trusts.  *See, e.g.*, Restatement (Third) of Trusts § 227 (1992). In the court's view, the latter rules demand more from trustees in terms of making prudent investments.  The court uses the earlier Restatement to negate any claim by defendant that its conduct is being judged by fiduciary standards that were not applicable during the period in question.

[22]  *See also Moench v. Robertson*, 62 F.3d 553, 571 (3d Cir. 1995), *cert. denied,* 516 U.S. 1115 (1996); George Gleason Bogert, George Taylor Bogert & Amy Morris Hess, Bogert's Trusts and Trustees § 671 (2012) (hereinafter, "Bogert's Trusts"); 4 Austin Wakeman Scott, William Franklin Fratcher & Mark L. Ascher, Scott & Ascher on Trusts §§ 19.1, 19.1.3-5 (5th ed. 2007) (hereinafter "Scott on Trusts") (a trustee must exercise care, skill, and caution in carrying out its duty to invest as a prudent investor would taking into account the risk and reward principles appropriate for the trust in question); Restatement (Second) of Trusts § 227 & cmts. b, c, e (1959).

[23]  These inversions occurred from mid-1973 to mid-1974, and again from early 1979 to mid-1981, times when inflation rates were very high.  A 2007 study of the past 80 years found that over 90 percent of the time, long-term rates exceeded short-term rates.  Defendant's experts do constantly cited to these inversions as indications that BIA's investment approach was reasonable – but, that effort plainly takes an *ex post facto* view, despite repeated statements by the same experts indicating that the review here should be *ex ante*.

and 10 years), was on the order of 1.5 percent.[24]  That spread, of course, represents an opportunity lost for the Nation.  Moreover, the record suggests that the risks associated with long-term investments – principally, the risk of loss/price volatility associated with the sale of a Treasury security prior to maturity – were outweighed by the benefits that would have been produced had BIA employed a prudent investment strategy that employed a mix of short- and long-term investments.

The record suggests that the BIA's heavy reliance on short-term investments also was not prudent because it violated aspects of what several expert witnesses, as well as the Price Waterhouse report, described as the "modern portfolio theory."  Under that theory, which was developed by Nobel prize-winning economist Harry Markowitz in the 1950s,[25] trust assets must not be evaluated in isolation, but rather in the context of a portfolio as a whole, a practice that allows the trustee to better correlate return and risk.[26]  A major focus of the modern portfolio theory is the benefit of diversification across and within asset classes, described by Price Waterhouse in a report in the record, thusly:

---

[24]  Defendant and its experts make much of the fact that the 1983 Price Waterhouse report stated that "[i]n assessing the overall performance of the funds in recent years, we have found that the BIA Branch of Investments has achieved excellent investment results relative to other managed portfolios operating under similar investment authorizations."  On this count, the report continued, "[t]hese recent successes are primarily attributable to a strategy of investing in short-term assets in the face of volatile interest rates and to the discovery of federal subsidies implicit in the pricing of FDIC and FSLIC insured CDs."  But, this report, which was commissioned by the BIA, did not examine whether the BIA's short-term investment practice was prudent during the entire period at issue, let alone prudent as to the BIA's actual investment of Jicarilla's funds. Rather, the cited finding primarily reflects the happenstance that the BIA's short-term approach did well during the time, relatively close to the study period, in which the yield curve was abnormally inverted.  *Compare* Harvey E. Bines, "Modern Portfolio Theory and Investment Management Law:  Refinement of Legal Doctrine," 76 Colum. L. Rev. 721, 764 (1976) (noting that the "prudent investor" standard in "*Hanover College* was in part a reflection of the reluctance of courts to adopt a rule which would exonerate any incompetent manager whose accounts were lucky enough to realize positive returns").  Indeed, at another point in its report, Price Waterhouse indicated that, under normal circumstances, dominant portfolios contain "a substantially larger proportion of longer-term securities than we have observed in the BIA portfolios."

[25]  *See* Houman B. Shadab, "The Law and Economics of Hedge Funds:  Financial Innovation and Investor Protection," 6 Berkeley Bus. L.J. 240, 265 n.148 (2009); Robert J. Aalberts & Percy S. Poon, "The New Prudent Investor Rule and the Modern Portfolio Theory:  A New Direction for Fiduciaries," 34 Am. Bus. L.J. 39, 54-60 (1996) (tracing the history of this theory).

[26]  *See* Harry M. Markowitz, Portfolio Selection:  Efficient Diversification of Investments 3 (1959); Harry Markowitz, "Portfolio Selection," 7 J. Fin. 77, 78, 81 (1952); *see also* Bevis Longstreth, Modern Investment Management and the Prudent Man Rule 16 (1986).

> The reason why a portfolio can perform better than a single instrument is that the portfolio can reduce risks. By holding a blend of short and long-term securities, a portfolio has a component which offsets the negative effects of events affecting the other component. With a judicious blend of short and long maturities, the combined effects of reinvestment risk and basis risk can be neutralized; and with a prudent blend of marketable and non-marketable securities, a portfolio manager can capture the reward for bearing liquidity risk without running a serious chance of not being able to meet cash requirements when they fall due.

This aspect of the "modern portfolio theory" – that of the benefits of diversification – "has been adopted in the investment community." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007). Over time, that emphasis on diversity caused the prudent investor standard to become less focused on individual investments and more on the features of composite portfolios to accomplish specific investment goals.[27] One can see the impact of this shift not only in cases arising under the Employee Retirement Income Security Act (ERISA),[28] but also in other settings in which it has become necessary to evaluate whether a trustee has breached its investment duties. *See, e.g.*, *Cent. Nat'l Bank of Mattoon v. United States Dep't of Treasury*, 912 F.2d 897, 901-02 (7th Cir. 1990) (Posner, J.); *Gulf Grp. Holdings, Inc. v. Coast Asset Mgmt. Corp.*, 516 F. Supp. 2d 1253, 1260-61 (S.D. Fla. 2007).

The record supports a finding that during the Andersen Period, a prudent investor would have, in choosing among the investments authorized by statute, employed a diversification strategy consistent with the modern portfolio theory in investing the Nation's funds. The BIA did not do this – indeed, it did not even attempt to do this. Had it done so, there is little doubt that diversification would have produced significantly greater financial returns for the Nation without exposing the trust corpus to inappropriate risks.[29] The BIA instead hewed to an ultra-

---

[27] This is all the more true with respect to the Restatement (Third) of Trusts, which was adopted in 1992. *See, e.g.*, Restatement (Third) of Trusts § 227 (1992) (trustee's duty applies to "investments not in isolation but in the context of the trust portfolio").

[28] *See DiFelice*, 497 F.3d at 423; *Summers v. State St. Bank & Trust Co.*, 453 F.3d 404, 406 (7th Cir. 2006), *cert. denied*, 549 U.S. 1245 (2007); *Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors, Inc.*, 173 F.3d 313, 317 (5th Cir.), *cert. denied*, 528 U.S. 967 (1999); *Bd. of Trustees of Birmingham Employee's Ret. Sys. v. Comerica Bank*, 767 F. Supp. 2d 793, 799 (E.D. Mich. 2011); *In re Regions Morgan Keegan ERISA Litig.*, 692 F. Supp. 2d 944, 962 (W.D. Tenn. 2010); *see also* 29 C.F.R. § 2550.404a-1(b)(1)(i) (adopting this as part of the prudent investor standard under ERISA); *see generally*, Bruce Stone, "The Prudent Investor Rule: Conflux of the Prudent Man Rule with Modern Portfolio Theory," 229 PLI/EST 9, 22 (1993). The Supreme Court has observed that ERISA "essentially codified" the equitable law of trusts and fiduciary conduct. *NLRB v. Amax Coal Co.*, 453 U.S. 322, 332 (1981).

[29] One of defendant's experts, Dr. Starks, developed a set of "reward-to-variability ratios" (more commonly referred to as "Sharpe ratios") that she claimed showed that BIA's investment approach "maximized the expected return relative to the risk that was borne by the Tribe." Sharpe ratios are designed to quantify the risk-return tradeoff for a given set of assets,

conservative approach for nearly two decades.  What is all the more remarkable is that the BIA failed to diversify the Nation's investments even after it began to diversify the investments of other Tribes.  For example, in an October 1992, newsletter issued by the OTFM, the BIA's then Chief of Investments, Fred Kellerup, advised "[e]ven if you have cash flow needs, go for the three-to-seven year government securities.  Avoid the one-year CDs."  In the same newsletter, Mr. Kellerup touted that "[f]our years ago we had 75 percent of our money in CD's and 25 percent in government securities. . . .  Now we have 75 percent in government securities and 25 percent in CDs."  By way of example, the newsletter highlighted, in particular, the OTFM's movement into "low risk, long-term, collateralized mortgage obligation (CMO) bonds."  Yet, there was no corresponding shift for Jicarilla, whose trust funds, at the end of September 1992, were still invested overwhelmingly (approximately 95 percent) in short-term CDs and Treasury

---

thereby providing an apples-to-apples basis for comparing risk-adjusted returns.  The formula for these ratios is:

$$S = \frac{E[R_a - R_b]}{\sigma} = \frac{E[R_a - R_b]}{\sqrt{\mathrm{var}[R_a - R_b]}}$$

where "$R_a$" is the asset return, "$R_b$" is the return on a benchmark asset (or the risk-free rate), "$E[R_a - R_b]$" is the expected value of the excess of the asset return over the benchmark return, and "$\sigma$" is the standard deviation of this excess return.

  As pointed out by one of plaintiff's experts, Dr. Goldstein, Dr. Starks' "Sharpe ratios" incorporated two significant computational errors.  First, she failed to subtract a benchmark return (*e.g.*, typically proxied by the return on a monthly or 90-day Treasury bill), when computing her ratios.  As the formula above suggests, this practice is standard in the industry in computing Sharpe ratios – a point emphasized in a paper written by Dr. Sharpe in 1994.  *See* William F. Sharpe, "The Sharpe Ratio," 21(1) J. of Portfolio Mgmt. (1994), *available at* http://www.Stanford.edu/~wfsharpe/art/sr/sr.htm (last visited June 3, 2013) ("Whether measured ex ante or ex post, it is essential that the Sharpe Ratio be computed using the mean and standard deviation of a *differential return* (or, more broadly, the return on what will be termed a zero investment strategy).  Otherwise it loses its *raison d'etre*." (emphasis in original)); *see also* Shadab, *supra*, at 264 n.152; Scott J. Lederman, Hedge Fund Regulation § 1:3, 1-18 (2007).  By failing to make this adjustment, Dr. Starks overstated the benefits associated with short-term investments.  Compounding this error, Dr. Sharpe mistakenly based her Sharpe ratios on yields instead of returns, essentially producing ratios that were meaningless.  Beyond these computational errors, in comparing short- and long-term yields (*e.g.*, five years), Dr. Starks calculated the latter by assuming one-month investments that were rolled-over repeatedly, an assumption that makes little sense, unless her goal was purposely to understate the benefits of long-term investments.

overnight certificates.[30]  Had the BIA done for Jicarilla what it apparently did for these other Tribes this would be a different case, indeed.

Despite every indication to the contrary, defendant steadfastly maintains that the BIA's short-term investment strategy was mandated for two reasons.  First, it asseverates that the BIA was obliged "to preserve the trust corpus above all else," *First Alabama Bank of Montgomery, N.A. v. Martin*, 425 So.2d 415, 427 (Ala. 1982), *cert. denied*, 461 U.S. 938 (1983) – or, as put in defendant's post-trial brief, that "BIA simply could not lose principal on investments."  To be sure, this was the law governing fiduciary investments – ***in the early nineteenth century***, before Justice Putnam enunciated the "prudent man" rule in his 1830 decision in *Harvard College v. Amory*, 26 Mass. (9 Pick.) 446, 469 (1830).[31]  The latter case broke away from the conservatism in English case law prohibiting investment in anything but those instruments considered extremely safe, in favor of an approach based on "how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in the regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of the capital to be invested." *Id.*  While it took some time for Putnam's farsightedness to become the prevailing view, the notion that a trustee was obliged "to preserve the trust corpus above all else" most certainly was no longer the paradigm for prudence long before the period in question.  Need evidence of this?  Look no farther than the 1959 version of the Restatement (Second) of Trusts § 227 cmt. e (1959), which advised that "[i]n making investments, . . . a loss is always possible, since in any investment there is always some risk. . . .  It is not ordinarily the duty of a trustee to invest only in the very safest and most conservative securities available."[32]  Aside from a few out-of-context quotes, defendant has no response to the body of law reflected in the Restatement – and to the extent that its experts parroted back its view on this count, they only served to undercut their own credibility.

---

[30]  Indeed, despite the advice given by Mr. Kellerup many years ago, defendant's experts persist in the view that, in determining whether there was a breach here, the performance of the Nation's portfolio should be compared to relatively short-term Treasury bills, with maturities of twelve months or less.  The experts cling to this view despite ample evidence that such an approach would not be consistent with modern portfolio theory.  The views of defendant's experts are also undercut by their unwavering fealty to the notion that the Nation's funds had to be invested at essentially no risk.

[31]  The collapse of the South Sea Company, which ruined a generation of investors, led the British to enact the Bubble Act, 6 Geog. I c. 18 (1719), which, in highly limiting acceptable investments, exemplified the zenith in the ultraconservatism of the British legal system in safeguarding trust *res* to the detriment of investment returns.  The *Harvard College* case represented a break from this tradition, in the form of the prudent investor standard.  *See* J. Alan Nelson, "The Prudent Person Rule:  A Shield for the Professional Trustee," 45 Baylor L. Rev. 933, 938-39 (1993); *see also* Bogert's Trusts, *supra*, at § 671 ("In the nineteenth century, the primary focus of trust law was the preservation of the trust corpus."); Note, "The Regulation of Risky Investments," 83 Harv. L. Rev. 603, 612-13 (1970).

[32]  *See also* Gary M. Ford, "Recent Controversies Involving the Purchase of Irrevocable Annuities and Insurance Company Insolvencies," C887 A.L.I.-A.B.A. 153, 162-63 (1994).

Alternatively, defendant argues that the BIA's investment approach was dictated by a statute, 25 U.S.C. § 162a.  Subsection (a) of that section provides:

> [T]he Secretary of the Interior, if he deems it advisable and for the best interest of the Indians, may invest the trust funds of any tribe or individual Indian in any public-debt obligations of the United States and in any bonds, notes, or other obligations which are unconditionally guaranteed as to both interest and principal by the United States.

25 U.S.C. §162a(a).  This subsection further iterates that "no tribal or individual Indian money shall be deposited in any bank until the bank shall have furnished an acceptable bond or pledged collateral security therefor in the form of any public-debt obligations of the United States and any bonds, notes, or other obligations which are unconditionally guaranteed as to both interest and principal."  *Id.*  Defendant argues that these provisions severely constrained the BIA's discretion in investing the Nation's trust fund accounts, preventing it from entering into any investment in which principal could be lost.  But, as even a cursory review of the relevant statutes reveals, they say nothing of the sort – indeed, any claim that Congress dictated the risk-averse investment strategy employed by the BIA in this case borders on the risible.

To recognize this instantly, one need only distinguish between two elemental forms of risk:  idiosyncratic/investment risk and market risk.  Idiosyncratic/investment risk arises from the particular circumstances of the debt/equity issuer and the potential for that issuer to default in paying either principal or interest.  Market risk, by contrast, is the risk that the value of an investment will increase or decrease in tandem with fluctuations in the overall market.  While defendant conflates these risks, the statute does not; it, quite obviously, deals only with idiosyncratic/investment risk, not market risk.  This is an important distinction for it is one thing to recognize that investments must take the form of obligations that are guaranteed as to both interest and principal, and quite another to suggest that the BIA could never risk the possibility that a sale of a given instrument prior to its maturity (necessitated, say, for liquidity purposes) would generate a loss of capital.  Section 162a dictates the former; it does not prohibit the latter – it limited the types of investments into which the BIA could enter, but did not compel that agency to invest only in short-term instruments that posed little or no market risk.  In fact, that section of Title 25 afforded the BIA a range of investment options, including not only Treasury bills and bonds that were for much longer terms, but nearly twenty other types of diverse, long-term investments offered by other Federal agencies, which were likewise unconditionally guaranteed as to both principal and interest by the United States.[33]  Even if we did not know this,

---

[33]   As noted in one of the trial exhibits, among the investment eligible under 25 U.S.C. § 162a were bonds or other obligations which were unconditionally guaranteed as to both principal and interest:  (i) bonds and other obligations issued by the Tennessee Valley Authority; (ii) obligations issued by the Federal Home Loan Banks; (iii) obligations issued by the Government National Mortgage Association; (iv) Export-Import Bank participation certificates; (v) Federal National Mortgage Association participation certificates and other obligations; (vi) debentures of the Federal Housing Administration; (vii) farm loan bonds issued by Federal Land

we could deduce this fact.  For if the law were otherwise, the BIA would have broken it when it eventually shifted (at least for some Tribes) away from short-term investments into better yielding, yet still fully-guaranteed, longer-term instruments.  Those investments were perfectly legal when made for those other Tribes – and would have been so had they also been made for the Nation.

Adopting defendant's restrictive gloss on these statutes would turn back the clock.  It would transform the tribal trust landscape at the expense of undercutting many other provisions Congress has passed to force the BIA to increase the productivity of tribal trust funds, among them the requirements in 25 U.S.C. § 161a.[34]  As noted elsewhere, "the placement of funds in

---

Banks; (viii) debentures of the Federal Intermediate Credit Bank; (ix) notes guaranteed as to principal and interest by the Small Business Administration; (x) bonds issued by local housing authorities secured by annual contribution contracts with the United States government (administered by the Department of Housing and Urban Development); (xi) bonds or notes of local housing authorities or urban renewal authorities secured by a contract or requisition agreement with the United States (administered by the Department of Housing and Urban Development); (xii) obligations of the Farm Credit Banks; (xiii) obligations issued by the Federal Home Loan Mortgage Corporation; (xiv) obligations of the Federal Financing Bank; (xv) obligations of the Department of Energy; (xvi) obligations of the United States Postal Service; (xvii) obligations of the Farm Credit System Financial Assistance Corporation; (xviii) obligations of the Farmers Home Administration; and (xix) obligations of the General Services Administration.

[34]  Prior to October 4, 1984, section 161a dictated that principal accounts in excess of $500 were to earn 4 percent simple interest.  25 U.S.C. § 161a (1982).  Effective October 4, 1984, section 161a was modified to require that Indian trusts funds be invested in "public debt securities with maturities suitable to the needs of the fund involved, as determined by the Secretary of the Interior, and bearing interest at rates determined by the Secretary of the Treasury, taking into consideration current market yields on outstanding marketable obligations of the United States of comparable maturities."  Act of Oct. 4, 1984, Pub. L. 98-451, 98 Stat. 1729 (1984).  The combined impact of these statutes was well-described by this court in *Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States*:

> The history of investment-related legislation indicates a congressional commitment to increasing the productivity of Indian funds held in trust by the government.  For trust funds held in Treasury accounts, Congress began by authorizing the deposit of trust funds in interest-bearing Treasury accounts (the 1880 enactment of 25 U.S.C. § 161 allowing interest to be paid on Treasury deposits), then mandated that all Indian trust funds held in Treasury accounts receive a floor interest rate of 4% unless otherwise provided by treaty or statute (the 1929 passage of § 161a making the payment of interest mandatory), and finally provided for variable interest rates that reflected current market yields for Indian trust funds held in Treasury accounts (the 1984 revision of § 161a(a) providing for the payment of variable interest rates on trust funds).  Prior to 1880,

accounts bearing interest rates well below those available from other properly secured investments[] would be difficult to reconcile with the intent of Congress expressed" in section 162a. *Chippewa Cree Tribe*, 69 Fed. Cl. at 660.  It has likewise been held that, consistent with these statutory mandates, "the United States [is] responsible for investing Indian trust funds in the highest yielding investment vehicles available to the funds in question."  *Osage Tribe*, 72 Fed. Cl. at 668; *see also Manchester Band of Pomo Indians, Inc. v. United States*, 363 F. Supp. 1238, 1247 (N.D. Cal. 1973) ("The Secretary of the Interior is under a duty to act pursuant to the Government's fiduciary obligations, and he is not prevented from doing so by the statutes which authorize various investments for Indian trust funds.").  The BIA did not do that here.

Sensing (correctly, as it turns out) that it needs more, defendant next claims that the BIA's short-term investments were dictated by the Nation's liquidity needs.  In this regard, it contends that, during the period in question, Jicarilla "had sizeable and irregular withdrawals from its tribal trust funds" that dictated the need to invest in short-term investments.  But, in making this claim, defendant grossly oversimplifies the liquidity analysis, rendering it into little more than a tally of deposits and withdrawals, with little consideration of what underlay those transactions.  Its approach – which looks at book entries largely in a vacuum – sheds no light on whether the BIA's investments were prudent, as it distinguishes neither between withdrawals dictated by outside economic forces and those that were discretionary, nor between those that were consumptive and those that were reinvested.  Sans these distinctions, defendant's analysis bears little resemblance to the liquidity analysis described in *Cheyenne-Arapaho Tribes*.  In that case, the Court of Claims held that "[i]n the absence of a showing by defendant of specific immediate budgetary commitments by the tribe[], claimed liquidity needs should be considered in the light of the actual history of the tribe['s] funds."  *Cheyenne-Arapaho Tribes*, 512 F.2d at 1395 n.9; *see also Osage Tribe*, 72 Fed. Cl. at 666.  Applying this standard, several courts have found that "[t]he fiduciary requirement to make prudent investments requires that any amount maintained as a cash balance that is in excess of the immediate disbursement needs for the period should be invested in a vehicle offering a higher return."  *Id.* at 666-67; *see also Blankenship*, 329 F. Supp. at 1095-96 (finding that the maintenance of a large accumulation of excess cash where "income and outgo were constant" and government securities could be redeemed at short

_____

Congress had also provided for the placement of trust funds in investments other than interest-bearing Treasury accounts that allowed the funds to attract more favorable market rates, but the risks involved led to the enactment of 25 U.S.C. § 161.  Yet the importance of seeking higher market-based yields prompted further legislation (the 1918 enactment of 25 U.S.C. § 162) that allowed for the investment of Indian trust funds outside of the Treasury in banks that offered adequate security, and even further legislation (the 1938 repeal of § 162 and replacement with § 162(a)) that permitted the use of "unconditionally guaranteed" investment vehicles including notes, bonds and other obligations.

69 Fed. Cl. 639, 659 (2006).

notice violated the "fiduciary obligation to maximize the trust income by prudent investment").[35] As these cases indicate, the focus of a proper liquidity analysis must be not only on whether withdrawals were made, but on **why** they were made (and whether better investment choices by the trustee would have altered the pattern).

The record demonstrates that defendant's short-term investment strategy was not dictated by Jicarilla's liquidity needs.  Both parties endeavored to study the Nation's withdrawals from its trust accounts during the years in question, to see whether the pattern of those transactions dictated that the BIA keep the Nation's funds invested in shorter-term certificates.  Many of the withdrawals made by the Nation were for discretionary expenditures – a function of recent deposits and based simply on the availability of funds.[36]  Put another way, there is little indication that many of these withdrawals were needed to cover mandatory expenses for which the Nation had no other source of funds, *i.e.*, that the withdrawals were unavoidably dictated by the Nation's financial needs.  The record, indeed, confirms that, to a significant degree, the withdrawals reflected little more than a shifting of investments.  Consider, for example, the $3.81 million withdrawal made on December 1, 1976.  One of defendant's experts characterized this as a sudden and unexpected need to liquidate "48.2 percent of its fund balance."  But, it appears instead that this withdrawal, which the Nation requested occur only upon certain investments maturing (it took three months for this to happen), was made to fund a private investment program for the Nation that utilized longer-term investments.  Of course, it should go without

---

[35]  Defendant has criticized plaintiff's experts for failing to consider Jicarilla's non-trust investments in considering whether the BIA's approach to investing the trust funds was prudent. However, plaintiff's experts were able to conclude that the BIA's approach was indefensible based on, *inter alia*, liquidity needs, even without considering the additional funds available to Jicarilla through its outside investments.  Nor, it might be added, is there any indication that, during the period in question, the BIA officials who were actually deciding how to invest Jicarilla's trust funds gave any consideration to Jicarilla's outside investments – indeed, as discussed below, there is no indication that they gave any consideration to Jicarilla's real liquidity needs at all.  Accordingly, the court does not consider the failure to consider Jicarilla's outside investments a deficiency in plaintiff's proof.

[36]  On this point, one of plaintiff's experts, Dr. Goldstein, criticized the report submitted by Dr. Starks, stating:

> The importance of the withdrawals being a function of recent deposits cannot be overstated, as it negates the contention that [the Nation] had such substantial and unpredictable liquidity needs that it might require liquidation of all or most of its trust funds at any time.  Once it is recognized that liquidation of all of [the Nation's] Trust investments would not have been necessary to satisfy [the Nation's] liquidity needs, many of the findings in the Starks report no longer follow.

On this point, Dr. Goldstein further concluded that "[a]n infrequent need to tap [the Nation's] existing savings means that a substantial portion of the trust monies could have been invested in longer-term maturities, with little-to-no-risk of pre-mature liquidation."

saying that withdrawals like this would have been unnecessary had the BIA simply adopted a more balanced investment approach.  Other withdrawals during the Andersen Period were non-consumptive transfers from one Jicarilla trust account to another, or from investment accounts into capital reserves, and thus also did not reflect on the Nation's liquidity needs, at least insofar as the investment of the trust funds is concerned.

Seen in this light, none of Jicarilla's withdrawals appear significant enough – either in number or magnitude, individually or as a pattern – to warrant the BIA's extraordinarily conservative investment approach.  In many instances, the withdrawals were less than the amount of funds that recently had been deposited in the accounts, and thus did not diminish the balance previously available for long-term investment.  Indeed, as the accompanying chart illustrates, for almost 90 percent of the period in question, the Nation's account balance never went below $4 million, and for a nearly eight-year period, it never went below $10 million.



This graph reveals a gradual, yet significant, increase of corpus from 1979 to 1984 – during which year the fund balance peaked at more than $70 million – and then a gradual decrease of corpus from 1984 to 1989, largely as the Nation shifted its investments elsewhere.  Yet, at no point during this decade of higher balances did the BIA deviate from the short-term investment practice first employed in 1974, when the fund had only $2.3 million.  Overall, from 1974 to 1992, the Nation withdrew only 12.5 percent of the available funds for consumptive expenditures – hardly a figure that would warrant 90 percent of the trust's assets continuously being invested in ultra short-term certificates, particularly since many of the permissible longer-term investments for the Nation's trust funds were themselves extraordinarily liquid, and could have been sold, prior to maturity, without any transaction costs.[37]

---

[37]  Beginning in 1975, Treasury made available "Treasury Specials," which were specially-issued, non-marketable Treasury securities that were direct obligations of the United

Defendant attempts to avoid this point by yet again alluding to the notion that the BIA was precluded from entering into any investment that risked losing principal. But, this claim does not get stronger based on repetition. Indeed, the claim that defendant makes today – that the need to avoid losing principal cabined the BIA from making longer-term investments – is the same one it made forty years ago, in *Cheyenne-Arapaho Tribes*, in unsuccessfully attempting to defend against a similar underinvestment claim. What the Court of Claims said then still resonates now:

> Because the investments are required by statute to be either heavily collateralized (in the case of bank deposits) or guaranteed by the Government, safety is not an issue. Moreover, because of the existence of a secondary market in many of the permitted investments (*e.g.* Treasury bills, Federal Home Loan Bank Board notes, Federal Intermediate Credit Bank notes, *etc.*), sudden requirements for cash do not present major obstacles to these types of investments.

512 F.2d at 1394; *see also White Mountain Apache Tribe*, 20 Cl. Ct. at 380. Of course, defendant has repeatedly reminded this court that it does not consider *Cheyenne-Arapaho Tribes* good law. But, this court has already rejected defendant's blithe invitation to "underrule" this important decision of the Court of Claims. *See Jicarilla Apache II*, 100 Fed. Cl. at 734; *see generally Consol. Edison Co. of N.Y., Inc. v. United States Dep't of Energy*, 247 F.3d 1378, 1386 (Fed. Cir. 2001) (Plager, J., concurring). And it sees even less reason now to deviate from that precedent. *See also United Keetoowah Band of Cherokee Indians in Okla. v. United States*, 104 Fed. Cl. 180, 184 (2012); *Kaw Nation of Okla. v. United States*, 103 Fed. Cl. 613, 618-19 (2012).

Defendant's liquidity arguments have a decidedly hollow ring for one final reason – there is no indication that, during the period in question, the BIA ever attempted to perform a serious analysis of Jicarilla's cash flow to aid its investment planning. The BIA officials making the trust investment decisions did not perform such a study despite being instructed to do so.[38] Nor is there any indication that any of the BIA officials assigned to assist the Nation with its investments performed such analyses – or were even capable of doing so. Accordingly, defendant's liquidity concerns must be taken for what they are – *post facto* reasoning at best. These gratuitous concerns, of decidedly recent vintage, constitute little more than a palliative for

States offered exclusively in book-entry form to various government agencies, including the BIA. These "Treasury Specials" bore the same terms as marketable Treasury securities, save for the fact that an agency could effectuate a trade in such securities merely by notifying Treasury.

[38] In various memoranda and letters issued during the period in question (*see, e.g.*, a memorandum dated May 6, 1974), the Acting Deputy Commissioner emphasized that investments could be made for 25 years or longer. The Acting Deputy Commissioner instructed BIA Area Directors to determine if "surplus funds" were available for investment purposes and to notify the Branch of Investments in Albuquerque so that it could take the necessary action to invest the funds.

BIA conduct that must otherwise be viewed as a plain and extended violation of defendant's fiduciary duties. *Compare Cheyenne-Arapaho Tribes*, 512 F.2d at 1395 n.9 ("In the absence of a showing by [the government] of specific immediate budgetary commitments by the tribes, claimed liquidity needs should be considered in light of the actual history of the tribes' funds."). Plain and simple, the BIA did not take into account the Nation's budgetary needs at the time it made its decisions, but engaged in its limited investment practices for other reasons – primarily, it would seem, bureaucratic simplicity and inertia.[39] *See* Restatement (Second) of Trusts § 227 cmt. e. (1959); Bogert's Trusts, *supra*, at § 684 ("Inherent in [the prudent investor] standard is the duty to reevaluate the trust's investments periodically as conditions change."). Defendant should not be heard to insist otherwise now.

For many of the reasons stated, the court finds wholly unpersuasive the testimony offered by defendant's primary expert witness on this point, Dr. Starks. Dr. Starks attempted to shoulder a large portion of the blame for BIA's short-term investment strategy on Jicarilla, repeatedly suggesting that the BIA was merely following the Nation's "instructions." She noted that the BIA's investment program stressed the participation of the beneficiary Tribes and asserted that "investment in shorter-term (and correspondingly less risky) securities appears to be what [the Nation] desired, when such desires were communicated to the government."[40] In statements like these, Dr. Starks tried to leave the impression – alas, a false one, as it turns out – that Jicarilla dictated how the BIA would invest its funds and, therefore, is responsible for the substandard investment results.

The record reveals otherwise. Contrary to Dr. Starks' claims, the Nation had no power to dictate the BIA's investment strategy – while the BIA urged agency officials to seek input on investments from tribal councils, it remained for the agency, and the agency alone, to determine how the trust funds would be invested.[41] The Court of Claims emphasized this in rejecting a similar claim made by defendant in *Cheyenne-Arapaho Tribes*, stating:

---

[39]   A review of the record, as a whole, suggests a tendency on the part of BIA officials to adopt the simplest investment path, with the least amount of administrative burden. There is no indication that the BIA conducted periodic reviews of their approach to investing the Nation's funds, or that the individuals who primarily were assigned to work on those investments knew enough to be able to conduct such reviews. The record, moreover, contains various memoranda suggesting that BIA officials frowned on the practice of selling investment instruments prior to their maturity – not because of concerns about potential losses, but because of a desire to avoid the additional work associated with the sale of such instruments and later reinvestment of proceeds.

[40]   In this regard, Dr. Starks cites 119 written instructions received by the BIA from the Nation from 1974 to 1992. It should be noted that these instructions appear to relate to less than 3 percent of the 4,520 investments made on behalf of the Nation by BIA during the relevant period.

[41]   To be fair, Dr. Starks was not the only witness who sought to leave this impression. Several current or former BIA employees also tried to convince the court that the BIA was merely following the Nation's "instructions." This view, however, is contradicted, *inter alia*, by

> [D]efendant says that any failure in productivity was due to its policy of
> consulting the Indians before investing and the plaintiffs' failure to respond to its
> requests for advice.  Our ruling is that while such consultation may have been a
> useful part of defendant's overall policy to make the Indians ready for dissolution
> of trust status, the Government was duty bound to make the maximum productive
> investment unless and until specifically told not to do so by a tribe and until
> defendant also made an independent judgment that the tribe's request was in its
> own best interest.

512 F.2d at 1396; *see also Jicarilla Apache II*, 100 Fed. Cl. at 734 n.10; *Oglala Sioux Tribe of
Pine Ridge Indian Reservation v. United States*, 21 Cl. Ct. 176, 193 (1990).  Contrary to
defendant's intimations, the BIA cannot escape the ramifications of its past failures by
conveniently claiming now that it was nothing more than a glorified "order-taker."  *Per contra.*
The BIA was obliged to use its "independent judgment that the tribe's request was in its own
best interest."  *Cheyenne-Arapaho Tribes*, 512 F.2d at 1396; *see also* Bogert's Trusts, *supra*, at §
706 ("A trustee who has an investment duty has an obligation to perform it with reasonable skill
and prudence, and not merely to follow blindly the direction of the settlor . . . .").[42]  Under basic
principles of trust law, it could not shift that fundamental responsibility to the Nation, at least
absent a statutory direction to do so (of which none is apparent).  *See, e.g.*, *Shriners Hosps. for
Crippled Children v. Gardiner*, 733 P.2d 1110, 1111-13 (Ariz. 1987); *Matter of Newhoff's Will*,
435 N.Y.S.2d 632, 637 (N.Y. Sur. Ct. Nassau Cnty. 1980), *aff'd*, 486 N.Y.S. 2d 956 (1985),

---

a June 16, 1966, memorandum from the Commissioner to a variety of Interior officials, which
emphasized that though "the wishes of the tribe to which the funds belong are desired before an
investment is made," the "Secretary's authority to invest tribal funds is discretionary with him."
Likewise, a January 22, 1973, memorandum from Interior's Office of the Solicitor stated that
"[o]f course, consideration of the tribe's wishes should be given, but the Secretary must exercise
an independent judgment pursuant to Congressional mandate."

[42]   In her examination by the court, Dr. Starks admitted as much:

Q.:     So if a beneficiary said to the trustee, what I want you to do is go dig a
        hole in the backyard and take my money and bury it and I'll tell you
        when to come back and get it, you're not suggesting, are you, that the
        trustee should just salute and go off and dig a hole, are you?

A.:     No, sir. . . .  I would not think it would be prudent if the beneficiary said
        go bury my money in a hole for the trustee to say, yes, do that.

        *          *          *          *          *

Q.:     So it's not simply a matter of following instructions no matter what?

A.:     That is correct.

*appeal denied*, 66 N.Y. 2d 605 (1985); *In re Estate of Talbot*, 296 P.2d 848, 853-55 (Cal. Dist. Ct. App. 1956).[43]   And, indeed, every indication is that Congress intended the BIA to bear this responsibility.[44]

Even if defendant could persuade this court that the BIA had to fulfill the Nation's investment wishes, it is far from clear that those wishes were as Dr. Starks portrays.  While a series of internal BIA documents in the record represent that the "President of the Jicarilla Apache Tribe" desired that various amounts be invested in short-term certificates, the record does not contain any formal tribal documents, including resolutions from the Tribal Council, supporting this view – an omission that is significant given the presence of numerous BIA memoranda specifying that the investment desires of Tribes should be expressed in formal resolutions.  Indeed, there are reasons to believe that the BIA investment personnel in Albuquerque never actually spoke with the President of the Nation.[45]   The notion that the desire

---

[43]   *See also* Restatement (Second) of Trusts §§ 171 ("The trustee is under a duty to the beneficiary not to delegate to others the doing of acts which the trustee can reasonably be required personally to perform."); 171 cmt. h ("A trustee cannot properly delegate to another [the] power to select investments."); 227 cmt. z (1959) (the trustee "cannot properly delegate to another [the] power to select investments"); *see generally*, John H. Langbein, "The Uniform Prudent Investor Act and the Future of Trust Investing," 81 Iowa L. Rev. 641, 650-52 (1996) (describing the traditional nondelegation rule).  While this nondelegation rule was relaxed somewhat under the Restatement (Third) of Trusts § 171 (1992), there is no indication that under this rule, particularly given the contrary Federal statutes, the BIA could delegate to the Nation its responsibilities regarding investment of the trust funds.  *See* 25 U.S.C. § 162a(a).

[44]   In *Jicarilla Apache II*, this court quoted from a 1992 Congressional report, Misplaced Trust, *supra*, that is part of the legislative history for the 1994 Trust Fund Act.  Specifically, it quoted a passage from the report that referenced *Cheyenne-Arapaho Tribes*:

> Apart from the duty to account, the Federal Government has a fiduciary duty to "maximize the trust income by prudent investment," and the burden to justify less than a maximum return.  This responsibility requires the Government to stay well-informed about the rates of return and investment opportunities and to intelligently choose from among authorized investment opportunities to obtain the highest rate of return to make the trust funds productive.

*Jicarilla Apache II*, 100 Fed. Cl. at 733 (quoting Misplaced Trust, *supra*, at 6 (quoting *Cheyenne-Arapaho Tribes*, 512 F.2d at 1394)).  Notably, in that same report, Congress documented the BIA's long-standing problems in investing trust funds, stating that the agency failed to fulfill its fiduciary duties because, among other things, it "cannot consistently and prudently invest trust funds."  Misplaced Trust, *supra*, at 56.

[45]   Various memoranda and phone records suggest that individuals in the Investment Branch did not speak with any official of the Nation, but instead received reinvestment advice in telephone conversations with Mr. Gabriel Abeyta, a BIA program officer assigned to work with

to invest in short-term obligations was continuous is also contradicted, *inter alia*, by at least one Tribal Council resolution, as well as several statements made by BIA and Nation officials.[46] Moreover, in making her representations, Dr. Starks steadfastly ignores the fact that the Nation, on various occasions, shifted money from its trust funds to outside investments in order to take advantage of long-term investments.

Nor can defendant shield itself by arguing that Jicarilla should have been more vigilant in demanding that the BIA adopt a more balanced investment approach. To know the facts is to be quickly disabused of this notion. For one thing, Jicarilla's failure to make those demands must be viewed through the prism of the BIA's own failure to obtain needed advice from investment professionals and to share that advice with the Nation. In this regard, it should not be overlooked that the main personnel the BIA assigned to help the Tribe with its investments – Mr. Abeyta and Ms. Vigil – both testified that they lacked any investment expertise and received no investment training except regarding BIA policy. That the BIA would entrust untrained employees with no investment experience with key responsibilities associated with investing tens of millions of dollars serves to underscore the extent to which the agency's investment practices deviated from the prudent investor standard. Defendant should not point the finger at others for its own malfeasance. As far as the law is concerned, the BIA has no one to blame but itself for its failure to obtain professional investment advice and its resulting use of a static investment approach that fell far short of its fiduciary obligation to maximize trust income through prudent investment.

To summarize: Based on its review of the record, the court concludes that by investing the lion's share of plaintiff's trust funds in relatively low-yielding, short-term obligations, defendant breached its fiduciary duty to the Nation. Defendant is, therefore, under a duty to pay the Nation the investment income lost by its imprudent management, the amount of which will be determined below. *See Cheyenne-Arapaho Tribes*, 512 F.2d at 1395; *Menominee Tribe of Indians v. United States*, 101 Ct. Cl. 10, 21 (1944) ("We conclude, therefore, that to whatever extent the Secretary of the Interior could have, in the course of prudent management of the affairs of the Indians, and without impairing funds which he reasonably thought it was necessary to keep supplied for the purpose of meeting authorized expenditures, used the non-interest-bearing funds or those bearing the lower rate of interest, and instead used funds bearing interest, or a higher rate of interest, the Government is under a duty to pay to the plaintiffs the interest thereby lost by them."); *see also Shoshone Indian Tribe*, 364 F.3d at 1353; C*hippewa Cree Tribe*, 69 Fed. Cl. at 662.

---

the Nation, or Ms. Sherryl Vigil, who later became the BIA Superintendent of the Jicarilla Agency Office.

[46]  A Tribal Council resolution dated September 7, 1976, called for $3,850,000 of the Nation's investments to be withdrawn from the trust funds and invested elsewhere. The resolution indicates that "after due consideration the Tribal Council has determined that such funds are capable of earning interest plus growth if invested under an investment program of long term . . . ."

(2)      **Pooling**

This court previously ruled that it had "jurisdiction to determine whether, in choosing among the alternative investments authorized by 25 U.S.C. §§ 161, 161a, and 162a, and the regulations thereunder, defendant was obligated to consider whether pooling the funds of more than one Tribe would maximize the income derived from particular investments." *Jicarilla Apache II*, 100 Fed. Cl. at 739.  As was also said at the time, "there is strong indication in the common law of trusts that, at least in some instances, a fiduciary charged with maximizing trust income by prudent investment would be expected to pool investments." *Id.* (citing Restatement (Third) of Trusts § 90 cmt. m (2007)).  This court noted that, as early as 1973, the district court in *Manchester Band of Pomo Indians*, 363 F. Supp. at 1248 n.3, observed that "'the Secretary must consider whether funds from one Indian trust fund should be combined with funds from another Indian trust to purchase a single instrument of indebtedness, and thereby extending to small trusts the benefits of larger returns from larger and longer term investments.'" *Jicarilla Apache II*, 100 Fed. Cl. at 739.

The record in this case indicates that the BIA and other government agencies extensively considered pooling during the Andersen Period.  As recounted in greater detail above, the debate over whether to employ this technique went on for nearly twelve years.  Ultimately, it appears that the BIA was unable to make this option available during the years in question because of concerns raised by Congress in terms of accounting for the pooled funds, and because the FDIC, Treasury, and Interior were unable to agree on how to insure the pooled accounts.  Overall, it appears that the critical difficulties encountered by the agencies attempting to implement pooling resulted from Congress' refusal to adopt the necessary laws to facilitate that arrangement, or at least from Congress' disapproval of this practice.  This is significant, as plaintiff has not contended that the Congress effectuated, by its conduct, a breach of the United States' fiduciary obligations in failing to take legislative steps to promote pooling.  *Compare Cheyenne-Arapaho Tribes*, 512 F.2d at 1393 ("We are not faced here with a claim that Congress breached its trust duties under the Constitution or treaties."); *Menominee Tribe*, 101 Ct. Cl. at 21 (indicating that it need not consider whether "former Congresses had been guilty of a breach of trust"); *see generally United States v. Winstar Corp.*, 518 U.S. 839 (1996).

The question, then, is not whether the BIA might have increased Jicarilla's income by pooling its resources with those of other Tribes – various documents penned by BIA officials over time all but admit this.  Rather, the question is whether the BIA's failure to implement pooling was imprudent and, by virtue of that imprudence, violated defendant's fiduciary duties to the Nation.  The most definitive view on this count was supplied by plaintiff's expert, who, under questioning by defendant's counsel, answered as follows:

> Q.:      Are you of the opinion that BIA should have pooled tribal trust funds for investment purposes?
>
> A.:      For Jicarilla or on a global basis?
>
> Q.:      Well, if the BIA pooled tribal trust funds, it was for all tribes, right?

A.:     I think it's my opinion that pooling would have been advantageous.

Q.:     Are you of the opinion that it was imprudent for BIA to not pool tribal trust funds?

A.:     No.

Q.:     Do you agree that it was prudent for BIA to invest tribal trust funds individually during the phase 1 time period?

A.:     Yes.

Try as it might, plaintiff is unable to overcome the admission of its expert.  It has not mustered much evidence in support of its pooling claim, beyond very general representations that the use of pooling would have improved Jicarilla's investment options by relaxing liquidity constraints, thereby enhancing the ability to invest in higher-yielding instruments.  That evidence is insufficient to support a finding that defendant breached its fiduciary obligations by failing to pool – particularly given that liquidity concerns did not warrant the BIA's policy of keeping large portions of the Nation's trust funds in short-term obligations.

### C.     Unauthorized Disbursement of Jicarilla's Trust Funds

Plaintiff alleges that defendant is liable for the unauthorized disbursement of tribal trust funds to pay for BIA payroll and expenses.  Defendant counters – citing plaintiff's own expert, Mr. Parris – that the Tribe may request that its tribal trust funds be used for BIA payroll or expenses.  As it turns out, both claims are correct – to a point.

The Restatement (Second) of Trusts recognizes that a trustee may incur certain authorized expenses, make disbursements therefor, and be reimbursed by the trust as a result.  For example, section 188 of the Restatement indicates:  "The trustee can properly incur expenses which are necessary or appropriate to carry out the purposes of the trust and are not forbidden by the terms of the trust, and such other expenses as are authorized by the terms of the trust."  Restatement (Second) of Trusts § 188 (1959).[47]  The Secretary of the Interior is charged with the power – as fiduciary – to approve duly authorized tribal trust fund disbursements.  25 U.S.C. § 4022(b); *see also* 25 C.F.R. § 1200.11.  To be duly authorized, and thus a disbursement the Secretary may approve, the disbursement must be "approved by the appropriate Indian tribe" and "accompanied by a resolution from the tribal governing body."  25 U.S.C. § 4022(b)(1).  Consistent with this statutory scheme, prior to the period at issue, in 1954, the Jicarilla Tribal Council duly authorized $6,810 of "tribal funds" to be appropriated annually through 1974 for

---

[47]     *See also* Restatement (Second) of Trusts § 244 (1959) ("[t]he trustee is entitled to indemnity out of the trust estate for expenses properly incurred by him in the administration of the trust"); *id.* at § 245 ("the trustee is not entitled to indemnity out of the trust estate for expenses not properly incurred by him in the administration of the trust").

BIA salaries and expenses associated with forest management.  The Nation, however, alleges that it did not approve the disbursements at issue – for BIA payroll and expenses.  And the fact that the Secretary could potentially incur and be reimbursed for duly-authorized expenses does not answer who has the burden of proving whether certain disbursements were duly authorized.

Fortunately, that answer is plain.  Despite defendant's claims to the contrary, the trustee bears the burden of proof to show that charges or expenses for which it claims a credit were proper disbursements.  *See, e.g.*, *In re McMillan's Estate*, 33 P.2d 369, 374 (N.M. 1934) ("The burden is upon a trustee to show that a credit claimed is a proper disbursement."); *Davis v. Jones*, 254 F.2d 696, 699 (10th Cir. 1958), *cert. denied*, 358 U.S. 865 (1958) ("the burden rested upon the trustee to show the nature of each challenged transaction"); *Navajo Tribe*, 9 Cl. Ct. at 385 n.42, 439 (discussing trustee's burden and collecting cases).  Placing the burden of proof on the trust beneficiary would require Jicarilla to prove a negative – that it did not authorize disbursements for BIA payroll and expenses – a nearly impossible task and a nonsensical one, at that.  *See* 9 John Wigmore, Evidence § 2486 (Chadbourn rev. 1981) ("It is often said that the burden is upon the party having in form the affirmative allegation."); *see also Smith v. United States*, 133 S. Ct. 714, 720-21 (2013).  Consistent with the common-sense notion that it is the trustee's burden to show that trust fund disbursements were authorized and otherwise proper, "if a trustee fails to keep proper accounts, 'all doubts will be resolved against him and not in his favor.'"  *Confederated Tribes of Warm Springs Reservation of Or. v. United States*, 248 F.3d 1365, 1373 (Fed. Cir. 2001) (citing William F. Fratcher, Scott on Trusts § 172 (4th ed. 1987)); *see also White Mountain Apache Tribe of Ariz. v. United States*, 26 Cl. Ct. 446, 449 (1992), *aff'd*, 5 F.3d 1506 (Fed. Cir. 1993), *cert. denied*, 511 U.S 1030 (1994) ("The burden of establishing the propriety of disbursements from tribal funds rests with the Government."); *Minn. Chippewa Tribe*, 14 Cl. Ct. at 125 ("The ultimate burden of proving the allowability of a disbursement is on defendant.").[48]  Defendant has failed to carry that burden with respect to the disbursements that plaintiff claims were unauthorized.  Accordingly, plaintiff prevails on its unauthorized disbursement claim.[49]

### D.     Deposit Lag

Under the law of trusts, "[w]hile the trustee has a reasonable time in which to make the initial investment . . . , he becomes liable for a breach of trust if that reasonable time is

---

[48]  Defendant's argument that plaintiff bears the burden of raising an exception to an accounting before the burden shifts to the defendant-trustee is misguided because plaintiff's claim that the disbursements were unauthorized does, in fact, raise such an exception.  As such, the burden of proof is with defendant regardless of whether it was there to begin with or was shifted there by virtue of plaintiff's allegations.  *See White Mountain Apache Tribe*, 26 Cl. Ct. at 448-49 (discussing burden shifting in Indian Claims Commission Act cases); *Minn. Chippewa Tribe*, 14 Cl. Ct. at 121-22, 125 (same).

[49]  The parties have stipulated that various exhibits to the supplemental expert report prepared by Mr. Parris accurately identify disbursements from Jicarilla's tribal trust accounts made for the purpose of paying BIA payroll and expenses.

exceeded." *Cheyenne-Arapaho Tribes*, 512 F.2d at 1394 (citing Restatement (Second) of Trusts §§ 231 & cmt. b., 181 & cmt. c (1959)).  In this case, what is "reasonable" is defined by law.  Thus, Tribal oil and gas royalties are to be deposited "at the earliest practicable date after such funds are received by the Secretary. . . ."  30 U.S.C. § 1714.  BIA's policy, as set forth in the BIAM Supplement, was that tribal trust funds "shall be deposited in an authorized Federal depositary with[in] 24 hours of receipt or by the next work day after receipt if the funds were received too late in the day to meet the depository's and/or cognizant Collection Officer's cutoff requirements."  42 BIAM Supp. 3 § 3.9I(1).  This provision added that "[f]ield collections shall be transmitted to the Depositing Collection Officer within 24 hours, or by the next work day, after receipt."  *Id.* at § 3.9I(1)(a).  The BIAM Supplement further indicated that "[t]o the greatest extent practicable, the cognizant Collection Officer shall not hold collections over a weekend no matter what value those collection might have," *id.* at § 3.9I(1)(b), indicating instead that "[a]ll collections shall be deposited and/or scheduled and transmitted to the appropriate deposit point at the end of each work week."  *Id.* at § 3.9I(1)(b)(i).

As documented in the Arthur Andersen report, the BIA did not always comply with these deadlines, often taking five to eight days – and sometimes more than thirty days – within which to make a deposit.  Defendant has offered no evidence that would excuse the BIA's non-compliance with its own regulation, save to point out that during some of the years in question there was no bank in the town where the BIA's Jicarilla Agency Office was based.  The BIA policy, however, admits to no exception in this instance – and defendant has failed to demonstrate that it complied with the BIAM Supplement as to any of the delayed transactions identified in the Arthur Andersen report.[50]  The court finds that defendant's failure to timely process certain deposits amounted to a breach of trust that entitles the Nation to damages, as determined below.  *See Osage Tribe*, 72 Fed. Cl. at 662-65.

### E.    Negative Interest

Plaintiff alleges that defendant allowed the Nation's trust fund accounts to be overdrawn, causing the tribe to be charged negative interest on the overdrawn amount.  The parties agree that it would be improper for the government to collect negative interest from Jicarilla, but they disagree about whether BIA did so.  That dispute, however, matters not, because plaintiff admits

---

[50]  While defendant asserts that some of the delay encountered with the deposits was associated with their transmittal to the Depositing Collection Officer, it provides – save one example – no specific documentation in this regard; indeed, it has failed to provide evidence as to where the Depositing Collection Officer was located throughout the period in question.  The court will not excuse defendant's delay based upon conjecture, that is, the possibility that, as authorized by the BIAM Supplement, all of the delay is attributable to the transmittal of field collections to the proper official.  Indeed, this appears unlikely, because, as illustrated by other portions of the BIAM Supplement, a "field" collection appears to be one received "in the field; e.g., away from the normal duty location."  42 BIAM Supp. 3 § 3.9B(8)(a).  Accordingly, it is far from apparent that collections received at the Jicarilla Agency Office in Dulce was subject to the "field collections" provisions – and, even if they were, these provisions seemingly would have afforded the agency only one extra day within which to make the Nation's deposits.

that even if defendant collected negative interest, the Nation suffered no discrete damages as a result.  Plaintiff's expert, Rocky Hill, admits that its damages model "does not calculate any separate damages attributable to the negative interest claim," and that "the amount of damages [the model] calculates would not change if the negative interest claim was withdrawn."  Put another way, plaintiff explains that "damages attributable to negative interest end up being redundant to damages caused by the other breaches of trust, and the amount of damages the model calculates would not change if the negative interest claim is ignored."  The court must give effect to plaintiff's admissions and, therefore, must dismiss the Nation's negative interest claim for the period in question.  There is no waiver of sovereign immunity to support the court's exercise of jurisdiction over this issue, as it is axiomatic that "the futile exercise of suing merely to win a suit was not consented to by the United States when it gave its consent to be sued for its breaches . . . ."  *Severin v. United States*, 99 Ct. Cl. 435, 443 (1943), *cert. denied*, 322 U.S. 733 (1944); *see also Perry v. United States*, 294 U.S. 330, 355 (1935) ("the Court of Claims has no authority to entertain an action for nominal damages"); *Nortz v. United States*, 294 U.S. 317, 327 (1935) (same); *Marion & Rye Valley Ry. Co. v. United States*, 270 U.S. 280, 282 (1926) (same); *D'Andrea Bros. LLC v. United States*, 2013 WL 1316534, at *3 n.3 (Fed. Cl. Mar. 28, 2013) (same).

## F.    Damages

Under general trust law, "a beneficiary is entitled to recover damages for the improper management of the trust's investment assets."  *Conf. Tribes of Warm Springs*, 248 F.3d at 1371; *see also Mitchell*, 463 U.S. at 226 ("It is well established that a trustee is accountable in damages for breaches of trust.").  Courts determine the amount of damages for such a breach by attempting to put the beneficiary in the position in which it would have been absent the breach.  *Conf. Tribes of Warm Springs*, 248 F.3d at 1371 (citing *Roth v. Sawyer-Cleator Lumber Co*., 61 F.3d 599, 604 (8th Cir. 1995)); *Donovan v. Bierwirth*, 754 F.2d 1049, 1058 (2d Cir. 1985); Scott on Trusts, *supra*, at § 24.11.1; *see also Osage Tribe of Indians of Okla. v. United States*, 96 Fed. Cl. 390, 407 (2010); Bogert's Trusts, *supra*, at § 701; Restatement (Second) of Trusts § 205(c) & cmt. i (1959).  The Federal Circuit has instructed, regarding this calculation, that "[i]t is a principle of long standing in trust law that once the beneficiary has shown a breach of the trustee's duty and a resulting loss, the risk of uncertainty as to the amount of the loss falls on the trustee."  *Conf. Tribes of Warm Springs*, 248 F.3d at 1371; *see also* Restatement (Second) of Trusts § 205(c) (1959).  Amplifying these points, Judge Bryson, writing on behalf of the panel in *Confederated Tribes of Warm Springs*, stated:

> Where several alternative investment strategies would have been equally plausible, the court should presume that the funds would have been used in the most profitable of these.  The burden of providing that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty.  Any doubt or ambiguity should be resolved against them.

248 F.3d at 1371 (quoting *Donovan*, 754 F.2d at 1056); *see also Osage Tribe*, 96 Fed. Cl. at 408.  More generally, "[t]he ascertainment of damages is not an exact science," the Federal Circuit has warned, and "where responsibility for damages is clear, it is not essential that the amount thereof

be ascertainable with absolute exactness or mathematical precision." *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001); *see also Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 746 (2004).

Given the state of the record here, it bears emphasizing that any gaps in the BIA's records must be weighed in plaintiff's favor.  In this regard, it is well-accepted that "if a trustee fails to keep proper accounts, 'all doubts will be resolved against [the trustee] and not in [the trustee's] favor.'"  *Conf. Tribes of Warm Springs*, 248 F.3d at 1373 (quoting William F. Fratcher, Scott on Trusts § 172 (4th ed. 1987)).[51]  In *Confederated Tribes of Warm Springs*, 248 F.3d at 1373-75, the Federal Circuit applied this principle to the calculation of damages in tribal trust cases, stating that Tribes do not bear the burden of proving damages "that cannot be established with certainty" because of the United States' failure to keep adequate records.  That controlling precedent further teaches that "to the extent that the difficulty in determining the amount of loss suffered by the Tribes is attributable to improper accounting procedures followed by the BIA, the consequences of those difficulties should not be visited upon the Tribes." *Id.* at 1375; *see also Osage Tribe*, 96 Fed. Cl. at 407; *Osage Tribe*, 72 Fed. Cl. at 670-71; *Shoshone Indian Tribe of Wind River Reservation, Wyo. v. United States*, 58 Fed. Cl. 77, 94 (2003).

In discussing damage calculations in a situation like this, *Cheyenne-Arapaho Tribes* indicated that it is incumbent on the trial judge to determine several points:  First, "both in the earlier segment of the period and later," the court "should take into account the availability of eligible investments" that would constitute alternatives to how the funds were actually invested. 512 F.2d at 1395.  Second, the court must "decide the length of time within which it would have been reasonable for [the Government] to make funds available for investment, to make actual investments, and to reinvest where appropriate." *Id.*  If the United States breached its fiduciary duty, damages are to be calculated as "the difference between what interest defendant paid for the funds and the maximum the funds could have legally and practically earned if properly invested outside." *Id.* at 1396.  The Court of Claims elaborated:

In fixing damages, it will be necessary . . . to make some determination as to the
term for which funds were available for investment.  In the absence of a showing

---

[51]  Part and parcel of the damages enquiry here is the need for an accounting.  *See* 28 U.S.C. § 1491(a)(2); *Yankton Sioux Tribe v. United States*, 84 Fed. Cl. 225, 234 (2008); *see also E. Shawnee Tribe of Okla. v. United States*, 582 F.3d 1306, 1308 (Fed. Cir. 2009), *judgment vacated on other grounds*, 131 S. Ct. 2872 (2011); Gregory C. Sisk, "The Jurisdiction of the Court of Federal Claims and Forum Shopping in Money Claims Against the Federal Government," 88 Ind. L.J. 83, 112-13 (2013) ("Through this statutory grant of limited equitable-type powers, the CFC may both award a money judgment for mismanagement of Native American resources and, incident and collateral to that money judgment, order correction of the financial records and trust accounts maintained by the government, either directly or by remanding the matter to the appropriate agency to reconcile trust accounts.").

by defendant of specific immediate budgetary commitments by the tribes, claimed liquidity needs should be considered in the light of the actual history of the tribes' funds.

*Id.* at 1395 n.9; *see also Menominee Tribe*, 101 Ct. Cl. at 21; *Osage Tribe*, 72 Fed. Cl. at 666. With these principles in mind, the court moves to consideration of the parties' damages models.

## 1.     The Parties' Damages Models

Both parties employ investment modeling techniques to calculate the Nation's damages in this case – defendant does so reluctantly, as it strenuously maintains that no breach occurred here and no damages, consequently, are owed.  These models use an investment portfolio proxy to calculate investment returns and the accretion of principal that would have resulted if the BIA properly had invested and managed the trust funds.  The models apply earning rates to the trust account balances that should have been available for investment at a given time.  To do this, they make various assumptions regarding the balances that should have been in the accounts at a given time, how those balances should have been invested, and the returns or yields that would have been produced by that investment.  Each model ultimately calculates the resulting investment income over time and, correspondingly, the accretion of principal that would have resulted from the periodic reinvestment of earnings.  This figure is then compared to the actual return that was obtained by the BIA, the difference being what is termed the "underinvestment gap," if any, owed for the period between February 22, 1974, and September 30, 1992.

The models diverge on key points – for example, as to the appropriate mix of investments in the proxy portfolio.  That disagreement, however, becomes a chasm once the parties reach the question whether the damages calculated as of October 1, 1992, should be carried forward to September 30, 2011, a time immediately preceding trial.  Defendant argues that its figures, as of September 30, 1992, represents the maximum recovery owed the Nation during this stage of the proceedings, with any future damages stemming from underinvestment to be determined in subsequent proceedings.  Plaintiff instead carries forward the calculation to shortly before the time of trial, presuming, for this purpose, that the Nation would have continued to reinvest the principal available as of September 30, 1992.

The following chart compares the parties' respective approaches to calculating the underinvestment damages:

|  | Plaintiff* | Defendant (High)** | Defendant (Low)*** |
|---|---|---|---|
| Period | 2/22/1974 to 9/30/1992 | Same | Same |
| Beginning Cash Balance | $ 2,319,423.80 (as of 2/22/1974) | $ 2,316,751.00 (as of 2/1/1974) | $ 2,319,424.00 (as of 2/22/1974) |
| Receipts/Disbursements | 925 receipts = $211,523,420.97 243 disbursements = $244,869,456.15 | Same | Same |
| Mix of Investment | Barclays U.S. Treasury Subcomponent Index = average maturity of about four to nine years; no maturities less than a year | 80% five-year Treasury notes; 20% three-month CDs | Twelve-month Treasury bills or six-month CDs |
| Projected Cash Balance as of 9/30/1992 | $ 26,407,691.93 | $ 14,019,278.00 | $ 5,427,484.00 – 5,441,423.00 |
| Cash Balance as of 9/30/1992 | $ 5,392,040.48 | Same | Same |
| Phase-1 Underinvestment Damages | $ 21,015,651.45 | $ 8,627,237.52 | $ 35,442.52 – 49,382.52 |
| Extended Damages (1992-2011) | $ 82,846,608.37 | 0 | 0 |
| Total Underinvestment Damages | $ 103,861,259.82 | $ 8,627,237.52 | $ 35,442.52 – 49,382.52 |
| * Rocky Hill model    ** Dr. Goldstein model    *** Dr. Alexander model | | | |

As can be seen, the parties varied approaches yield very different damage figures.  Traced back through the calculations, these differences primarily are attributable to two premises:  First, the parties disagree greatly as to the financial features of the hypothetical portfolio that should act as a proxy for how a prudent investor would have invested the trust funds.  As will be discussed in greater detail below, plaintiff assumes a mix of investments – the Barclays U.S. Treasury Index (Barclays UST) – that includes a much greater percentage of long-term instruments.  By comparison, defendant's lowest damage estimate assumes a portfolio mix roughly equivalent to that in the original portfolio; defendant's alternative estimate, which is higher, is predicated upon a hypothetical used by one of plaintiff's experts, Dr. Goldstein.  That hypothetical puts a significant portion of the portfolio into five-year notes, but leaves 20 percent of the proxy portfolio in three-month CDs.  As can be seen from the chart, a second major difference between the parties' damages calculations stems from differing views as to whether the damages found as of September 30, 1992 should be projected to shortly before the date of trial.  Plaintiff says "yes;" defendant says "no."  Plaintiff's approach would add nearly $83 million to its recovery.  The court will examine these major points of disagreement *seriatim* in the segments that follow.

## 2.      Evaluation of the Hypothetical Portfolios

As has been done in calculating damages elsewhere, plaintiff seeks to calculate damages by using a market index as a benchmark for determining the performance of a properly invested portfolio.[52]  Plaintiff's Rocky Hill investment model uses, for this purpose, a Barclay's index of U.S. Treasury instruments, specifically the Barclays UST, which is part of the Barclays U.S. Government Index.  That index captures all public obligations of the U.S. Treasury with a remaining maturity of at least one year, and includes Treasury obligations with maturities ranging from one to 30 years.  Under this index, the allocation as between short-, medium-, and long-term bonds at any point reflects market forces (*i.e.*, all relevant obligations outstanding) rather than any judgment by plaintiff's experts or others regarding what that mix should have been.  Put another way, the Barclays UST is a passive, mechanical representation of market performance for a defined debt instrument market.  In measuring performance, the Barclays index also includes, on a quarterly basis, the gains and losses on the bonds being tracked, thereby providing for the further accretion of principal.

In selecting this index, the Rocky Hill experts carefully considered the maturity structure of the Barclays UST to make sure that it aligned with what would have been a prudent investment of Jicarilla's funds.  They ascertained that the Barclays UST had an aggregate

---

[52]  *See, e.g.*, *Maiz v. Virani*, 253 F.3d 641, 664-65 (11th Cir. 2001); *Alco Indus., Inc. v. Wachovia Corp.*, 527 F. Supp. 2d 399, 410 (E.D. Pa. 2007); *William v. Sec. Nat'l Bank* , 358 F. Supp. 2d 782, 804 (N.D. Iowa 2005).  Defendant complains that the use of such indices is inappropriate unless it can be shown that the exact mix of assets reflected in an index could have been purchased by investors.  Adoption of this argument, however, would impose unreasonable limitations on the recovery of damages – while awards may not be speculative, approximations certainly are appropriate.  *See Franconia Assocs.*, 61 Fed. Cl. at 746 ("care must be taken lest the calculation of damages become a quixotic quest for delusive precision or worse, an insurmountable barrier to any recovery").  Contrary to defendant's claims, a beneficiary injured by the misfeasance of a fiduciary need not demonstrate exactly what would have happened but for the breach.  As stated in the Restatement (Third) of Trusts § 100 cmt. b(1) (2012):

> Depending on the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case, the projected returns on indefinite hypothetical investments during the surcharge period may appropriately be based, inter alia, on:  the return experience (positive or negative) for other investments, or suitable portions of other investments, of the trust in question; average return rates of portfolios, or suitable parts of portfolios, of a representative selection of other trusts having comparable objectives and circumstances; or return rates of one or more suitable common trust funds, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate).

*See also Meyer v. Berkshire Life Ins. Co.*, 250 F. Supp. 2d 544, 572-73 (D. Md. 2003), *aff'd*, 372 F.3d 261 (4th Cir. 2001).

average maturity that grew from 3.8 years to 9.1 years over the period in question,[53] but observed that during this entire period, approximately 60 percent of the index was comprised of maturities ranging between one and five years, with an average maturity for this component of less than 2.5 years.[54]  In their view, the maturity structure of the Barclays UST aligned well with the maturity capacity of the funds in the Nation's trust accounts.  They viewed their choice of the Barclays UST as somewhat conservative, as it was based neither upon the notion that there would be active management of the tribal trust funds nor upon any assumption that the funds would have been invested so as to generate an extraordinary performance that beat the market.  In their view, the use of this index was also consistent with Jicarilla's demonstrated liquidity needs – a view that this court has confirmed in concluding that the BIA's short-term investment practices constituted a breach of trust.

    In challenging plaintiff's investment model, defendant reiterates many of the claims that this court has already rejected.  Echoing assertions made by its experts (or vice-versa),

---

[53]  The increase in the average maturity of the index over this time was not based upon any variation in the *modus operandi* of the index in terms of its selection of investments, but rather upon changes in the actual debt issuances of the United States, which reflected the needs of the Treasury as well as the demand by the public for longer-term Treasury securities.

[54]  In this regard, the Rocky Hill expert report provided the following statistics:

| Year | Total Securities in Index | Total Securities 1-5 Year | 1-5 Year % of Index | Index Maturity | 1-5 Year Maturity |
|---|---|---|---|---|---|
| 1976 | 138,520 | 98,924 | 71.41% | 5.00 | 2.42 |
| 1977 | 158,146 | 115,243 | 72.87% | 4.98 | 2.51 |
| 1978 | 182,924 | 130,143 | 71.15% | 5.48 | 2.32 |
| 1979 | 206,044 | 133,801 | 64.94% | 6.26 | 2.23 |
| 1980 | 240,014 | 155,323 | 64.71% | 6.41 | 2.28 |
| 1981 | 301,668 | 190,093 | 63.01% | 6.55 | 2.37 |
| 1982 | 380,733 | 234,592 | 61.62% | 6.78 | 2.38 |
| 1983 | 508,581 | 311,096 | 61.17% | 6.85 | 2.37 |
| 1984 | 617,556 | 363,046 | 58.79% | 7.39 | 2.40 |
| 1985 | 743,150 | 423,174 | 56.94% | 8.26 | 2.46 |
| 1986 | 879,758 | 484,845 | 55.11% | 8.78 | 2.45 |
| 1987 | 975,100 | 533,222 | 54.68% | 8.58 | 2.45 |
| 1988 | 1,044,577 | 553,750 | 53.01% | 8.90 | 2.58 |
| 1989 | 1,139,375 | 589,457 | 51.74% | 9.33 | 2.58 |
| 1990 | 1,283,509 | 657,188 | 52.60% | 9.13 | 2.56 |
| 1991 | 1,455,993 | 802,816 | 55.14% | 9.26 | 2.73 |
| 1992 | 1,614,756 | 902,821 | 55.91% | 9.08 | 2.76 |
| **(In millions $$)** | | **Average =** | **60.28%** | **Average =** | **2.46** |

defendant's banner claim thus is that the short-term investment strategy employed by the BIA was prudent and particularly attuned to the Nation's liquidity needs.  Based on the evidence discussed above, however, the court has rejected both prongs of this claim.  And these arguments are no more persuasive the second time around, in this damages context, even if they now take on a somewhat different cast.[55]  As such, based upon the strength of its liability findings, the court cannot remotely accept Dr. Alexander's damages model, which, in relying upon those rejected propositions, produces damages of at most approximately $50,000.

That said, in talking about damages, defendant takes a somewhat different tack regarding liquidity.  It claims that even if a significant portion of the portfolio should be treated as having been invested in longer-term securities, some portion of the portfolio needed to be kept in short-term instruments, to provide some opportunity for the Nation to make withdrawals without having to liquidate investments.  Based on this proposition, defendant claims that, at most, plaintiff is entitled to the damages associated with a hypothetical used by plaintiff's witness, Dr. Goldstein, who examined the performance of a portfolio invested eighty percent in five-year Treasury notes and twenty percent in three-month CDs – the approach that, in the chart above, the court references as "Defendant (High)."  But, there are several major flaws with this claim.

First, defendant's claim hinges on an unproven proposition, namely, that the Nation's trust funds needed to maintain a certain balance of cash or cash equivalents in order to meet periodic withdrawal needs.  The record simply does not support this factual claim.  While the record suggests that the BIA often invested in very short-term obligations, there is no evidence that this was necessary to meet the Nation's true liquidity needs.  Even assuming *arguendo* that there was a periodic need for the BIA to have cash on hand, there is no reason to believe that the BIA could not have produced that cash by selling longer-term securities – that, for example, the U.S. debt instruments in the Barclays UST were any less marketable or liquid than the three-month CDs used in Dr. Goldstein's hypothetical portfolio.[56]  To the extent that the sale of such instruments might have produced gain or loss, this was accounted for in the Barclays UST, which presumed that there would be periodic sales of the instruments in that index.  Lastly, plaintiff was, in the court's view, entitled to assume in its model that the special debt certificates

---

[55]  These rejected factual propositions impact various aspects of the calculations performed by defendant's experts.  For example, Dr. Alexander's comparison of short-term and long-term investments is heavily biased in favor of the former because he assumes that all of the instruments in his hypothetical portfolio would be sold off on a monthly basis and then reinvested.  But, the record reflects that no prudent investor would do this under the circumstances presented and that, in particular, there was no need to conduct such periodic sell-offs to meet the Nation's liquidity needs.

[56]  Indeed, it is important to note that Dr. Goldstein's 80/20 portfolio was designed not as an alternative to the Rocky Hill model, but rather as a "simple, passive model" to test Professor Starks' assertion that liquidity constraints required all of the Nation's funds be invested in short-term instruments.  Thus, in his report, Dr. Goldstein indicated that his model demonstrated that "a substantial portion of the trust monies could have been invested in longer-term maturities, with little-to-no risk of pre-mature liquidation."

made available by the Treasury to the BIA – which offered the BIA the ability to shift in and out of investments without transaction costs or penalties – still would have been available if the BIA had employed an investment strategy using maturities like those in the Barclays UST. For all these reasons, the court credits the testimony of plaintiff's experts that a portfolio patterned after the Barclays UST represented a reasonable proxy for how the trust funds in question should have been invested.[57] And, on that basis, the court concludes that the model proposed by plaintiff provides a reasonable and appropriate basis for calculating the damages owed here.

The court would reach these conclusions even if the burden of proof on these issues were on the Nation. But, it is important to remember that that is not the case. Likewise, it is important to remember what the Federal Circuit taught in *Confederated Tribes of Warm Springs*, 248 F.3d at 1371, regarding the calculation of damages in a case like this, specifically: (i) among several alternative investment strategies that are equally plausible, the court should presume that the funds would have been used in the most profitable way; (ii) the burden of providing that the funds would have earned less than this figure is on the United States, as the breaching fiduciary; and (iii) any doubt or ambiguity regarding the foregoing should be resolved against the United States. Under the Federal Circuit's standard, the Nation is required to select and prove neither the "best" nor the "most appropriate" benchmark. In the court's view, the record amply shows that plaintiff's damages model reflects an investment strategy that was at least as plausible as the alternatives offered by defendant – indeed, a strategy much more plausible than those alternatives – requiring the court to presume that the funds would have been invested in this fashion. Defendant has not borne its burden of demonstrating otherwise. Accordingly, the court concludes that plaintiff has demonstrated that it is entitled to damages in the amount of $ 21,015,651.45 for the period from February 22, 1974, through September 30, 1992.[58]

### 3.      Plaintiff's Damages From 1992 to the Present

Plaintiff claims that, as part of its underinvestment damages, it is entitled to the investment return that should have been earned on the funds that should have been in the Nation's account on October 1, 1992, up to the present. It argues that the same measure of accumulating damages has been applied in breach of contract cases involving lost profits or other expectancy damages, citing, for this purpose, *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1330 (Fed. Cir. 2002). And it notes that damages of the sort that it seeks were awarded in

---

[57]   Although defendant argues that the Barclays UST is an inappropriate proxy portfolio because it cannot be reproduced in the "real world," a passive model exactly like the Barclays UST – invested in U.S. securities in proportion to those outstanding in the market – was suggested as one of many possibilities for the investment of tribal funds by Price Waterhouse in 1983.

[58]   As explained by the experts from Rocky Hill, this figure includes damages attributable to the unauthorized disbursement of the Nation's trust funds because the investment model employed computes the growth of Jicarilla's funds as though these disbursements had not been made. Accordingly, no separate calculation is required to make the Nation whole on its unauthorized disbursement claim.

*Osage Tribe*.  *See Osage Tribe*, 93 Fed. Cl. at 39-40; *Osage Tribe*, 75 Fed. Cl. at 480-82.  For its part, defendant contends that plaintiff is actually seeking prejudgment interest, for which there is no waiver of sovereign immunity.  It argues that any underinvestment damages the Nation is owed post-September 30, 1992, should be determined in the subsequent phases of this case.

The court disagrees with defendant that plaintiff improperly is seeking prejudgment interest.  Defendant correctly asserts both that, absent a waiver of sovereign immunity, the United States generally is "not liable for interest on claims against it" and that there is no waiver for prejudgment interest applicable here.  *See Library of Congress v. Shaw*, 478 U.S. 310, 317 (1986).  However, defendant is flatly wrong in suggesting that what is being sought here is prejudgment interest.  In fact, what plaintiff seeks as additional damages is investment income it claims was lost during the period between October 1, 1992 and the end of fiscal year 2011 – income that, it claims, would have been received if the amount of principal produced by proper investment practices as of October 1, 1992, were further invested properly up to the time of trial.  This interest, accordingly, does not represent interest on the damages owed, but rather is an actual component of those damages.  Indeed, a variety of cases have recognized this distinction in the past, among them the Supreme Court's decision in *Peoria Tribe of Indians of Oklahoma v. United States*, 390 U.S. 468, 471-72 (1968), where the Court held that interest appropriately may be included in a damage award against the United States for breach of its trust obligations.  *See also Short v. United States*, 50 F.3d 994, 998-99 (Fed. Cir. 1995).  As in that case, defendant here may owe the Nation additional investment income as part of the damage award itself.  *See Peoria Tribe*, 390 U.S. at 472; *Short*, 50 F.3d at 999; *Cheyenne-Arapaho Tribes*, 512 F.2d at 1393-94.  Indeed, there is little doubt that the proper measure of damages for defendant's misfeasance in investing the trust funds will include some degree of investment income lost from October 1, 1992, to the present.  *See Shoshone Indian Tribe*, 364 F.3d at 1351-52; *Osage Tribe*, 75 Fed. Cl. at 468-69; *Pueblo of San Ildefonso v. United States*, 35 Fed. Cl. 777, 797 (1996).

The proper parameters of that extended award, as well as the timing of its determination, are different questions.  Several observations impact this calculus.  First, in the cases above, the courts simply extended the damages stream by assuming that the principal in the funds as of a given day would have produced a very predictable amount of additional interest via the application of the 4-percent simple interest statutorily available to tribes under 25 U.S.C. §161a.[59]  Because of this, the courts in these cases were required to make additional findings neither regarding the alternative investments that might have been available during the extension period nor regarding the prudence of defendant's investment practices during that extended period.  Plaintiff's request for extension damages, however, does not rely upon the simple application of interest, but rather continues to assume that the appropriate index to use in calculating these additional damages is the Barclays UST.  But, plaintiff has made no showing that this index would remain the appropriate investment proxy during the period from October 1, 1992, through September 30, 2011.  Indeed, to this point, the Nation has not demonstrated that any proxy is needed at all during this time period, in which defendant's investment practices may

---

[59]  As noted earlier, effective October 4, 1984, 25 U.S.C. § 161a was rewritten to authorize the payment of interest at a variable rate, rather than at the 4-percent rate paid previously.

have shifted from those that gave rise to the breach during the earlier period. Moreover, while certain findings made by the court likely would hold true during this extended period – for example, that the Nation's liquidity needs did not dictate a more conservative investment approach – the court has had no opportunity whatsoever to examine the actual facts in this regard to confirm whether these additional findings are warranted.

That these facts are undeveloped is expected. Plaintiff's complaint raises several issues that date as far back as August 14, 1946, and forward to present day. At the urging of the parties, the court broke this case into tranches, the first of which was for the period currently under consideration, from February 22, 1974, through September 30, 1992. Later phases of this case will focus on issues involving the management of the Nation's trust funds and trust assets (*e.g.*, timber); at least one of these phases, however, will address issues involving the potential underinvestment of plaintiff's trust funds from October 1, 1992, to present day. While it is conceivable that the court could have organized this case by subject matters, it did not do this, but instead followed the case management approach suggested by the parties. But, the selection of one versus another case management approach should not affect the amount ultimately recoverable here. In the court's view, questions regarding how much the Nation's accounts would have increased from October 1, 1992, to present day are inextricably intertwined with the calculation of other underinvestment damages owed, if any, for the same period. Given the complexities of these calculations, any extended award here risks a double recovery based upon the court's inability to distinguish, in its damages calculation, between those damages strands.

Accordingly, the court determines, without prejudice, that plaintiff has not demonstrated its entitlement to the additional damages requested for the extended period. Barring a settlement by the parties, the determination of those damages awaits further proceedings in this case.[60]

### 4.   Damages for Deposit Lag

Recall that plaintiff's deposit lag claim asserts that defendant is liable for taking an excessive amount of time to deposit the Nation's trust revenue into interest-bearing trust accounts. The court has concluded that this claim is well-taken. To calculate damages on its deposit lag claim, plaintiff began with the data contained in the Arthur Andersen report, which detailed the number of days between the time funds were received by the BIA and the time those funds were deposited into the Nation's trust accounts. Rocky Hill then deducted one day for

---

[60] Contrary to plaintiff's claims, this case is fundamentally different than *Osage Tribe* for several reasons. First, in that case, the court employed a relatively static interest rate – that associated with 7-year Treasury bills – in calculating the compounded interest owed. *Osage Tribe*, 93 Fed. Cl. at 39. Second, the nature of the extension there was fundamentally different because the trial in *Osage Tribe* only covered a sample period – a few of the months of the entire period at issue (from 1973 through 1992) – and the court's case management order had anticipated that the results from that sample period would be extended to that entire period. *Id.* at 40. The nature of the case management approach here is fundamentally different. Finally, in *Osage Tribe*, the court noted that, in its pretrial filings, defendant had not objected to this extension. *Id.* at 5 n.3, 30. Such is not the case here.

each receipt – reflecting the period allowed by the BIA's own policy – to determine the number of "excessive" lag days for each deposit.[61]  *See Osage Tribe*, 72 Fed. Cl. at 662-65.  Using these figures, Rocky Hill applied its investment model to determine that defendant's deposit lag resulted in uncollected nominal earnings of $607.55.  Taking into account the investment model, which would have generated investment earnings of $1,233.00, plaintiff is entitled to $1,840.54 in damages for its deposit lag claim for the period at issue.[62]

## III.   CONCLUSION

Plaintiff has demonstrated that, during the period from February 22, 1974, to September 30, 1992, defendant breached its fiduciary duties to the Nation by mismanaging the Nation's trust assets and other funds.  Plaintiff has established all the traditional elements for recovery of damages on those breach claims.  Based on the foregoing, the court finds that, for the period in question, plaintiff is entitled to damages in the amount of **$21,017,491.99 – $21,015,651.45** on its underinvestment claim and **$1,840.54** for its deposit lag claim.  Plaintiff is entitled to recover nothing on its negative interest claim, which claim is dismissed for lack of jurisdiction.  On or before June 17, 2013, the parties shall file a joint status report indicating how this case should proceed.  Said report shall also discuss whether any form of additional relief is currently required under 28 U.S.C. § 1491(a)(2).[63]

**IT IS SO ORDERED.**


                            s/ Francis M. Allegra
                            Francis M. Allegra
                            Judge


----

[61]  Despite defendant's protestations that there was no bank in Dulce, New Mexico during part of the period at issue, as well as its related suggestion that more time was required to mail deposits to Albuquerque, New Mexico, the court will not reduce plaintiff's calculation of damages on this claim for three reasons.  First, as noted above, there is no exception in the BIA's policy that would forgive deposit lags of the length demonstrated by plaintiff here.  Second, the court will not allow defendant to take advantage of gaps in the record – regarding, for example, the circumstances surrounding certain deposits – that are of the BIA's own making.  *See Confederated Tribes of Warm Springs*, 248 F.3d at 1375; *Franconia Assocs.*, 61 Fed. Cl. at 746.  Finally, the court finds that plaintiff's calculation, which produces damages of $607.55, is reasonable under the circumstances.

[62]  For the reasons described above, the court will not project the damages associated with plaintiff's deposit lag claim beyond the period at issue here.

[63]  It is the court's intention to unseal and publish this opinion after June 13, 2013.  On or before June 13, 2013, each party shall file proposed redactions to this opinion, along with the specific reasons therefor.